# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| KENNETH PETERSON and RICHARD KIMBLE,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>AGRI STATS, INC., JBS USA FOOD COMPANY HOLDINGS, TYSON FOODS, INC., CARGILL, INC., and NATIONAL BEEF PACKING COMPANY,<br><br>                                    Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT<br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I.     NATURE OF ACTION ..................................................................................... 1

II.    JURISDICTION AND VENUE ....................................................................... 13

III.   PARTIES ........................................................................................................ 14

      A.     Plaintiffs ............................................................................................. 14

      B.     Defendants .......................................................................................... 14

IV.    THE MEATPACKING DEFENDANTS CONSPIRED TO ELEVATE
      THEIR MARGINS BY DEPRESSING THE PRICE THAT  THEY PAID TO
      ACQUIRE CATTLE ........................................................................................ 16

      A.     Industry Background ........................................................................... 16

      B.     The Meatpacking Defendants coordinated to reduce output, elevate
           their margins, and suppress the prices paid to beef farmers. .................... 19

V.     THE MEATPACKING DEFENDANTS REPORTED RECORD MARGINS
      AFTER THE ENTRANCE OF EXPRESS MARKETS, A MARKET
      FORECASTING SERVICE, INTO THE BEEF MARKET ............................... 26

      A.     Agri Stats colluded with certain of the Meatpacking Defendants
           in the broiler chicken industry to anticompetitively share essential,
           confidential information. ....................................................................... 27

      B.     After success in the broiler industry, Agri Stats markets its collusive
           scheme to the leading pork manufacturers. ............................................. 29

      C.     Prior to the entrance of Express Markets into the beef market,
           the profits for the Meatpacking Defendants were low. .............................. 31

      D.     After success in the chicken and pork markets, Express Markets
           entered the beef market in 2015 and proceeded to steadily ramp up
           its beef operations over the following years ............................................. 31

      E.     Following the entrance of Express Markets into the beef market in
           2015, the margins for the Meatpacking Defendants soared. ..................... 33

      F.     Tyson and JBS attributed their record 2017 & 2018 profits to their
           visibility into the beef supply chain. ....................................................... 35

VI.    THE STRUCTURE OF THE BEEF PACKER INDUSTRY IS CONDUCIVE TO
      THE CONSPIRACY ........................................................................................ 37

A.    The beef meatpacking industry was highly concentrated. .........................38

B.    The beef packer market featured high barriers to entry. ...........................41

C.    Beef is a commodity product. ...................................................................42

D.    The beef meatpacking market featured unusual market share stability during the relevant period. .......................................................................43

E.    The demand for beef is inelastic. ..............................................................45

F.    Abnormal pricing during the Class Period demonstrates the success of the collusive scheme. ...............................................................................46

G.    Overcharges due to the cartel were passed through to the indirect purchaser class.......................................................................................47

H.    The elevation in processor margins during the Class Period is not explained by changes in export levels or international demand for beef...52

I.    The Meatpacking Defendants actively concealed the conspiracy..............54

VII.    CLASS ACTION ALLEGATIONS.......................................................................56

VIII.   ANTITRUST INJURY.........................................................................................62

IX.    CAUSES OF ACTION.........................................................................................64

X.    REQUEST FOR RELIEF...................................................................................124

XI.    JURY TRIAL DEMANDED ..............................................................................125

010808-11 1120636 V1

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons and entities who purchased beef indirectly from a defendant or co-conspirator for personal use in the United States from at least January 1, 2015 until the present (Class Period). Plaintiffs bring this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of the several states against defendants, and demand a trial by jury.

## I.      NATURE OF ACTION

1.      Four of the defendants in this case are the largest meatpacking companies in the world and the leading processors of approximately $100 billion in annual commerce in the retail beef industry. One defendant, Agri Stats, Inc., is a statistical research and analysis firm which provides detailed pricing reports to the industry. These defendants entered into a conspiracy to maximize profits from the distribution channel of beef – by both extracting all gains from the ranchers who raised the cattle, as well as artificially inflating the price of beef being sold to the consumer. The defendants engaged in a concerted scheme to suppress throughput of beef, artificially depressing both the amount of cattle they purchased and the amount of processed beef they sold to retail operations. The purpose of the scheme was to lower throughput of beef supply and thus maximize the margins they received from sale of beef. The result of the scheme was that the defendants underpaid the farmers by artificially depressing demand for cattle and thus lowering press, and simultaneously overcharged consumers by reducing their output of beef and thus inflating consumer prices.

- 1 -

2.      Defendants' scheme was successful, in part, because of the structure of the beef industry. The slaughter and packing of beef is an essential part of the beef supply chain. A small number of meatpackers – the Meatpacking Defendants – control this crucial step of the distribution chain. The Meatpacking Defendants purchase fed cattle from farmers, process them into beef, and then sell the beef to retailers. Defendants and their co-conspirators collectively control over 70 percent of the wholesale beef market.

3.      An industry insider familiar with the operations of the Meatpacking Defendants stated that the "beef industry is very unique." According to insiders, much of the business operations for the beef industry operate in a "gray area" and that "**meat works like the mafia**." The business operations of the Meatpacking Defendants are intertwined because, due to vertical integration into various stages of the distribution stages of beef, the Meatpacking Defendants frequently sell meat to each other which is then processed for retail sale. The result is that "someone may be a competitor but also a customer." Given these frequent interactions, executives at companies in the Meatpacking Industry "all know each other."

4.      The Meatpacking Defendants, Cargill, Inc., JBS USA, Tyson Foods, Inc., and National Beef Packing Company entered into a conspiracy from at least 2015 to the present to fix, raise, maintain and stabilize the price of beef.[1] The principal (but not exclusive) method by which defendants implemented and executed their conspiracy was by coordinating on collusive conduct that depressed the price, and thus future supply, of

---

[1] For the purposes of this complaint, beef includes beef meat purchased fresh or frozen.

cattle that they purchased while continuing to maintain an elevated price at which they sold beef to retail operations.

5.       Beginning in 2015, the beef market saw a marked change in pricing practices. Before 2015, the prices of cattle and beef moved in tandem. This is a natural relationship because beef is simply cattle that has been processed for sale. After 2015, and during the conspiracy, this fundamental economic relationship was severed. From 2015 through 2018, the price of cattle declined significantly while the price of beef remained elevated. As starkly demonstrated in the following chart, around 2015, the price of live cattle declined (the orange line), while the retail price being charged to consumers (the blue bars) remained inflated, and unlike in prior years, almost completely unrelated to the price of live cattle:



Source: USDA

6.      While the Meatpacking Defendants reaped billions of dollars in profits, consumers suffered financial harm. In a functioning market, lower cattle prices would lead to lower beef prices. But, as discussed below, the econometric evidence is indicative that the Meatpacking Defendants agreed not to compete on the price of beef because during the period of anticompetitive activity, beef prices no longer reflected changes in underlying cattle prices and consumers overpaid for their beef. Prior to the conspiracy, the U.S. Department of Justice (DOJ) recognized that when the beef market is functioning competitively, there is a strong relationship between the supply of cattle and the price being charged to consumers (the pass-through of the overcharge). The DOJ has stated that:

> [A]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [beef] because less is available for purchase. Because the supply of fed cattle and demand for [beef] are relatively insensitive to short-term changes in price, even small changes in industry production levels can significantly affect packer profits.

In fact, as the United States pointed out in 2008, concern over anticompetitive conduct by beef processors that harmed both cattle ranchers and beef consumers was a leading driver for the initial passage of the Sherman Act.[2]

---

[2] *See* Note by the United States, pg. 1 Roundtable on Monopsony and Buyer Power, October 13, 2008 ("The 1890 debates in both houses of the United States Congress demonstrated concern with the exercise of market power on both the buying and selling sides of the market. Many legislators singled out large meat packers for condemnation, and they were condemned as much for reducing the prices paid to cattle farmers as for raising prices to consumers. In response, Congress passed the Sherman Act, "aimed at preserving free and unfettered competition as the rule of trade." "The Act is

- 4 -

7.      The anticompetitive actions of the defendants were successful in severing the relationship between cattle and beef prices. As shown in the following chart, prior to the conspiracy, cattle and beef prices were closely correlated to each other:



8.      After the start of the anticompetitive activity in 2015, the strong relationship between cattle and beef prices disappeared as a result of the anticompetitive actions of the defendants. This econometric evidence is indicative of an agreement among defendants not to compete on price in the beef market. As shown in the following

---

comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.") (*available at* https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-international-competition-fora/monopsony.pdf).

chart, cattle and beef prices had almost no relationship to each other between January 2016 and February 2019:



9.     As shown in the below chart, during certain periods of time from 2015-2018, the relationship between cattle and beef prices inverted. This is an expected economic consequence of a conspiracy by the Meatpacking Defendants to reduce throughput – artificially reducing both the supply of cattle they purchase and the supply of beef that they sell to retail operations – because the supply reductions on both end of the beef supply chain causes both a reduction in the number of cattle and an elevation in the retail price of beef:



10.    In any market, economic theory predicts that it may be more profitable for an industry to produce a smaller amount of output. There are two reasons for this:  (1) the industry is able to buy from the subset of suppliers who are able to tolerate lower prices, and (2) the industry is able to sell their output to the subset of consumers that are able to tolerate a higher price. Upstream producers and downstream consumers both lose out as overall level of throughput is constricted – sellers are underpaid as if there were a glut, while buyers pay a premium as if there were a shortage. The market may eventually adjust to this situation, as suppliers go out of business and consumers learn to pay more or live with less, but the long-term effect is inevitably a smaller industry and a worse-off consumer.

11.    The econometric data showing the suppression of cattle prices and the maintenance of retail prices for beef from 2015 to the present is indicative of the same underlying agreement to reduce throughput. Indeed, as the econometric evidence shows,

- 7 -

the defendant's anti-competitive conspiracy to restrain beef output had consequences both for cattle feeders and consumers. The sharp drop in the price of fed cattle from 2015 onwards reflects a pent-up supply of cows that packers were not slaughtering, while the unexpectedly high retail price reflects a relative undersupply of beef in the consumer market. By 2016, even though cattle prices had generally been pushed back down to pre-2014/2015 levels, consumers were still paying inflated retail prices as if it were the height of the cattle price spike. Because no packer was willing "break ranks" and increase throughput, connecting the oversupply of fed cattle to the unmet consumer demand for beef, the packer cartel was able to maintain its unprecedented margins.

12.     Under competitive conditions, however, an industry is prevented from intentionally restricting its production levels in this way because competitors will pick up the slack. A company willing to operate at a tight margin can out-produce and undercut a company that is not, bringing a larger quantity of less expensive goods to the benefit of both consumers and suppliers. The degree to which competing companies can both agree between themselves about the degree to which they will restrain their throughput, and the degree to which all are able to verify that the others are holding to the agreement, is directly proportional to their ability to keep margins high over a long period of time. In short, information sharing regarding present and future plans is a critical ingredient for a successful agreement between competitors to restrain throughput.

13.     Defendant Agri Stats, Inc. aided the Meatpacking Defendants in their conspiracy through its subsidiary, Express Markets, Inc. (Express Markets) which began providing information and forecasting services in the beef industry in 2015. Express

- 8 -

Markets is a pricing forecast service, which provides pricing information to many of the protein markets. Agri Stats (the parent company) has been active in the poultry industry since the early 2000s and in the pork industry since the late 2000s. Tyson, a leading participant in the poultry industry, played a key role in aiding and abetting Agri Stats' sharing of confidential information in the poultry industry that allowed profits of poultry integrators to soar. Tyson, JBS, and Cargill also each used Agri Stats services in the pork industry, where the entrance of Agri Stats had a similar effect in boosting margins through the facilitation of collusive information sharing among market participants.

