# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

KENNETH PETERSON, RICHARD
KIMBLE, SHARON DAWSON-GREEN,
LISA MELEGARI, CINDY
ABERNATHY, ANDREW COHEN,
MARCELO LOPEZ, TANYA LEWIS,
NICOLE GUTIERREZ, SHARON
KILLMON, KAREN CARTER, CHARLIE
MORGAN, BRENT RASMUSSEN, APRIL
O'CONNOR, KENT WINCHESTER,
BRENDA KING, CHOR LONG,
MICHELLE OVERSEN, WILLIAM GEE,
and JACQUELYN WATSON.

                        Plaintiffs,

      v.

JBS USA FOOD COMPANY HOLDINGS,
TYSON FOODS, INC., CARGILL, INC.,
and NATIONAL BEEF PACKING
COMPANY,

                    Defendants.

Case No. 0:19-cv-01129-JRT-HB

**SECOND AMENDED CLASS
ACTION COMPLAINT**

**<u>DEMAND FOR JURY TRIAL</u>**

544430.1

# TABLE OF CONTENTS

**Page**

I.   NATURE OF ACTION .................................................................................. 1

II.  JURISDICTION AND VENUE ................................................................... 14

III. PARTIES .................................................................................................... 16

    A.   Plaintiffs ........................................................................................... 16

    B.   Defendants ........................................................................................ 20

IV.  THE MEATPACKING DEFENDANTS CONSPIRED TO ELEVATE THEIR
    MARGINS BY DEPRESSING THE PRICE THAT THEY PAID TO ACQUIRE
    CATTLE ...................................................................................................... 21

    A.   Industry Background ......................................................................... 22

    B.   The Meatpacking Defendants coordinated to reduce output, elevate their
        margins, and suppress the prices paid to beef farmers..................... 25

        1.   The Meatpacking Defendants agreed to reduce their slaughter numbers
            so as to reduce beef output. .................................................. 26

        2.   The Meatpacking Defendants agreed to reduce slaughter capacity by
            closing or idling slaughter plants ......................................... 31

        3.   The Meatpacking Defendants agreed to limit their purchase of cash
            cattle. ..................................................................................... 35

        4.   The Meatpacking Defendants coordinated their procurement operations
            for cash-cattle purchases. ..................................................... 38

        5.   The Meatpacking Defendants continued to import foreign cattle after it
            became uneconomical for them to do so. ............................... 43

V.   THE MEATPACKING DEFENDANTS REPORTED RECORD MARGINS AFTER
    THE START OF THEIR COLLUSIVE ACTIVITY .................................. 45

    A.   The Meatpacking Defendants' scheme began to impact prices in 2015. .......... 45

    B.   Prior to 2015, the profits for the Meatpacking Defendants were low. .............. 49

    C.   Starting in 2015, the margins for the Meatpacking Defendants soared. .......... 50

    D.   Tyson and JBS attributed their record 2017 & 2018 profits to their visibility
        into the beef supply chain. ................................................................ 52

E.      After a recent plant closure, Tyson, JBS, Cargill, and National Beef drastically decreased cattle prices, while increasing beef prices. ........................................ 54

VI.     THE STRUCTURE OF THE BEEF PACKER INDUSTRY IS CONDUCIVE TO THE CONSPIRACY ............................................................................................... 57

        A.      The beef meatpacking industry was highly concentrated. ............................... 57

        B.      The beef packer market featured high barriers to entry. .................................. 61

        C.      Beef is a commodity product. .......................................................................... 61

        D.      The beef meatpacking market featured unusual market share stability during the relevant period. ......................................................................................... 62

        E.      The demand for beef is inelastic. ................................................................... 64

        F.      Abnormal pricing during the Class Period demonstrates the success of the collusive scheme. ........................................................................................... 65

        G.      Overcharges due to the cartel were passed through to the indirect purchaser class. ............................................................................................................. 66

        H.      The elevation in processor margins during the Class Period is not explained by changes in export levels or international demand for beef. ............................. 70

        I.      The Meatpacking Defendants had numerous trade organizations and opportunities to meet and collude. .................................................................. 72

        J.      The Meatpacking Defendants have significant oversight of each other's prices and production decisions. ................................................................................ 74

        K.      The Meatpacking Defendants actively concealed the conspiracy. .................. 76

        L.      The Meatpacking Defendants' conspiracy continues through the present. ...... 84

VII.    CLASS ACTION ALLEGATIONS ............................................................................. 85

VIII.   ANTITRUST INJURY ................................................................................................ 91

IX.     CAUSES OF ACTION ............................................................................................... 93

X.      REQUEST FOR RELIEF .......................................................................................... 152

XI.     JURY TRIAL DEMANDED ...................................................................................... 154

Plaintiffs bring this action on behalf of themselves individually and on behalf of a plaintiff class consisting of all persons and entities who purchased beef indirectly from a defendant or co-conspirator for personal use in the United States from at least January 1, 2015 until the present (Class Period). Plaintiffs bring this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment common laws of the several states against defendants, and demand a trial by jury.

## I.     NATURE OF ACTION

1.      The defendants in this case (at times referred to in this complaint as the Meatpacking Defendants) are the largest meatpacking companies in the world and the leading processors of approximately $100 billion in annual commerce in the retail beef industry. These defendants entered into a conspiracy to maximize profits from the distribution channel of beef—by both extracting all gains from the ranchers who raised the cattle, as well as artificially inflating the price of beef being sold to the consumer. The defendants engaged in a concerted scheme to suppress throughput of beef, artificially depressing both the amount of cattle they purchased and the amount of processed beef they sold to retail operations. The purpose of the scheme was to lower throughput of beef supply and thus maximize the margins they received from sale of beef. The result of the scheme was that the defendants underpaid the farmers by artificially depressing demand for cattle and thus lowering press, and simultaneously overcharged consumers by reducing their output of beef and thus inflating consumer prices.

2.     Defendants' scheme was successful, in part, because of the structure of the beef industry. The slaughter and packing of beef is an essential part of the beef supply chain. A small number of meatpackers—the Meatpacking Defendants—control this crucial step of the distribution chain. The Meatpacking Defendants purchase fed cattle from farmers, process them into beef, and then sell the beef to retailers. Defendants and their co-conspirators collectively control over 70 percent of the wholesale beef market.

3.     An industry insider familiar with the operations of the Meatpacking Defendants stated that the "beef industry is very unique." According to insiders, much of the business operations for the beef industry operate in a "gray area" and that "**meat works like the mafia**." The business operations of the Meatpacking Defendants are intertwined because, due to vertical integration into various stages of the distribution stages of beef, the Meatpacking Defendants frequently sell meat to each other which is then processed for retail sale. The result is that "someone may be a competitor but also a customer." Given these frequent interactions, executives at companies in the Meatpacking Industry "all know each other."

4.     The Meatpacking Defendants, Cargill, Inc., JBS USA, Tyson Foods, Inc., and National Beef Packing Company entered into a conspiracy from at least 2015 to the present to fix, raise, maintain and stabilize the price of beef.[1] Defendants collectively purchase nearly 85% of the fed cattle market. The principal (but not exclusive) method by which defendants implemented and executed their conspiracy was by coordinating on

---

[1] For the purposes of this complaint, beef includes beef meat purchased fresh or frozen.

collusive conduct that depressed the price, and thus future supply, of cattle that they purchased while continuing to maintain an elevated price at which they sold beef to retail operations. As alleged in this complaint, as long as they act in concert with one another, the Meatpacking Defendants have a shared incentive to reduce the amount of beef that they procure, because this artificial restriction on their collective demand for fed cattle will lead to reduced prices that each one must pay for fed cattle. The Meatpacking Defendants increase their profits by widening the spread between the price that they pay for cattle and the price at which they sell beef. The basics of supply and demand mean that if there is less beef produced by all Meatpacking Defendants because of their artificially lowered demand for fed cattle, then there will be a higher price for beef sold to consumers and other purchasers. The Meatpacking Defendants reap increased profits while both the cattle ranchers and consumers are harmed.

5.      Beginning in 2015, the beef market saw a marked change in pricing practices. Before 2015, the prices of cattle and beef moved in tandem. This is a natural relationship because beef is simply cattle that has been processed for sale. After 2015, and during the conspiracy, this fundamental economic relationship was severed. From 2015 through 2018, the price of cattle declined significantly while the price of beef remained elevated. As starkly demonstrated in the following chart, around 2015, the price of live cattle declined (the orange line), while the retail price being charged to consumers (the blue bars) remained inflated, and unlike in prior years, almost completely unrelated to the price of live cattle:



6.  While the Meatpacking Defendants reaped billions of dollars in profits, consumers suffered financial harm. In a functioning market, lower cattle prices would lead to lower beef prices. But, as discussed below, the econometric evidence indicates the Meatpacking Defendants agreed not to compete on the price of beef because during the period of anticompetitive activity, beef prices became severed from underlying cattle prices. Unlike the period prior to the conspiracy, at several points during the class period, the relationship between cattle and beef prices actually inverted – with beef prices rising even as cattle prices fell. Furthermore, the actions of the Defendants artificially reduced demand for cattle, reducing future supply of cattle, and thus elevating prices of beef.. Prior to the conspiracy, the U.S. Department of Justice (DOJ) recognized that when the beef market is functioning competitively, there is a strong relationship between the supply of

cattle and the price being charged to consumers (the pass-through of the overcharge). The

DOJ has stated that:

> [A]ll else being equal, when the meat packing industry reduces
> production levels, feedlots and cattle producers are paid less
> for fed cattle because fewer fed cattle are demanded and
> customers pay more for [beef] because less is available for
> purchase. Because the supply of fed cattle and demand for
> [beef] are relatively insensitive to short-term changes in price,
> even small changes in industry production levels can
> significantly affect packer profits.

In fact, as the United States pointed out in 2008, concern over anticompetitive conduct by

beef processors that harmed both cattle ranchers and beef consumers was a leading driver

for the initial passage of the Sherman Act.[2]

7.      The anticompetitive actions of the defendants were successful in severing the

relationship between cattle and beef prices. As shown in the following chart, prior to the

conspiracy, cattle and beef prices were closely correlated to each other:

---

[2] *See* Note by the United States, pg. 1 Roundtable on Monopsony and Buyer Power,
October 13, 2008 ("The 1890 debates in both houses of the United States Congress
demonstrated concern with the exercise of market power on both the buying and selling
sides of the market. Many legislators singled out large meat packers for condemnation, and
they were condemned as much for reducing the prices paid to cattle farmers as for raising
prices to consumers. In response, Congress passed the Sherman Act, "aimed at preserving
free and unfettered competition as the rule of trade." "The Act is comprehensive in its terms
and coverage, protecting all who are made victims of the forbidden practices by whomever
they         may         be         perpetrated.")         (*available         at*
https://www.ftc.gov/sites/default/files/attachments/us-submissions-oecd-and-other-
international-competition-fora/monopsony.pdf).



8.      After the start of the anticompetitive activity in 2015, the strong relationship between cattle and beef prices disappeared as a result of the anticompetitive actions of the defendants. This econometric evidence indicates an agreement among defendants not to compete on price in the beef market. As shown in the following chart, cattle and beef prices had almost no relationship to each other between January 2016 and February 2019:



9.      As shown in the below chart, during certain periods of time from 2015-2018, the relationship between cattle and beef prices inverted. This is an expected economic consequence of a conspiracy by the Meatpacking Defendants to reduce throughput—artificially reducing both the supply of cattle they purchase and the supply of beef that they sell to retail operations—because the supply reductions on both end of the beef supply chain cause both a reduction in the number of cattle and an elevation in the retail price of beef:



10.    Tyson, JBS, Cargill, and National Beef each engaged in periodic and parallel slaughter reductions since 2015. As shown in the below chart,[3] each Meatpacking Defendant reduced its respective annual slaughter volume relative to the pre-Class Period for which data exists. However, other U.S. beef packers—i.e., independent regional packing businesses—increased their slaughter volume as a whole during the same time period.

---

[3] CBW Top 30 Beef Packers; 2017 Meat & Poultry Facts, at 11.



11.    The annual slaughter volumes for each Meatpacking Defendant was lower for each year in the Class Period compared to their pre-2015 averages. The below chart[4] shows the Meatpacking Defendants' and the other U.S. beef packers' annual slaughter volumes pre-2015 and post-2015—but broken out by year for each year of the Class Period for which data is available. Again, the below chart shows the Meatpacking Defendants' annual slaughter volumes were lower than pre-2015 averages. And, although Tyson, JBS, Cargill, and National Beef each increased its slaughter volume during the Class Period, the below chart shows independent regional packing businesses had much higher rates of slaughter volume increases during the same period.

_____

    [4] CBW Top 30 Beef Packers; 2017 Meat & Poultry Facts, at 11.



12.     As shown in the above figures, each Defendant slashed its fed cattle slaughter levels in 2015, and then maintained artificially low slaughter levels throughout the remainder of the Class Period.

13.     In any market, economic theory predicts it may be more profitable for an industry to produce a smaller amount of output. There are two reasons for this: (1) the industry is able to buy from the subset of suppliers who are able to tolerate lower prices, and (2) the industry is able to sell their output to the subset of consumers that are able to tolerate a higher price. Upstream producers and downstream consumers both lose out as overall level of throughput is constricted – sellers are underpaid as if there were a glut, while buyers pay a premium as if there were a shortage. The market may eventually adjust to this situation, as suppliers go out of business and consumers learn to pay more or live

with less, but the long-term effect is inevitably a smaller industry and a worse-off consumer. Courts recognize such markets harm both producers, here, the cattle ranchers, and the end user consumers, because they lead to higher consumer prices, suboptimal output of the product, reduced product quality, and the substitution of less efficient alternative products.[5]

14.     The econometric data showing the suppression of cattle prices and the maintenance of retail prices for beef from 2015 to the present is indicative of the same underlying agreement to reduce throughput. Indeed, as the econometric evidence shows, the defendant's anti-competitive conspiracy to restrain beef output had consequences both for cattle feeders and consumers. The sharp drop in the price of fed cattle from 2015 onwards reflects a pent-up supply of cows that packers were not slaughtering, while the unexpectedly high retail price reflects a relative undersupply of beef in the consumer market. By 2016, even though cattle prices had generally been pushed back down to pre-2014/2015 levels, consumers were still paying inflated retail prices as if it were the height of the cattle price spike. Because no packer was willing "break ranks" and increase throughput, connecting the oversupply of fed cattle to the unmet consumer demand for beef, the packer cartel was able to maintain its unprecedented margins.

15.     Under competitive conditions, however, an industry is prevented from intentionally restricting its production levels in this way because competitors will pick up the slack. A company willing to operate at a tight margin can out-produce and undercut a

---

[5]*Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1232 (10th Cir. 2007).

company that is not, bringing a larger quantity of less expensive goods to the benefit of both consumers and suppliers. The degree to which competing companies can both agree between themselves about the degree to which they will restrain their throughput, and the degree to which all are able to verify that the others are holding to the agreement, is directly proportional to their ability to keep margins high over a long period of time. In short, information sharing regarding present and future plans is a critical ingredient for a successful agreement between competitors to restrain throughput.

16.     Following the collusive scheme by the Meatpacking Defendants to suppress cattle prices, the operating margins of the beef packers steadily grew from 2016 to 2018. By the end of 2018, Tyson and JBS, the two publicly traded beef packers, were reporting record operating margins in their beef business. For example, in 2018, Tyson reported operating margins for its beef business of 7 percent, now above its margin for poultry of 6 percent. Similarly, in the second quarter of 2018, JBS reported margins of 10.2 percent for its beef business, significantly higher than its margin of 7.2 percent for its pork business.

17.     Confidential witness accounts confirm the existence of the Meatpacking Defendants' collusive scheme.  For example, a confidential witness previously employed by a Meatpacking Defendant ("Witness 1") has confirmed that Tyson, JBS, Cargill, and National Beef each expressly agreed to periodically reduce its respective purchase and slaughter volumes in order to reduce the prices they would otherwise pay for fed cattle during the Class Period.

18.     In addition, there are numerous "plus factors" in the beef industry during the Class Period, including but not limited to multiple industry characteristics which facilitate

collusion, such as high barriers to entry, high beef industry consolidation and concentration, inelastic supply and demand, unusual market share stability, and a homogenous product. These plus factors add plausibility to plaintiffs' allegations of a price fixing scheme.

19.    Defendants' coordination caused plaintiffs to pay artificially elevated prices for beef. Beginning in 2015, the earnings of the Meatpacking Defendants began to increase, as they took an increasing amount of the profits available in the beef industry. In the two years between 2015 and 2017, the average farm value of cattle dropped by 29 percent from its pre-2015 peak value. In contrast to earlier years, however, the relationship between cattle prices and beef prices became severed, as the retail price of beef only dropped around 6 percent. As shown in the below chart, the beef packers have nearly doubled their share

of revenues from consumer spending on beef over the relevant time period:



20.     As a result of defendants' unlawful conduct, plaintiffs and the classes paid artificially inflated prices for beef during the Class Period. Such prices exceeded the amount they would have paid if the price for beef had been determined by a competitive market. Thus, plaintiffs and class members were injured by defendants' conduct.

## II.     JURISDICTION AND VENUE

21.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure injunctive relief against defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs also bring these state law class claims on behalf of all the classes to recover actual and/or compensatory damages, double and treble damages as permitted, pre- and post-judgment interest, costs, and attorneys' fees for the injury caused

by defendants' conduct in restricting the supply of beef and increasing the price of beef. Plaintiffs seek damages in excess of $5,000,000. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

22.     Venue is appropriate in this District under 28 U.S.C. § 1391(b), (c) and (d) because one or more defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

23.     This Court has personal jurisdiction over each defendant because, *inter alia*, each defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of beef throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

24.     The activities of the defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on, the foreign and interstate commerce of the United States.

## III.    PARTIES

**A.    Plaintiffs**

25.    Plaintiff Kenneth Peterson is a resident of Nevada and citizen of the United States. During the Class Period and while residing in Nevada, plaintiff Peterson indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Peterson suffered injury as a result of defendants' conduct alleged herein.

26.    Plaintiff Richard Kimble is a resident of Wisconsin and citizen of the United States. During the Class Period and while residing in Wisconsin, plaintiff Kimble indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Kimble suffered injury as a result of defendants' conduct alleged herein.