14.    The pricing data exchanged through the Agri Stats subsidiary, Express Markets, provided a modern-day forum for collusion. This pricing data is current and forward-looking – which courts consistently hold has "the greatest potential for generating anticompetitive effects."[3] While "[p]ublic dissemination is a primary way for data exchange to realize its pro-competitive potential,"[4] the opposite occurred here. None of the Express Markets information is publicly available – it is a subscription service, costing thousands of dollars – far in excess of any other pricing and production indices.

15.    Prior to the entrance of Express Markets into the beef industry in 2015, the beef packers faced low operating margins. For example, Tyson stated in 2014 that normalized margins for its beef processing business would be close to 4 percent, significantly lower than Tyson's normalized operating margins of 7 to9 percent in the

---

[3] *Todd v. Exxon Corp.*, 275 F.3d 191, 2011 (2d Cir. 2001) (Sotomayor, J.) (quoting *United States v. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).

[4] *Id.* at 213.

poultry business, where Agri Stats had already been active for many years. Similarly, at the end of 2014, JBS stated that it was looking for 4-percent margin in its beef segment. By comparison, at the same time, JBS stated that it had been posting 9 to 10 percent quarterly margins in its pork business, where Agri Stats had also already been active.

16.     In May 2015, Express Markets acquired Paragon Economics and in April 2016 hired a vice president specializing in Beef. The responsibilities of this vice president "include supply and demand side analysis and forecasting of cattle numbers and beef supplies as well as domestic and international trade impacts." Under the supervision of this vice president, Express Markets "factor[ed] in these variables and their combined effects to price forecasts for various classes of cattle and beef cuts" in order "to assess margin impacts and shifts" and "to better the economic position clients in all areas of the supply chain."[5] Following this entrance into beef, Express Markets included beef as one of its covered topics at regularly held protein conferences in 2017 and 2018.

17.     Following both the entrance of Express Markets into the beef industry and the collusive scheme by the Meatpacking Defendants to suppress cattle prices, the operating margins of the beef packers steadily grew from 2016 to 2018. By the end of 2018, Tyson and JBS, the two publicly traded beef packers, were reporting record operating margins in their beef business. For example, in 2018, Tyson reported operating margins for its beef business of 7 percent, now above its margin for poultry of 6 percent – a dramatic reversal of Tyson's results prior to the entrance of Express Markets. Similarly,

---

[5] *Available at* https://www.asi.k-state.edu/events/2016bif/16_BIFProceedings.pdf.

in the second quarter of 2018, JBS reported margins of 10.2 percent for its beef business,

significantly higher than its margin of 7.2 percent for its pork business.

18.     Both Tyson and JBS attributed their results to their visibility into the beef

supply. For example, JBS stated on a November 14, 2018 call that:

> We have the visibility because of the cattle herd and the
> number of cows that the supplier being a very healthy
> situation '19, '20 and up to '21. That's – we can have the
> visibility for the next 3 years and we know that we'll be in
> very good shape. So I don't think anything relevant to change
> in terms of margin for the foreseeable future.

19.     In addition, there are numerous "plus factors" in the beef industry during

the Class Period, including but not limited to multiple industry characteristics which

facilitate collusion, such as high barriers to entry, high beef industry consolidation and

concentration, inelastic supply and demand, unusual market share stability, and a

homogenous product. These plus factors add plausibility to plaintiffs' allegations of a

price fixing scheme.

20.     Defendants' coordination caused plaintiffs to pay artificially elevated prices

for beef. Beginning in 2015, the earnings of the Meatpacking Defendants began to

increase, as they took an increasing amount of the profits available in the beef industry.

In the two years of 2015 to 2017, the average farm value of cattle dropped by 29 percent

from its pre-2015 peak. In contrast to earlier years, however, these cost decreases were

not passed on to consumers, as the retail price of beef only dropped around 6 percent. As

shown in the below chart, the beef packers have nearly doubled their share of revenues

from consumer spending on beef over the relevant time period:



21.     In a competitive market, the spread between fed cattle prices and wholesale price of beef would have remained the same after the entrance of Express Markets into the beef market. The fact that the spread radically diverged supports the inference that Express Markets facilitated the collusive sharing of information among the Meatpacking Defendants that allowed them to reduce throughput, lower cattle prices, and elevate beef prices.

22.     As a result of defendants' unlawful conduct, plaintiffs and the classes paid artificially inflated prices for beef during the Class Period. Such prices exceeded the

- 12 -

amount they would have paid if the price for beef had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' conduct.

## II.   JURISDICTION AND VENUE

23.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also bring these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by defendants' conduct in restricting the supply of beef and increasing the price of beef. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

24.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

25.     This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of beef throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of

- 13 -

causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

26.     The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

### III.     PARTIES

**A.     Plaintiffs**

27.     Plaintiff Kenneth Peterson is a resident of Nevada and citizen of the United States. During the Class Period and while residing in Nevada, plaintiff Peterson indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Peterson suffered injury as a result of defendants' conduct alleged herein.

28.     Plaintiff Richard Kimble is a resident of Wisconsin and citizen of the United States. During the Class Period and while residing in Wisconsin, plaintiff Kimble indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Kimble suffered injury as a result of defendants' conduct alleged herein.

**B.     Defendants**

29.     Agri Stats, Inc. (Agri Stats) is an Indiana corporation located in Fort Wayne, Indiana and is a subsidiary of Elanco Animal Health Incorporated. Throughout the Class Period, Agri Stats acted as a co-conspirator of the Meatpacking Defendants by

facilitating the exchange of confidential, proprietary, and competitively sensitive data among defendants and their co-conspirators.

30.     Cargill, Incorporated (Cargill) is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

31.     JBS USA Food Company Holdings (JBS USA) is a subsidiary of Brazilian-based JBS SA. JBS Food Company Holdings is a Delaware corporation, headquartered in Greeley, Colorado. JBS USA Food Company Holdings holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. During the Class Period, JBS USA and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

32.     Tyson Foods, Inc. (Tyson) is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

33.     National Beef Packing Company (National Beef) is a privately owned Delaware corporation headquartered in Kansas City, Missouri. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate

commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## IV.  THE MEATPACKING DEFENDANTS CONSPIRED TO ELEVATE THEIR MARGINS BY DEPRESSING THE PRICE THAT THEY PAID TO ACQUIRE CATTLE

34.     Starting in at least 2015 and continuing to the present, the Meatpacking Defendants coordinated with each other and Agri Stats to increase their margins and thus harm consumers who paid elevated prices for beef as a result. The Meatpacking Defendants' conspiracy to depress throughput of beef and elevate their margins included anticompetitive activity to depress the prices that they paid to beef ranchers through a variety of coordinated mechanisms.

### A.     Industry Background

35.     The value chain for beef has various components, including ranch and farm grazing operations, feedlot operations, meatpacking operations, and retail operations.

36.     At the first stage, ranch and farm operations are responsible for initially birthing and raising the cattle. There are hundreds of thousands of ranching operations in the United States. The significant majority of these operations are family-owned or individually operated.[6]

37.     At the second stage, feedlot operations take possession of cattle and are responsible for intensive feeding operations that raise the weight of the cattle prior to

---

[6] *Available at* http://www.beefusa.org/beefindustrystatistics.aspx

010808-11 1120636 V1

sale. Once cattle reach between 950 to 1,500 pounds, they are sold to meatpacking operations. These cattle are referred to as fed cattle.

38.     In the third stage, meatpacking operations purchase fed cattle from feedlot operations. The Meatpacking Defendants collectively controlled approximately 75 percent of meatpacking operations in the United States during the relevant period.

39.     Each Meatpacking Defendant has its own team of employees responsible for procurement of fed cattle. The teams feature "field buyers" who are responsible for procurement within specific territories. Feed buyers negotiate with producers and feedlot operators.

40.     Meatpacking operations slaughter the cattle that they purchase and then process the cattle for sale. The cattle is processed into various cuts that is then sold as "boxed beef" to various retail and foodservice operations. Boxed beef is a commodity product, which means that competition for sales of boxed beef of the same USDA quality and yield grade is primarily on price.

41.     Retail operations purchase processed beef and sell it to retailers or consumers. Retail operations include supermarkets and wholesalers. Retail operations include companies such as Sysco, US Foods, Costco, and Sam's Club.

42.     The supply of fed cattle is insensitive to short term changes of price because of fed cattle's long life cycle and lack of alternative uses. Because beef demand also is relatively insensitive to changes in price, historically the meat margin was highly correlated with changes in the underlying slaughter price. But because of their concerted scheme, the Meatpacking Defendants were able to increase their margins and profitability

- 17 -

by artificially suppressing the price they pay for beef while at the same time keeping the retail price of beef elevated.

43.     Fed cattle is sold to processors through two channels: 1) long-term contractual arrangements between processors and suppliers; and 2) individual sales on the spot market.

44.     The Meatpacking Defendants procure the majority of their cattle supply through contractual arrangements with ranch or feedlot operations. The price of cattle under these contracts is usually determined through a price formula that incorporates the price at which cattle are sold in weekly trade on the industry's spot market.

45.     The use of formula contracts that rely on the cash-cattle trade as the price discovery mechanism means that the price that processors pay for fed cattle in the cash-cattle spot market determines the price of almost all fed cattle purchased by the Meatpacking Defendants.

46.     Formula contracts use a stipulated measure of cash-cattle prices at, or just prior to, the date of delivery. These contracts commonly use a specified average cash price reported by the USDA Agricultural Marketing Service's Livestock Mandatory Reporting summaries.

47.     The Meatpacking Defendants use contractual agreements for approximately 70 percent of their supply of fed cattle. The widespread use of these contractual agreements, known as captive supply agreements, has facilitated the ability of the Meatpacking Defendants to suppress cash-cattle prices. Cattle sold through these type of contractual agreements are sometimes referred to as captive cattle.

- 18 -

48.     The Meatpacking Defendants are not as reliant on the cash-cattle trade because they have a guaranteed supply of cattle through their captive supply agreements. Therefore, the Meatpacking Defendants can refuse to participate in procuring cash cattle, thus pushing down the price of both cash cattle and captive cattle whose price is set based on cash-cattle sales.

**B.      The Meatpacking Defendants coordinated to reduce output, elevate their margins, and suppress the prices paid to beef farmers.**

49.     From 2009 to 2014, fed-cattle prices increased significantly with beef prices increasing in tandem. By the beginning of 2015, the Meatpacking Defendants faced low margins as a result of the market dynamics in the cattle and beef market.

50.     On information and belief, at this point in time, the Meatpacking Defendants initiated a conspiracy to depress the price they paid for fed cattle while at the same time stabilizing the price at which they sold beef. The Meatpacking Defendants implemented this by, among other ways, agreeing to: (1) reducing slaughter capacity by closing or idling slaughter plants; (2) limiting their purchase of cash cattle; (3) coordinating their procurement operations for cash-cattle purchases; and (4) reducing their slaughter numbers so as to reduce beef output.

51.     The Meatpacking Defendants have significantly reduced slaughter capacity over the last ten years. Cargill closed its Plainview, Texas and Milwaukee, Wisconsin plants in February 2013 and August 2014, respectively. These closures removed over 5,000 head per day of capacity. National Beef shut its Brawley, California plant in June 2014. This closure removed 2,000 head per day of capacity. Tyson closed its Denison,

Iowa plant in August 2015. This plant had 2,000 head per day of capacity. Collectively, these closures reduced the industry's annual slaughter capacity by millions of cattle per year.