27.    Plaintiff Sharon Dawson-Green is a resident of Missouri and citizen of the United States. During the Class Period and while residing in Missouri, plaintiff Dawson-Green indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Dawson-Green suffered injury as a result of defendants' conduct alleged herein.

28.    Plaintiff Lisa Melegari is a resident of Florida and citizen of the United States. During the Class Period and while residing in Florida, plaintiff Melegari indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Melegari suffered injury as a result of defendants' conduct alleged herein.

29.     Plaintiff Cindy Abernathy is a resident of Utah and citizen of the United States. During the Class Period and while residing in Florida, plaintiff Abernathy indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Abernathy suffered injury as a result of defendants' conduct alleged herein.

30.     Plaintiff Andrew Cohen is a resident of Arizona and citizen of the United States. During the Class Period and while residing in Arizona, plaintiff Cohen indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators.  Plaintiff Cohen suffered injury as a result of defendants' conduct alleged herein.

31.     Plaintiff Marcelo Lopez is a resident of California and citizen of the United States. During the Class Period and while residing in California, plaintiff Lopez indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators.  Plaintiff Lopez suffered injury as a result of defendants' conduct alleged herein.

32.     Plaintiff Tanya Lewis is a resident of Hawaii and citizen of the United States. During the Class Period and while residing in Hawaii, plaintiff Lewis indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators.  Plaintiff Lewis suffered injury as a result of defendants' conduct alleged herein.

33.     Plaintiff Nicole Gutierrez is a resident of Illinois and citizen of the United States. During the Class Period and while residing in Illinois, plaintiff Gutierrez indirectly

purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators.  Plaintiff Gutierrez suffered injury as a result of defendants' conduct alleged herein.

34.    Plaintiff Sharon Killmon is a resident of Iowa and citizen of the United States. During the Class Period and while residing in Iowa, plaintiff Killmon indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators.  Plaintiff Killmon suffered injury as a result of defendants' conduct alleged herein.

35.    Plaintiff Karen Carter is a resident of Massachusetts and citizen of the United States. During the Class Period and while residing in Massachusetts, plaintiff Carter indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators.  Plaintiff Carter suffered injury as a result of defendants' conduct alleged herein.

36.    Plaintiff Charlie Morgan is a resident of Minnesota and citizen of the United States. During the Class Period and while residing in Minnesota, plaintiff Morgan indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators.  Plaintiff Morgan suffered injury as a result of defendants' conduct alleged herein.

37.    Plaintiff Brent Rasmussen is a resident of Montana and citizen of the United States. During the Class Period and while residing in Montana, plaintiff Rasmussen indirectly purchased beef and beef products for his own use and not for resale that were

produced by one or more defendants or their co-conspirators. Plaintiff Rasmussen suffered injury as a result of defendants' conduct alleged herein.

38. Plaintiff April O'Connor is a resident of Nebraska and citizen of the United States. During the Class Period and while residing in Nebraska, plaintiff O'Connor indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff O'Connor suffered injury as a result of defendants' conduct alleged herein.

39. Plaintiff Kent Winchester is a resident of New Mexico and citizen of the United States. During the Class Period and while residing in New Mexico, plaintiff Winchester indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Winchester suffered injury as a result of defendants' conduct alleged herein.

40. Plaintiff Brenda King is a resident of New York and citizen of the United States. During the Class Period and while residing in New York, plaintiff King indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff King suffered injury as a result of defendants' conduct alleged herein.

41. Plaintiff Chong Lor is a resident of North Carolina and citizen of the United States. During the Class Period and while residing in North Carolina, plaintiff Lor indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Lor suffered injury as a result of defendants' conduct alleged herein.

42.     Plaintiff Michelle Oversen is a resident of North Dakota and citizen of the United States. During the Class Period and while residing in North Dakota, plaintiff Oversen indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators.  Plaintiff Oversen suffered injury as a result of defendants' conduct alleged herein.

43.     Plaintiff William Gee is a resident of the District of Columbia and citizen of the United States. During the Class Period and while residing in the District of Columbia, plaintiff Gee indirectly purchased beef and beef products for his own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Gee suffered injury as a result of defendants' conduct alleged herein.

44.     Plaintiff Jacquelyn Watson is a resident of Tennessee and citizen of the United States. During the Class Period and while residing in Tennessee, plaintiff Watson indirectly purchased beef and beef products for her own use and not for resale that were produced by one or more defendants or their co-conspirators. Plaintiff Watson suffered injury as a result of defendants' conduct alleged herein.

**B.      Defendants**

45.     Cargill, Incorporated (Cargill) is a privately held Delaware corporation headquartered in Minnetonka, Minnesota. During the Class Period, Cargill and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

46.     JBS USA Food Company Holdings (JBS USA) is a subsidiary of Brazilian-based JBS SA. JBS Food Company Holdings is a Delaware corporation, headquartered in Greeley, Colorado. JBS USA Food Company Holdings holds a 78.5 percent controlling interest in Pilgrim's Pride Corporation, one of the largest chicken-producing companies in the world. During the Class Period, JBS USA and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

47.     Tyson Foods, Inc. (Tyson) is a publicly traded Delaware corporation headquartered in Springdale, Arkansas. During the Class Period, Tyson and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

48.     National Beef Packing Company (National Beef) is a privately owned Delaware corporation headquartered in Kansas City, Missouri. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

## IV.     THE MEATPACKING DEFENDANTS CONSPIRED TO ELEVATE THEIR MARGINS BY DEPRESSING THE PRICE THAT THEY PAID TO ACQUIRE CATTLE

49.     Starting in at least 2015 and continuing to the present, the Meatpacking Defendants coordinated with each other to increase their margins and thus harm consumers who paid elevated prices for beef as a result. The Meatpacking Defendants' conspiracy to

depress throughput of beef and elevate their margins included anticompetitive activity to depress the prices that they paid to beef ranchers through a variety of coordinated mechanisms.

## A.      Industry Background

50.      The value chain for beef has various components, including ranch and farm grazing operations, feedlot operations, meatpacking operations, and retail operations.

51.      At the first stage, ranch and farm operations are responsible for initially birthing and raising the cattle. There are hundreds of thousands of ranching operations in the United States. The significant majority of these operations are family-owned or individually operated.[6]

52.      At the second stage, feedlot operations take possession of cattle and are responsible for intensive feeding operations that raise the weight of the cattle prior to sale. Once cattle reach between 950 to 1,500 pounds, they are sold to meatpacking operations. These cattle are referred to as fed cattle.

53.      In the third stage, meatpacking operations purchase fed cattle from feedlot operations. The Meatpacking Defendants collectively controlled approximately 75 percent of meatpacking operations in the United States during the relevant period.

54.      Tyson, JBS, Cargill, and National Beef all operate a live cattle procurement team of employees responsible for procurement of fed cattle. The teams feature "field buyers" who are responsible for procurement within specific territories. Feed buyers

---

[6] *Available at* http://www.beefusa.org/beefindustrystatistics.aspx.

negotiate with producers and feedlot operators. Field buyers negotiate directly with the fed cattle producers and their agents within the parameters set by their head buyer.[7]

55.     Tyson, JBS, Cargill, and National Beef each conduct daily meetings, attended by representatives of their respective cattle procurement, plant operations, scheduling, beef sales, and risk management teams, among others, to make decisions regarding their respective cattle and beef operations. Among other matters, the attendees of these meetings will discuss the number of cattle their firms will procure, the terms on which they will be bought, plant scheduling (including slaughter rates), and beef sales strategy.

56.     Tyson, JBS, Cargill, and National Beef each seek to procure sufficient fed cattle to operate its slaughter plants at its chosen utilization rates without interruption. Weekly plant capacity is determined not only by plant size, but by the number and length of shifts run in a given week, and the "chain-speed" at which those shifts are run.[8] Meatpacking Defendants' average cost of production increases if they underutilize their plant capacity.  Thus, it is in the individual interest of each Meatpacking Defendant to make sure that it has timely access to sufficient fed cattle to run its plants efficiently.

57.     Meatpacking operations slaughter the cattle that they purchase and then process the cattle for sale. The cattle is processed into various cuts that is then sold as

---

[7]   Producers commonly delegate authority for marketing their cattle to the commercial feedlot which has fed their cattle or to third-party marketing cooperatives.  A small portion of the fed cattle sales to Meatpacking Defendants also occur at public auctions.

[8]   "Chain-speed" refers to the head per hour rate at which a plant slaughters and fabricates cattle.

"boxed beef" to various retail and foodservice operations. Boxed beef is a commodity product, which means that competition for sales of boxed beef of the same USDA quality and yield grade is primarily on price.

58.     Retail operations purchase processed beef and sell it to retailers or consumers. Retail operations include supermarkets and wholesalers. Retail operations include companies such as Sysco, US Foods, Costco, and Sam's Club.

59.     The supply of fed cattle is insensitive to short term changes of price because of fed cattle's long life cycle and lack of alternative uses. Because beef demand also is relatively insensitive to changes in price, historically the meat margin was highly correlated with changes in the underlying slaughter price. But because of their concerted scheme, the Meatpacking Defendants were able to increase their margins and profitability by artificially suppressing the price they pay for beef while at the same time keeping the retail price of beef elevated.

60.     Fed cattle is sold to processors through two channels: (1) long-term contractual arrangements between processors and suppliers; and (2) individual sales on the spot market.

61.     The Meatpacking Defendants procure the majority of their cattle supply through contractual arrangements with ranch or feedlot operations. The price of cattle under these contracts is usually determined through a price formula that incorporates the price at which cattle are sold in weekly trade on the industry's spot market.

62.     The use of formula contracts that rely on the cash-cattle trade as the price discovery mechanism means that the price that processors pay for fed cattle in the

cash-cattle spot market determines the price of almost all fed cattle purchased by the Meatpacking Defendants.

63.     Formula contracts use a stipulated measure of cash-cattle prices at, or just prior to, the date of delivery. These contracts commonly use a specified average cash price reported by the USDA Agricultural Marketing Service's Livestock Mandatory Reporting summaries.

64.     Tyson, JBS, Cargill, and National Beef use contractual agreements for approximately 70 percent of their supply of fed cattle. The widespread use of these contractual agreements, known as captive supply agreements, has facilitated the ability of the Meatpacking Defendants to suppress cash-cattle prices. Cattle sold through these type of contractual agreements are sometimes referred to as captive cattle.

65.     The Meatpacking Defendants are not as reliant on the cash-cattle trade because they have a guaranteed supply of cattle through their captive supply agreements. Therefore, each Meatpacking Defendant can refuse to participate in procuring cash cattle, thus pushing down the price of both cash cattle and captive cattle whose price is set based on cash-cattle sales.

**B.      The Meatpacking Defendants coordinated to reduce output, elevate their margins, and suppress the prices paid to beef farmers.**

66.     From 2009 to 2014, fed-cattle prices increased significantly with beef prices increasing in tandem. By the beginning of 2015, the Meatpacking Defendants faced low margins as a result of the market dynamics in the cattle and beef market.

67.     On information and belief, at this point in time, Tyson, JBS, Cargill, and National Beef initiated their conspiracy to depress the price they paid for fed cattle while at the same time stabilizing the price at which they sold beef. The Meatpacking Defendants implemented this by, among other ways: (1) agreeing to reduce their slaughter numbers so as to reduce beef output; (2) agreeing to reduce slaughter capacity by closing or idling slaughter plants; (3) agreeing to limit their purchase of cash cattle; (4) coordinating their procurement operations for cash-cattle purchases; ; and (5) continuing to import foreign cattle after it became uneconomical for them to do so.

**1.     The Meatpacking Defendants agreed to reduce their slaughter numbers so as to reduce beef output.**

68.     Tyson, JBS, Cargill, and National Beef started in 2015 to collectively reduce their slaughter volumes in response to rising fed-cattle prices. The purpose of these slaughter reductions was to create a condition of oversupply that would cause ranchers to accept lower cash prices for their cattle, as well as to stabilize the price of beef being paid by consumers. During this period of time, the Meatpacking Defendants shared information about the current and future operations of their processor plants with each other.

69.     As confirmed by Witness 1, each of the Meatpacking Defendants expressly agreed to periodically reduce its respective purchase and slaughter volumes in order to reduce the prices they would otherwise pay for fed cattle during the Class Period.

70.     Witness 1 is a former employee of one of the Meatpacking Defendants ("Defendant 1"). Witness 1 was a quality assurance officer ("QA") at one of Defendant 1's slaughter plants located within the Texas Panhandle / Western Kansas region ("Slaughter

Plant 1" and "Panhandle Region", respectively) for over 10 years until his employment ceased in 2018.

71.     During the Class Period, Witness 1 acted as a head QA and had primary responsibility for the plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, *i.e.*, head, hide, and internal organs removed. The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

72.     Witness 1 learned of the Meatpacking Defendants' collusive purchase and slaughter reduction agreement from another employee in a position to know about the unlawful "agreement": Slaughter Plant 1's head of fabrication ("Fabrication Manager").

73.     Witness 1 reports having multiple discussions with the Fabrication Manager during which the Fabrication Manager explained that all of the Meatpacking Defendants reduced their purchase and slaughter volume in order to reduce fed cattle prices when Meatpacking Defendants viewed fed cattle prices as being or becoming "too high" for their liking. For example, during one conversation, the Fabrication Manager specifically admitted the Meatpacking Defendants had an agreement to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

74.     That conversation occurred sometime in 2015 or early 2016. Witness 1 reports he was in the Fabrication Manager's office when the Fabrication Manager received an angry phone call from his immediate supervisor, who worked out of Defendant 1's central office.

75.     After the call concluded, Witness 1 reports he asked the Fabrication Manager how "many are we [Slaughter Plant 1] cutting [*i.e.*, fabricating]?" Witness 1 reports the Fabrication Manager replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).[9] Witness 1 then reports asking the Fabrication Manager whether other Meatpacking Defendants' plants in the Panhandle Region were also cutting back their kill.  Witness 1 reports he recalls that the Fabrication Manager answered Witness 1's question as follows: "Yes, they are. We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

76.     Witness 1 recalls specifically that the Fabrication Manager used the word "***agreement***" and understood the Fabrication Manager was referring to at least all of the Meatpacking Defendants' plants in the Panhandle Region, namely Tyson Amarillo, Texas; JBS Cactus, Texas; Cargill Friona, Texas; and National Beef, Liberal, Kansas. Each of these plants provides a significant portion of each Meatpacking Defendants' fed cattle slaughter capacity (at least 20% in the case of each Meatpacking Defendant).

77.     Witness 1 is certain the Fabrication Manager intended to convey that all of the Meatpacking Defendants were reducing their slaughter volumes by agreement in response to high prices, and was not simply commenting on the fact that one or some of the Meatpacking Defendants had independently decided to do so.

---

[9]     Witness 1 reports that there was typically a lag between the commencement of a slaughter reduction and the reduction of fabrication activities. Among other reasons, this reflected the fact that Slaughter Plant 1's fabrication team had to continue to process the carcasses that were already hanging in the coolers.

78.     Witness 1 understands the Fabrication Manager had first-hand knowledge of Meatpacking Defendants' anticompetitive agreement. The Fabrication Manager continues to work at Slaughter Plant 1, where he has worked for over 15 years in that role. In that capacity, the Fabrication Manager reported directly to Defendant 1's head office. As head of fabrication, the Fabrication Manager needed to be informed as to cattle buying, cattle slaughter, and beef selling aspects of Defendant 1's business. He thus interacted with personnel across Defendant 1's business.

79.     Witness 1 reports that prior to working for Defendant 1, the Fabrication Manager worked at another Meatpacking Defendant ("Defendant 2") for a number of years. Witness 1 understands the Fabrication Manager was head of fabrication for the slaughter plant operated by Defendant 2 in the Panhandle Region where he was employed ("Slaughter Plant 2").

80.     The Fabrication Manager regularly told Witness 1 he was in contact with his former colleagues at Slaughter Plant 2, including his replacement there. The Fabrication Manager also told Witness 1 he had friends and former colleagues with whom he stayed in touch at other Meatpacking Defendant plants.

81.     The Fabrication Manager would often provide Witness 1 with detailed information as to the current and future operations of the Meatpacking Defendants' nearby packing plants. Witness 1 regularly stopped by the Fabrication Manager's office prior to starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days, as this affected the execution of his and his team's responsibilities. Witness 1 and the Fabrication Manager had a good working relationship.

82. Witness 1 stated the purpose of the agreed slaughter reductions was to force cattle producers (in particular, cash cattle producers) to feed their cattle for longer periods, and in doing so, create a condition of oversupply that would encourage producers to either accept lower cash prices for their cattle or commit their cattle in advance on captive supply agreements. Put another way, by creating and encouraging an apprehension among producers that they might not be able to "get their cattle dead," Tyson, JBS, Cargill, and National Beef each sought to increase their collective leverage over producers. As Witness 1 noted, once cattle are fed beyond their ideal slaughter-weight, producers face increasing "pressure to drop their prices in order to get rid of their [perishable] cattle."

83. Witness 1 stated that Slaughter Plant 1 had a 5,500-6,000 head per day slaughtering capacity and might drop its kill level back to around 4,800-5,200 head per day when implementing the Meatpacking Defendants' agreement. While Defendant 1 implemented the Meatpacking Defendants' agreement by buying and slaughtering fewer cattle, the second order consequences of these actions included running its slaughter plants at reduced hours, operating those plants at lower "chain speeds," and/or scheduling maintenance shutdowns.

84. Witness 1 reported that Slaughter Plant 1 would reduce its slaughter during periods associated with seasonal rises in fed cattle prices, such as those traditionally experienced in the late winter/early spring. He believes such actions formed part of the Meatpacking Defendants' anticompetitive agreement. Public reports indicate that all Meatpacking Defendants reduce their slaughter volume during these periods to suppress

price rises in fed cattle by ensuring that their collective demand for cattle did not exceed the available supply.[10]

85.     As shown in the above paragraphs, the data reflects that except for Cargill, each Meatpacking Defendant's annual slaughter volume in 2016 either remained below 2014 levels (Tyson (-6%) and JBS (-6%)) or flat (National Beef).[11] Although Cargill's 2016 slaughter volume rose 10% as against 2014, the volume remained significantly below historic levels (see the charts in paragraphs 10 and 11 above).[12]

## 2.     The Meatpacking Defendants agreed to reduce slaughter capacity by closing or idling slaughter plants

86.     In order to further their agreement to reduce slaughter, increase margins, and stabilize the price of beef being sold to consumers, Tyson, JBS, Cargill, and National Beef reached an understanding to significantly reduce slaughter capacity over the past ten years, in the years leading up to the Class Period. The four Meatpacking Defendants collectively refused to expand their slaughter capacity of fed cattle once these permanent closures occurred.