52.     The Meatpacking Defendants also took further actions to prevent increases in slaughter capacity. For example, Tyson closed a Cherokee, Iowa processing plant in 2014. But, even after closure, Tyson refused to break its lease. According to media reports, Tyson officials "told the city they would consider handing over the shuttered plant – but not to any firm that they believe is competition."[7]

53.     In 2018, four years after the initial closure, Tyson allowed another company to purchase the plant but only after inserting a requirement into the deed that "limited the amount of cattle that can be processed at the plant for the next 10 years."[8]

54.     The Meatpacking Defendants actions have been successful at reducing slaughter capacity. The following chart shows a decline in slaughter capacity among the Meatpacking Defendants with post-2015 levels well below historic levels.

---

[7] *Available at*
https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/.

[8] *Available at*
https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/.



55.     The Meatpacking Defendants recognized the importance of restraining supply capacity in order to artificially inflate their margins. Tyson CEO Donnie Smith stated as such on Tyson's fourth-quarter 2015 earnings call: "You've got relatively low cattle supply, you've got too much -- **well, not to say too much, probably not the right way to say it, but you've got excess industry capacity**. And that limits our ability to drive margins above the 1.5% to 3%, we think."

56.     On information and belief, the Meatpacking Defendants started in 2015 to collectively reduce their slaughter volumes in response to rising fed-cattle prices. The purpose of these slaughter reductions was to create a condition of oversupply that would cause ranchers to accept lower cash prices for their cattle. During this period of time, the

Meatpacking Defendants shared information about the current and future operations of their processor plants with each other.

57.    On information and belief, the Meatpacking Defendants agreed to reduce their purchase of cash cattle at the same time as they reduced their slaughter numbers. Because the cash-cattle trade portion of the market was comparatively small; reductions in cash-cattle purchases would have a significant impact on demand for cash cattle. By artificially reducing their cash-cattle purchases, the Meatpacking Defendants could significantly lower the spot prices that they paid for cattle because cattle ranchers needed to sell their perishable product. The lower cash prices were then incorporated into the formula used to set the price that cattle was sold under the Meatpacking Defendants' contractual arrangements.

58.    On information and belief, the Meatpacking Defendants collectively enforced a bidding procedure for cash-cattle sales that suppressed fed-cattle prices. Under the system enforced by the Meatpacking Defendants, a beef producer could either accept or reject a bid from a meatpacker but could not shop the bid to other Meatpacking Defendants. If the beef producer rejected the bid, then the producer was required to inform the other Meatpacking Defendants of the initial bid that it had received and was only allowed to accept bids higher than the initial bid it had received. On information and belief, field buyers for the Meatpacking Defendants retaliated against producers who refused to follow this bidding procedure.

59.     On information and belief, the Meatpacking Defendants engaged in an informal market allocation process where only one meatpacker would bid on a particular feed lot's cattle week to week over a period of months.

60.     On information and belief, the Meatpacking Defendants would sometimes collectively stop all purchases of cash cattle from the spot market for particular regions for a number of weeks. This would produce a bottleneck that would back up cash cattle in these regions. The Meatpacking Defendants would then begin purchasing cattle from that region at the same time. The Meatpacking Defendants would then first negotiate prices in the bottlenecked regions, which would be artificially low because of the collective boycott, and then use that depressed price to influence nationwide prices.

61.     On information and belief, the Meatpacking Defendants would conduct the majority of their weekly cash-cattle procurement during a very narrow window of time on a Friday. The Meatpacking Defendants would generally offer prices for cash cattle that was not higher than the initial bid by the Meatpacking Defendant that had opened the cash-cattle trade. By contrast, the regional beef processors who are not named defendants would purchase cash cattle across most days of the week. The Meatpacking Defendants reduced competition among themselves as a result of this practice.

62.     Cattle prices peaked at around $170 CWT in late 2014. For the first half of 2015, prices hovered around $160 CWT.[9] At this point, the collusive scheme of the Meatpacking Defendants began to noticeably take effect, as shown in the following chart:

_____

[9] Cattle prices are frequently denominated in hundredweight, ("CWT"), which refers to the price of a hundred pounds of cattle.



Live Steer Price, Dollars per Hundredweight (CWT)

63.     On June 12, 2015, Cassandra Fish, a former risk analyst at Tyson and a

proprietor of a market analysis report known as "The Beef," discussed the then-recent

and remarkable cohesion being displayed by the Meatpacking Defendants. "Rarely has

this industry segment [the beef packers,] been an all-for-one and one-for-all group. All

packers need to buy cattle inventory. Most have cut hours. So will someone break ranks,

pay up for cattle and add hours to capture the better realization that the next boxed beef

rally will bring? Will one short a customer only to find that order filled by a

competitor?"[10]

64.     On June 25, 2015, Ms. Fish emphasized the cohesion being shown by the

Meatpacking Defendants: "packers refuse to reach for cattle and are currently in

---

[10] Cassie Fish, "Futures Holding Gains; Waiting on Cash," THE BEEF (Jun. 11,
2015), *available at* https://www.thebeefread.com/2015/06/11/futures-holding-gains-
waiting-on-cash/.

command. After 3 weeks of sharply curtailed kills, **packers are exhibiting incredible discipline** and letting the kill increase gradually, limiting the ability "of feeders to get all cattle marketed [i.e., sold] in a timely fashion."[11]

65.    By September 2015, cattle prices had declined from $160 CWT to $120 CWT as the effects of the Meatpacking Defendants' actions began to take hold.

66.    On November 10, 2015, Ms. Fish emphatically stated the new collusive reality in the cattle market: "It's been happening for a while, and it's gone on long enough now that it seems normal. **Packers no longer compete against each other to buy fed cattle each week**. Once in a while there will be a week when all buyers are accounted for and active, but it occurs less frequently as time goes on. The conversation is no longer, what's cash going to be, but rather, who needs any."[12]

67.    The Meatpacking Defendants continued their collusive activities throughout 2016 to the present. The result is that the Meatpacking Defendants collected an artificially elevated margin as the CWT price that the Meatpacking Defendants paid remained low, while the retail price that consumers paid remained elevated throughout the period. As shown in the below chart, the Meatpacking Defendants' anticompetitive activities to suppress beef throughput resulted in an elevated margin as a result of their successful collusion:

---

[11] Cassie Fish, "Another Round of the Blues," THE BEEF (Jun. 25, 2015), *available at* https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.

[12] Cassie Fish, "Whatever Happened to a Fair Fight," THE BEEF (Nov. 10, 2015), *available at* https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/.



**V. THE MEATPACKING DEFENDANTS REPORTED RECORD MARGINS AFTER THE ENTRANCE OF EXPRESS MARKETS, A MARKET FORECASTING SERVICE, INTO THE BEEF MARKET**

68. The Meatpacking Defendants' conspiracy to stabilize the price of beef was facilitated by Express Markets, a subsidiary of Agri Stats. Agri Stats has played a central

role in collusive conduct by certain of the Meatpacking Defendants in other meat

industries, such as broiler chickens.[13]

69.     Three of the leading four Meatpacking Defendants, Tyson, Cargill and JBS

USA, were already familiar with the collusive opportunities Agri Stats provided. Tyson

had business operations in both broiler chickens and pork, and was using Agri Stats

reports in those industries prior to 2015. JBS USA had business operations in pork and

used Agri Stats reports in pork prior to 2015. Cargill had business operations in pork that

were subsequently sold to JBS in 2015 and used Agri Stats reports in pork prior to 2015.

70.     Agri Stats' subsidiary, Express Markets, began providing services to the

beef industry in 2015. Following the entrance of Express Markets, the Meatpacking

Defendants experienced steadily increasing margins that led to record profits in 2017 and

2018. On investor calls, the Meatpacking Defendants frequently attributed their

newfound success to their visibility into the cattle supply chain.

**A.      Agri Stats colluded with certain of the Meatpacking Defendants in the broiler chicken industry to anticompetitively share essential, confidential information.**

71.     As alleged in *In re Broiler Chicken Antitrust Litigation,* No. 16-cv-08637

(N.D. Ill.), the broiler chicken producers used Agri Stats as a part of their conspiracy to

restrain production and inflate prices.

72.     In the broiler industry, Agri Stats collected and disseminated to the other

members of the conspiracy disaggregated financial information (such as monthly

---

[13] Broilers are chickens raised to be slaughtered before the age of 13 weeks.

operating profit, sales and cost per live pound), production volumes, capacity, slaughter information, inventory levels and sales data for finished product form and type, amongst other pieces of competitively sensitive business information. The Agri Stats reports contain **line-by-line** entries for plants, lines, and yields of various broiler facilities. Agri Stats relied upon (and the co-conspirators agreed to) a detailed audit process to verify the accuracy of data from each broiler producer's complex, sometimes directly contacting the broiler defendants to verify the data. Agri Stats also provided detailed price reports to the broiler industry through its subsidiary, Express Markets. Agri Stats collected data from the broiler producers on a weekly basis and provided its reports to broiler producers on a weekly and monthly basis.

73.     The detail of these reports ensured that competitors could quickly decode the information of their erstwhile competitors. The *Broiler* complaints allege it was common knowledge that the detail of the Agri Stats reports allowed any reasonably informed producer to discern the identity of the competitors' individual broiler complexes. The broiler reports, in parts, contained so few producers participating that the identities were obvious. Other reports contained such detailed data that it could be matched with the publicly stated aggregate data for larger broiler defendants such as Tyson. The complaints allege that Agri Stats purposefully circulated this information to top executives to facilitate agreement on supply, constraints, and price.

74.     In the broiler industry, it is also alleged that Agri Stats – known to its co-conspirators to be a willing and informed conduit for illicit information exchanges – used public and semi-public forums to convey messages to industry participants that

- 28 -

furthered the purposes of the conspiracy by reassuring conspirators that production cuts would continue, and by inducing them to continue to act in concert to ensure they did. Agri Stats' own statements in the broiler industry facilitated the implementation of the agreement to restrict supply – where Agri Stats would transmit the intentions of the broiler producers to restrict supply.

75.    In denying the defendants' motions to dismiss in the *Broiler* litigation, the District Court noted that given the nature of the Agri Stats reports, the defendants are in fact sharing future anticipated production information with one another, which suggests antitrust concerns.[14]

**B.    After success in the broiler industry, Agri Stats markets its collusive scheme to the leading pork manufacturers.**

76.    Beginning in at least 2008, Agri Stats began to propose a series of benchmarks to the pork (or swine) industry along the lines of the benchmarks used to restrict competition in the broiler industry. Benchmarking is the act of comparing practices, methods or performance against those of other companies. Benchmarking, of the type undertaken by Agri Stats and its co-conspirators here, reduces strategic uncertainty in the market and changes the incentives for competitors to compete, thereby enabling companies to coordinate their market strategies and otherwise restrict competition. This is especially true where benchmarking involves the exchange of commercially sensitive information among competitors.

---

[14] Memorandum Opinion and Order at 11, *In re Broiler Chicken Antitrust Litig.*, No. 16-cv-08637 (N.D. Ill.), Nov. 20, 2017, ECF No. 541.

77. In 2008, Greg Bilbrey of Agri Stats told pork industry producers that "Benchmarking in the swine industry could range from simple production comparisons to elaborate and sophisticated total production and financial comparisons. ***Each and every commercial swine operation is encouraged to participate in some benchmarking effort***."

78. Agri Stats emphasized to pork producers that the goal of its benchmarking services (and the agreement to share information) was profitability, not production, and invited pork producers again, to participate in its benchmarking. Agri Stats emphasized that "We must remember that the ***ultimate goal is increasing profitability*** – not always increasing the level of production." Furthermore, Agri Stats told the industry that "[e]ach swine production company should be participating in some type of benchmarking. ***To gain maximum benefit, production, cost and financial performance should all be part of the benchmarking program***."

79. In April 2009, through Greg Bilbrey, Agri Stats again invited swine producers to design and operate their own benchmarking effort: "Though all producers may not be part of or fit into an Agri Stats type benchmarking program, all producers could participate in benchmarking in some way. Commercial benchmarking opportunities are available. ***Producer groups could design and operate their own benchmarking effort***."