---

[10]   *See, e.g.*, Cassie Fish, *And the Beat Goes On*, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/.   ("Packers also know that February is typically the lightest slaughter month and even though they are killing more cattle than a year ago – some plant 'dark days' began yesterday as plans to keep the balance between supply and demand are paramount.  Some plants will undertake maintenance or upgrade projects and some will honor holidays such as Monday's President's Day.  Others will pull back hours to 36-hour work week.").

[11]   Total industry slaughter was 24.56 million head in 2016, up from 24.11 million in 2014.  2017 Meat & Poultry Facts, p.11.

[12]   CBW Top 30 Beef Packers.

87.     Cargill closed its Plainview, Texas in February 2013. This closure removed 4,650 cattle per day of capacity. The Plainview, Texas plant had been one of Cargill's larger plants. One report remarked that this single plant shutdown corresponded to "nearly 4% of the U.S. beef industry current capacity."[13]

88.     As if on cue, in February 2013, Tyson disclosed a reduction in live cattle processing in its Q1 2013 Form 8-K, despite reporting "increased production due to sufficient cattle supply and strong demand for our beef products" for its previous quarter in its Q4 2012 Form 8-K.

89.     Similarly, JBS acquired its Nampa, Idaho plant in April 2013. However, JBS announced it would keep the plant closed throughout the Class Period. This Nampa, Idaho plant had the capacity to process 1,100 cattle per day; yet, JBS had "no immediate plans to reopen the facility."[14] The plant appears to still remain idle at the time of this filing.

90.     National Beef shut its Brawley, California plant in June 2014. This closure removed 2,000 cattle per day of capacity.

91.     Shortly afterwards, in July 2014, Cargill announced it would close its Milwaukee, Wisconsin plant in August 2014. This closure decreased slaughter capacity by 1,300 to 1,400 cattle per day.

92.     In September 2015, Cargill announced it would sell its Plainview, Texas plant that it had closed in February 2013.

---

[13] Apr. 3, 2013 Votorantim Equity Research Report on JBS.

[14] *See* https://jbssa.com/about/news/2013/04-04/#.XbxLJuhKiUm (last accessed Nov. 1, 2019).

93.     To match these closures, Tyson posted a "reduction in live cattle processed" for each of the eight quarters from Q2 2014 to Q1 2016, as reported in its Form –K for the same time period. This report in reduction was in spite of Tyson reporting "historically high wholesale beef prices," "[l]ow production volumes relative to demand," and "adequate supplies for [its] beef operations as [its] plants are located close to the fed cattle supplies" in its Q1 2014 8-K.

94.     Tyson also closed its Denison, Iowa plant in August 2015. This plant had 2,000 head per day of capacity.

95.     Collectively, these closures by Tyson, JBS, Cargill, and National Beef reduced the industry's annual slaughter capacity by millions of cattle per year.

96.     The Meatpacking Defendants also took further actions to prevent increases in slaughter capacity. For example, Tyson closed a Cherokee, Iowa processing plant in 2014. But, even after closure, Tyson refused to break its lease. According to media reports, Tyson officials "told the city they would consider handing over the shuttered plant – but not to any firm that they believe is competition."[15]

97.     In 2018, four years after the initial closure, Tyson allowed another company to purchase the Cherokee, Iowa plant, but only after inserting a requirement into the deed that "limited the amount of cattle that can be processed at the plant for the next 10 years."[16]

---

[15] *Available at* https://www.desmoinesregister.com/story/money/business/2016/07/08/held-hostage-tyson-iowa-towns-dilemma/86449400/.

[16] *Available at* https://www.desmoinesregister.com/story/money/business/2018/09/19/tyson-foods-

98.     Tyson, JBS, Cargill, and National Beef's actions have been successful at reducing slaughter capacity. The following chart shows a decline in slaughter capacity among the Meatpacking Defendants with post-2015 levels well below historic levels.



99.     The Meatpacking Defendants recognized the importance of restraining supply capacity in order to artificially inflate their margins. Tyson CEO Donnie Smith stated as such on Tyson's fourth-quarter 2015 earnings call: "You've got relatively low cattle supply, you've got too much— **well, not to say too much, probably not the right way to say it, but you've got excess industry capacity**. And that limits our ability to drive margins above the 1.5% to 3%, we think."

---

cherokee-iowa-plant-iowa-food-group-moves-justin-robinson-pork-beef-chicken-processing/1356962002/.

100.    Even excluding plant idling, Meatpacking Defendants' slaughter plant closures stripped out approximately two million head from the industry's annual slaughter capacity, thereby limiting demand for fed cattle. In relation to each closure, the relevant Meatpacking Defendants offered pretextual explanations, such as a lack of available cattle in the adjacent regions and plant inefficiencies.[17]

### 3. The Meatpacking Defendants agreed to limit their purchase of cash cattle.

101.    At the same time as they reduced their slaughter numbers, Tyson, JBS, Cargill, and National Beef agreed to reduce their purchase of cash cattle.

102.    When the Meatpacking Defendants reduced their cash cattle purchases, Tyson, JBS, Cargill, and National Beef could still obtain the cattle needed to satisfy their curtailed kill numbers by pulling forward cattle deliverable under previously-agreed formula and forward contracts.[18]  Cargill and JBS could also lean on their own cattle being fed at their own feedlots.[19]

---

[17]    National Beef even rejected a significant package of incentives offered by local government, utilities, and nearby feedlots when it decided to close its Brawley plant. *National Beef plant closing Brawley Facility*, PROGRESSIVE CATTLEMAN (March 24, 2014), https://www.progressivecattle.com/news/industry-news/national-beef-plant-closing-brawley-facility.

[18]    *See also* Cassie Fish, *Futures Treading Water; Packers Keep Pressure On*, The Beef (Jun. 17, 2015), https://www.thebeefread.com/2015/06/17/futures-treading-water-packers-keep-pressure-on/ ("The news is well known this week and the packer has the upper hand. Boxes are higher and margins are black but packers are keeping kills small.  The reliance of packers on captive supply coupled with enormous kill cuts enabled the packer to buy a limited number of negotiated cattle in June and to buy them cheaper.").

[19]    Until April 2017 and March 2018, respectively, Defendants Cargill and JBS owned two of the nation's largest feedlot businesses and fed a large number of their own cattle for

103.    Because Tyson, JBS, Cargill, and National Beef had each largely transitioned to formula and forward contracts in the decade preceding 2015, drastically thinning the cash cattle trade, even small reductions in their cash cattle purchases had an outsized impact on cash cattle demand.

104.    By reducing their purchases of cash cattle, the Meatpacking Defendants sought to reduce the price of all cattle by using the link between cash cattle prices and the prices paid under formula and forward contracts. By reducing their cash cattle purchases for a period of weeks or months, the Meatpacking Defendants could "back-up" the volume of slaughter-ready cash cattle, thereby encouraging producers to overfeed their cattle and/or accept lower prices or enter captive supply agreements to timely market their perishable product.[20]

105.    One former feedlot manager, who managed a 35,000 head commercial feedlot in the Panhandle region from 2012 until early 2016 ("Witness 2"), explained the

---

slaughter at their respective plants. Both continue to purchase all of the cattle fed by their former feedlots. *See also* JBS S.A., Q2 2017 Earnings Call, Bloomberg Transcript (Aug. 16, 2017), at 16-17 (JBS's André Nogueira noted the sale of JBS Five Rivers would not impact cattle availability – "Around 25% of the cattle that we buy, we buy from Five Rivers, and we will continue to buy from Five Rivers after the sale").

[20]    Cassie Fish, *Whatever Happened to a Fair Fight*, The Beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/        ("The conversation is no longer, what's cash going to be, but rather, who needs any. . . The smaller feeder is left to fight it out. Hoping he can get a buyer to come by and look at his cattle. Pressured to sell cattle with time. Anything to get cattle gone. Those that attempt to fight the market run the risk of making cattle too big even by today's standards or worse, alienate their local buyer. Powerlessness is widely felt by smaller producers on a regular basis.").

limited incentives for a producer to try to bid up the Meatpacking Defendants in such circumstances.[21] Witness 2 elaborated:

> There was a good chance that you wouldn't get your cattle sold if you rejected the [top-of the market] basis bid.[22] Even if you did succeed in getting a higher [cash] bid on Friday, you had taken a huge risk for which others, who just accepted the [top-of the market] basis bid, got to benefit from [*i.e.*, through the higher reported cash prices used to set prices under their contracts]. But by accepting the bid, you added to the packers' captive supply and helped them push the prices down, which of course hurt you as well [through the lower reported cash prices].

106.   The lower reported cash prices were then incorporated into the Meatpacking Defendants' formula and forward contacts—the latter via a depression of live cattle future prices—thereby lowering the costs of all the cattle delivered to the Meatpacking Defendants' plants.[23] And once a condition of actual or perceived oversupply had been

---

[21]   As manager of the feedlot, Witness 2 was responsible for marketing all of the cattle fed there, whether owned by the feedlot or its customers. In this capacity, Witness 2 negotiated with field buyers from Tyson, JBS, Cargill, and National Beef on a weekly basis. Most weeks, Witness 2 would market between 600 to 1,500 head of cattle on behalf of the feedlot. The feedlot marketed the majority of its cattle via the cash cattle market. Witness 2 reports that by 2015, Tyson, JBS, Cargill, and National Beef would predominately offer only basis bids for the cattle fed at his feedlot.

[22]   The "basis bid" is a form of most favored nation contract under which the packer offers to pay the producer marketing cattle on the cash cattle market some variant of that week's top reported cash price, with or without a premium. For example, a packer might offer to pay the producer the top price reported by the USDA in relation to Kansas for that week, plus a $1 per CWT, provided that top price was paid for at least 20% of the reported cattle sales. Tyson, JBS, Cargill, and National Beef used such bids during the Class Period to further reduce the number of cattle whose price they needed to negotiate during the weekly cash cattle trade, which was typically conducted on Friday. This further reduced the leverage of those producers who sought to generate price competition among the Meatpacking Defendants, thereby putting further pressure on cash cattle prices.

[23]   Cassie Fish, *Cash Trade Volume Tiny; Futures Shake It Off*, The Beef (Jun. 8, 2015),        https://www.thebeefread.com/2015/06/08/cash-trade-volume-tiny-futures-shake-it-off/ ("A historically small number of negotiated fed cattle traded at the

created, the Meatpacking Defendants could gradually increase their cash cattle purchases (and slaughter volumes) without putting any significant upward pressure on prices.

> ### 4. The Meatpacking Defendants coordinated their procurement operations for cash-cattle purchases.

1.    Tyson, JBS, Cargill, and National Beef supported their conspiracy by collectively enforcing a bidding procedure for cash-cattle sales that suppressed fed-cattle prices. That convention, which operated predominately in relation to those cattle sold in the cash market (including basis baids), works as follows: once a producer receives a bid from Packer A, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers. [24]   If the producer passes on the bid to seek further bids from other packers, the producer must inform the other packers wishing to bid on the pen that it was

---

eleventh hour late Friday and Saturday at \$155-\$156, though the official USDA tally isn't out yet.  But at least at this writing it appears it was enough to price formulas \$4 lower than last week, jerking packer margins back to a positive.").

[24]    In a standard ascending bid auction, which is generally considered a competitive procurement method, the current high bid binds the high bidder until a new higher bid is received from another bidder. That is, the seller invariably "shops" the current highest bid to other bidders. *See*, *e.g.*, Paul Klemperer, AUCTIONS: THEORY AND PRACTICE 1-2, 11 (2004).  Under the "no shop" rule, the current bidder is not bound by their current bid if the seller attempts to solicit higher bids from other packers. Thus, relative to a standard ascending bid auction, the queuing convention amounts to a series of individual negotiations, each of which shifts substantial risk onto the seller. This has a depressing effect on the price received.  *See* Jeremy Bulow and Paul Klemperer, *Auctions Versus Negotiations*, 86 THE AMERICAN ECONOMIC REVIEW 180, 180 (March 1996).  The need for buyers to coordinate on the enforcement of the "no shop" rule shows that sellers have an incentive to deviate from the rule and individual buyers have an incentive to deviate from it (by unilaterally offering higher prices) as well, but that buyers are collectively advantaged by it. For a discussion of the effects of bidder collusion on auction prices *see* Robert C. Marshall and Leslie M. Marx, *The Economics of Collusion: Cartels and Bidding Rings*, THE MIT PRESS (2012, second printing February 2013), especially Section III.

bid "X" by Packer A that it passed on and that it can, therefore, only accept bids of X+$1.25

If Packer B is willing to pay X+$1, the producer may again choose to accept that bid or

pass on it, but may not "shop" that higher bid to other packers.  If Packer B is only willing

to bid X or if the producer wants to change its reservation price, the producer is obligated

to first return to Packer A, who is "on the cattle" at price X and offer it a right-of-first-

refusal.[26]  Only if Packer A declines can the producer offer to sell to Packer B at X or the

producer's new reservation price.  At this point, however, Packer B is under no obligation

to purchase from the producer.

107.    Witness 2 confirmed the field buyers from Tyson, JBS, Cargill, and National

Beef who visited his feedlot enforced strict adherence to this queuing convention with

threats of retaliation. He reported that each of these field buyers individually spoke to him

about the importance of his feedlot complying with the convention, and that they would

not "come by" anymore should he break with it. For example, Witness 2 reports that when

he took over management of the feedlot in 2012, the feedlot would only receive bids from

National Beef and Cargill. When he subsequently spoke to the field buyers from Tyson and

JBS responsible for his region in the fall of 2012, they both told him that they had stopped

---

[25]    In certain instances, it may be acceptable to offer/accept bids in $0.50 per CWT increments.

[26]    The right-of-first-refusal, as well as the requirement that the producer must disclose to other packers the identity and bid amount of the packer whose bid it passed on, provides packers with information relevant for monitoring compliance with collusively set prices among the packers.  Such information is critical to sustaining an effective cartel.  *See*, *e.g.*,  J. George Stigler, *Theory of Oligopoly*, 72 THE JOURNAL OF POLITICAL ECONOMY 44, 46 (Feb. 1964); Marshall, *supra* n.24, Section 10.1.

visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids. Witness 2 reports the Tyson and JBS field buyers re-commenced visiting the feedlot after he confirmed his commitment to following the convention.

108.   Witness 2 also heard from the Defendants' field buyers and other industry participants about other producers being "blackballed" for breaking with the queuing convention.  In those circumstances, Witness 2 understood the Meatpacking Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer whom the producer contacted while shopping the Meatpacking Defendant's bid, or would ex-post pressure the producer for details of their sale.

109.   However, Witness 2 reports that very few producers or their agents would be willing to break with the convention for fear of alienating one or more of their buyers. He reports never breaking the convention for this reason. He said that commercial feedlots or third party marketing bodies, such as his feedlot, were particularly reluctant to risk retaliation given the duties they owed to their clients. As such, Tyson, JBS, Cargill, and National Beef's threats of boycott were typically sufficient to ensure adherence to the convention.

110.   The convention is an allocation mechanism imposed on the cash market by the packers; it was not chosen by producers. It depresses fed cattle prices by limiting price competition among beef packers. It does so, in part by requiring producers to relinquish their current offer in order to seek higher offers, thus reducing their incentives to reject the initial offer in the hope of generating better offers. Moreover, the queuing convention and other features of the bidding process also rendered the cash cattle market susceptible to

collusion and enabled Tyson, JBS, Cargill, and National Beef to monitor each other's bidding behavior.[27]

111.   The convention created an artificial sense of urgency that encouraged producers to accept the Meatpacking Defendants' low initial offers.[28] This effectively reduced competition among Meatpacking Defendants for any particular pen of cash cattle to which a Meatpacking Defendant would be the first to deliver what essentially amounts to a take-it-or-leave-it offer, with no fear of subsequent price competition.

112.   Over time, the Meatpacking Defendants engaged in an informal market allocation process where only one meatpacker would bid on a particular feed lot's cattle week to week, over a period of months.

113.   Witness 2 reports that in late 2014 or early 2015, the Tyson, JBS, Cargill, and National Beef field buyers who attended his feedlot jointly demanded that he determine who had the right to make the first bid each week by having them draw cards in his office. Witness 2 reports that he acquiesced under duress.

114.   Thereafter, and at least until Witness 2 left the feedlot in early 2016, the field buyers from Tyson, JBS, Cargill, and National Beef would draw cards to determine who could place the first bid.[29] Witness 2 cannot recall a single week in 2015 when one of the

---

[27]   For the importance of monitoring by cartels, see footnote 26.

[28]   Economic literature finds that sellers, here the producers, tend to accept lower prices when they feel time is running out and their other options are relatively unattractive. Ariel Rubinstein, *Perfect Equilibrium in a Bargaining Model*, 50 ECONOMETRICA 97 (1982).

[29]   Randomization devices like this have been used by other cartels. For example, the electrical contractors cartel used the phase of the Moon to determine which of the bidding ring members had the right to bid, free from competition from other members of the ring.

other field buyers actually raised the initial bid placed by the winner of the card draw. That is, Witness 2 reports Tyson, JBS, Cargill, and National Beef did not engage in any price competition for the cattle sold by Witness 2's feedlot.

115.   The field buyers tried to justify the card drawing scheme to Witness 2 by saying it would allow them to avoid attending the feedlot at increasingly early hours in an attempt to place the first bid. In a competitive market, however, in which purchasers engage in genuine competition to acquire a producer's products, no purchaser would have a unilateral incentive to propose or adhere to such a scheme (nor would a producer have an incentive to agree to such a scheme). Rather, each purchaser would instead have a unilateral incentive to preserve the right to make an offer to the producer and rely on its ability to offer the best terms to acquire the producer's products.