**80.** The pork producers accepted this offer, and beginning no later than 2009, created the detailed benchmarking scheme based upon and found in the Agri Stats reports. The agreement between the defendants was to use the exchanged benchmarking

- 30 -

information to reduce the supply and stabilize the prices of pork sold in the United States, to provide and in return receive information from Agri Stats, and to use this detailed and competitively sensitive information to monitor each other's production and pricing.

**C.    Prior to the entrance of Express Markets into the beef market, the profits for the Meatpacking Defendants were low.**

81.    In November 2014, two of the publicly traded Meatpacking Defendants announced their profit margins for the beef segment. In a November 7, 2014, earnings call, Tyson reported an operating margin of **3.5 percent** for its beef division for the quarter. Compared against Tyson's poultry division (where the broiler conspiracy was already successfully underway), the beef division was underperforming. Tyson's poultry division reported a normalized operating margin range of 7-9 percent.

82.    Similarly, on a November 13, 2014 earnings call, JBS stated that it was looking for a 4 percent EBITDA margin in its beef segment. The beef division was less profitable at this point in time than JBS' pork division (where the pork conspiracy was already successfully underway). JBS for this quarter reported a margin of 12 percent for its pork business.

**D.    After success in the chicken and pork markets, Express Markets entered the beef market in 2015 and proceeded to steadily ramp up its beef operations over the following years.**

83.    In May 2015, Express Markets announced that it was adding its market analysis of beef to their product offerings in order to meet the broad information and knowledge needs of its customers. Express Markets specialized in market forecasting

offerings to its consumers. On its website, Express Markets states that for the poultry market it provides "short and long-term price and production forecasts."[15]

84.     As part of its addition of market analysis of beef in 2015, Express Markets purchased Paragon Economics, an independent consulting firm that provided economic analysis of the pork and beef markets.[16]

85.     In April 2016, Express Markets hired Dave Weaber as a vice president who specialized in the beef market. In June 2016, Mr. Weaber moderated a session at the 2016 Beef Improvement Federation Annual Meeting and Research Symposium entitled "Opportunities for the Beef Value Chain: Can we become more coordinated and more profitable?" On October 28, 2016, Mr. Weaber attended a USDA Data Users conference on behalf of EMI Express.

86.     Express Markets held regular protein outlook conferences that covered the beef industry. Express Markets held protein outlook conferences in September 2017, September 2018, and April 2019.[17] Express Markets provided comprehensive information at these conferences. For example, Express Markets stated for the September

---

[15] *Available at* https://www.expressmarketsinc.com/aboutus.

[16] *Available at* https://www.nationalhogfarmer.com/marketing/paragon-economics-sold-express-markets.

[17] September 2017 (https://www.expressmarketsinc.com/node/13); September 2018 (https://www.expressmarketsinc.com/node/24); April 2019 (https://www.expressmarketsinc.com/node/21).

010808-11 1120636 V1

2018 protein conference that the conference is "an excellent opportunity to get comprehensive outlooks of the current and future protein markets."[18]

**E.    Following the entrance of Express Markets into the beef market in 2015, the margins for the Meatpacking Defendants soared.**

87.    The entrance of Express Markets into the beef market in 2015, in addition to the collusive activity described above, fundamentally changed the pricing dynamics of the market. Starting in 2016, the Meatpacking Defendants profits rose to unprecedented levels as they expanded their margin and caused consumers to pay artificially elevated prices for beef.

88.    On August 11, 2016, JBS reported that it expected the beef business to have an EBITDA margin of **4-5 percent** for the rest of the year and that "we are very positive now that second half we are going to see this positive cycle showing in the results and showing in our results."

89.    On November 16, 2016, JBS reported that JBS USA will be at the top of its margin range for 2017, stating that there is "**a very positive dynamic for the U.S. business now**."

90.    On November 21, 2016, Tyson reported that it expected its beef business operating margin to be at the upper end of the normalized range of 1.5 to 3 percent for fiscal year 2017.

91.    On February 6, 2017, Tyson reported a record quarterly operating margin of 8 percent for its beef business, raised its operating margin for the year to 5 percent, and

---

[18] *Available at* https://www.expressmarketsinc.com/node/24.

stated that it did not think 2017 was an aberrational performance for the beef division.

Tyson's performance significantly exceeded the normalized margin range of 1.5 to 3

percent that it had forecast for its beef business before the entrance of Express Markets.

92.    On March 14, 2017, JBS reported an EBITDA margin of 7.3 percent for the

fourth quarter of 2016, significantly higher than its 2015 margins.

93.    On May 8, 2017, Tyson forecast operating margins of 5 percent for its beef

business for 2017 and 2018 – above the normalized margin range of 1.5 to 3 percent. An

investment analyst stated that Tyson's "outperformance jumped dramatically during the

quarter" and questioned whether Tyson was "doing something different in [the beef]

business" based on Tyson's forecasted margins.

94.    On August 15, 2017, JBS reported an EBITDA margin of 5.9 percent for its

beef business and stated that "**This was the best EBITDA and EBITDA margin posted**

**for a second quarter in the history of the company in this business unit**."

95.    On November 13, 2017, Tyson reported an operating margin of 6 percent

for its beef unit for the year, above its prior forecast of 5 percent and its normalized

operating margins of 1.5 to 3 percent.

96.    On November 14, 2017, JBS reported record EBITDA margins of 7.3

percent for its beef business. JBS stated that these results have "reinforced our confidence

in the outlook for business."

97.    From 2015 to 2018, the Meatpacking Defendants nearly doubled the share

of profits that they captured from the overall beef value chain.



**F.     Tyson and JBS attributed their record 2017 & 2018 profits to their visibility into the beef supply chain.**

98.     Tyson and JBS continued to report elevated margins throughout 2017 and 2018. On earnings conference calls during this period, executives from JBS and Tyson frequently attributed their new, record profits to their ability to understand the amount of cattle in the beef supply chain in upcoming years. Express Markets and Agri Stats had previously provided this type of future-based forecasting in the poultry and swine markets. On certain earnings periods during this period, JBS executives also noted at points that they were not taking market share from competitors and that the elevated margins were helped by capacity decreases resulting from plant closures.

99.     On August 7, 2017, Tyson reported an operating margin for its beef business of 3.7 percent for the third quarter of 2017 and emphasized its confidence in the beef business going forward: "With ample supplies of cattle, we see very good conditions

for our Beef business as far out as 2020, as we enter the early stages of a multiyear expansion cycle. Absent a shock to the system such as a drought or an import ban, our Beef business is well-positioned for profitable, long-term growth." In response to an investment analyst question, Tyson stated that "it's on our minds" whether Tyson should raise the forecasted normalized operating margins for its beef business of 1.5 to 3 percent.

100.    On February 8, 2018, Tyson reported quarterly operating margins of 6.6 percent and yearly margins close to 6 percent. Tyson emphasized that it had "pretty good visibility into '19 and '20 at this point. We see the number of animals out there." Tyson refused to talk about its "idled capacity" but emphasized that "**we have…good visibility into the cattle that's out there**. We see the number of animal so that's that certainly good for us."

101.    On May 7, 2018, Tyson forecast operating margins of 6 percent for the year – above its normalized operating margin range for 1.5 to 3 percent. Tyson attributed its forecast to be "on the back of those cattle on feed reports and knowing that the supplies in our region are exceptionally good."

102.    On May 15, 2018, JBS reported an EBITDA margin of 6.1 percent for the quarter and forecast that margins would be at record levels for the following two quarters. JBS emphasized that its performance was not based on "taking share from anyone."

103.    On August 6, 2018, Tyson reported an operating margin of 8 percent for the quarter. Tyson stated that it had an "optimistic outlook" because "we have good visibility into 2021…that's good because we do see the number of animals that are out there."

- 36 -

104.    On August 15, 2018, JBS reported an EBITDA margin of 10.2 percent for the quarter and that "**we're moving the overall margin in beef for a different level that was in the past**." JBS emphasized that it was benefitted from the shutting of several plants in the last five years. JBS could not "see how the beef U.S. can be less profitable in 2019 compared to how it is going to perform in 2018." At the same point, JBS reported that its EBITDA margin for pork for the quarter was 7.2 percent. This was a reversal from 2014, where JBS expected margins of approximately 4 percent for its beef business as compared to 9-10 percent for its pork business.

105.    On November 13, 2018, Tyson reported record operating margins of 8.9 percent for the quarter and 6.7 percent for the year. Tyson stated that it expected similar results in the following years because of its visibility into cattle supply: "As we look at 2019, 2020, even in 2021 we frankly we don't see a lot of change. The supply appears to be relatively stable. We have a good sense of what that looks like just due to the calf crop that gives us good visibility for at least a couple of years."

## VI.    THE STRUCTURE OF THE BEEF PACKER INDUSTRY IS CONDUCIVE TO THE CONSPIRACY

106.    Defendants' conspiracy to constrain the supply of cattle, restrain the amount of processed beef they sold, stabilize the price of beef, and maximize their margins, was facilitated by the structure of the meatpacking market. The beef meatpacking industry has all of the hallmark features found in highly-cartelized markets, including: (1) a highly concentrated market with high barriers to entry; (2) a commodity product; (3) inelastic demand; and (4) unusual market share stability.

**A.     The beef meatpacking industry was highly concentrated.**

107.    Market concentration facilitates collusion. Collusive agreements are easier to implement and sustain when there are only a few firms controlling a large portion of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players. Moreover, this high degree of control also simplifies coordination because there is little outside competitive presence to undermine the cartel, and it is easier for cartel participants to monitor each other's actions related to supply and pricing. Also, with fewer firms in the market, the transitory gains that might be achieved by undercutting the cartel price and gaining a transitory increase in market share would be outweighed by the greater long-term profits for a colluding firm in a concentrated industry with artificially elevated prices.

108.    By contrast, if an industry is divided into a large number of small firms, the current gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the cartel's continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully).

109.    Throughout the Class Period, **the four Meatpacking Defendants controlled approximately 75 percent of the market for both slaughter capacity and processed beef sales**:

- 38 -



110.    The Herfindahl-Hirschman index (HHI) is a commonly accepted measure of market concentration. The DOJ considers markets in between 1,500 to 2,500 to be moderately concentrated.

111.    As of 2017, the cattle processing HHI for both slaughter capacity and beef processing sales was over 2,000. Under the HHI ratio, the beef-packing market is more concentrated than either the pork or poultry processing markets:



112.    A highly concentrated market makes it easier cartelists to facilitate their conspiracy by making it easier to make agreements, form understandings, combinations

- 39 -

or conspiracies to fix, raise, maintain, and/or stabilize prices, and/or to allocate market shares, and to set and keep prices at artificially high, supra-competitive levels.

113.    The four-firm concentration ratio (CR-4) is a commonly used metric for measuring market concentration that measures the sum of the market shares for the top four firms in a particular market.

114.    The sum of the market shares for the four Meatpacking Defendants is greater than 70 percent in both cattle slaughtering and beef sales. According to the CR-4 typology, a market with this type of market share distribution is classified as a tight oligopoly:



115.    Prior to and in the beginning of the Class Period, the beef industry underwent a period of increasing market concentration, resulting in a small number of beef processors controlling a large amount of market share. In 2001, Tyson purchased

- 40 -

IBP, then the United States' largest beef packer. In 2002, Cargill purchased Taylor

Packing, a beef packer. In 2007 and 2008, JBS acquired Swift & Co and Smithfield Beef

Group, respectively the third- and fifth-largest beef packers in the United States.

116.    The level of concentration in the beef industry therefore rested in an ideal

zone for collusion. Because the industry was dominated by a small number of

meatpackers, it was feasible to manipulate price through coordination between the

Meatpacking Defendants, the four dominant players that controlled the market. Further,

this coordinated activity was necessary to increase margins because none of the largest

producers had sufficient market share to control price through their actions alone.