116.   Additionally, the Meatpacking Defendants would sometimes collectively stop all purchases of cash cattle from the spot market for particular regions for a number of weeks. This would produce a bottleneck that would back up cash cattle in these regions. The Meatpacking Defendants would then begin purchasing cattle from that region at the same time. The Meatpacking Defendants would then first negotiate prices in the bottlenecked regions, which would be artificially low because of the collective boycott, and then use that depressed price to influence nationwide prices.

---

*See*, *e.g.*, J. Asker, *Bidding Rings, in* THE NEW PALGRAVE DICTIONARY OF ECONOMICS (In: Palgrave Macmillan eds., 2010); R. Preston McAfee and John McMillan, *Bidding Rings*, 82 AMERICAN ECONOMIC REVIEW 580, 585 (June 1992).

117.   Tyson, JBS, Cargill, and National Beef all would conduct the majority of their weekly cash-cattle procurement during a very narrow window of time on a Friday. The Meatpacking Defendants would generally offer prices for cash cattle that were no higher than the initial bid by the Meatpacking Defendant that had opened the cash-cattle trade. By contrast, the regional beef processors who are not named defendants would purchase cash cattle across most days of the week. The Meatpacking Defendants reduced competition among themselves as a result of this practice.

118.   This practice further reduced producers' ability and incentive to generate price competition. Producers who passed on the initial bid they received during the trading window would rarely receive a higher bid from one of the other Meatpacking Defendants. At best, they would typically receive the same bid. And if the producer then wished to sell at that price, they were required by the queuing convention to return to the initial bidder who was "on the cattle" at that price. However, given the short trading window, the initial bidder would regularly be unwilling or unable to renew its bid. This forced the producer to return to the second bidder, who was then commonly unwilling or unable to renew its bid, even if the bid had been given minutes before.

**5.     The Meatpacking Defendants continued to import foreign cattle after it became uneconomical for them to do so.**

119.   Tyson, JBS, Cargill, and National Beef also engaged in coordinated import and shipping practices that reduced demand for domestic fed cattle and suppressed the cash price transaction reports used to set the price of cattle procured under captive supply agreements. Meatpacking Defendants would ship cattle over uneconomically long

distances to their slaughter plants, from locations both inside the United States and from Canada, to avoid bidding up the reported price of cattle in closer AMS LMR reporting regions.[30]

120.   Given the additional freight costs incurred in procuring fed cattle from Canada or regions within the U.S. outside a slaughter plants' typical procurement radius, it is only economical for a Meatpacking Defendant to do so when the prevailing price differences as against domestic/local prices exceeded these additional costs.

121.   On information and belief, suppressing the demand for U.S. fed cattle through the strategic importation of Canadian fed cattle is a practice that Defendants Tyson, JBS, and Cargill have used during the Class Period and continue to use.  But Meatpacking Defendants appear to have continued to import fed cattle from mid-2015 onwards, when procuring cattle for immediate slaughter was regularly more expensive than procuring fed cattle from the United States.

122.   Defendants Tyson, JBS, and Cargill have sought and received regulatory approval to import fed cattle for immediate slaughter at their packing facilities, including:

---

[30] In relation to cross-region shipping in the U.S., *see*, for example, The_Meat_Gentleman (@blakealbers), TWITTER (Nov. 16, 2015, 12:02 PM), https://twitter.com/blakealbers/status/666300194338660353 ("The amount of cattle going south to dodge city and the like is incredible"); T. Heinle (@ndsuhsker), TWITTER (Feb. 26, 2016, 7:37 AM, https://twitter.com/ndsuhsker/status/703197081205391360 ("Shipping cattle from wne to ene to be slaughtered #dontfigure!"); and T. Heinle (@ndsuhsker), TWITTER (Apr. 14, 2016, 5:45 PM), https://twitter.com/ndsuhsker/status/720729811241414656 (Truckers are the packer's best friend, first haul south early now haul north! #everycattlefeederbuytrk! -- @CornfedBeef response: Apparently paying freight must be cheaper than paying up for cash cattle in the region they need them! #BuyLowAndHaul").

(1) Tyson's packing plants in Pasco, Washington and Joslin, Illinois; (2) JBS's packing plants in Greeley, Colorado; Hyrum, Utah; Plainwell, Michigan; Omaha, Nebraska; Souderton, Pennsylvania; and Green Bay, Wisconsin; and (3) Cargill's packing plants in Ft. Morgan, Colorado; Wyalusing, Pennsylvania; and Fresno, California.[31]

123.   These actions are consistent with an intent to depress U.S. fed cattle cash prices. A Meatpacking Defendant would not incur the additional cost associated with the import and purchase of foreign or extra-regional cattle in the hope of lowering its fed cattle supply procurement costs, unless it was certain that its major competitors would do the same thing, and therefore, also abstain from bidding up local cash cattle prices.

## V.   THE MEATPACKING DEFENDANTS REPORTED RECORD MARGINS AFTER THE START OF THEIR COLLUSIVE ACTIVITY

### A.   The Meatpacking Defendants' scheme began to impact prices in 2015.

124.   The Meatpacking Defendants' coordinated conduct was successful. Responding to the compression of their margins in late 2014, the Meatpacking Defendants coordinated a reduction of their respective slaughter volumes. This reduction in slaughter levels had the desired effect.

125.   Fed cattle prices increased consistently from 2009 through 2014. Market analysts, such as the USDA Economic Research Service, predicted the price levels established in 2014 would continue for a number of years before experiencing a gradual

---

[31]   USDA, List of Plants Approved to Receive Immediate Slaughter Animals, https://www.aphis.usda.gov/import_export/downloads/slaughter_list.pdf.

decline.[32] Some forecasters even foresaw no drastic change from 2014 prices, "barring any outside market shocks like drought or a U.S. economic recession."[33]

126.    Cattle prices peaked at around $170 CWT in late 2014. For the first half of 2015, prices hovered around $160 CWT.[34] At this point, the collusive scheme of the Meatpacking Defendants began to noticeably take effect, as shown in the following chart:

---

[32]   U.S. DEP'T OF AGRIC., OCE-2015-1, OFF. OF THE CHIEF ECONOMIST: USDA AGRICULTURAL PROJECTIONS TO 2024, INTERAGENCY AGRICULTURAL PROJECTIONS COMMITTEE    81    (February    2015), https://www.usda.gov/oce/commodity/projections/USDA_Agricultural_Projections_t o_2024.pdf.

[33]   *Livestock Monitor, A Newsletter for Extension Staff*, LIVESTOCK MARKETING INFORMATION CENTER, STATE EXTENSION SERVICES IN COOPERATION WITH USDA 2 (Jan. 12, 2015); and *CattleFax Predicts Strong Prices to Remain in 2015*, AGWEB (Feb. 6,    2015),    https://www.agweb.com/article/cattlefax-predicts-strong-prices-to-remain-in-2015-naa-news-release/ ("Analyst[s] . . . expect fed cattle prices averaging in the mid-$150s [per CWT in 2015], slightly higher than last year.  Prices will trade in a range from the near $140 [per CWT] in the lows to near $170 [per CWT] in the highs in the year ahead.").

[34] Cattle prices are frequently denominated in hundredweight, ("CWT"), which refers to the price of a hundred pounds of cattle.



127.    On June 12, 2015, Cassandra Fish, a former risk analyst at Tyson and a proprietor of a market analysis report known as "The Beef," discussed the then-recent and remarkable cohesion being displayed by the Meatpacking Defendants. "Rarely has this industry segment [the beef packers,] been an all-for-one and one-for-all group. All packers need to buy cattle inventory. Most have cut hours. So will someone break ranks, pay up for cattle and add hours to capture the better realization that the next boxed beef rally will bring? Will one short a customer only to find that order filled by a competitor?"[35]

128.    On June 25, 2015, Ms. Fish emphasized the cohesion being shown by the Meatpacking Defendants: "packers refuse to reach for cattle and are currently in command. After 3 weeks of sharply curtailed kills, **packers are exhibiting incredible discipline** and

---

[35] Cassie Fish, "Futures Holding Gains; Waiting on Cash," THE BEEF (Jun. 11, 2015), *available at* https://www.thebeefread.com/2015/06/11/futures-holding-gains-waiting-on-cash/.

letting the kill increase gradually, limiting the ability "of feeders to get all cattle marketed [i.e., sold] in a timely fashion."[36]

129.   By September 2015, cattle prices had declined from $160 CWT to $120 CWT as the effects of the Meatpacking Defendants' actions began to take hold.

130.   On November 10, 2015, Ms. Fish emphatically stated the new collusive reality in the cattle market: "It's been happening for a while, and it's gone on long enough now that it seems normal. **Packers no longer compete against each other to buy fed cattle each week**. Once in a while there will be a week when all buyers are accounted for and active, but it occurs less frequently as time goes on. The conversation is no longer, what's cash going to be, but rather, who needs any."[37]

131.   The Meatpacking Defendants continued their collusive activities throughout 2016 to the present. The result is that the Meatpacking Defendants collected an artificially elevated margin as the CWT price that the Meatpacking Defendants paid remained low, while the retail price that consumers paid remained elevated throughout the period. As shown in the below chart, the Meatpacking Defendants' anticompetitive activities to suppress beef throughput resulted in an elevated margin as a result of their successful collusion:

---

[36] Cassie Fish, "Another Round of the Blues," THE BEEF (Jun. 25, 2015), *available at* https://www.thebeefread.com/2015/06/25/another-round-of-the-blues/.

[37] Cassie Fish, "Whatever Happened to a Fair Fight," THE BEEF (Nov. 10, 2015), *available at* https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/.



**B.      Prior to 2015, the profits for the Meatpacking Defendants were low.**

132.    In November 2014, two of the publicly traded Meatpacking Defendants announced their profit margins for the beef segment. In a November 7, 2014, earnings call, Tyson reported an operating margin of **3.5 percent** for its beef division for the quarter. Compared against Tyson's poultry division (where the broiler conspiracy was already successfully underway), the beef division was underperforming. Tyson's poultry division reported a normalized operating margin range of 7-9 percent.

133.     Similarly, on a November 13, 2014 earnings call, JBS stated that it was looking for a 4 percent EBITDA margin in its beef segment. The beef division was less profitable at this point in time than JBS' pork division (where the pork conspiracy was already successfully underway). JBS for this quarter reported a margin of 12 percent for its pork business.

**C.     Starting in 2015, the margins for the Meatpacking Defendants soared.**

134.     The collusive activity described above fundamentally changed the pricing dynamics of the market. Starting in 2016, the Meatpacking Defendants profits rose to unprecedented levels as they expanded their margin and caused consumers to pay artificially elevated prices for beef.

135.     On August 11, 2016, JBS reported that it expected the beef business to have an EBITDA margin of **4-5 percent** for the rest of the year and that "we are very positive now that second half we are going to see this positive cycle showing in the results and showing in our results."

136.     On November 16, 2016, JBS reported that JBS USA will be at the top of its margin range for 2017, stating that there is "**a very positive dynamic for the U.S. business now**."

137.     On November 21, 2016, Tyson reported that it expected its beef business operating margin to be at the upper end of the normalized range of 1.5 to 3 percent for fiscal year 2017.

138.     On February 6, 2017, Tyson reported a record quarterly operating margin of 8 percent for its beef business, raised its operating margin for the year to 5 percent, and

stated that it did not think 2017 was an aberrational performance for the beef division. Tyson's performance significantly exceeded the normalized margin range of 1.5 to 3 percent that it had forecast for its beef business prior to 2015.

139.   On March 14, 2017, JBS reported an EBITDA margin of 7.3 percent for the fourth quarter of 2016, significantly higher than its 2015 margins.

140.   On May 8, 2017, Tyson forecast operating margins of 5 percent for its beef business for 2017 and 2018 – above the normalized margin range of 1.5 to 3 percent. An investment analyst stated that Tyson's "outperformance jumped dramatically during the quarter" and questioned whether Tyson was "doing something different in [the beef] business" based on Tyson's forecasted margins.

141.   On August 15, 2017, JBS reported an EBITDA margin of 5.9 percent for its beef business and stated that "**This was the best EBITDA and EBITDA margin posted for a second quarter in the history of the company in this business unit**."

142.   On November 13, 2017, Tyson reported an operating margin of 6 percent for its beef unit for the year, above its prior forecast of 5 percent and its normalized operating margins of 1.5 to 3 percent.

143.   On November 14, 2017, JBS reported record EBITDA margins of 7.3 percent for its beef business. JBS stated that these results have "reinforced our confidence in the outlook for business."

144.   From 2015 to 2018, the Meatpacking Defendants nearly doubled the share of profits that they captured from the overall beef value chain.



**D.    Tyson and JBS attributed their record 2017 & 2018 profits to their visibility into the beef supply chain.**

145.    Tyson and JBS continued to report elevated margins throughout 2017 and 2018. On earnings conference calls during this period, executives from JBS and Tyson frequently attributed their new, record profits to their ability to understand the amount of cattle in the beef supply chain in upcoming years.  On certain earnings periods during this period, JBS executives also noted at points that they were not taking market share from competitors and that the elevated margins were helped by capacity decreases resulting from plant closures.

146.    On August 7, 2017, Tyson reported an operating margin for its beef business of 3.7 percent for the third quarter of 2017 and emphasized its confidence in the beef business going forward: "With ample supplies of cattle, we see very good conditions for our Beef business as far out as 2020, as we enter the early stages of a multiyear expansion

cycle. Absent a shock to the system such as a drought or an import ban, our Beef business is well-positioned for profitable, long-term growth." In response to an investment analyst question, Tyson stated that "it's on our minds" whether Tyson should raise the forecasted normalized operating margins for its beef business of 1.5 to 3 percent.

147.    On February 8, 2018, Tyson reported quarterly operating margins of 6.6 percent and yearly margins close to 6 percent. Tyson emphasized that it had "pretty good visibility into '19 and '20 at this point. We see the number of animals out there." Tyson refused to talk about its "idled capacity" but emphasized that "**we have…good visibility into the cattle that's out there**. We see the number of animal so that's that certainly good for us."

148.    On May 7, 2018, Tyson forecast operating margins of 6 percent for the year – above its normalized operating margin range for 1.5 to 3 percent. Tyson attributed its forecast to be "on the back of those cattle on feed reports and knowing that the supplies in our region are exceptionally good."

149.    On May 15, 2018, JBS reported an EBITDA margin of 6.1 percent for the quarter and forecast that margins would be at record levels for the following two quarters. JBS emphasized that its performance was not based on "taking share from anyone."

150.    On August 6, 2018, Tyson reported an operating margin of 8 percent for the quarter. Tyson stated that it had an "optimistic outlook" because "we have good visibility into 2021…that's good because we do see the number of animals that are out there."

151.    On August 15, 2018, JBS reported an EBITDA margin of 10.2 percent for the quarter and that "**we're moving the overall margin in beef for a different level that**

**was in the past**." JBS emphasized that it was benefitted from the shutting of several plants in the last five years. JBS could not "see how the beef U.S. can be less profitable in 2019 compared to how it is going to perform in 2018." At the same point, JBS reported that its EBITDA margin for pork for the quarter was 7.2 percent. This was a reversal from 2014, where JBS expected margins of approximately 4 percent for its beef business as compared to 9-10 percent for its pork business.

152.    On November 13, 2018, Tyson reported record operating margins of 8.9 percent for the quarter and 6.7 percent for the year. Tyson stated that it expected similar results in the following years because of its visibility into cattle supply: "As we look at 2019, 2020, even in 2021 we frankly we don't see a lot of change. The supply appears to be relatively stable. We have a good sense of what that looks like just due to the calf crop that gives us good visibility for at least a couple of years."

**E.    After a recent plant closure, Tyson, JBS, Cargill, and National Beef drastically decreased cattle prices, while increasing beef prices.**

153.    On August 9, 2019, Tyson closed its Holcomb, Kansas slaughter and processing plant after a fire occurred at the plant. Tyson suggested in early September 2019 that the plant will remain partially closed until early 2020 while repairs are conducted.[38]

154.    Immediately following the plant fire, Tyson, JBS, Cargill, and National Beef all slashed their fed cattle bids by at least $5 CWT and hiked their beef prices. These actions caused a $5 CWT drop in fed cattle prices and a $14 CWT rise in wholesale beef prices the

---

[38] *Tyson Plant Back Online By January*, FEEDLOT (September 6, 2019), http://feedlotmagazine.com/tyson-plant-back-online-by-january/.

following trading week.[39] This resulted in packer per head margins rise from $191 to $358. Although the Meatpacking Defendants blamed the loss of Holcomb's 5,500 to 6,000 head per day slaughter capacity for these price changes, weekly fed slaughter volume actually remained steady in the weeks that followed the fire (averaging around 521,900 head in the three weeks that followed the fire, as compared to the 521,700 killed in the week of the fire).[40] Tyson has subsequently confirmed it expects its slaughter volume loss to be "somewhat minimal."[41]

155.  Tyson, JBS, Cargill, and National Beef also drastically reduced their respective cash cattle purchases after the fire, and relied upon their captive supplies. Tyson, in particular, was largely absent from the cash cattle market in the weeks that followed the fire. This placed further pressure on cash cattle prices (and thus reduced the price of each Defendant's contracted cattle).[42] Tyson, JBS, Cargill, and National Beef continued to drop their bids in lockstep.

---

[39] *Sterling Beef Profit Tracker: week ending August 16, 2019*, STERLING MARKETING INC. (August 20, 2019), https://cdn.farmjournal.com/s3fs-public/inlinefiles/ Beef%20Tracker%2081919.pdf. Live cattle futures contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

[40] These declines also reflected seasonally declining supplies of fed cattle.

[41] FEEDLOT, *supra* n.38.

[42] An overview of the industry wide drop in cash cattle sales is available here: *National Weekly Fed Cattle Comprehensive*, U.S. DEP'T OF AGRIC. (September 24, 2019), https://www.ams.usda.gov/market-news/national-direct-slaughter-cattle-reports; and *Weekly Newsletter*, CATTLE BUYERS WEEKLY (August 26, 2019), http://www.cattlebuyersweekly.com/users/newsletters.php/2019/0826.txt.

156.    As a result, cash cattle prices continued to slide in the following weeks, with 5-Area Choice Steers bottoming out at around the $100 CWT in the week ending on September 13, 2019, down from $113 CWT in the week of the fire.