**B.      The beef packer market featured high barriers to entry.**

117.    Barriers to entry are obstacles which prevent new competitors from easily

entering the market. They restrict competition in a market and may make it easier for

incumbents to collude.

118.    A collusive arrangement that raises product prices above competitive levels

would, under basic economic principles, attract new entrants seeking to benefit from the

profits to be reaped from supra-competitive pricing. Where, however, there are

significant barriers to entry, new entrants are less likely to enter the market. Thus,

barriers to entry help to facilitate the formation and maintenance of a cartel.

119.    Barriers to entry kept would-be competitors out of the beef-packing

industry. New entry into beef processing is costly and time consuming. The estimated

cost of building a small processing plant, with a slaughter capacity of 1,000-1,500 head

per day, would cost an estimated $150 million.

- 41 -

120.    In addition to the cost of opening a plant, new entrants would have to comply with numerous regulations, find and train a large workforce, and successfully market the processed beef.

121.    As a result of these barriers, new entrants into the beef packing market, such as Northern Beef Packers and Kane Beef, have gone bankrupt after attempting to enter the market.

**C.    Beef is a commodity product.**

122.    In economics, a commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as inputs in the production of other goods or services. Examples of traditional commodities are sugar, wheat, and rubber. As technologies for markets and goods mature, a product is more likely to be considered a commodity, at least in its more basic implementations.

123.    Markets for commodity products are conducive to collusion. Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes such as product quality or customer service. This factor facilitates coordination because firms wishing to form a cartel can more easily monitor and detect defections from an anticompetitive agreement where any observed differences in prices are more likely to reflect cheating on the conspiracy than any other factor which might affect pricing, such as special product characteristics, service or other aspects of the transaction.

124.    Beef is a commodity. For example, beef roasts from Tyson and Cargill are virtually indistinguishable, as both share similar nutritional values and differ only in branding and packaging.

**D.    The beef meatpacking market featured unusual market share stability during the relevant period.**

125.    In a competitive market, market shares are expected to fluctuate as manufacturers compete and win customer business from one another. Stable market shares over time are consistent with an agreement to divide up a market, fix prices, or restrict output.

126.    Although market-share stability does not prove collusion, it is suggestive of an understanding within a cartel group not to compete over existing business. A distinct drop in market-share volatility between two time periods is consistent with an agreement coming into effect in a previously competitive market.

127.    Market share by sales among the Meatpacking Defendants appears to be more stable during the Class Period as compared to the preceding decade for both beef sales:



128.   The same is true for slaughter capacity – the market share amongst the

Meatpacking Defendants appears to be more stable during the Class Period than the

decade prior:



### E. The demand for beef is inelastic.

129. "Price Elasticity" or "Elasticity" are terms used to describe the sensitivity of supplier or consumers to changes in the price of a good or service. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, under conditions of inelastic demand, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

130.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

131.    Price elasticity of demand (PED) is a measure used to quantify the degree to which the quantity demanded for a good or service changes in response to a change in price. The formula to calculate the PED is the percentage change in quantity consumed divided by the percentage change in price. A PED value between 0 and -1 indicates an "inelastic" demand for a good or service, i.e. a 1% increase in price induces a less than 1 percent decrease in the quantity demanded.

132.    A review of the relevant literature found that the average PED estimate for beef was -0.43, reflecting a relatively inelastic level of demand for beef:

| Good/Service | Elasticity of Demand | % Increase in Price | % Change in Quantity Demanded | Description of Elasticity |
|---|---|---|---|---|
| (Example) Medical Care and Insurance | -0.17 | 1% | -0.17% | Inelastic[2] |
| Beef | -0.43 | 1% | -0.43% | Relatively inelastic |
| (Example) Restaurant Meals | -2.3 | 1% | -2.3% | Highly elastic[3] |

## F.    Abnormal pricing during the Class Period demonstrates the success of the collusive scheme.

133.    Beginning in 2015, the beef industry showed abnormal price movements as beef packers began to reap an increasing share of consumer spending on beef.

- 46 -

134.    The average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to the present than it was in the preceding 5 years. And in those preceding years there was a smaller relative increase in the spread between wholesale and retail values of beef:

| | Farm-to-Wholesale Spread | Proportional Increase | Wholesale-to-Retail Spread | Proportional Increase |
|---|---|---|---|---|
| Jan 2010 - Dec 2014 | 34 | - | 215 | - |
| Jan 2015 - Dec 2018 | 54 | 59% | 270 | 26% |
| As of Jan 2019 | 69 | 27% | 264 | -2% |

135.    Beef processors have nearly doubled their share of consumer beef spending following the introduction of Express Markets into the market and the beginning of their collusive scheme to inflate their margins:

| | Approximate Allocation of $1 of Consumer Spending on Beef | | |
|---|---|---|---|
| | Farmer | Processor | Retailer |
| Jan 2010 – Dec 2014 | 42.4 cents | 6.8 cents | 50.8 cents |
| Jan 2015 – Dec 2018 | 44.9 cents | 9.0 cents | 46.1 cents |
| As of Jan 2019 | 44.5 cents | 11.7 cents | 43.8 cents |

**G.    Overcharges due to the cartel were passed through to the indirect purchaser class.**

136.    The USDA has stated that high levels of market concentration allow the largest participants to extract more of the economic value from food transactions, but "consumers typically bear the burden, paying higher prices for goods of lower quality."

- 47 -

137.    As a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to consumers in the form of higher retail prices. For a firm to be profitable, the firm must recover its marginal cost of production. In a perfectly competitive market, firms price at marginal cost and when marginal costs increase, the cost increases are passed through to the consumer 1:1 or at a 100 percent pass-through rate. As a general matter, the pass-through rate will be determined by the relative elasticities of supply and demand. When demand is inelastic (as it is for beef) the pass-through rate is closer to 100 percent.

138.    Starting in 2015, the retail price of beef and the price paid for live steer diverged dramatically, as falling wholesale prices for live steer did not lead to matching decreases in the retail price of beef. This divergence from the prior historical pattern is a result of the Meatpacking Defendants' collusive activity:



139.   Publicly available data confirms that the consumer-class members were injured. Using the period prior to the conspiracy (2010 to 2014) as an approximation of the non-collusive processor markup, plaintiffs have modeled what the price of beef would have been from 2015 to 2018 in the absence of a conspiracy. The orange dotted line in the following chart shows what the wholesale price of beef would have been, *but for* the existence of the conspiracy – demonstrating clear impact in the post-2015 period:



140.    The following diagrams clearly show the Meatpacking Defendants'
anticompetitive conduct was successful at dramatically elevating their markup margins in
the 2015 to 2018 period as compared to the benchmark pre-2015 period, where the
anticompetitive conduct is presumed to be absent:





**H.    The elevation in processor margins during the Class Period is not explained by changes in export levels or international demand for beef.**

141.    Changes in relative levels of export vs. import of beef during the relevant period do not explain the increase in processor margins because the United States has actually transitioned from being a net exporter of beef from 2010 to 2014 to being a net importer of beef from after 2015:



142.    This change in status from net exporter to net importer is consistent with an artificial bottleneck in domestic supply. It is not consistent with rising meatpacker margins being caused by increased foreign demand, as foreign demand, on net, fell in relation to domestic demand over the relevant period.

143.    Furthermore, export prices have increased since 2010, but the volume-weighted average export price has not increased faster than domestic prices. This result is

- 52 -

also inconsistent with the increase in processor margins being caused by changes in exporting amounts:



144.   The change in meatpacking margins is also not explained by a change in international levels of demand. On the international level, there is strong historical evidence that the degree of international demand has very little impact on the wholesale or retail price of beef. Regression analysis shows that quarterly changes in the export amounts of beef has very little impact on changes in the wholesale or retail price of beef. The absence of any impact is particularly visible during the Mad Cow crisis of 2004. During this period, international demand for, and thus exports, of beef almost entirely collapsed, but there was almost no effect on the retail price of domestic beef:

- 53 -



Beef Export Levels and the Domestic Price of Beef

**I.      The Meatpacking Defendants actively concealed the conspiracy.**

145.    Throughout the Class Period, The Meatpacking Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from plaintiffs and class members.

146.    The combination and conspiracy alleged herein was fraudulently concealed by the Meatpacking Defendants by various means and methods, including, but not limited to secret meetings, surreptitious communications between defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, limiting any explicit reference to competitor pricing or supply-restraint communications on documents, communicating competitively sensitive data to one another through Agri Stats - a "proprietary, privileged, and confidential" system that kept both the content and participants in the system secret, and concealing the existence and nature of their

- 54 -

competitor supply-restraint and price discussions from non-conspirators (including customers).

147. In 2009, the President of Agri Stats, Bryan Snyder, commented on how secretive the true nature of Agri Stats was, when he stated:

> Agri Stats has always been kind of a quiet company. ***There's not a whole lot of people that know a lot about us obviously due to confidentiality that we try to protect. We don't advertise. We don't talk about what we do. It's always kind of just in the background***, and really our specialty is working directly with companies about their opportunities and so forth.

148. At the same 2009 presentation, when discussing "bottom line numbers" (a company's net earnings), Mr. Snyder declined to display those numbers publicly stating, "I'm not going to display the actual bottom line to the group here just because of the confidentiality nature of the information." And yet, despite refusing to show this information publicly, competitors were provided with the "bottom line numbers" of their competitors on a regular basis via the reports discussed above. These statements acted to conceal the true detail and nature of the Agri Stats reports from plaintiffs and the public in general.

149. By virtue of the fraudulent concealment of their wrongful conduct by the Meatpacking Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that plaintiffs and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

## VII.   CLASS ACTION ALLEGATIONS

150.   Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following classes:

A.   **Nationwide Injunctive Relief class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in the United States during the Class Period.

B.   **Arizona class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Arizona during the Class Period.

C.   **California class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in California during the Class Period.

D.   **District of Columbia class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in the District of Columbia during the Class Period.

E.   **Florida class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Florida during the Class Period.

F.   **Hawaii class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Hawaii during the Class Period.

G.   **Illinois class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Illinois during the Class Period.

H.   **Iowa class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Iowa during the Class Period.

- 56 -

I.    **Kansas class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Kansas during the Class Period.

J.    **Maine class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Maine during the Class Period.

K.    **Massachusetts class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Massachusetts during the Class Period.

L.    **Michigan class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Michigan during the Class Period.

M.    **Minnesota class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Minnesota during the Class Period.

N.    **Mississippi class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Mississippi during the Class Period.

O.    **Missouri class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Missouri during the Class Period.

P.    **Montana class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Montana during the Class Period.

Q.    **Nebraska class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Nebraska during the Class Period.

R.    **Nevada class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Nevada during the Class Period.

010808-11 1120636 V1

S.   **New Hampshire class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in New Hampshire during the Class Period.

T.   **New Mexico class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in New Mexico during the Class Period.

U.   **New York class:** All persons and who indirectly purchased beef from defendants or co-conspirators for personal use in New York during the Class Period.

V.   **North Carolina class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in North Carolina during the Class Period.

W.   **North Dakota class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in North Dakota during the Class Period.

X.   **Oregon class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Oregon during the Class Period.

Y.   **Rhode Island class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Rhode Island during the Class Period.

Z.   **South Carolina class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in South Carolina during the Class Period.

AA.   **South Dakota class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in South Dakota during the Class Period.

BB.   **Tennessee class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Tennessee during the Class Period.

CC.   **Utah class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Utah during the Class Period.

- 58 -

DD. **West Virginia**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in West Virginia during the Class Period.

EE. **Wisconsin class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Wisconsin during the Class Period.