157.    Tyson, JBS, Cargill, and National Beef have consequently enjoyed significant increases to already record high margins in the weeks that followed the Holcomb fire, by stepping down fed cattle prices and raising beef prices in parallel. By the week ending on September 13, the spread between the packer and producers' per head margin exceeded $600, with packers making over $400 per head, while producers sustained $200 per head losses.[43]

158.    The U.S. Secretary of Agriculture has announced that the Packers and Stockyards Division, the division of the USDA responsible for enforcement of the Packers and Stockyards Act,[44] launched an investigation into the conduct of the Defendants and other beef packers in the aftermath of Tyson's Holcomb, Kansas plant fire "to determine if there is any evidence of price manipulation, collusion, restrictions of competition or other unfair practices."[45]

---

[43] *Sterling Beef Profit Tracker: week ending September 13, 2019*, STERLING MARKETING INC. (September 18, 2019), https://cdn.farmjournal.com/s3fs-public/inlinefiles/Beef%20Tracker%2081919.pdf.

[44] The purpose of the Packers and Stockyards Act of 1921 is "to assure fair competition and fair trade practices." The Act was originally enacted in response to concerns that the five largest meat packers at the time had engaged in anticompetitive practices. *See Packers and Stockyards Act*, U.S. DEP'T OF AGRIC., https://www.ams.usda.gov/rules-regulations/packers-and-stockyards-act; *The Packers and Stockyards Act: An Overview*, THE NAT'L AGRIC. LAW CTR., https://nationalaglawcenter.org/overview/packers-and-stockyards/.

[45] *Secretary Perdue Statement on Beef Processing Facility in Holcomb, Kansas*, U.S. DEP'T OF AGRIC. (August 28, 2019), https://www.usda.gov/media/pressreleases/2019/08/28/secretary-perdue-statement-beef-processing-facility-holcomb-kansas

## VI.   THE STRUCTURE OF THE BEEF PACKER INDUSTRY IS CONDUCIVE TO THE CONSPIRACY

159.   Defendants' conspiracy to constrain the supply of cattle, restrain the amount of processed beef they sold, stabilize the price of beef, and maximize their margins, was facilitated by the structure of the meatpacking market. The beef meatpacking industry has all of the hallmark features found in highly-cartelized markets, including: (1) a highly concentrated market with high barriers to entry; (2) a commodity product; (3) inelastic demand; and (4) unusual market share stability.

### A.   The beef meatpacking industry was highly concentrated.

160.   Market concentration facilitates collusion. Collusive agreements are easier to implement and sustain when there are only a few firms controlling a large portion of the market. Practical matters, such as coordinating cartel meetings and exchanging information, are much simpler with a small number of players. Moreover, this high degree of control also simplifies coordination because there is little outside competitive presence to undermine the cartel, and it is easier for cartel participants to monitor each other's actions related to supply and pricing. Also, with fewer firms in the market, the transitory gains that might be achieved by undercutting the cartel price and gaining a transitory increase in market       share       would       be       outweighed       by       the       greater

("I have directed USDA's Packers and Stockyards Division to launch an investigation into recent beef pricing margins to determine if there is any evidence of price manipulation, collusion, restrictions of competition or other unfair practices. If any unfair practices are detected, we will take quick enforcement action. . . . I know this is a difficult time for the industry as a whole. USDA is committed to ensuring support is available to ranchers who work hard to the feed the United States and the world.").

long-term profits for a colluding firm in a concentrated industry with artificially elevated prices.

161.   By contrast, if an industry is divided into a large number of small firms, the current gain from cheating on a cartel (profits from sales captured from other cartel members through undercutting of the cartel-fixed price in the current time period, which risks causing the cartel to fall apart in the future) is large relative to the firm's possible gains from the cartel's continuing future success (the firm's future share of the total cartel profits if collusion were to continue successfully).

162.   Throughout the Class Period, the Defendants purchased and slaughtered between 82% and 87% of all fed cattle sold within the United States on an annual basis.

163.   Throughout the Class Period, **Defendants controlled approximately 75 percent of the market for both slaughter capacity and processed beef sales**:



164.    The Herfindahl-Hirschman index (HHI) is a commonly accepted measure of market concentration. The DOJ considers markets in between 1,500 to 2,500 to be moderately concentrated.

165.    As of 2017, the cattle processing HHI for both slaughter capacity and beef processing sales was over 2,000. Under the HHI ratio, the beef-packing market is more concentrated than either the pork or poultry processing markets:



166.    A highly concentrated market makes it easier cartelists to facilitate their conspiracy by making it easier to make agreements, form understandings, combinations or conspiracies to fix, raise, maintain, and/or stabilize prices, and/or to allocate market shares, and to set and keep prices at artificially high, supra-competitive levels.

167.    The four-firm concentration ratio (CR-4) is a commonly used metric for measuring market concentration that measures the sum of the market shares for the top four firms in a particular market.

168.    The sum of the market shares for the four Meatpacking Defendants is greater than 70 percent in both cattle slaughtering and beef sales. According to the CR-4 typology, a market with this type of market share distribution is classified as a tight oligopoly:



169.    Prior to and in the beginning of the Class Period, the beef industry underwent a period of increasing market concentration, resulting in a small number of beef processors controlling a large amount of market share. In 2001, Tyson purchased IBP, then the United States' largest beef packer. In 2002, Cargill purchased Taylor Packing, a beef packer. In 2007 and 2008, JBS acquired Swift & Co and Smithfield Beef Group, respectively the third- and fifth-largest beef packers in the United States.

170.    The level of concentration in the beef industry therefore rested in an ideal zone for collusion. Because the industry was dominated by a small number of meatpackers, it was feasible to manipulate price through coordination between the Meatpacking Defendants, the four dominant players that controlled the market. Further, this coordinated activity was necessary to increase margins because none of the largest producers had sufficient market share to control price through their actions alone.

**B.    The beef packer market featured high barriers to entry.**

171.    Barriers to entry are obstacles which prevent new competitors from easily entering the market. They restrict competition in a market and may make it easier for incumbents to collude.

172.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the profits to be reaped from supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

173.    Barriers to entry kept would-be competitors out of the beef-packing industry. New entry into beef processing is costly and time consuming. The estimated cost of building a small processing plant, with a slaughter capacity of 1,000-1,500 head per day, would cost an estimated $150 million.

174.    In addition to the cost of opening a plant, new entrants would have to comply with numerous regulations, find and train a large workforce, and successfully market the processed beef.

175.    As a result of these barriers, new entrants into the beef packing market, such as Northern Beef Packers and Kane Beef, have gone bankrupt after attempting to enter the market.

**C.    Beef is a commodity product.**

176.    In economics, a commodity is a basic item or good used in commerce that is interchangeable with other goods of the same type. Commodities are most often used as

inputs in the production of other goods or services. Examples of traditional commodities are sugar, wheat, and rubber. As technologies for markets and goods mature, a product is more likely to be considered a commodity, at least in its more basic implementations.

177.    Markets for commodity products are conducive to collusion. Typically, when a product is characterized as a commodity, competition is based principally on price, as opposed to other attributes such as product quality or customer service. This factor facilitates coordination because firms wishing to form a cartel can more easily monitor and detect defections from an anticompetitive agreement where any observed differences in prices are more likely to reflect cheating on the conspiracy than any other factor which might affect pricing, such as special product characteristics, service or other aspects of the transaction.

178.    Beef is a commodity. For example, beef roasts from Tyson and Cargill are virtually indistinguishable, as both share similar nutritional values and differ only in branding and packaging.

**D.     The beef meatpacking market featured unusual market share stability during the relevant period.**

179.    In a competitive market, market shares are expected to fluctuate as manufacturers compete and win customer business from one another. Stable market shares over time are consistent with an agreement to divide up a market, fix prices, or restrict output.

180.    Although market-share stability does not prove collusion, it is suggestive of an understanding within a cartel group not to compete over existing business. A distinct

drop in market-share volatility between two time periods is consistent with an agreement coming into effect in a previously competitive market.

181.   Market share by sales among the Meatpacking Defendants appears to be more stable during the Class Period as compared to the preceding decade for both beef sales:



182.   The same is true for slaughter capacity – the market share amongst the Meatpacking Defendants appears to be more stable during the Class Period than the decade

prior:



**E.     The demand for beef is inelastic.**

183.    "Price Elasticity" or "Elasticity" are terms used to describe the sensitivity of supplier or consumers to changes in the price of a good or service. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, under conditions of inelastic demand, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

184.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result

in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

185.    Price elasticity of demand (PED) is a measure used to quantify the degree to which the quantity demanded for a good or service changes in response to a change in price. The formula to calculate the PED is the percentage change in quantity consumed divided by the percentage change in price. A PED value between 0 and -1 indicates an "inelastic" demand for a good or service, i.e. a 1% increase in price induces a less than 1 percent decrease in the quantity demanded.

186.    A review of the relevant literature found that the average PED estimate for beef was -0.43, reflecting a relatively inelastic level of demand for beef:

| Good/Service | Elasticity of Demand | % Increase in Price | % Change in Quantity Demanded | Description of Elasticity |
|---|---|---|---|---|
| (Example) Medical Care and Insurance | -0.17 | 1% | -0.17% | Inelastic[2] |
| Beef | -0.43 | 1% | -0.43% | Relatively inelastic |
| (Example) Restaurant Meals | -2.3 | 1% | -2.3% | Highly elastic[3] |

## F.    Abnormal pricing during the Class Period demonstrates the success of the collusive scheme.

187.    Beginning in 2015, the beef industry showed abnormal price movements as beef packers began to reap an increasing share of consumer spending on beef.

188.    The average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 to the present than it was in the

preceding 5 years. And in those preceding years there was a smaller relative increase in the

spread between wholesale and retail values of beef:

| | Farm-to-Wholesale Spread | Proportional Increase | Wholesale-to-Retail Spread | Proportional Increase |
|---|---|---|---|---|
| Jan 2010 - Dec 2014 | 34 | - | 215 | - |
| Jan 2015 - Dec 2018 | 54 | 59% | 270 | 26% |
| As of Jan 2019 | 69 | 27% | 264 | -2% |

189.    Beef processors have nearly doubled their share of consumer beef spending

following the beginning of their collusive scheme to inflate their margins:

| | Approximate Allocation of $1 of Consumer Spending on Beef | | |
|---|---|---|---|
| | Farmer | Processor | Retailer |
| Jan 2010 – Dec 2014 | 42.4 cents | 6.8 cents | 50.8 cents |
| Jan 2015 – Dec 2018 | 44.9 cents | 9.0 cents | 46.1 cents |
| As of Jan 2019 | 44.5 cents | 11.7 cents | 43.8 cents |

## G.    Overcharges due to the cartel were passed through to the indirect purchaser class.

190.    The USDA has stated that high levels of market concentration allow the

largest participants to extract more of the economic value from food transactions, but

"consumers typically bear the burden, paying higher prices for goods of lower quality."

191.    As a matter of economic principle, firms must recover the short-run variable

costs of production when they price their products for the market, which ultimately get

passed to consumers in the form of higher retail prices. For a firm to be profitable, the firm

must recover its marginal cost of production. In a perfectly competitive market, firms price

at marginal cost and when marginal costs increase, the cost increases are passed through to the consumer 1:1 or at a 100 percent pass-through rate. As a general matter, the pass-through rate will be determined by the relative elasticities of supply and demand. When demand is inelastic (as it is for beef) the pass-through rate is closer to 100 percent.

192.   Starting in 2015, the retail price of beef and the price paid for live steer diverged dramatically, as falling wholesale prices for live steer did not lead to matching decreases in the retail price of beef. This divergence from the prior historical pattern is a result of the Meatpacking Defendants' collusive activity:



193.   Publicly available data confirms that the consumer-class members were injured. Using the period prior to the conspiracy (2010 to 2014) as an approximation of the non-collusive processor markup, plaintiffs have modeled what the price of beef would have been from 2015 to 2018 in the absence of a conspiracy. The orange dotted line in the

following chart shows what the wholesale price of beef would have been, *but for* the existence of the conspiracy – demonstrating clear impact in the post-2015 period:



194.   The following diagrams clearly show the Meatpacking Defendants' anticompetitive conduct was successful at dramatically elevating their markup margins in the 2015 to 2018 period as compared to the benchmark pre-2015 period, where the anticompetitive conduct is presumed to be absent:





**H.    The elevation in processor margins during the Class Period is not explained by changes in export levels or international demand for beef.**

195.    Changes in relative levels of export vs. import of beef during the relevant period do not explain the increase in processor margins because the United States has actually transitioned from being a net exporter of beef from 2010 to 2014 to being a net importer of beef from after 2015:



196.    This change in status from net exporter to net importer is consistent with an artificial bottleneck in domestic supply. It is not consistent with rising meatpacker margins being caused by increased foreign demand, as foreign demand, on net, fell in relation to domestic demand over the relevant period.

197.    Furthermore, export prices have increased since 2010, but the volume-weighted average export price has not increased faster than domestic prices. This result is

also inconsistent with the increase in processor margins being caused by changes in exporting amounts:



198.    The change in meatpacking margins is also not explained by a change in international levels of demand. On the international level, there is strong historical evidence that the degree of international demand has very little impact on the wholesale or retail price of beef. Regression analysis shows that quarterly changes in the export amounts of beef has very little impact on changes in the wholesale or retail price of beef. The absence of any impact is particularly visible during the Mad Cow crisis of 2004. During this period, international demand for, and thus exports, of beef almost entirely collapsed, but there was almost no effect on the retail price of domestic beef:



I.      **The Meatpacking Defendants had numerous trade organizations and opportunities to meet and collude.**

199.    Meatpacking Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations, including: the National Cattlemen's Beef Association ("NCBA"); the U.S. Meat Export Federation ("USMEF"); the Global and U.S. Roundtables for Sustainable Beef ("USRSB")[46]; and the North American Meat Institute ("NAMI") (which resulted from the merger of The North American Meat Association and the American Meat Institute).

---

[46]  In 2015, Meatpacking Defendants were among the founding members of the USRSB.  Meatpacking Defendants participate in its annual meetings (held in the spring), with JBS and Cargill additionally having leadership positions in certain working groups.

200.   For example, the NCBA holds an annual convention (known as "CattleCon"), a summer conference, a legislative conference, and regional meetings.[47] The NCBA Product Council, which includes Meatpacking Defendants, other packers, and certain retailers and restaurants, meets quarterly for the Beef Executive Forum, an invitation-only event.[48] Representatives of each Meatpacking Defendant typically attend these events.  Meatpacking Defendants also participate in meetings of the Beef Checkoff program run by the Federation of State Beef Councils that are held in conjunction with the NCBA summer and winter meetings.[49]

201.   Similarly, the USMEF—a trade association that develops export opportunities for U.S. protein producers and whose leadership includes current and former employees and officers of Meatpacking Defendants—holds both spring and fall conferences and monthly international trade shows.[50]

---

[47]   *NCBA Allied Industry Membership*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), www.beefusa.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20 Brochure.pdf.

[48]   *Id.*

[49]   *See also The Association*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/theassociation.aspx; and *Federation*, NAT'L CATTLEMEN'S BEEF ASS'N (2019), http://www.beefusa.org/federation.aspx.

[50]   *Events:     Meetings*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/bod-meetings/; *Events: Trade Show Calendar*, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/.

202.   The NAMI—which is a national trade association that represents companies that process 95% of red meat—conducts a series of annual conference and educational workshops all across the country.[51]

**J.     The Meatpacking Defendants have significant oversight of each other's prices and production decisions.**

203.   The Meatpacking Defendants' field buyers' weekly trips to inspect the feedlots in their territories provide an opportunity to meet and exchange commercially sensitive information among each other. Field buyers routinely communicate "market color" obtained from the field, including reports of their competitors' activities obtained from producers, back to their respective head offices and other field buyers through their daily conference calls.

204.   For example, Witness 2 reported that the field buyers from Tyson, JBS, Cargill, and National Beef assigned to his feedlot would call him each week to confirm who bought his cattle that week and on what terms. The field buyers would request such information even when they had not placed a bid that week. Witness 2 felt obliged to provide such information and would acquiesce to their requests. Field buyers from Tyson, JBS, Cargill, and National Beef make similar inquiries of other producers and feedlots across the feeding regions. Most producers would provide such information on request, unwilling to risk alienating one of their buyers.

---

[51] *See   About   NAMI*, NAT'L   AM.   MEAT   ASS'N   (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/204/pid/204;   *Events*,   NAT'L AMERICAN   MEAT   ASS'N   (2019), https://www.meatinstitute.org/index.php?ht=d/sp/i/10422/pid/10422.

205.    Tyson, JBS, Cargill, and National Beef would also direct their field buyers and other staff to drive past their competitors' plants to determine and report upon those plants' operating levels (for example, whether the plant had reduced labor hours or was operating on Saturday). Tyson had a standing policy which precluded these directives, and the resulting reports about their competitors' operations, from being put into writing. Such communications were effectuated through phone calls. On information and belief, JBS, Cargill, and National Beef operate similar policies. The activities of their respective competitors, including their slaughter volumes, would also be discussed by those attending Tyson, JBS, Cargill, and National Beef's daily planning meetings.

206.    Combined with widespread formal and informal reporting of fed cattle and beef bids, transactions and volumes, and each slaughter plant's current and planned output, these activities enable Meatpacking Defendants to monitor each other's adherence to any anticompetitive agreement. The purchasing dynamics of the fed cattle market, with its weekly cash trade, also provide Meatpacking Defendants with the ability to punish any suspected non-compliance with such an agreement.[52]

---

[52]    Research shows that markets, such as the fed cattle market, in which a large number of sellers make repetitive sales to a small group of purchasers, facilitate the formation and maintenance of price-fixing agreements as they provide opportunities for the purchasers to agree, sustain, and enforce market sharing arrangements.  R. Posner, ANTITRUST LAW 68 (2nd ed. 2001); and *Price Fixing, Bid Rigging, and Market Allocation Schemes: What They Are and What to Look For*, U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION, www.justice.gov/atr/public/guidelines/211578.htm.

**K.      The Meatpacking Defendants actively concealed the conspiracy.**

207.    Throughout the Class Period, the Meatpacking Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from plaintiffs and class members.

208.    The combination and conspiracy alleged herein was fraudulently concealed by the Meatpacking Defendants by various means and methods, including, but not limited to (i) communicating with each other by telephone about their purchases and slaughter volumes so that they would not have written evidence of sharing this information with a competitor, as well as relying on non-public forms of communication; (ii) offering false or pretextual reasons for low fed cattle prices; (iii) offering pretextual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade; (iv) affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and (v) misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to government officials and to the public.