151. The state classes are collectively referred to as the "classes" unless otherwise indicated. Specifically excluded from these classes are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded from these classes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action. Further excluded from the classes and National Injunctive Relief Class are purchasers of value-added products not manufactured, supplied or processed by defendants, or otherwise not under the control of defendants.

152. Class Identity: The above-defined classes are readily identifiable and is one for which records should exist.

153. Numerosity: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of beef. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members

- 59 -

geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

154.   Typicality: Plaintiffs' claims are typical of the claims of the members of the classes because plaintiffs purchased beef indirectly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the classes and the relief sought is common to the classes.

155.   Common Questions Predominate: There are questions of law and fact common to the classes, including, but not limited to:

A.   Whether defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of beef sold in interstate commerce in the United States;

B.   The identity of the participants of the alleged conspiracy;

C.   The duration of the conspiracy alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

D.   Whether the alleged conspiracy violated the antitrust and consumer protection laws of the various states;

E.   Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the classes;

F.   The effect of defendants' alleged conspiracy on the prices of beef sold in the United States during the Class Period;

G.   Whether plaintiffs and other members of the classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

H.   The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the classes, predominate over any questions affecting only individual members of the classes.

156.   Adequacy: Plaintiffs will fairly and adequately protect the interests of the classes in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the classes who indirectly purchased beef from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the classes.

157.   Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the classes is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the classes compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the classes to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

158.   The prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

- 61 -

159.    Plaintiffs bring the classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more beef products that a defendant or co-conspirator produced for personal use during the respective class periods.

160.    Defendants have acted on grounds generally applicable to the classes, thereby making final injunctive relief appropriate with respect to the classes as a whole.

## VIII.  ANTITRUST INJURY

161.    Defendants' anticompetitive conduct had the following effects, among others:

A.  Price competition has been restrained or eliminated with respect to beef;

B.  The prices of beef have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C.  Indirect purchasers of beef have been deprived of free and open competition; and

D.  End-user consumers of beef who indirectly purchased beef for personal use, including plaintiffs, paid artificially inflated prices.

162.    The beef that plaintiffs and class members purchased was in substantially the same form as when they were initially sold by defendants. As a result, the beef follows a traceable physical chain from defendants to plaintiffs and class members, and the overcharges on beef can be traced from defendants to plaintiffs and class members.

163.    As discussed in detail, as a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the

market, which ultimately get passed to consumers, plaintiffs and class members here, in the form of higher retail prices. When demand is inelastic, as it is for beef, the pass-through rate to end users is at or near 100 percent.

164.   Consequently, while the direct purchasers were the first to pay supra-competitive prices, the overcharge was passed along the distribution chain and absorbed by plaintiffs and class members when they purchased the beef for personal use.

165.   Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution to end-user consumers. Thus, the economic harm to plaintiffs and the class member can be quantified.

166.   The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of beef and, as a direct and foreseeable result. Plaintiffs and the classes paid supra-competitive prices for beef during the Class Period.

167.   By reason of the alleged violations of the antitrust laws, plaintiffs and the classes have sustained injury to their businesses or property, having paid higher prices for beef than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

168.   This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.    CAUSES OF ACTION

## VIOLATION OF THE SHERMAN ACT

## <u>FIRST CLAIM FOR RELIEF</u>
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
## 15 U.S.C. § 1
## (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF)

169.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

170.    Beginning at a time currently unknown to plaintiffs, but at least as early as 2015, and continuing through the present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for beef in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

171.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

A. Fixing, raising, and stabilizing the price of beef; and

B. Allocating among themselves and collusively reducing the production of beef.

172.    The combination and conspiracy alleged herein has had the following effects, among others:

A.  Price competition in the sale of beef has been restrained, suppressed, and/or eliminated in the United States;

B.  Prices for beef sold by defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

C.  Those who purchased beef indirectly from defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition.

173.  Plaintiffs and members of the classes have been injured and will continue to be injured in their businesses and property by paying more for beef purchased indirectly from the defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

174.  Plaintiffs and members of the classes are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST LAWS

175.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

176.  The following claims for relief are pleaded under the antitrust laws of each jurisdiction identified below on behalf of the indicated class.

## SECOND CLAIM FOR RELIEF
### VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. § 44-1401, *ET SEQ.* (ON BEHALF OF THE ARIZONA CLASS)

177.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

178.    By reason of the conduct alleged herein, defendants have violated Arizona Rev. Stat. § 44-1401, *et seq*.

179.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Arizona.

180.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

181.    Defendants' violations of Arizona law were flagrant.

182.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

183.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.

184. By reason of the foregoing, plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq*.

## THIRD CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16700, *ET SEQ*. (ON BEHALF OF THE CALIFORNIA CLASS)

185. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

186. The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

187. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

188. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

189. A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

- 67 -

190.    Plaintiffs purchased beef within the State of California during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

191.    Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

192.    Plaintiffs and members of the California Class were injured in their business or property, with respect to purchases of beef in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501, *ET SEQ*.
### (ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)

193.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

194.    The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

195.    Plaintiffs purchased beef within the District of Columbia during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

- 68 -

196.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

197.    Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for beef within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq*.

198.    Plaintiffs and members of the District of Columbia Class were injured with respect to purchases of beef in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.* (ON BEHALF OF THE ILLINOIS CLASS)

199.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

200.    The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade. . . ." 740 ILCS 10/2.

- 69 -

201.    Plaintiffs purchased beef within the State of Illinois during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

202.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

203.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for beef sold, and/or for allocating customers or markets for beef within the intrastate commerce of Illinois.

204.    Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for beef in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq*.

205.    Plaintiffs and members of the Illinois Class were injured with respect to purchases of beef in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE IOWA COMPETITION LAW**
**IOWA CODE § 553.1, *ET SEQ.***
**(ON BEHALF OF THE IOWA CLASS)**

206.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

- 70 -

207.    The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

208.    Plaintiffs purchased beef within the State of Iowa during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

209.    Defendants contracted, combined or conspired to restrain or monopolize trade in the market for beef, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for beef, in violation of Iowa Code § 553.1, *et seq.*

210.    Plaintiffs and members of the Iowa Class were injured with respect to purchases of beef in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## SEVENTH CLAIM FOR RELIEF
### VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT
### KAN. STAT. ANN. § 50-101, *ET SEQ.*
### (ON BEHALF OF THE KANSAS CLASS)

211.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

212.    The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

213.    Plaintiffs purchased beef within the State of Kansas during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

214.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

215.    Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of beef, increasing the price of beef, preventing competition in the sale of beef, or binding themselves not to sell beef, in a manner that established the price of beef and precluded free and unrestricted competition among themselves in the sale of beef, in violation of Kan. Stat. Ann. § 50-101, *et seq*.

216.    Plaintiffs and members of the Kansas Class were injured with respect to purchases of beef in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

### EIGHTH CLAIM FOR RELIEF
### VIOLATION OF THE MAINE'S ANTITRUST STATUTE
### ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.*
### (ON BEHALF OF THE MAINE CLASS)

217.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

218.    Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally

prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev.
Stat. Ann. Tit. 10, §§ 1101-02.

219.    Plaintiffs purchased beef within the State of Maine during the Class Period.
But for defendants' conduct set forth herein, the price per pound of beef would have been
lower, in an amount to be determined at trial.

220.    Under Maine law, indirect purchasers have standing to maintain an action
based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

221.    Defendants contracted, combined or conspired in restraint of trade or
commerce of beef within the intrastate commerce of Maine, and monopolized or
attempted to monopolize the trade or commerce of beef within the intrastate commerce of
Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq*.

222.    Plaintiffs and members of the Maine Class were injured with respect to
purchases of beef in Maine and are entitled to all forms of relief, including actual
damages, treble damages, reasonable attorneys' and experts' fees and costs.

## NINTH CLAIM FOR RELIEF
### VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT
### MICH. COMP. LAWS § 445.771, *ET SEQ*.
### (ON BEHALF OF THE MICHIGAN CLASS)

223.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and
every allegation set forth in the preceding paragraphs of this Complaint.

224.    The Michigan Antitrust Reform Act aims "to prohibit contracts,
combinations, and conspiracies in restraint of trade or commerce . . . to prohibit

- 73 -

monopolies and attempts to monopolize trade or commerce . . . [and] to provide

remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

225.    Plaintiffs purchased beef within the State of Michigan during the Class

Period. But for defendants' conduct set forth herein, the price per pound of beef would

have been lower, in an amount to be determined at trial.

226.    Under the Michigan Antitrust Reform Act, indirect purchasers have

standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp.

Laws. § 452.778(2).

227.    Defendants contracted, combined or conspired to restrain or monopolize

trade or commerce in the market for beef, in violation of Mich. Comp. Laws § 445.772,

*et seq.*

228.    Plaintiffs and members of the Michigan Class were injured with respect to

purchases of beef in Michigan and are entitled to all forms of relief, including actual

damages, treble damages for flagrant violations, interest, costs, reasonable attorneys'

fees, and injunctive or other appropriate equitable relief.

## TENTH CLAIM FOR RELIEF
### VIOLATION OF THE MINNESOTA ANTITRUST LAW, MINN. STAT. § 325D.49, *ET SEQ.* (ON BEHALF OF THE MINNESOTA CLASS)

229.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

230.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract,

combination or conspiracy when any part thereof was created, formed, or entered into in

Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

231.    Plaintiffs purchased beef within the State of Minnesota during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

232.    Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

233.    Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for beef within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for beef within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for beef within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

234.    Plaintiffs and members of the Minnesota Class were injured with respect to purchases of beef in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

## ELEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,
## MISS. CODE ANN. § 74-21-1, *ET SEQ*.
## (ON BEHALF OF THE MISSISSIPPI CLASS)

235.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

236.    Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

237.    Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

238.    Plaintiffs purchased beef within the State of Mississippi during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

239.    Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

240.    Defendants combined, contracted, understood and agreed in the market for beef, in a manner inimical to public welfare, with the effect of restraining trade,

- 76 -

increasing the price of beef and hindering competition in the sale of beef, in violation of

Miss. Code Ann. § 75-21-1(a), *et seq.*

241.   Defendants monopolized or attempted to monopolize the production,

control or sale of beef, in violation of Miss. Code Ann. § 75-21-3, *et seq.*

242.   Defendants' beef is sold indirectly via distributors throughout the State of

Mississippi. During the Class Period, defendants' illegal conduct substantially affected

Mississippi commerce.

243.   Plaintiffs and members of the Mississippi Class were injured with respect

to purchases of beef in Mississippi and are entitled to all forms of relief, including actual

damages and a penalty of $500 per instance of injury.

**TWELFTH CLAIM FOR RELIEF**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT,**
**MO. ANN. STAT. § 407.010, *ET SEQ.***
**(ON BEHALF OF THE MISSOURI CLASS)**

244.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

245.   Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA")

generally governs unlawful business practices, including antitrust violations such as

restraints of trade and monopolization.

246.   Plaintiffs purchased beef within the State of Missouri during the Class

Period. But for defendants' conduct set forth herein, the price per pound of beef would

have been lower, in an amount to be determined at trial.

247.    Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc*., 216 S.W.3d 667, 669 (Mo. 2007).

248.    Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the market for beef within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq.*

249.    Plaintiffs and members of the Missouri Class were injured with respect to purchases of beef in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## THIRTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NEBRASKA JUNKIN ACT,
### NEB. REV. STAT. § 59-801, *ET SEQ.*
### (ON BEHALF OF THE NEBRASKA CLASS)

250.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

251.    Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

- 78 -

252.   Plaintiffs purchased beef within the State of Nebraska during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

253.   Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

254.   Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for beef within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

255.   Plaintiffs and members of the Nebraska Class were injured with respect to purchases of beef in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## FOURTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.010, *ET SEQ.* (ON BEHALF OF THE NEVADA CLASS)

256.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

- 79 -

257.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

258.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

259.    Plaintiffs purchased beef within the State of Nevada during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

260.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

261.    Defendants fixed prices by agreeing to establish prices for beef in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of beef within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq*.