209.    The Meatpacking Defendants offered pretextual justifications for plant closures, slaughter reductions, and withdrawal from the cash cattle trade.  The Meatpacking Defendants also offered pretextual reasons for low fed cattle prices. Just some, but by no means all, examples are as follows:

210.    In furtherance of the conspiracy, Tyson repeatedly issued pretextual public statements to conceal Defendants' conspiracy. For example, in their SEC filings between 2015 and 2018, Tyson stated that it had "limited or no control" over the production and pricing of cattle, rather, the price is "determined by constantly changing market forces of

supply and demand."[53] According to Tyson, factors that affect the cost of cattle include "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign governments."[54] Additionally, Tyson stated that it "ceased operations at our Denison, Iowa plant" in order to "better align our overall production capacity with current cattle supplies."[55] Furthermore, Tyson stated, "[t]he Beef segment earnings improved . . . due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."[56]

211. Tyson made these pretextual public statements in order to conceal its participation in the conspiracy. Rather than disclose that their improved earnings were in fact the supracompetitive profits of Defendants' unlawful conspiracy, Tyson instead

---

[53] Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018).

[54] Tyson Foods, Inc., Annual Report (Form 10-K) at 7 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K), at 7 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K) at 6 (Sept. 30, 2017); Tyson Foods, Inc., Annual Report (Form 10-K), at 7-8 (Sept. 29, 2018).

[55] Tyson Foods, Inc., Annual Report (Form 10-K), at 56 (Oct. 3, 2015); Tyson Foods, Inc., Annual Report (Form 10-K), at 54, 68 (Oct. 1, 2016); Tyson Foods, Inc., Annual Report (Form 10-K), at 57, 72 (Sept. 30, 2017).

[56] Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Oct. 1, 2016); *see also* Tyson Foods, Inc., Annual Report (Form 10-K), at 23 (Sept. 30, 2017) ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson Foods, Inc., Annual Report (Form 10-K), at 25 (Sept. 29, 2018) (same).

offered the innocuous pretexts of "lower fed cattle costs" and "favorable market conditions."[57]

212.   In furtherance of the conspiracy, JBS repeatedly issued pretextual public statements to conceal Defendants' conspiracy. For example, in November 2015, JBS executive, Andre Nogueira, stated that "Cattle price will go down" in the United States because "we are going to see more cattle available."[58] In March 2016, JBS CEO, Wesley Mendonca Batista, similarly stated that JBS would enjoy "better margin[s]" because of an "increase in the herd in the U.S."[59] Similar statements continued throughout 2016 and into 2017 and 2018, with JBS executives repeatedly stating that its strong financial performance in the United States was due to "more cattle available in the U.S.,"[60] "cattle price[s] . . . [being] back to the normal level,"[61] "greater cattle availability,"[62] and "strong demand for beef."[63]

213.   JBS made these pretextual public statements in order to conceal its participation in the conspiracy. Rather than disclose that the "improvement in EBITDA

---

[57]   Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Oct. 1, 2016); *see also* Tyson Foods, Inc., Annual Report (Form 10-K) at 23 (Sept. 30, 2017) ("The Beef segment experienced strong export demand and more favorable domestic market conditions associated with an increase in cattle supply."); Tyson Foods, Inc., Annual Report (Form 10-K) at 25 (Sept. 29, 2018) (same).

[58]   JBS, Q3 2015 Earnings Call, Bloomberg Transcript (Nov. 12, 2015) at 11.

[59]   JBS, Q4 2015 Earnings Call, Bloomberg Transcript (Mar. 17, 2016) at 6.

[60]   JBS, Q2 2016 Earnings Call, Bloomberg Transcript (Aug. 11, 2016) at 6.

[61]   JBS, Q3 2016 Earnings Call, Bloomberg Transcript (Nov. 16, 2016) at 10.

[62]   JBS, Q1 2017 Earnings Call, Bloomberg Transcript (May 16, 2017) at 2.

[63]   JBS, Q2 2018 Earnings Call, Bloomberg Transcript (Aug. 15, 2018) at 4.

margin"[64] JBS in fact, reflected the supracompetitive profits of Defendants' unlawful conspiracy, it instead offered the innocuous pretexts of "greater cattle availability" and cattle prices mysteriously being "back to the normal level."

214.    In furtherance of the conspiracy, Cargill repeatedly issued pretextual public statements to conceal Defendants' conspiracy. For example, in May 2018, Cargill reported that "excellent results in North American beef" led the company's Animal Nutrition & Protein segment to deliver the largest share of corporate earnings on the year. Cargill concealed the true reason for its "excellent results," instead attributing them simply to "lower cattle costs and rising demand in both domestic and export markets."[65] Similarly, in its 2017 Annual Report, Cargill reported that "favorable market conditions in North America" were simply the product of "[r]enewed consumer demand for beef . . ."[66] In 2018, Cargill announced that its Animal Nutrition & Protein business surpassed even the prior year's "strong performance," "fueled by rising domestic and export demand for North American beef . . ."[67]

215.    Cargill made these pretextual public statements in order to conceal its participation in the conspiracy. Rather than disclose that its "excellent results" were in fact

---

[64]    *Id.*

[65]    Cargill, Inc. Management's Discussion and Analysis of Financial Condition and Results of Operations for the three months and year ended May 31, 2018, Municipal Secondary Market Disclosure Filing Sheet, at 2 (Aug. 14, 2018).

[66]    Cargill,         Inc.,         2017         Annual         Report         at         1, https://www.cargill.com/doc/1432094802973/2017-annual-report.pdf.

[67]    Cargill,         Inc.,         2018         Annual         Report         at         3, https://www.cargill.com/doc/1432124831909/2018-annual-report.pdf.

the supracompetitive profits of Defendants' unlawful conspiracy, Cargill instead offered the innocuous pretexts of "lower cattle costs" and "rising demand."

216.   In furtherance of the conspiracy, National Beef repeatedly issued pretextual public statements to conceal Defendants' conspiracy. On information and belief, National Beef was the original and knowing source of every pretextual public statement ostensibly made by Jefferies Financial Group[68] and Marfrig Global Foods S.A.[69] to conceal Defendants' conspiracy. For example, in October 2015, Jefferies Financial Group stated that the expected expansion of the cow-herd "bodes well for [packing industry] margins as it will lead to an increase in the number of fed cattle available for slaughter."[70] In October 2016, Jefferies Financial Group touted that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when explaining how "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle has fallen from $1.48 to $1.16."[71] Jefferies Financial Group continued to offer similar explanations throughout 2017 and 2018, noting, for example, that: "National Beef generated record

---

[68] National Beef's controlling shareholder prior to June 2018. Jefferies Financial Group Inc., Annual Report, (Form 10-K) at 6 (Jan. 10, 2019) ("Jefferies 2018 Annual Report"). After the acquisition, Jefferies Financial Group, retained a 31% interest in National Beef.

[69] A Brazilian meatpacking conglomerate with operations around the world. Since June 2018, Marfrig owns a controlling interest in National Beef Packing Company, LLC. *Marfrig Concludes Acquisition of National Beef*, Marfrig (Jun. 6, 2018), http://www.marfrig.com.br/en/documentos?id=780.

[70] Leucadia National Corporation (Jefferies Financial Group), 2015 Investor Day Presentation at 118 (Oct. 8, 2015).

[71] Leucadia National Corporation (Jefferies Financial Group), 2016 Investor Meeting Presentation at 53 (Oct. 5, 2016).

results for [Last Twelve Months] on the back of a more balanced supply of cattle and robust end market demand";[72] "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016";[73] "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins";[74] and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."[75] National Beef's CEO and President, Tim Klein, attended the Jefferies Financial Group Investor Day presentations in 2015, 2016, and 2017 at which the above statements were made.[76] Mr. Klein was the designated speaker for the portion of these events directed to National Beef's performance.

217.    Marfrig Global Foods S.A. continued to offer similar pretextual explanations for the low prices caused by Meatpacking Defendants' anticompetitive agreement after it

---

[72]   Leucadia National Corporation (Jefferies Financial Group), 2017 Investor Meeting at 1 (Oct. 5, 2017).

[73]   *Id*. at 58.

[74]   Jefferies Financial Group Inc., 2017 Annual Report (Form 10-K) at 33 (Feb. 28, 2018).

[75]   Jefferies Financial Group Inc, 2018 Investor Meeting at 61 (Oct. 4, 2018).  National Beef director, and Jefferies Capital Partners Managing Director, Nick Daraviras, presented in relation to National Beef at this event, further noting that "favorable supply and demand dynamics continue, leading to an enhanced margin environment industry-wide".

[76]   Press Release, *Leucadia to Host Investor Day on October 8, 2015*, Leucadia National Corporation (Jefferies Financial Group) (Sept. 1, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2016*, Leucadia National Corporation (Jefferies Financial Group) (Sep. 12, 2015), http://www.leucadia.com/All/1/1113; Press Release, *Leucadia to Host Investor Day on October 5, 2017*, Leucadia National Corporation (Jefferies Financial Group) (Sept. 13, 2017), http://www.leucadia.com/All/1/1113.

bought a controlling stake in National Beef. For example, in November 2018, Marfrig reported that "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."[77] Marfrig executives reiterated the point on the company's earnings call for the third quarter of 2018, stating that "the U.S. beef industry has delivered record results" thanks to "an ample supply of cattle" and "strong demands [sic] in both the domestic and international markets."[78] Marfrig acknowledged that it achieved these "record results" and "better margins" while reducing cattle slaughter volumes—but the company claimed that its reduced slaughter volumes were merely the result of there being "fewer weeks in the third quarter 2018 compared to the third quarter 2017."[79] National Beef CEO, Tim M. Klein—referred to as "CEO of [Marfrig's] North American Operations" by Marfrig CEO, Eduardo de Oliveira Miron—participated in this call.[80] Similarly, in the fourth quarter of 2018, Marfrig announced that it achieved a "[s]olid result from North America Operation, sustained by strong demand for beef protein and the higher cattle availability."[81]

218.    Jefferies and Marfrig made these pretextual public statements on behalf of National Beef in order to conceal its participation in the conspiracy. Rather than disclose that its "record results" and "better margins" in fact reflected the supracompetitive profits

---

[77]   Marfrig Global Foods S.A., Earnings Release 3Q18 (Nov. 5, 2018) at 2.

[78]   Marfrig, Q3 2018 Earnings Call, Bloomberg Transcript (Nov. 6, 2018) at 5.

[79]   *Id*. at 3.

[80]   *Id*. at 2.

[81]   Marfrig Global Foods, Earnings Conference Call 4Q18 and 2018 Presentation (Feb. 28, 2018) at 8.

of Meatpacking Defendants' unlawful conspiracy, Jefferies and Marfrig echoed the innocuous pretexts offered up by the Tyson, JBS, and Cargill Defendants—suggesting, falsely, that "ample supply of cattle," "higher cattle availability," and "strong demand" were responsible for its supracompetitive profits.

219.   The Meatpacking Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation. Had the public learned that Defendants conspired to lower supply and effectively fix prices, their conspiracy could not have continued for as long as it did.

220.   Although the federal government recently was asked to review factors affecting pricing in the U.S. cattle market, the Government Accountability Office (GAO) had limited investigative authority in producing its April 2018 report, and "did not obtain and review internal packer documents."[82] The GAO's analysis explicitly "did not include a review of whether packers engaged in anticompetitive behavior" of the type complained herein.[83] Plaintiffs also were not able to obtain or review internal packer documents to learn about Defendants' misconduct.

221.   Because of Defendants' fraudulent concealment, Plaintiffs and the Class had insufficient information concerning Defendants' misconduct on which to base a complaint,

---

[82] U.S. Gov't Accountability Off., GAO-18-296, *U.S. Dep't of Agriculture: Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market* 16 (Apr. 2018), https://www.gao.gov/assets/700/691178.pdf at 28-29.

[83] *Id.*

and could not have discovered it through the exercise of due diligence until recently. Plaintiffs have acted diligently in seeking to bring their claims promptly.

222.    Accordingly, by virtue of the fraudulent concealment of their wrongful conduct by the Meatpacking Defendants and all of their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that plaintiffs and the other class members have as a result of the unlawful combination and conspiracy alleged in this complaint.

**L.    The Meatpacking Defendants' conspiracy continues through the present.**

223.    As alleged herein, the Meatpacking Defendants' price-fixing conspiracy lasted from at least January 1, 2015 and continues through the present.

224.    Tyson, JBS, Cargill, and National Beef each engaged in the conspiracy to fix and suppress the price of fed cattle in the United States.

225.    As a result of the anticompetitive conduct challenged in this Complaint, throughout the Class Period, the Meatpacking Defendants were able to and did purchase cattle at artificially suppressed cash prices and purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts throughout the Class Period.

226.    Each Meatpacking Defendant's purchase for fed cattle at artificial and non-competitive price constituted a new overt act causing injury to the proposed Classes.

227.    The Meatpacking Defendants' purchases pursuant to the conspiracy continued throughout the Class Period and, accordingly members of the proposed Class were injured and may recover for damages suffered at any point in the conspiracy.

228. The Meatpacking Defendants continue to engage in the anticompetitive conduct alleged herein, and continue to be able to and do purchase cattle at artificially suppressed cash prices and purchase cattle at artificially suppressed prices pursuant to formula, forward, and/or grid contracts throughout the Class Period.

229. The Meatpacking Defendants' unlawful communications regarding pricing and procurement decisions continue to this day.

## VII. CLASS ACTION ALLEGATIONS

230. Plaintiffs bring this action on behalf of themselves, and as a class action under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), seeking injunctive relief pursuant to federal law, and damages pursuant to various state antitrust, unfair competition, unjust enrichment, and consumer protection laws of the states listed below on behalf of the members of the following classes:

A. **Nationwide Injunctive Relief class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in the United States during the Class Period.

B. **Arizona class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Arizona during the Class Period.

C. **California class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in California during the Class Period.

D. **District of Columbia class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in the District of Columbia during the Class Period.

E. **Florida class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Florida during the Class Period.

- 85 -

F.   **Hawaii class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Hawaii during the Class Period.

G.   **Illinois class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Illinois during the Class Period.

H.   **Iowa class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Iowa during the Class Period.

I.   **Kansas class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Kansas during the Class Period.

J.   **Maine class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Maine during the Class Period.

K.   **Massachusetts class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Massachusetts during the Class Period.

L.   **Michigan class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Michigan during the Class Period.

M.   **Minnesota class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Minnesota during the Class Period.

N.   **Mississippi class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Mississippi during the Class Period.

O.   **Missouri class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Missouri during the Class Period.

P.   **Montana class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Montana during the Class Period.

Q.   **Nebraska class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Nebraska during the Class Period.

R.   **Nevada class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Nevada during the Class Period.

S.   **New Hampshire class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in New Hampshire during the Class Period.

T.   **New Mexico class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in New Mexico during the Class Period.

U.   **New York class:** All persons and who indirectly purchased beef from defendants or co-conspirators for personal use in New York during the Class Period.

V.   **North Carolina class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in North Carolina during the Class Period.

W.   **North Dakota class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in North Dakota during the Class Period.

X.   **Oregon class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Oregon during the Class Period.

Y.   **Rhode Island class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Rhode Island during the Class Period.

Z.   **South Carolina class:** All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in South Carolina during the Class Period.

AA. **South Dakota class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in South Dakota during the Class Period.

BB. **Tennessee class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Tennessee during the Class Period.

CC. **Utah class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Utah during the Class Period.

DD. **West Virginia**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in West Virginia during the Class Period.

EE. **Wisconsin class**: All persons and entities who indirectly purchased beef from defendants or co-conspirators for personal use in Wisconsin during the Class Period.

231. The state classes are collectively referred to as the "classes" unless otherwise indicated. Specifically excluded from these classes are the defendants; the officers, directors or employees of any defendant; any entity in which any defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any defendant. Also excluded from these classes are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, and any co-conspirator identified in this action. Further excluded from the classes and National Injunctive Relief Class are purchasers of value-added products not manufactured, supplied or processed by defendants, or otherwise not under the control of defendants.

232.   <u>Class Identity</u>: The above-defined classes are readily identifiable and is one for which records should exist.

233.   <u>Numerosity</u>: Plaintiffs do not know the exact number of class members because such information presently is in the exclusive control of defendants, retailers, resellers and other entities in the supply chain of beef. Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

234.   <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the classes because plaintiffs purchased beef indirectly from one or more of the defendants for personal use, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the classes and the relief sought is common to the classes.

235.   <u>Common Questions Predominate</u>: There are questions of law and fact common to the classes, including, but not limited to:

A.   Whether defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of beef sold in interstate commerce in the United States;

B.   The identity of the participants of the alleged conspiracy;

C.   The duration of the conspiracy alleged herein and the acts performed by defendants and their co-conspirators in furtherance of the conspiracy;

D.   Whether the alleged conspiracy violated the antitrust and consumer protection laws of the various states;

E.   Whether the conduct of defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the plaintiffs and the other members of the classes;

F.   The effect of defendants' alleged conspiracy on the prices of beef sold in the United States during the Class Period;

G.   Whether plaintiffs and other members of the classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

H.   The appropriate class-wide measure of damages.

These and other questions of law or fact, which are common to the members of the classes, predominate over any questions affecting only individual members of the classes.

236.   <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the classes in that plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the classes who indirectly purchased beef from defendants and plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the classes.

237.   <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the classes is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the classes compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the classes to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory

judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

238.   The prosecution of separate actions by individual members of the classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for defendants.

239.   Plaintiffs bring the classes on behalf of all persons similarly situated pursuant to Rule 23, on behalf of all persons and entities that, as residents of various states, indirectly purchased one or more beef products that a defendant or co-conspirator produced for personal use during the respective class periods.

240.   Defendants have acted on grounds generally applicable to the classes, thereby making final injunctive relief appropriate with respect to the classes as a whole.

## VIII.   ANTITRUST INJURY

241.   Defendants' anticompetitive conduct had the following effects, among others:

A. Price competition has been restrained or eliminated with respect to beef;

B. The prices of beef have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C. Indirect purchasers of beef have been deprived of free and open competition; and

D.  End-user consumers of beef who indirectly purchased beef for personal use, including plaintiffs, paid artificially inflated prices.