262.    Plaintiffs and members of the Nevada Class were injured with respect to purchases of beef in Nevada in that at least thousands of sales of defendants' beef took

place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by defendants' conduct.

263.    Accordingly, plaintiffs and members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

264.    In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by plaintiffs.

### FIFTEENTH CLAIM FOR RELIEF
### VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE, N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.* (ON BEHALF OF THE NEW HAMPSHIRE CLASS)

265.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

267.    Plaintiffs purchased beef within the State of New Hampshire during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

268.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

269.    Defendants fixed, controlled or maintained prices for beef, allocated customers or markets for beef, and established, maintained or used monopoly power, or

attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

270.    Plaintiffs and members of the New Hampshire Class were injured with respect to purchases of beef in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**SIXTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,**
**N.M. STAT. ANN. §§ 57-1-1, *ET SEQ.***
**(ON BEHALF OF THE NEW MEXICO CLASS)**

271.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

272.    The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

273.    Plaintiffs purchased beef within the State of New Mexico during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

274.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

275.    Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for beef within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

276.     Plaintiffs and members of the New Mexico Class were injured with respect to purchases of beef in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## SEVENTEENTH CLAIM FOR RELIEF
## VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW
## (ON BEHALF OF THE NEW YORK CLASS)

277.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

278.     Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

279.     Plaintiffs purchased beef within the State of New York during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

280.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

281.     Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of beef and restrained competition in the free exercise of the conduct of the business of beef within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

- 83 -

282.    Plaintiffs and members of the New York Class were injured with respect to purchases of beef in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

## EIGHTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES, N.C. GEN. STAT. § 75-1, *ET SEQ.* (ON BEHALF OF THE NORTH CAROLINA CLASS)

283.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

284.    Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the beef market, a substantial part of which occurred within North Carolina.

285.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

286.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

287.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

- 84 -

288.    By reason of the foregoing, plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

### NINETEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE § 51-08.1, *ET SEQ.* (ON BEHALF OF THE NORTH DAKOTA CLASS)

289.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

290.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, *et seq.*

291.    Plaintiffs purchased beef within the State of North Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

292.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

293.    Defendants contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for beef, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or controlling, fixing or maintaining prices for beef, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

294.    Plaintiffs and members of the North Dakota Class were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**TWENTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. § 646.705, *ET SEQ.***
**(ON BEHALF OF THE OREGON CLASS)**

295.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

296.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

297.    Plaintiffs purchased beef within the State of Oregon during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

298.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

299.    Defendants contracted, combined, or conspired in restraint of trade or commerce of beef, and monopolized or attempted to monopolize the trade or commerce of beef, in violation of Or. Rev. Stat. § 646.705, *et seq.*

- 86 -

300.     Plaintiffs and members of the Oregon Class were injured with respect to purchases of beef within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

## TWENTY-FIRST CLAIM FOR RELIEF
### VIOLATION OF THE RHODE ISLAND ANTITRUST ACT, R.I. GEN LAWS § 6-36-1, *ET SEQ.* (ON BEHALF OF THE RHODE ISLAND CLASS)

301.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

302.     The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 636-2(a)(2).

303.     Plaintiffs purchased beef within the State of Rhode Island during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

304.     Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a). In Rhode Island, the claims of plaintiffs and the Class alleged herein run from January 1, 2008, through the date that the effects of defendants' anticompetitive conduct cease.

- 87 -

305.    Defendants contracted, combined and conspired in restraint of trade of beef within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of beef for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq*.

306.    Plaintiffs and members of the Rhode Island Class were injured with respect to purchases of beef in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

## TWENTY-SECOND CLAIM FOR RELIEF
### VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE, S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ*. (ON BEHALF OF THE SOUTH DAKOTA CLASS)

307.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

308.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

309.    Plaintiffs purchased beef within the State of South Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

- 88 -

310.   Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

311.   Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of beef within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, *et seq.*

312.   Plaintiffs and members of the South Dakota Class were injured with respect to purchases of beef in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## TWENTY-THIRD CLAIM FOR RELIEF
### VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT, TENN. CODE, § 47-25-101, *ET SEQ.* (ON BEHALF OF THE TENNESSEE CLASS)

313.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

314.   The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or

- 89 -

which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.

315.    Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

316.    Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, defendants' combination or conspiracy had the following effects: (1) price competition for beef was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for beef were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) plaintiffs and the Tennessee Class were deprived of free and open competition; and (4) plaintiffs and the Tennessee Class paid supra-competitive, artificially inflated prices for beef.

317.    During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce as beef was sold in Tennessee.

318.    Plaintiffs and the Tennessee Class purchased beef within the State of Tennessee during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and the Tennessee Class have been injured in their business and property and are threatened with further injury

- 90 -

319.    Under Tennessee law, indirect purchasers (such as plaintiffs and the Tennessee Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

320.    Plaintiffs and members of the Tennessee Class were injured with respect to purchases of beef in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

## TWENTY-FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE UTAH ANTITRUST ACT,
## UTAH CODE ANN. §§ 76-10-911, *ET SEQ.*
## (ON BEHALF OF THE UTAH CLASS)

321.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

322.    The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

323.    Plaintiffs purchased beef within the State of Utah during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

324.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

- 91 -

325.    Defendants contracted, combined or conspired in restraint of trade or commerce of beef, and monopolized or attempted to monopolize trade or commerce of beef, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

326.    Plaintiffs and members of the Utah Class who are either Utah residents or Utah citizens were injured with respect to purchases of beef in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

**TWENTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,**
**W. VA. CODE §47-18-1, *ET SEQ.***
**(ON BEHALF OF THE WEST VIRGINIA CLASS)**

327.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

328.    The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

329.    During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, *et seq.*

330.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

331.    As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the West Virginia Class have been injured in their business and property

in that they paid more for beef than they otherwise would have paid in the absence of

defendants' unlawful conduct. As a result of defendants' violation of Section 47-18-3 of

the West Virginia Antitrust Act, plaintiffs and members of the West Virginia Class seek

treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to

section 47-18-9 of the West Virginia Code.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE WISCONSIN ANTITRUST ACT,**
**WIS. STAT. ANN. § 133.01(1), *ET SEQ*.**
**(ON BEHALF OF THE WISCONSIN CLASS)**

332.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

333.    Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with

the intent "to safeguard the public against the creation or perpetuation of monopolies and

to foster and encourage competition by prohibiting unfair and discriminatory business

practices which destroy or hamper competition." Wis. Stat. § 133.01.

334.    Plaintiffs purchased beef within the State of Wisconsin during the Class

Period. But for defendants' conduct set forth herein, the price per pound of beef would

have been lower, in an amount to be determined at trial.

335.    Under Wisconsin law, indirect purchasers have standing under the antitrust

provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in

this Complaint. Wis. Stat. 133.18(a).

336.    Defendants contracted, combined or conspired in restraint of trade or

commerce of beef, and monopolized or attempted to monopolize the trade or commerce

of beef, with the intention of injuring or destroying competition therein, in violation of

Wis. Stat. § 133.01, *et seq*.

337.    Plaintiffs and members of the Wisconsin Class were injured with respect to

purchases of beef in Wisconsin in that the actions alleged herein substantially affected the

people of Wisconsin, with at least thousands of consumers in Wisconsin paying

substantially higher prices for defendants' beef in Wisconsin.

338.    Accordingly, plaintiffs and members of the Wisconsin Class are entitled to

all forms of relief, including actual damages, treble damages, costs and reasonable

attorneys' fees, and injunctive relief.

339.    Defendants' and their co-conspirators' anticompetitive activities have

directly, foreseeably and proximately caused injury to the Wisconsin Class. Their injuries

consist of: (1) being denied the opportunity to purchase lower-priced beef from

defendants, and (2) paying higher prices for defendants' beef than they would have in the

absence of defendants' conduct. These injuries are of the type of the laws of Wisconsin

were designed to prevent, and flow from that which makes defendants' conduct unlawful.

340.    Defendants are jointly and severally liable for all damages suffered by

plaintiffs and members of the Wisconsin Class.

## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

341.    Plaintiffs incorporate by reference the allegations in the preceding

paragraphs.

342.    The following claims for relief are pled under the consumer protection or

similar laws of each jurisdiction identified below, on behalf of the indicated class.

## TWENTY-SEVENTH CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. (THE "UCL")
### (ON BEHALF OF THE CALIFORNIA CLASS)

343.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

344.    The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq.* of California Business and Professions Code.

345.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

346.    This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated the UCL.

347.    The defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

348.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of

- 95 -

California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

349.   Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

350.   The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

351.   The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiffs and the members of the California Class to pay supra-competitive and artificially inflated prices for beef sold in the State of California. Plaintiffs and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

352.   As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Plaintiffs and the members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

## TWENTY-EIGHTH CLAIM FOR RELIEF
## VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT,
## D.C. CODE § 28-3901, *ET SEQ.*
## (ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)

353.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

354.    Plaintiffs and members of the District of Columbia Class purchased beef for personal, family, or household purposes.

355.    By reason of the conduct alleged herein, defendants have violated D.C. Code § 28-3901, *et seq.*

356.    Defendants are "merchants" within the meaning of D.C. Code § 28-3901(a)(3).

357.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Beef market, a substantial part of which occurred within the District of Columbia.

358.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Beef Market.

359.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

360.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

- 97 -

361.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the District of Columbia Class have been injured in their business or property and are threatened with further injury.

362.    By reason of the foregoing, plaintiffs and members of the District of Columbia Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

**TWENTY-NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. § 501.201(2), *ET SEQ.***
**(ON BEHALF OF THE FLORIDA CLASS)**

363.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

364.    The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

365.    The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

- 98 -

366.    A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

367.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

368.    Plaintiffs purchased beef within the State of Florida during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

369.    Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Florida.

370.    Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for beef, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2008 and continuing through the date of this filing.

371.    Accordingly, defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

372.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

373.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for beef and are threatened with further injury.

374.    By reason of the foregoing, plaintiffs and the members of the Florida Class is entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

### THIRTIETH CLAIM FOR RELIEF
### VIOLATION OF THE HAWAII REVISED STATUTES ANNOTATED §§ 480-1, *ET SEQ.*
### (ON BEHALF OF HAWAII CLASS)

375.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

376.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

377.    Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) beef prices were, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) plaintiffs and members of the Hawaii Class were deprived of free and open competition; and (4) plaintiffs and members of the Hawaii Class paid supra-competitive, artificially inflated prices for beef.

- 100 -

378.   During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

379.   As a direct and proximate result of Defendants' unlawful conduct, plaintiffs and members of the Hawaii Class have been injured and are threatened with further injury.

## THIRTY-FIRST CLAIM FOR RELIEF
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN. 505/10A, *ET SEQ.* (ON BEHALF OF THE ILLINOIS CLASS)

380.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

381.   By reason of the conduct alleged herein, defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

382.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Illinois.

383.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

384.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

385.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the classes.

386.    Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

387.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Illinois Class were actually deceived and have been injured in their business or property and are threatened with further injury.

388.    By reason of the foregoing, plaintiffs and members of the Illinois Class are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*

## THIRTY-SECOND CLAIM FOR RELIEF
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS CH. 93A § 1, *ET SEQ.* (ON BEHALF OF THE MASSACHUSETTS CLASS)

389.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

390.    Plaintiffs reserve their right to bring a claim under Mass. Gen. Laws Ch. 93A *et seq.* Pursuant to Mass. Gen. Laws Ch. 93A § 9, plaintiffs served all defendants on April 26, 2019, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters explained the unfair acts, the injury suffered, and requested relief from the defendants within 30 days. If necessary, plaintiffs will amend to add specific claims under Mass. Gen. Laws Ch. 93A *et seq.*

- 102 -

## THIRTY-THIRD CLAIM FOR RELIEF
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT, MICH. COMP. LAWS ANN. § 445.901, *ET SEQ.* (ON BEHALF OF THE MICHIGAN CLASS)

391.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

392.    By reason of the conduct alleged herein, defendants have violated Mich. Comp. Laws Ann. § 445.901, *et seq.*

393.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Michigan.