242.   The beef that plaintiffs and class members purchased was in substantially the same form as when they were initially sold by defendants. As a result, the beef follows a traceable physical chain from defendants to plaintiffs and class members, and the overcharges on beef can be traced from defendants to plaintiffs and class members.

243.   As discussed in detail, as a matter of economic principle, firms must recover the short-run variable costs of production when they price their products for the market, which ultimately get passed to consumers, plaintiffs and class members here, in the form of higher retail prices. When demand is inelastic, as it is for beef, the pass-through rate to end users is at or near 100 percent.

244.   Consequently, while the direct purchasers were the first to pay supra-competitive prices, the overcharge was passed along the distribution chain and absorbed by plaintiffs and class members when they purchased the beef for personal use.

245.   Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution to end-user consumers. Thus, the economic harm to plaintiffs and the class member can be quantified.

246.   The purpose of the conspiratorial conduct of defendants and their co-conspirators was to raise, fix, or maintain the price of beef and, as a direct and foreseeable result. Plaintiffs and the classes paid supra-competitive prices for beef during the Class Period.

247.    By reason of the alleged violations of the antitrust laws, plaintiffs and the classes have sustained injury to their businesses or property, having paid higher prices for beef than they would have paid in the absence of defendants' illegal contract, combination, or conspiracy and as a result have suffered damages.

248.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.    CAUSES OF ACTION

## VIOLATION OF THE SHERMAN ACT

### FIRST CLAIM FOR RELIEF
VIOLATION OF SECTION 1 OF THE SHERMAN ACT
15 U.S.C. § 1
(ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE
RELIEF)

249.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

250.    Beginning at a time currently unknown to plaintiffs, but at least as early as 2015, and continuing through the present, the exact dates being unknown to plaintiffs, defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade artificially to fix, raise, and stabilize price for beef in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

251.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others:

      A. Fixing, raising, and stabilizing the price of beef; and

      B. Allocating among themselves and collusively reducing the production of

      beef.

252.    The combination and conspiracy alleged herein has had the following effects, among others:

      A. Price competition in the sale of beef has been restrained, suppressed, and/or eliminated in the United States;

      B. Prices for beef sold by defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

      C. Those who purchased beef indirectly from defendants and their co-conspirators for their personal use have been deprived of the benefits of free and open competition.

253.    Plaintiffs and members of the classes have been injured and will continue to be injured in their businesses and property by paying more for beef purchased indirectly from the defendants and their co-conspirators for their personal use than they would have paid and will pay in the absence of the combination and conspiracy.

254.    Plaintiffs and members of the classes are entitled to an injunction against defendants, preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST LAWS

255.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

256.    The following claims for relief are pleaded under the antitrust laws of each

jurisdiction identified below on behalf of the indicated class.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT,**
**ARIZ. REV. STAT. § 44-1401, *ET SEQ.***
**(ON BEHALF OF THE ARIZONA CLASS)**

257.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

every allegation set forth in the preceding paragraphs of this complaint.

258.    By reason of the conduct alleged herein, defendants have violated Arizona

Rev. Stat. § 44-1401, *et seq.*

259.    Defendants entered into a contract, combination, or conspiracy between two

or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a

substantial part of which occurred within Arizona.

260.    Defendants established, maintained, or used a monopoly, or attempted to

establish a monopoly, of trade or commerce in the beef market, a substantial part of which

occurred within Arizona, for the purpose of excluding competition or controlling, fixing,

or maintaining prices in the beef market.

261.    Defendants' violations of Arizona law were flagrant.

262.    Defendants' unlawful conduct substantially affected Arizona's trade and

commerce.

263.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs

and members of the Arizona Class have been injured in their business or property and are

threatened with further injury.

264.    By reason of the foregoing, plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

## THIRD CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16700, *ET SEQ.* (ON BEHALF OF THE CALIFORNIA CLASS)

265.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266.    The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, Cal. Bus. & Prof. Code §§ 16700-16770, governs antitrust violations in California.

267.    California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. Cal. Bus. & Prof. Code § 301.

268.    Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Cal. Bus. & Prof. Code § 16750(a).

269.    A trust in California is any combination intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of merchandise, or preventing competition in the market for a commodity. Cal. Bus. & Prof. Code § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

270. Plaintiffs purchased beef within the State of California during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

271. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of Cal. Bus. & Prof. Code § 16700, *et seq.*

272. Plaintiffs and members of the California Class were injured in their business or property, with respect to purchases of beef in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT,**
**D.C. CODE § 28-4501, *ET SEQ*.**
**(ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)**

273. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

274. The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

275. Plaintiffs purchased beef within the District of Columbia during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

276.   Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods . . . shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

277.   Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the market for beef within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq*.

278.   Plaintiffs and members of the District of Columbia Class were injured with respect to purchases of beef in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ*.**
**(ON BEHALF OF THE ILLINOIS CLASS)**

279.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

280.   The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade. . . ." 740 ILCS 10/2.

- 98 -

281.    Plaintiffs purchased beef within the State of Illinois during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

282.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

283.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for beef sold, and/or for allocating customers or markets for beef within the intrastate commerce of Illinois.

284.    Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for beef in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq*.

285.    Plaintiffs and members of the Illinois Class were injured with respect to purchases of beef in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE IOWA COMPETITION LAW**
**IOWA CODE § 553.1, *ET SEQ*.**
**(ON BEHALF OF THE IOWA CLASS)**

286.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

287.    The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

288.    Plaintiffs purchased beef within the State of Iowa during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

289.    Defendants contracted, combined or conspired to restrain or monopolize trade in the market for beef, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for beef, in violation of Iowa Code § 553.1, *et seq.*

290.    Plaintiffs and members of the Iowa Class were injured with respect to purchases of beef in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT**
**KAN. STAT. ANN. § 50-101, *ET SEQ.***
**(ON BEHALF OF THE KANSAS CLASS)**

291.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

292.    The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

293.    Plaintiffs purchased beef within the State of Kansas during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

294.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

295.    Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of beef, increasing the price of beef, preventing competition in the sale of beef, or binding themselves not to sell beef, in a manner that established the price of beef and precluded free and unrestricted competition among themselves in the sale of beef, in violation of Kan. Stat. Ann. § 50-101, *et seq*.

296.    Plaintiffs and members of the Kansas Class were injured with respect to purchases of beef in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE MAINE'S ANTITRUST STATUTE**
**ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ*.**
**(ON BEHALF OF THE MAINE CLASS)**

297.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

298.    Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally

prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

299.    Plaintiffs purchased beef within the State of Maine during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

300.    Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

301.    Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of beef within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

302.    Plaintiffs and members of the Maine Class were injured with respect to purchases of beef in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

## NINTH CLAIM FOR RELIEF
### VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT
### MICH. COMP. LAWS § 445.771, *ET SEQ.*
### (ON BEHALF OF THE MICHIGAN CLASS)

303.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

304.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies

and attempts to monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

305.    Plaintiffs purchased beef within the State of Michigan during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

306.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

307.    Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for beef, in violation of Mich. Comp. Laws § 445.772, *et seq.*

308.    Plaintiffs and members of the Michigan Class were injured with respect to purchases of beef in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

**TENTH CLAIM FOR RELIEF**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**MINN. STAT. § 325D.49, *ET SEQ.***
**(ON BEHALF OF THE MINNESOTA CLASS)**

309.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

310.    The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in

Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

311. Plaintiffs purchased beef within the State of Minnesota during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

312. Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

313. Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for beef within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for beef within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for beef within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

314. Plaintiffs and members of the Minnesota Class were injured with respect to purchases of beef in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

**ELEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,**
**MISS. CODE ANN. § 74-21-1, *ET SEQ*.**
**(ON BEHALF OF THE MISSISSIPPI CLASS)**

315.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

316.    Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

317.    Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

318.    Plaintiffs purchased beef within the State of Mississippi during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

319.    Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

320.    Defendants combined, contracted, understood and agreed in the market for beef, in a manner inimical to public welfare, with the effect of restraining trade, increasing

- 105 -

the price of beef and hindering competition in the sale of beef, in violation of Miss. Code Ann. § 75-21-1(a), *et seq.*

321.    Defendants monopolized or attempted to monopolize the production, control or sale of beef, in violation of Miss. Code Ann. § 75-21-3, *et seq.*

322.    Defendants' beef is sold indirectly via distributors throughout the State of Mississippi. During the Class Period, defendants' illegal conduct substantially affected Mississippi commerce.

323.    Plaintiffs and members of the Mississippi Class were injured with respect to purchases of beef in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

**TWELFTH CLAIM FOR RELIEF**
**VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT,**
**MO. ANN. STAT. § 407.010, *ET SEQ.***
**(ON BEHALF OF THE MISSOURI CLASS)**

324.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

325.    Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

326.    Plaintiffs purchased beef within the State of Missouri during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

327. Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc*., 216 S.W.3d 667, 669 (Mo. 2007).

328. Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of Missouri, and monopolized or attempted to monopolize the market for beef within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Mo. Ann. Stat. § 407.010, *et seq*.

329. Plaintiffs and members of the Missouri Class were injured with respect to purchases of beef in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## THIRTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NEBRASKA JUNKIN ACT, NEB. REV. STAT. § 59-801, *ET SEQ*. (ON BEHALF OF THE NEBRASKA CLASS)

330. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

331. Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

332.    Plaintiffs purchased beef within the State of Nebraska during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

333.    Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

334.    Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for beef within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq.*

335.    Plaintiffs and members of the Nebraska Class were injured with respect to purchases of beef in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## FOURTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. § 598A.010, *ET SEQ.* (ON BEHALF OF THE NEVADA CLASS)

336.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

337.    The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities...is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

338.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. Nev. Rev. Stat. Ann. § 598A.060.

339.    Plaintiffs purchased beef within the State of Nevada during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

340.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. §598A.210(2).

341.    Defendants fixed prices by agreeing to establish prices for beef in Nevada, divided Nevada markets, allocated Nevada customers, and monopolized or attempted monopolize trade or commerce of beef within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, *et seq.*

342.    Plaintiffs and members of the Nevada Class were injured with respect to purchases of beef in Nevada in that at least thousands of sales of defendants' beef took

place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by defendants' conduct.

343.    Accordingly, plaintiffs and members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

344.    In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by plaintiffs.

**FIFTEENTH CLAIM FOR RELIEF**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE,**
**N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.***
**(ON BEHALF OF THE NEW HAMPSHIRE CLASS)**

345.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

346.    Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

347.    Plaintiffs purchased beef within the State of New Hampshire during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

348.    Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

349.    Defendants fixed, controlled or maintained prices for beef, allocated customers or markets for beef, and established, maintained or used monopoly power, or

attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

350.    Plaintiffs and members of the New Hampshire Class were injured with respect to purchases of beef in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

**SIXTEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW MEXICO ANTITRUST ACT,**
**N.M. STAT. ANN. §§ 57-1-1, *ET SEQ.***
**(ON BEHALF OF THE NEW MEXICO CLASS)**

351.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

352.    The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

353.    Plaintiffs purchased beef within the State of New Mexico during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

354.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

355.    Defendants contracted, agreed, combined or conspired, and monopolized or attempted to monopolize trade for beef within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

356.    Plaintiffs and members of the New Mexico Class were injured with respect to purchases of beef in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## SEVENTEENTH CLAIM FOR RELIEF
## VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW
## (ON BEHALF OF THE NEW YORK CLASS)

357.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

358.    Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

359.    Plaintiffs purchased beef within the State of New York during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

360.    Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

361.    Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of beef and restrained competition in the free exercise of the conduct of the business of beef within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

362.   Plaintiffs and members of the New York Class were injured with respect to purchases of beef in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

### EIGHTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES,
### N.C. GEN. STAT. § 75-1, *ET SEQ.*
### (ON BEHALF OF THE NORTH CAROLINA CLASS)

363.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

364.   Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the beef market, a substantial part of which occurred within North Carolina.

365.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

366.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

367.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

368.    By reason of the foregoing, plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

**NINETEENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT,**
**N.D. CENT. CODE § 51-08.1, *ET SEQ.***
**(ON BEHALF OF THE NORTH DAKOTA CLASS)**

369.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

370.    The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, *et seq.*

371.    Plaintiffs purchased beef within the State of North Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

372.    Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

373.    Defendants contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for beef, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or controlling, fixing or maintaining prices for beef, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

374.    Plaintiffs and members of the North Dakota Class were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

**TWENTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. § 646.705, *ET SEQ*.**
**(ON BEHALF OF THE OREGON CLASS)**

375.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

376.    Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

377.    Plaintiffs purchased beef within the State of Oregon during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

378.    Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

379.    Defendants contracted, combined, or conspired in restraint of trade or commerce of beef, and monopolized or attempted to monopolize the trade or commerce of beef, in violation of Or. Rev. Stat. § 646.705, *et seq.*

380.    Plaintiffs and members of the Oregon Class were injured with respect to purchases of beef within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

### TWENTY-FIRST CLAIM FOR RELIEF
### VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,
### R.I. GEN LAWS § 6-36-1, *ET SEQ.*
### (ON BEHALF OF THE RHODE ISLAND CLASS)

381.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

382.    The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 636-2(a)(2).

383.    Plaintiffs purchased beef within the State of Rhode Island during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

384.    Under the Rhode Island Antitrust Act, as of January 1, 2008, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a). In Rhode Island, the claims of plaintiffs and the Class alleged herein run from January 1, 2008, through the date that the effects of defendants' anticompetitive conduct cease.

385.    Defendants contracted, combined and conspired in restraint of trade of beef within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of beef for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq*.

386.    Plaintiffs and members of the Rhode Island Class were injured with respect to purchases of beef in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

## TWENTY-SECOND CLAIM FOR RELIEF
## VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,
## S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ*.
## (ON BEHALF OF THE SOUTH DAKOTA CLASS)

387.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

388.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

389.    Plaintiffs purchased beef within the State of South Dakota during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

390.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

391.    Defendants contracted, combined or conspired in restraint of trade or commerce of beef within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of beef within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, *et seq.*

392.    Plaintiffs and members of the South Dakota Class were injured with respect to purchases of beef in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## TWENTY-THIRD CLAIM FOR RELIEF
### VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT, TENN. CODE, § 47-25-101, *ET SEQ.* (ON BEHALF OF THE TENNESSEE CLASS)

393.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

394.    The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.

395.   Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

396.   Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, defendants' combination or conspiracy had the following effects: (1) price competition for beef was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for beef were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) plaintiffs and the Tennessee Class were deprived of free and open competition; and (4) plaintiffs and the Tennessee Class paid supra-competitive, artificially inflated prices for beef.

397.   During the Class Period, defendants' illegal conduct had a substantial effect on Tennessee commerce as beef was sold in Tennessee.

398.   Plaintiffs and the Tennessee Class purchased beef within the State of Tennessee during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial. As a direct and proximate result of defendants' unlawful conduct, plaintiffs and the Tennessee Class have been injured in their business and property and are threatened with further injury

399.   Under Tennessee law, indirect purchasers (such as plaintiffs and the Tennessee Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

- 119 -

400.    Plaintiffs and members of the Tennessee Class were injured with respect to purchases of beef in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**TWENTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. §§ 76-10-911, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

401.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

402.    The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

403.    Plaintiffs purchased beef within the State of Utah during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

404.    Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

405.    Defendants contracted, combined or conspired in restraint of trade or commerce of beef, and monopolized or attempted to monopolize trade or commerce of beef, in violation of Utah Code Ann. § 76-10-3101, *et seq.*

406.   Plaintiffs and members of the Utah Class who are either Utah residents or Utah citizens were injured with respect to purchases of beef in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

**TWENTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,**
**W. VA. CODE §47-18-1, *ET SEQ.***
**(ON BEHALF OF THE WEST VIRGINIA CLASS)**

407.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

408.   The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

409.   During the Class Period, defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, *et seq.*

410.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

411.   As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the West Virginia Class have been injured in their business and property in that they paid more for beef than they otherwise would have paid in the absence of defendants' unlawful conduct. As a result of defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, plaintiffs and members of the West Virginia Class seek

treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

**TWENTY-SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE WISCONSIN ANTITRUST ACT,**
**WIS. STAT. ANN. § 133.01(1), *ET SEQ*.**
**(ON BEHALF OF THE WISCONSIN CLASS)**

412.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

413.    Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

414.    Plaintiffs purchased beef within the State of Wisconsin during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

415.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

416.    Defendants contracted, combined or conspired in restraint of trade or commerce of beef, and monopolized or attempted to monopolize the trade or commerce of beef, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq*.

417.    Plaintiffs and members of the Wisconsin Class were injured with respect to purchases of beef in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for defendants' beef in Wisconsin.

418.    Accordingly, plaintiffs and members of the Wisconsin Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

419.    Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to the Wisconsin Class. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced beef from defendants, and (2) paying higher prices for defendants' beef than they would have in the absence of defendants' conduct. These injuries are of the type of the laws of Wisconsin were designed to prevent, and flow from that which makes defendants' conduct unlawful.

420.    Defendants are jointly and severally liable for all damages suffered by plaintiffs and members of the Wisconsin Class.

## VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

421.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

422.    The following claims for relief are pled under the consumer protection or similar laws of each jurisdiction identified below, on behalf of the indicated class.

**TWENTY-SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ*. (THE "UCL")**
**(ON BEHALF OF THE CALIFORNIA CLASS)**

423.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

424.    The violations of federal antitrust law set forth above also constitute violations of section 17200*, et seq.* of California Business and Professions Code.

425.    Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

426.    This claim is instituted pursuant to sections 17203 and 17204 of California Business and Professions Code, to obtain restitution from these defendants for acts, as alleged herein, that violated the UCL.

427.    The defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq.*, of California Business and Professions Code, set forth above.

428.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq.*, of

California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent.

429.    Plaintiffs and members of the California Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

430.    The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

431.    The unlawful and unfair business practices of defendants, and each of them, as described above, have caused and continue to cause plaintiffs and the members of the California Class to pay supra-competitive and artificially inflated prices for beef sold in the State of California. Plaintiffs and the members of the California Class suffered injury in fact and lost money or property as a result of such unfair competition.

432.    As alleged in this Complaint, defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition. Plaintiffs and the members of the California Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to California Business and Professions Code sections 17203 and 17204.

**TWENTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION**
**PROCEDURES ACT,**
**D.C. CODE § 28-3901, *ET SEQ*.**
**(ON BEHALF OF THE DISTRICT OF COLUMBIA CLASS)**

433.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

434.    Plaintiffs and members of the District of Columbia Class purchased beef for personal, family, or household purposes.

435.    By reason of the conduct alleged herein, defendants have violated D.C. Code § 28-3901*, et seq.*

436.    Defendants are "merchants" within the meaning of D.C. Code § 28-3901(a)(3).

437.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Beef market, a substantial part of which occurred within the District of Columbia.

438.    Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Beef Market.

439.    Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

440.    Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

441.     As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the District of Columbia Class have been injured in their business or property and are threatened with further injury.

442.     By reason of the foregoing, plaintiffs and members of the District of Columbia Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorney's fees and costs under D.C. Code § 28-3901, *et seq.*

**TWENTY-NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. § 501.201(2), *ET SEQ*.**
**(ON BEHALF OF THE FLORIDA CLASS)**

443.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

444.     The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

445.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2).

446.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

447.    Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

448.    Plaintiffs purchased beef within the State of Florida during the Class Period. But for defendants' conduct set forth herein, the price per pound of beef would have been lower, in an amount to be determined at trial.

449.    Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Florida.

450.    Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for beef, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2008 and continuing through the date of this filing.

451.    Accordingly, defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

452.    Defendants' unlawful conduct substantially affected Florida's trade and commerce.

453.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for beef and are threatened with further injury.

454. By reason of the foregoing, plaintiffs and the members of the Florida Class is entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**THIRTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE HAWAII REVISED STATUTES ANNOTATED §§ 480-1,**
***ET SEQ.***
**(ON BEHALF OF HAWAII CLASS)**

455. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

456. Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

457. Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) beef prices were, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) plaintiffs and members of the Hawaii Class were deprived of free and open competition; and (4) plaintiffs and members of the Hawaii Class paid supra-competitive, artificially inflated prices for beef.

458. During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

459. As a direct and proximate result of Defendants' unlawful conduct, plaintiffs and members of the Hawaii Class have been injured and are threatened with further injury.

## THIRTY-FIRST CLAIM FOR RELIEF
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT,
## 815 ILL. COMP. STAT. ANN. 505/10A, *ET SEQ.*
## (ON BEHALF OF THE ILLINOIS CLASS)

460.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

461.    By reason of the conduct alleged herein, defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

462.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Illinois.

463.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

464.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

465.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the classes.

466.    Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

467.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Illinois Class were actually deceived and have been injured in their business or property and are threatened with further injury.

468.    By reason of the foregoing, plaintiffs and members of the Illinois Class are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, *et seq.*

## THIRTY-SECOND CLAIM FOR RELIEF
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS CH. 93A § 1, *ET SEQ.* (ON BEHALF OF THE MASSACHUSETTS CLASS)

469.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

470.    Plaintiffs reserve their right to bring a claim under Mass. Gen. Laws Ch. 93A *et seq.* Pursuant to Mass. Gen. Laws Ch. 93A § 9, plaintiffs served all defendants on April 26, 2019, via certified mail, return receipt requested, Demand for Payment Letters. In accordance with the statute, these letters explained the unfair acts, the injury suffered, and requested relief from the defendants within 30 days. If necessary, plaintiffs will amend to add specific claims under Mass. Gen. Laws Ch. 93A *et seq.*

## THIRTY-THIRD CLAIM FOR RELIEF
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT, MICH. COMP. LAWS ANN. § 445.901, *ET SEQ.* (ON BEHALF OF THE MICHIGAN CLASS)

471.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

472.   By reason of the conduct alleged herein, defendants have violated Mich. Comp. Laws Ann. § 445.901, *et seq*.

473.   Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Michigan.

474.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Michigan.

475.   Defendants' conduct was conducted with the intent to deceive Michigan consumers regarding the nature of defendants' actions within the stream of Michigan commerce.

476.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Michigan.

477.   Defendants' conduct misled consumers, withheld material facts, and took advantage of plaintiffs and members-of-the-classes' inability to protect themselves.

478.   Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

479.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and members of the Michigan Class have been injured in their business or property and are threatened with further injury.

480.    By reason of the foregoing, plaintiffs and the Michigan Class are entitled to seek all forms of relief available under Mich. Comp. Laws Ann. § 445.911.

**THIRTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT,**
**MINN. STAT. § 325F.68, *ET SEQ*.**
**(ON BEHALF OF THE MINNESOTA CLASS)**

481.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

482.    By reason of the conduct alleged herein, defendants have violated Minn. Stat. § 325F.68, et seq.

483.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

484.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Minnesota, for the purpose of controlling, fixing, or maintaining prices in the beef market.

485.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Minnesota.

486.    Defendants' conduct, specifically in the form of fraudulent concealment of their horizontal agreement, created a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

487.    Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

488.   Defendants' conduct was willful.

489.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Minnesota Class have been injured in their business or property and are threatened with further injury.

490.   By reason of the foregoing, plaintiffs and the members of the Minnesota Class are entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs under Minn. Stat. § 325F.68, et seq. and applicable case law.

## THIRTY- FIFTH CLAIM FOR RELIEF
### VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1970, MONT. CODE, §§ 30-14-103, *ET SEQ.*, AND §§ 30-14-201, *ET. SEQ.* (ON BEHALF OF THE MONTANA CLASS)

491.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

492.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*

493.   Defendants' unlawful conduct had the following effects: (1) beef price competition was restrained, suppressed, and eliminated throughout Montana; (2) beef prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) plaintiffs and members of the Montana Class were deprived of free and open competition; and (4) plaintiffs and members of the Montana Class paid supra-competitive, artificially inflated prices for beef.

494.    During the Class Period, defendants' illegal conduct substantially affected Montana commerce and consumers.

495.    As a direct and proximate result of defendants' unlawful conduct, plaintiffs and members of the Montana Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and §§ 30-14-201, *et. seq.*, and, accordingly, plaintiffs and members of the Montana Class seek all relief available under that statute.

## THIRTY-SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT, NEB. REV. STAT. § 59-1602, *ET SEQ.* (ON BEHALF OF THE NEBRASKA CLASS)

496.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

497.    By reason of the conduct alleged herein, defendants have violated Neb. Rev. Stat. § 59-1602, *et seq.*

498.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Nebraska.

499.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

500.    Defendants' conduct was conducted with the intent to deceive Nebraska consumers regarding the nature of defendants' actions within the stream of Nebraska commerce.

501.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

502.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the Nevada Class's ability to protect themselves.

503.    Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

504.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Nebraska Class have been injured in their business or property and are threatened with further injury.

505.    By reason of the foregoing, plaintiffs and members of the Nebraska Class are entitled to seek all forms of relief available under Neb. Rev. Stat. § 59- 1614.

**THIRTY-SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,**
**NEV. REV. STAT. § 598.0903, *ET SEQ*.**
**(ON BEHALF OF THE NEVADA CLASS)**

506.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

507.    By reason of the conduct alleged herein, defendants have violated Nev. Rev. Stat. § 598.0903*, et seq.*

508.    Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

509.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

510.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

511.    Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

512.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

513.    Defendants' conduct was willful.

514.    As a direct and proximate cause of defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

515.    By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

**THIRTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. TIT. XXXI, § 358-A, *ET SEQ*.**
**(ON BEHALF OF THE NEW HAMPSHIRE CLASS)**

516. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

517. By reason of the conduct alleged herein, defendants have violated N.H. Rev. Stat. Ann. tit. XXXI, § 358-A, *et seq*.

518. Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within New Hampshire.

519. Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within New Hampshire.

520. Defendants' conduct was conducted with the intent to deceive New Hampshire consumers regarding the nature of defendants' actions within the stream of New Hampshire commerce.

521. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

522. Defendants' conduct was willful and knowing.

523.   Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs and members of the New Hampshire Class's ability to protect themselves.

524.   Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

525.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Hampshire Class have been injured in their business or property and are threatened with further injury.

526.   By reason of the foregoing, plaintiffs and the members of the New Hampshire Class are entitled to seek all forms of relief available under N.H. Rev. Stat. Ann. tit. XXXI, §§ 358-A:10 and 358-A:10-a.

**THIRTY-NINTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT,**
**N.M. STAT. ANN. §§ 57-12-3, *ET SEQ*.**
**(ON BEHALF OF THE NEW MEXICO CLASS)**

527.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

528.   By reason of the conduct alleged herein, defendants have violated N.M. Stat. Ann. §§ 57-12-3, *et seq.*

529.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within New Mexico.

530.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

531.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

532.    Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the New Mexico Class.

533.    Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

534.    Defendants' conduct constituted "unconscionable trade practices" in that such conduct, inter alia, resulted in a gross disparity between the value received by the New Mexico Class members and the price paid by them for beef as set forth in N.M. Stat. Ann. § 57-12-2E.

535.    Defendants' conduct was willful.

536.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the New Mexico Class have been injured in their business or property and are threatened with further injury.

537.    By reason of the foregoing, plaintiffs and members of the New Mexico Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. Stat. Ann. §§ 57-12-10.

**FORTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS**
**PRACTICES ACT,**
**N.C. GEN. STAT. § 75-1.1, *ET SEQ*.**
**(ON BEHALF OF THE NORTH CAROLINA CLASS)**

538.  Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

539.  By reason of the conduct alleged herein, defendants have violated N.C. Gen. Stat. § 75-1.1*, et seq.*

540.  Defendants entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within North Carolina.

541.  Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

542.  Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

543.  Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the North Carolina Class.

544.  Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

545.  Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North

Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

546.     As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Carolina Class have been injured in their business or property and are threatened with further injury.

547.     By reason of the foregoing, plaintiffs and the members of the North Carolina Class are entitled to seek all forms of relief, including treble damages under N.C. Gen. Stat. § 7516.

## FORTY-FIRST CLAIM FOR RELIEF
### VIOLATION OF THE NORTH DAKOTA UNFAIR TRADE PRACTICES LAW, N.D. CENT. CODE § 51-10, *ET SEQ*. (ON BEHALF OF THE NORTH DAKOTA CLASS)

548.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

549.     By reason of the conduct alleged herein, defendants have violated N.D. Cent. Code § 51-10-01, et seq.

550.     Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

551.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within North Dakota, for the purpose of controlling, fixing, or maintaining prices in the beef market.

552.    Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Dakota.

553.    Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

554.    Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

555.    Defendants' conduct was willful.

556.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the North Dakota Class have been injured in their business or property and are threatened with further injury.

557.    By reason of the foregoing, plaintiffs and the members of the North Dakota Class are entitled to seek all forms of relief, including damages and injunctive relief under N.D. Cent. Code § 51-10-06.

**FORTY-SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT,**
**OR. REV. STAT. § 646.605, *ET SEQ*.**
**(ON BEHALF OF THE OREGON CLASS)**

558.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

559.    By reason of the conduct alleged herein, defendants have violated Or. Rev. Stat. § 646.608, *et seq.*

560.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Oregon.

561.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Oregon.

562.    Defendants' conduct was conducted with the intent to deceive Oregon consumers regarding the nature of defendants' actions within the stream of Oregon commerce.

563.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Oregon.

564.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs' and members of the Oregon Class's ability to protect themselves.

565.    Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

566.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Oregon Class have been injured in their business or property and are threatened with further injury.

567.    By reason of the foregoing, plaintiffs and the members of the Oregon Class are entitled to seek all forms of relief available under Or. Rev. Stat. § 646.638.

568.    Pursuant to section 646.638 of the Oregon Unlawful Trade Practices Act, with the filing of this action, a copy of this Complaint is being served upon the Attorney General of Oregon.

**FORTY-THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT,**
**R.I. GEN. LAWS § 6-13.1-1, *ET SEQ*.**
**(ON BEHALF OF THE RHODE ISLAND CLASS)**

569.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

570.    By reason of the conduct alleged herein, defendants have violated R.I. Gen Laws § 6-13.1-1, *et seq.*

571.    Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

572.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the beef market.

573.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

574.    Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

575.    Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

576.   Defendants' conduct was willful.

577.   Defendants deliberately failed to disclose material facts to plaintiffs and members of the Rhode Island Class concerning defendants' unlawful activities, including the horizontal conspiracy and artificially-inflated prices for beef.

578.   Defendants' deception, including its affirmative misrepresentations and/or omissions concerning the price of beef, constitutes information necessary to plaintiffs and members of the Rhode Island Class relating to the cost of beef purchased.

579.   Plaintiffs and members of the Rhode Island class purchased goods, namely beef, primarily for personal, family, or household purposes.

580.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Rhode Island Class have been injured in their business or property and are threatened with further injury.

581.   By reason of the foregoing, plaintiffs and the members of the Rhode Island Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. Gen Laws § 6-13.1-5.2.

## FORTY-FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE SOUTH CAROLINA'S UNFAIR TRADE PRACTICES ACT,
## S.C. CODE ANN. §§ 39-5-10, *ET SEQ*.
## (ON BEHALF OF THE SOUTH CAROLINA CLASS)

582.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

583.    By reason of the conduct alleged herein, defendants have violated S.C. Code Ann. §§ 39-5-10.

584.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within South Carolina.

585.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within South Carolina.

586.    Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of defendants' actions within the stream of South Carolina commerce.

587.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

588.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon plaintiffs' and members of the South Carolina Class's ability to protect themselves.

589.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

590.    Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as nearly all members of the public purchase and consume beef.

**FORTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES**
**AND CONSUMER PROTECTION LAW,**
**S.D. CODIFIED LAWS § 37-24, *ET SEQ.***
**(ON BEHALF OF THE SOUTH DAKOTA CLASS)**

591.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

592.   By reason of the conduct alleged herein, defendants have violated S.D. Codified Laws § 37-24-6.

593.   Defendants engaged in a deceptive trade practice with the intent to injure competitors and consumers through supra-competitive profits.

594.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within South Dakota, for the purpose of controlling, fixing, or maintaining prices in the beef market.

595.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of South Dakota.

596.   Defendants' conduct amounted to a fraudulent or deceptive act or practice committed by a supplier in connection with a consumer transaction.

597.   Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

598.   Defendants' conduct was willful.

599.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the South Dakota Class have been injured in their business or property and are threatened with further injury.

600.   By reason of the foregoing, plaintiffs and the members of the South Dakota Class are entitled to seek all forms of relief, including actual damages and injunctive relief under S.D. Codified Laws § 37-24-31.

**FORTY-SIXTH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT,**
**UTAH CODE ANN. §§ 13-11-1, *ET SEQ*.**
**(ON BEHALF OF THE UTAH CLASS)**

601.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

602.   By reason of the conduct alleged herein, defendants have violated Utah Code Ann. §§ 13-11-1, *et seq*.

603.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Utah.

604.   Defendants are suppliers within the meaning of Utah Code Ann. §§ 13-11-3.

605.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

606.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

607.   Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions.

608.   Defendants knew or had reason to know that their conduct was unconscionable.

609.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to plaintiffs and members of the Utah Class.

610.   Defendants' unlawful conduct substantially affected Utah's trade and commerce.

611.   As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

612.   By reason of the foregoing, plaintiffs and the members of the Utah Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

**FORTY-SEVENTH CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH UNFAIR PRACTICES ACT,**
**UTAH CODE ALL. §§ 13-5-1, *ET SEQ.***
**(ON BEHALF OF THE UTAH CLASS)**

613.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

614.    By reason of the conduct alleged herein, defendants have violated Utah Code Ann. §§ 13-5-1, *et seq*.

615.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the beef market, a substantial part of which occurred within Utah.

616.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the beef market, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the beef market.

617.    Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Utah.

618.    Defendants' unlawful conduct substantially affected Utah's trade and commerce.

619.    As a direct and proximate cause of defendants' unlawful conduct, plaintiffs and the members of the Utah Class have been injured in their business or property and are threatened with further injury.

620.    By reason of the foregoing, plaintiffs and the members of the Utah Class are entitled to seek all forms of relief, including actual damages or $2000 per Utah Class member, whichever is greater, plus reasonable attorney's fees under Utah Code Ann. §§ 13-5-14, et seq.

## FORTY-EIGHTH CLAIM FOR RELIEF UNJUST ENRICHMENT

621.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

622.   As a result of their unlawful conduct described above, defendants have and will continued to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of beef.

623.   Under common law principles of unjust enrichment, defendants should not be permitted to retain the benefits conferred on them by overpayments by plaintiffs and members of the classes in the following states: Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

## X.      REQUEST FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and the classes of all others so similarly situated, respectfully requests judgment against defendants as follows:

624.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

625. The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act and listed state antitrust laws, unfair competition laws, state consumer protection laws, and common law;

626. Plaintiffs and the Class recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of plaintiffs and the members of the Classes be entered against defendants in an amount to be trebled to the extent such laws permit;

627. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

628. Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of company's information;

629. Plaintiffs and the members of the classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

630. Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

631. Plaintiffs and the members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

632. Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: November 22, 2019

HAGENS BERMAN SOBOL SHAPIRO LLP

By:   s/ Steve W. Berman
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
T: (206) 623-7292
F: (206) 623-0594
steve@hbsslaw.com

Shana E. Scarlett
Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California 94710
T: (510) 725-3000
F: (510) 725-3001
shanas@hbsslaw.com
riop@hbsslaw.com

s/ Brian D. Clark
W. Joseph Bruckner (MN #0147758)
Elizabeth R. Odette (MN #0340698)
Brian D. Clark (MN #0390069)

Arielle S. Wagner (MN #0398332)
Stephanie A. Chen (MN #0400032)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
T:  (612) 339-6900
F:  (612) 339-0981
wjbruckner@locklaw.com
erodette@locklaw.com
bdclark@locklaw.com
aswagner@locklaw.com
sachen@locklaw.com

Karl L. Cambronne (MN #14321)
Bryan L. Bleichner (MN #0326689)
Jeffrey D. Bores (MN #227699)
CHESTNUT CAMBRONNE PA
17 Washington Avenue North, Suite 300
Minneapolis, MN 55401
T:  (612) 339-7300
kcambronne@chestnutcambronne.com
bbleichner@chestnutcambronne.com
jbores@chestnutcambronne.com

J. Barton Goplerud
Shindler, Anderson, Goplerud & Weese, PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
T: (515) 223-4567
F: (515) 223-8887
goplerud@sagwlaw.com

*Counsel for Plaintiffs and the Proposed Indirect
Purchaser Classes*