394.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Michigan.

395.    Defendants' conduct was conducted with the intent to deceive Michigan consumers regarding the nature of defendants' actions within the stream of Michigan commerce.

396.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Michigan.

397.    Defendants' conduct misled consumers, withheld material facts, and took advantage of plaintiffs and members-of-the-classes' inability to protect themselves.

398.    Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

399.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Michigan Class have been injured in their business or property and are threatened with further injury.

400.    By reason of the foregoing, plaintiffs and the Michigan Class are entitled to seek all forms of relief available under Mich. Comp. Laws Ann. § 445.911.

**THIRTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT,**
**MINN. STAT. § 325F.68, *ET SEQ*.**
**(ON BEHALF OF THE MINNESOTA CLASS)**

401.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

402.    By reason of the conduct alleged herein, defendants have violated Minn. Stat. § 325F.68, et seq.

403.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

404.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the beef market.

405.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

- 104 -

406.    Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

407.    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

408.    Defendants' conduct was willful.

409.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

410.    By reason of the foregoing, plaintiffs and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.

### THIRTY- FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1970, MONT. CODE, §§ 30-14-103, *ET SEQ.*, AND §§ 30-14-201, *ET. SEQ.* (ON BEHALF OF THE MONTANA CLASS)

411.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

412.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*

- 105 -

413.    Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Montana; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) plaintiffs and members of the Montana Class were deprived of free and open competition; and (4) plaintiffs and members of the Montana Class paid supra-competitive, artificially inflated prices for beef.

414.    During the Class Period, defendants' illegal conduct substantially affected Montana commerce and consumers.

415.    As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Montana Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et seq.*, and, accordingly, plaintiffs and members of the Montana Class seek all relief available under that statute.

## THIRTY-SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT, NEB. REV. STAT. § 59-1602, *ET SEQ*. (ON BEHALF OF THE NEBRASKA CLASS)

416.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

417.    By reason of the conduct alleged herein, defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

418.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Nebraska.

419.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

420.    Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of defendants' actions within the stream of Nebraska commerce.

421.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

422.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the Nevada Class's ability to protect themselves.

423.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

424.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

425.    By reason of the foregoing, plaintiffs and members of the Nebraska Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59- 1614.

- 107 -

## THIRTY-SEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT, NEV. REV. STAT. § 598.0903, *ET SEQ*.
## (ON BEHALF OF THE NEVADA CLASS)

426.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

427.    By reason of the conduct alleged herein, defendants have violated Nev. Rev. Stat. § 598.0903, *et seq.*

428.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

429.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

430.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

431.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

432.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

433.    Defendants' conduct was willful.

- 108 -

434.    As a direct and proximate cause of defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

435.    By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

### THIRTY-EIGHTH CLAIM FOR RELIEF
### VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT, N.H. REV. STAT. ANN. TIT. XXXI, § 358-A, *ET SEQ.* (ON BEHALF OF THE NEW HAMPSHIRE CLASS)

436.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

437.    By reason of the conduct alleged herein, defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq*.

438.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within New Hampshire.

439.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

440.    Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of defendants' actions within the stream of New Hampshire commerce.

441.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

442.    Defendants' conduct was willful and knowing.

443.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the New Hampshire Class's ability to protect themselves.

444.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

445.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

446.    By reason of the foregoing, plaintiffs and the members of the New Hampshire Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

## THIRTY-NINTH CLAIM FOR RELIEF
### VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-3, *ET SEQ*. (ON BEHALF OF THE NEW MEXICO CLASS)

447.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

448.    By reason of the conduct alleged herein, defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

449.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within New Mexico.

450.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

451.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

452.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the New Mexico Class.

453.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

454.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico Class members and the price paid by them for beef as set forth in N.M. Stat. Ann. § 57-12-2E.

455.    Defendants' conduct was willful.

456.     As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

457.     By reason of the foregoing, plaintiffs and members of the New Mexico Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

**FORTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT,**
**N.C. GEN. STAT. § 75-1.1,** *ET SEQ.*
**(ON BEHALF OF THE NORTH CAROLINA CLASS)**

458.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

459.     By reason of the conduct alleged herein, defendants have violated N.C. Gen. Stat. § 75-1.1, *et seq.*

460.     Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within North Carolina.

461.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

462.     Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

010808-11 1120636 V1

463.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the North Carolina Class.

464.    Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

465.    Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

466.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

467.    By reason of the foregoing, plaintiffs and the members of the North Carolina Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 7516.

## FORTY-FIRST CLAIM FOR RELIEF
## VIOLATION OF THE NORTH DAKOTA UNFAIR TRADE PRACTICES LAW, N.D. CENT. CODE § 51-10, *ET SEQ*.
## (ON BEHALF OF THE NORTH DAKOTA CLASS)

468.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

469.    By reason of the conduct alleged herein, defendants have violated N.D. Cent. Code § 51-10-01, et seq.

470.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

471.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within North Dakota, for the purpose of controlling, fixing, or maintaining prices in the beef market.

472.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Dakota.

473.    Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

474.    Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

475.    Defendants' conduct was willful.

476.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

477.    By reason of the foregoing, plaintiffs and the members of the North Dakota Class are entitled to seek all forms of relief, including damages and injunctive relief under N.D. Cent. Code § 51-10-06.

## FORTY-SECOND CLAIM FOR RELIEF
### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT, OR. REV. STAT. § 646.605, *ET SEQ.* (ON BEHALF OF THE OREGON CLASS)

478.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

479.    By reason of the conduct alleged herein, defendants have violated Or. Rev. Stat. § 646.608, *et seq.*

480.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Oregon.

481.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

482.    Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of defendants' actions within the stream of Oregon commerce.

483.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

484.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs' and members of the Oregon Class's ability to protect themselves.

485.    Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

486.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Oregon Class have been injured in their business or property and are threatened with further injury.

487.    By reason of the foregoing, plaintiffs and the members of the Oregon Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

488.    Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, with the filing of this action, a copy of this Complaint is being served upon the Attorney General of Oregon.

### FORTY-THIRD CLAIM FOR RELIEF
### VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,
### R.I. GEN. LAWS § 6-13.1-1, *ET SEQ*.
### (ON BEHALF OF THE RHODE ISLAND CLASS)

489.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

490.    By reason of the conduct alleged herein, defendants have violated R.I. Gen Laws § 6-13.1-1, *et seq.*

491.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

492.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of

- 116 -

which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the beef market.

493.   Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

494.   Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

495.   Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

496.   Defendants' conduct was willful.

497.   Defendants deliberately failed to disclose material facts to plaintiffs and members of the Rhode Island Class concerning defendants' unlawful activities, including the horizontal conspiracy and artificially-inflated prices for beef.

498.   Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of beef, constitutes information necessary to plaintiffs and members of the Rhode Island Class relating to the cost of beef purchased.

499.   Plaintiffs and members of the Rhode Island class purchased goods, namely beef, primarily for personal, family, or household purposes.

500.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

501.   By reason of the foregoing, plaintiffs and the members of the Rhode Island Class are entitled to seek all forms of relief, including actual damages or $200 per

- 117 -

violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen

Laws § 6-13.1-5.2.

## FORTY-FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT,
## S.C. CODE ANN. §§ 39-5-10, *ET SEQ.*
## (ON BEHALF OF THE SOUTH CAROLINA CLASS)

502.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this Complaint.

503.   By reason of the conduct alleged herein, defendants have violated S.C.

Code Ann. §§ 39-5-10.

504.   Defendants have entered into a contract, combination, or conspiracy

between two or more persons in restraint of, or to monopolize, trade or commerce in the

beef market, a substantial part of which occurred within South Carolina.

505.   Defendants established, maintained, or used a monopoly, or attempted to

establish a monopoly, of trade or commerce in the beef market, for the purpose of

excluding or limiting competition or controlling or maintaining prices, a substantial part

of which occurred within South Carolina.

506.   Defendants' conduct was conducted with the intent to deceive South

Carolina consumers regarding the nature of defendants' actions within the stream of

South Carolina commerce.

507.   Defendants' conduct was unfair or deceptive within the conduct of

commerce within the State of South Carolina.

508.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs' and members of the South Carolina Class's ability to protect themselves.

509.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

510.    Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as nearly all members of the public purchase and consume beef.

## FORTY-FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW, S.D. CODIFIED LAWS § 37-24, *ET SEQ.* (ON BEHALF OF THE SOUTH DAKOTA CLASS)

511.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

512.    By reason of the conduct alleged herein, defendants have violated S.D. Codified Laws § 37-24-6.

513.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

514.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within South Dakota, for the purpose of controlling, fixing, or maintaining prices in the beef market.

- 119 -

515.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

516.    Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

517.    Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

518.    Defendants' conduct was willful.

519.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.

520.    By reason of the foregoing, plaintiffs and the members of the South Dakota Class are entitled to seek all forms of relief, including actual damages and injunctive relief under S.D. Codified Laws § 37-24-31.

**FORTY-SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT,**
**UTAH CODE ANN. §§ 13-11-1, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

521.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

522.    By reason of the conduct alleged herein, defendants have violated Utah Code Ann. §§ 13-11-1, *et seq*.

523.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Utah.

524.    Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11-3.

525.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

526.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

527.    Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions.

528.    Defendants knew or had reason to know that their conduct was unconscionable.

529.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the Utah Class.

530.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

531.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

532.    By reason of the foregoing, plaintiffs and the members of the Utah Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

**FORTY-SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH UNFAIR PRACTICES ACT,**
**UTAH CODE ALL. §§ 13-5-1, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

533.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

534.    By reason of the conduct alleged herein, defendants have violated Utah Code Ann. §§ 13-5-1, *et seq*.

535.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Utah.

536.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

537.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

538.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

- 122 -

539.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

540.   By reason of the foregoing, plaintiffs and the members of the Utah Class are entitled to seek all forms of relief, including actual damages or $2000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, et seq.

## FORTY-EIGHTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

541.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

542.   As a result of their unlawful conduct described above, defendants have and will continued to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of beef.

543.   Under common law principles of unjust enrichment, defendants should not be permitted to retain the benefits conferred on them by overpayments by plaintiffs and members of the classes in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

010808-11 1120636 V1

## X.      REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the classes of all others so similarly situated, respectfully requests judgment against defendants as follows:

544.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

545.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

546.    Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of plaintiffs and the members of the Classes be entered against defendants in an amount to be trebled to the extent such laws permit;

547.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

548.    Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

549.    Plaintiffs and the members of the classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

550.    Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

551.    Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

552.    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

- 125 -

Dated: April 26, 2019

HAGENS BERMAN SOBOL SHAPIRO LLP

By:   s/ Steve W. Berman
     STEVE W. BERMAN
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Shana E. Scarlett
Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

s/ Brian D. Clark
W. Joseph Bruckner (MN #0147758)
Elizabeth R. Odette (MN #0340698)
Brian D. Clark (MN #0390069)
Arielle S. Wagner (MN #0398332)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T:  (612) 339-6900
F:  (612) 339-0981
wjbruckner@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com

Karl L. Cambronne, #14321
Bryan L. Bleichner, #0326689
Jeffrey D. Bores, #227699
17 Washington Avenue North, Suite 300
Minneapolis, MN 55401
(612) 339-7300
kcambronne@chestnutcambronne.com
bbleichner@chestnutcambronne.com
jbores@chestnutcambronne.com

*Counsel for Plaintiffs and the Proposed Indirect Purchaser Classes*

- 127 -