## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| KENNETH PETERSON, RICHARD KIMBLE, SHARON DAWSON-GREEN, LISA MELEGARI, CINDY ABERNATHY, ANDREW COHEN, MARCELO LOPEZ, TANYA LEWIS, NICOLE GUTIERREZ, SHARON KILLMON, KAREN CARTER, CHARLIE MORGAN, BRENT RASMUSSEN, APRIL O'CONNOR, KENT WINCHESTER, BRENDA KING, CHOR LONG, MICHELLE OVERSEN, WILLIAM GEE, and JACQUELYN WATSON, | Case No. 0:19-cv-01129-JRT-HB |

Plaintiffs,

v.

JBS USA FOOD COMPANY HOLDINGS, TYSON FOODS, INC., CARGILL, INC., and NATIONAL BEEF PACKING COMPANY,

Defendants.

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THE MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STANDARD OF REVIEW .................................................................................. 5

ARGUMENT ....................................................................................................... 6

I.      PLAINTIFFS FAIL TO STATE A SHERMAN ACT CLAIM ............................ 6

      A.    Plaintiffs' Allegations About "Witness 1" And "Witness 2" Do Not Provide Direct Evidence Of A Conspiracy ................................ 7

            1.    Plaintiffs Have Failed To Sufficiently Identify The Confidential Witnesses And Their Allegations Should Not Be Credited ............................................................................................ 8

            2.    The Confidential Witness Allegations Cannot Support A Conspiracy Claim Even if They Are Afforded Any Weight ......... 13

      B.    Plaintiffs' Allegations About Ostensibly Parallel Conduct Cannot Support An Inference Of Conspiracy ........................................... 17

            1.    Plaintiffs Have Not Alleged That Defendants Engaged In Parallel Conduct To Reduce Their Slaughter Capacity ................. 18

            2.    Plaintiffs Have Not Alleged That Defendants Engaged In Parallel Conduct To Limit Their Cash Cattle Purchases ............... 23

            3.    Plaintiffs Have Not Adequately Alleged That Defendants Coordinated Their Cash Cattle Procurement Practices ................. 25

            4.    Plaintiffs Have Undermined Their Own Conspiracy Allegations By Claiming Defendants Imported Fed Cattle ........... 27

      C.    Plaintiffs' "Plus Factor" Allegations Are Irrelevant Without Facts to Support Their Parallel Conduct Allegations ............................... 29

II.     PLAINTIFFS FAIL TO ALLEGE AN INJURY-IN-FACT THAT CONFERS STANDING TO SUE ........................................................ 36

III.    PLAINTIFFS' SHERMAN ACT CLAIM IS TIME BARRED .......................... 38

      A.    Plaintiffs Do Not Plead Concealment ........................................ 38

      B.    Plaintiffs Do Not Allege That They Failed To Timely Discover The Conspiracy ............................................................................ 40

      C.    Plaintiffs Do Not Plead Due Diligence ...................................... 41

      D.    The Continuing Violation Doctrine Does Not Apply Here ...................... 42

IV.    ALL OF PLAINTIFFS' STATE CLAIMS ARE DERIVATIVE OF THEIR FEDERAL CLAIMS AND MUST BE DISMISSED ........................................ 43

i

A.    Plaintiffs Do Not Have Standing To Sue Under The Laws Of States
      Where They Do Not Reside Or Did Not Suffer Injury ............................. 47

B.    Most Of Plaintiffs' State Law Claims Are Time-Barred .......................... 48

C.    The State Law Claims All Fail For Additional Reasons ........................... 49

      1.    Many Of Plaintiffs' State Antitrust Law Claims Are Barred
            By The *AGC* & *Illinois Brick* Decisions ......................................... 49

      2.    Indirect Purchasers Cannot Maintain A Class Action Under
            Illinois Law ..................................................................................... 53

      3.    Under Mississippi Law, Plaintiffs Must Allege Wholly
            *Intra*state Conduct .......................................................................... 54

      4.    There Is No Private Right of Action Under New Mexico Law ...... 55

      5.    Arizona, Nevada, And Utah Laws Required Plaintiffs To
            Provide Notice Of Suit To The Attorneys General Of Those
            States ............................................................................................... 55

D.    Plaintiffs' Consumer Protection Claims Fail For Every State ................. 57

      1.    Plaintiffs Have Not Pleaded The Fraud Underlying Their
            Consumer Claims With Particularity .............................................. 57

      2.    Many Of The Consumer Protection Statutes Do Not Apply To
            Alleged Antitrust Conspiracies ....................................................... 59

      3.    Plaintiffs Fail To Plead The Reliance Element Required By
            Three States And The District Of Columbia ................................... 61

      4.    Plaintiffs Fail To Plead Intrastate Conduct Required By Four
            States ............................................................................................... 62

      5.    Plaintiffs Are Prohibited From Proceeding As A Class Action
            Under Three State Consumer-Protection Laws ............................... 64

      6.    Plaintiffs' Failure To Provide Statutory Notice Warrants
            Dismissing The Hawaii Consumer Claim ....................................... 64

E.    Plaintiffs' Unjust Enrichment Claims Fail In Every State ....................... 65

      1.    Plaintiffs Do Not Plead The Elements Of Unjust Enrichment
            In Any Jurisdiction ......................................................................... 65

      2.    Plaintiffs Do Not Allege A Direct Benefit, As Required In
            Seven States .................................................................................... 66

      3.    Plaintiffs Do Not Allege a Legal Duty, as Is Required in Two
            States ............................................................................................... 67

4.    Plaintiffs Have An Adequate Legal Remedy, Precluding Unjust Enrichment In Eleven States ............................................... 68

5.    Plaintiffs' Unjust Enrichment Claims Are Barred By *Illinois Brick* In Three States ...................................................... 69

6.    Unjust Enrichment Is Not A Standalone Cause Of Action In Two States ...................................................................... 70

V.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE ........ 70

CONCLUSION ......................................................................... 71

## TABLE OF AUTHORITIES

**CASES**

*Admiral Theatre Corp. v. Douglas Theatre Co.*,
    585 F.2d 877 (8th Cir. 1978) ..................................................................... 36

*Ahlgrim v. Keefe Grp., LLC*,
    2016 WL 9819520 (D.N.M. Oct. 19, 2016)................................................ 55

*Alessi v. Bowen Court Condominium*,
    2010 WL 897246 (R.I. Super. Ct. Mar. 10, 2010)....................................... 66

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................... passim

*Ashley Cty. v. Pfizer, Inc.*,
    552 F.3d 659 (8th Cir. 2009) ..................................................................... 52

*Associated General Contractors of California, Inc. v. California State
    Council of Carpenters*,
    459 U.S. 519 (1983)............................................................................... passim

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................... passim

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*,
    203 F.3d 1028 (8th Cir. 2000) .............................................................. passim

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)................................................................................... 17

*Brown v. Ameriprise Fin. Servs., Inc.*,
    276 F.R.D. 599 (D. Minn. 2011).................................................................. 13

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011)........................................................................ 33

*Chamberlain v. Reddy Ice Holdings, Inc.*,
    757 F. Supp. 2d 683 (E.D. Mich. 2010)................................................. 11, 12

*City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ........................................................ 8

*Cortellesso v. Cortellesso*,
1997 WL 839911 (R.I. Super. Apr. 29, 1997) ............................ 51

*De Havilland v. FX Networks, Inc.*,
21 Cal. App. 5th 845, 870 (2018) .............................................. 70

*Dooner v. Yuen*,
2016 WL 6080814 (D. Minn. Oct. 17, 2016) ............................ 68

*Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s*,
998 S.W.2d 821, 825 (Mo. Ct. App. 1999)................................. 51

*Dvorak v. St. Clair Cty., Ill.*,
2018 WL 1532793 (S.D. Ill. Mar. 29, 2018) ............................ 53

*E. Elec. Corp. v. FERD Const., Inc.*,
2005 WL 3447957 (D.N.H. Dec. 15, 2005)................................. 68

*E-Shops Corp. v. U.S. Bank Nat. Ass'n*,
678 F.3d 659 (8th Cir. 2012) ..................................................... 57

*ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*,
355 F. Supp. 3d 785 (D. Minn. 2019)......................................... 71

*Effler v. Pyles*,
380 S.E.2d 149 (N.C. Ct. App. 1989) ......................................... 66

*Erie Cty., Ohio v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) ............................................... 32, 33

*Five for Entm't S.A. v. Rodriguez*,
877 F. Supp. 2d 1321 (S.D. Fla. 2012) ...................................... 62

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
788 F. Supp. 1042 (D. Minn. 1992)...................................... 13, 34

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..................................................................... 37

iii

*Furlough v. Spherion Atl. Workforce, LLC*,
   397 S.W.3d 114 (Tenn. 2013) ........................................................................ 68

*Garrard v. Gateway Fin. Servs., Inc.*,
   207 P.3d 1227 (Utah 2009) ............................................................................ 61

*Gen. Insulation Co. v. Eckman Const.*,
   992 A.2d 613 (N.H. 2010) ............................................................................. 70

*Hill v. Roll International Corp.*,
   195 Cal. App. 4th 1295 (2011) ...................................................................... 70

*Holdsworth v. Nissly*,
   520 N.W.2d 332 (Iowa Ct. App. 1994) .......................................................... 68

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
   231 F. Supp. 2d 1253 (N.D. Ga. 2002) .......................................................... 32

*Home Valu, Inc. v. Pep Boys*,
   213 F.3d 960 (7th Cir. 2000) ......................................................................... 52

*IBP, Inc. v. Glickman*,
   187 F.3d 974 (8th Cir. 1999) ......................................................................... 26

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ................................................................................. passim

*In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*,
   393 F. Supp. 3d 745 (N.D. Ill. July 16, 2019) .............................................. 62

*In re Aftermarket Filters Antitrust Litig.*,
   2010 WL 1416259 (N.D. Ill. April 1, 2010) .................................................. 67

*In re Aftermarket Filters Antitrust Litig.*,
   2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) .................................................. 61

*In re Aggrenox Antitrust Litig.*,
   2016 WL 4204478 (D. Conn. Aug. 9, 2016) .................................................. 53

*In re Asacol Antitrust Litig.*,
   2016 WL 4083333 (D. Mass. July 20, 2016) ................................................. 65

*In re Beef Indus. Antitrust Litig.*,
  907 F.2d 510 (5th Cir. 1990) .................................................. 30

*In re Canadian Imp. Antitrust Litig.*,
  470 F.3d 785 (8th Cir. 2006) .................................................. 36

*In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*,
  2015 WL 5166014 (E.D. Tenn. June 24, 2015)........................... 60

*In re Cattle Antitrust Litig.*,
  No. 19-cv-01222 (D. Minn 2019) ....................................... passim

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999) ................................................. 33

*In re Dealer Management Sys. Antitrust Litig.*,
  362 F. Supp. 3d 519 (N.D. Ill. 2019) ....................................... 52

*In re Digital Music Antitrust Litig.*,
  812 F. Supp. 2d 390 (S.D.N.Y. 2011).................................. 51, 69

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  516 F. Supp. 2d 1072 (N.D. Cal. 2007) .................... 50, 60, 61, 64

*In re Effexor Antitrust Litig.*,
  357 F. Supp. 3d 363 (D.N.J. 2018) .......................................... 56

*In re Fla. Cement & Concrete Antitrust Litig.*,
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) ............................... 30, 31

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) .................................... 61

*In re Flonase Antitrust Litig.*,
  692 F. Supp. 2d 524 (E.D. Pa. 2010) ....................................... 41

*In re Generic Pharm. Pricing Antitrust Litig.*,
  368 F. Supp. 3d 814 (E.D. Pa. 2019) .................................. 19, 53

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) .................................... 60

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010).................................................................. 14, 30

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019)........................................ 50, 51, 54, 55

*In re Late Fee & Over-Limit Fee Litig.*,
528 F. Supp. 2d 953 (N.D. Cal. 2007) ......................................................... 31

*In re Lehman Bros. Secs. & ERISA Litig.*,
2013 WL 3989066 (S.D.N.Y. July 31, 2013) ............................................. 13

*In re Lidoderm Antitrust Litig.*,
103 F. Supp. 3d 1155 (N.D. Cal. 2015) ...................................................... 60

*In re Lipitor Antitrust Litig.*,
336 F. Supp. 3d 395 (D.N.J. 2018) ................................................. 54, 56, 64

*In re Metawave Commc'ns Corp. Secs. Litig.*,
298 F. Supp. 2d at 1069 ................................................................. 11, 12, 13

*In re Milk Prods. Antitrust Litig.*,
84 F. Supp. 2d 1016 (D. Minn. 1997)........................................ 19, 24, 38, 41

*In re Monosodium Glutamate Antitrust Litig.*,
2003 WL 297287 (D. Minn. Feb. 6, 2003) ................................................. 39

*In re Mylan N.V. Sec. Litig.*,
379 F. Supp. 3d 198 (S.D.N.Y. 2019)......................................................... 14

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
350 F. Supp. 2d 160 (D. Me. 2004) ............................................................ 60

*In re NextWave Personal Comm's, Inc.*,
200 F.3d 43 (2d Cir. 1999).......................................................................... 26

*In re Niaspan Antitrust Litig.*,
42 F. Supp. 3d 735 (E.D. Pa. 2014) ............................................................ 60

*In re Opana ER Antitrust Litig.*,
162 F. Supp. 3d 704 (N.D. Ill. 2016) .................................................... 65, 66

*In re Packaged Ice Antitrust Litig.*,
723 F. Supp. 2d 987 (E.D. Mich. 2010)................................................................. 8, 11

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011)....................................................................... 58

*In re Packaged Seafood Prod. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017)....................................................................... 60

*In re Polyurethane Foam Antitrust Litig.*,
799 F. Supp. 2d 777 (N.D. Ohio 2011)....................................................................... 59

*In re Pork Antitrust Litigation*,
2019 WL 3752497(D. Minn. Aug. 8, 2019) .........................................................passim

*In re Possis Med., Inc. Sec. Litig.*,
2007 WL 335051 (D. Minn. Feb. 1, 2007) ............................................................. 2, 8

*In re Potash Antitrust Litig.*,
954 F. Supp. 1334 (D. Minn. 1997) ............................................................................ 32

*In re Pre-Filled Propane Tank Antitrust Litig.*,
860 F.3d 1059 (8th Cir. 2017) ............................................................................ 42, 43

*In re Pre-Filled Propane Tank Antitrust Litig.*,
893 F.3d 1047 (8th Cir. 2018) ...................................................................... 5, 13, 69

*In re Refrigerant Compressors Antitrust Litig.*,
92 F. Supp. 3d 652 (E.D. Mich. 2015)........................................................................ 41

*In re Refrigerant Compressors Antitrust Litig.*,
2013 WL 1431756 (E.D. Mich. Apr. 9, 2013)...................................................... 63, 67

*In re Suboxone Antitrust Litig.*,
64 F. Supp. 3d 665 (E.D. Pa. 2014) ........................................................................... 59

*In re Syngenta AG MIR 162 Corn Litig.*,
131 F. Supp. 3d 1177 (D. Kan. 2015) ......................................................................... 62

*In re TD Bank, N.A.*,
150 F. Supp. 3d 593 (D.S.C. 2015).............................................................................. 64

*In re Terazosin Hydrochloride Antitrust Litig.*,
  160 F. Supp. 2d 1365 (S. D. Fla. 2001) ..................................................... 62

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  599 F. Supp. 2d 1179 (N.D. Cal. 2009) ..................................................... 52

*In re Tyson Foods, Inc. Sec. Litig.*,
  275 F. Supp. 3d 970 (W.D. Ark. 2017)...................................................... 29

*In re Wellbutrin XL Antitrust Litig.*,
  756 F. Supp. 2d 670 (E.D. Pa. 2010) ........................................................ 53

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
  797 F.3d 538 (8th Cir. 2015) ............................................................ 41, 47

*InterVest, Inc. v. Bloomberg, L.P.*,
  340 F.3d 144 (3d Cir. 2003).................................................................. 34

*Ireland v. Microsoft Corp.*,
  2001 WL 1868946 (Mo. Cir. Ct. Jan. 24, 2001).......................................... 51

*Jackson v. ASA Holdings*,
  751 F. Supp. 2d 91 (D.D.C. 2010) ...................................................... 58, 62

*Jones v. Mackey Price Thompson & Ostler*,
  355 P.3d 1000 (Utah 2015)................................................................... 66

*Jones v. Micron Tech. Inc.*,
  2019 WL 4232417 (N.D. Cal. Sept. 3, 2019) ............................................. 53

*Kanne v. Visa U.S.A. Inc.*,
  273 N.W.2d 293 (Neb. 2006)................................................................. 68

*Karnatcheva v. JPMorgan Chase Bank, N.A.*,
  704 F.3d 545 (8th Cir. 2013) ................................................................ 43

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
  910 F.3d 927 (7th Cir. 2018) ................................................................ 16

*Klehr v. A.O. Smith Corp.*,
  521 U.S. 179 (1997)........................................................................... 42

*Kopel v. Kopel*,
  229 So. 3d 812 (Fla. 2017) ......................................................................... 66

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
  781 N.E.2d 787 (Mass. 2003) ..................................................................... 63

*Kwikset Corp. v. Superior Court*,
  246 P.3d 877 (Cal. 2011) ........................................................................... 61

*Laughlin v. Evanston Hosp.*,
  550 N.E.2d 986 (Ill. 1990) .......................................................................... 59

*Lerma v. Univision Commc'ns, Inc.*,
  52 F. Supp. 2d 1011 (E.D. Wis. 1999) ........................................................ 20

*MacArthur v. San Juan Cty.*,
  416 F. Supp. 2d 1098 (D. Utah 2005) ......................................................... 61

*Mack v. LLR, Inc.*,
  2018 WL 6927860 (C.D. Cal. Aug. 15, 2018) ............................................. 58

*McDonald v. Johnson & Johnson*,
  722 F.2d 1370 (8th Cir. 1983) .................................................................... 37

*McDonough v. Anoka Cty.*,
  799 F.3d 931 (8th Cir. 2015) ................................................................... 6, 28

*McKie Ford, Inc. v. Sec'y of Labor*,
  191 F.3d 853 (8th Cir. 1999) ................................................................. 26, 33

*Midwest Commc'ns v. Minn. Twins, Inc.*,
  779 F.2d 444 (8th Cir. 1985) ...................................................................... 21

*Nat'l Farmers' Org., Inc. v. Associated Milk Producers., Inc.*,
  850 F.2d 1286 (8th Cir. 1988) .................................................................... 36

*Nelson v. Nelson*,
  205 P.3d 715 (Kan. 2009) ........................................................................... 68

*Novell, Inc. v. Microsoft Corp.*,
  731 F.3d 1064 (10th Cir. 2013) .................................................................. 20

*Pacamor Bearings, Inc. v. Minebea Co.*,
918 F. Supp. 491 (D.N.H. 1996) ................................................................. 63

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
310 F. Supp. 3d 1002 (E.D. Mo. 2018) ....................................................... 29

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
911 F.3d 505 (8th Cir. 2018) ......................................................... 6, 19, 29

*Parnes v. Gateway 2000, Inc.*,
122 F.3d 539 (8th Cir. 1997) ..................................................................... 59

*Perret v. Wyndham Vacation Resorts, Inc.*,
846 F. Supp. 2d 1327 (S.D. Fla. 2012) ....................................................... 58

*Petersen v. England*,
2010 WL 3893797 (D. Minn. Sept. 30, 2010) ............................................ 19

*Phila. Indem. Ins. Co. v. Pace Suburban Bus. Serv.*,
67 N.E.3d 556 (Ill. Ct. App. 2016) ............................................................. 70

*Pickett v. Tyson Fresh Meats, Inc.*,
420 F.3d 1272 (11th Cir. 2005) .............................................................. 3, 25

*Pitts v. Jackson Nat'l Life Ins.*,
574 S.E.2d 502 (S.C. Ct. App. 2002) .......................................................... 67

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
828 F.2d 211 (4th Cir. 1987) ..................................................................... 40

*Podpeskar v. Makita USA Inc.*,
247 F. Supp. 3d 1001 (D. Minn. 2017) ....................................................... 38

*Rapp v. Green Tree Servicing, LLC*,
302 F.R.D. 505 (D. Minn. 2014) ................................................................. 65

*Ret. Sys. & Local 295/Local 851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ................................................................... 8, 9

*Rindal v. Sohler*,
658 N.W.2d 769 (S.D. 2003) ...................................................................... 68

*Rivers v. Amato*00-cv-131,
   2001 WL 1736498 (Me. Super. Ct. June 22, 2001)..................................... 66

*Ruggers Inc. v. U.S. Rugby Football Union, Ltd.*,
   843 F. Supp. 2d 139 (D. Mass. 2012) ......................................................... 68

*Shoemaker v. Cardiovascular Sys., Inc.*,
   2017 WL 1180444 (D. Minn. Mar. 29, 2017) ........................................ 9, 11

*Small v. Univ. Med. Ctr. of S. Nev.*,
   2016 WL 4157309 (D. Nev. Aug. 3, 2016) ................................................. 68

*Smith v. Glenmark Generics, Inc.*, *USA*,
   2014 WL 4087968 (Mich. Ct. App. Aug. 19, 2014)................................... 66

*Smith v. Video Lottery*,
   858 P.2d 11 (Mont. 1993) .......................................................................... 52

*Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.*,
   493 N.W. 2d 137 (Minn. 1992)................................................................... 68

*Spires v. Hosp. Corp. of Am.*,
   289 Fed. App'x 269 (10th Cir. 2008) ......................................................... 66

*St. Louis Convention & Visitors Comm'n v. Nat'l Football League*,
   154 F.3d 851 (8th Cir. 1998) ....................................................................... 6

*State ex rel. Leech v. Levi Strauss & Co.*,
   1980 WL 4696 (Tenn. Ch. Sept. 25, 1980)................................................. 49

*Summerhill v. Terminix, Inc.*,
   637 F.3d 877 (8th Cir. 2011) ................................................................ 38, 39

*Tatone v. SunTrust Mortg., Inc.*,
   857 F. Supp. 2d 821 (D. Minn. 2012)......................................................... 19

*Thorpe v. Washington City*,
   243 P.3d 500 (Utah Ct. App. 2010) ........................................................... 68

*Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*,
   738 F. Supp. 1472 (S.D.N.Y. 1990)............................................................ 32

*Trustmark Ins. Co. v. Bank One, Ariz.*,
  48 P.3d 485 (Ariz. Ct. App. 2002) ................................................................. 68

*United States v. Bame*,
  721 F.3d 1025 (8th Cir. 2013) ...................................................................... 69

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ...................................................................................... 21

*Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
  328 F.3d 824 (N.D. Ill. 2018) ........................................................................ 30

*White v. R.M. Packer Co., Inc.*,
  635 F.3d 571 (1st Cir. 2011) ..................................................................... 30, 33

*Wilcox Indus. Corp. v. Hansen*,
  870 F. Supp. 2d 296 (D.N.H. 2012) ............................................................. 63

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ................................................................. 30, 32

*Yong Ki Hong v. KBS Am., Inc.*,
  951 F. Supp. 2d 402 (E.D.N.Y. 2013) .......................................................... 69

## STATUTES

7 U.S.C. § 1638 ................................................................................................. 29

15 U.S.C. § 1 ............................................................................................. passim

15 U.S.C. § 115b ............................................................................................... 39

740 Ill. Comp. Stat. 10/7(2) ...................................................................... 48, 53

815 Ill. Comp. Stat. 505/10a ........................................................................... 49

Ariz. Rev. Stat. § 12-550 .................................................................................. 49

Ariz. Rev. Stat. § 44-1410 ................................................................................ 48

Ariz. Rev. Stat. § 44-1415 ................................................................................ 56

Cal. Bus. & Prof. Code § 16750.1 ................................................................ 48

Cal. Bus. & Prof. Code § 17208 ................................................................... 49

Cal. Code Civ. Proc. § 339 .......................................................................... 49

Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 759, 129
    Stat. 2242, 2284–85 (2015) .................................................................... 29

D.C. Code § 12-301 ..................................................................................... 49

D.C. Code § 28-4511 ................................................................................... 48

Fla. Stat. § 95.11 ......................................................................................... 49

Haw. Rev. Stat. Ann. § 480-13.3 ................................................................. 64

Haw. Rev. Stat. § 480-24 ............................................................................. 49

Iowa Code § 553.16 ..................................................................................... 48

Kan. Stat. Ann. § 60-512 ......................................................................... 48, 49

Mass. Gen. Laws Chap. 260, § 5A .............................................................. 49

Minn. Stat. § 325D.64 ................................................................................. 48

Miss. Code Ann. § 15-1-49 .......................................................................... 48

Miss. Code. Ann. § 75-21-1 ......................................................................... 54

Mo. Rev. Stat. § 416.131 ............................................................................. 48

Mont. Code § 27-2-211 ................................................................................ 49

Mont. Code § 30-14-133 .............................................................................. 64

N.C. Gen. Stat. § 1-52 ................................................................................. 49

N.C. Gen. Stat. § 75-16.2 ........................................................................ 48, 49

N.D. Cent. Code § 28-01-17 ........................................................................ 49

N.D. Cent. Code § 51-08.1-10 ..................................................................... 48

N.D. Cent. Code § 51-15-02 ............................................................................................ 62

N.H. Rev. Stat. Ann. § 356:12 ....................................................................................... 48

N.H. Rev. Stat. Ann. § 508:4 ......................................................................................... 49

N.M. Stat. Ann. § 57-1-1 ................................................................................................ 55

N.M. Stat. Ann. § 57-1-10 .............................................................................................. 55

N.M. Stat. Ann. § 57-1-12 .............................................................................................. 48

N.M. Stat. Ann. § 37-1-4 ................................................................................................ 49

N.Y. Gen. Bus. Law § 340 ............................................................................................. 48

Neb. Rev. Stat. § 25-206 ................................................................................................. 49

Neb. Rev. Stat. § 25-212 ................................................................................................. 48

Neb. Rev. Stat. § 59-1612 ............................................................................................... 49

Nev. Rev. Stat. § 11.190 ................................................................................................. 49

Nev. Rev. Stat. § 598A.210 ............................................................................................ 56

Nev. Rev. Stat. § 598A.220 ............................................................................................ 48

Or. Rev. Stat. § 646.638 ................................................................................................. 49

Or. Rev. Stat. § 646.800 ................................................................................................. 48

R.I. Gen. Laws § 6-36-23 ............................................................................................... 48

S.C. Code Ann. § 39-5-140 ............................................................................................ 64

S.C. Code § 39-5-10 ....................................................................................................... 49

S.C. Stat. § 15-3-530 ...................................................................................................... 49

S.D. Cod. Laws § 37-1-14.4 ........................................................................................... 48

S.D. Codified Laws § 37-24-33 ...................................................................................... 49

Utah Code Ann. § 13-11-19 ........................................................................... 64

Utah Code Ann. § 76-10-3109 ....................................................................... 56

Utah Code Ann. § 76-10- 3117 ...................................................................... 49

Utah Code Ann. § 78B-2-307........................................................................ 49

W. Va. Code § 47-18-11................................................................................ 49

## INTRODUCTION

Plaintiffs have now had three opportunities to allege concrete facts, not baseless or anonymous speculation, to support their claim that Defendants JBS USA Food Company, Tyson Foods, Inc., Cargill, Inc., and National Beef Packing Company (collectively, "Defendants") engaged in a concerted scheme to "suppress throughput of beef" or to "artificially depress" the number of cattle they purchased from feedlots or the amount of beef they sold to retail entities.  Second Amended Complaint ("Complaint," ECF No. 114) ¶ 1.  But the Complaint still lacks sufficient facts—or a coherent theory—on which to rest a plausible antitrust conspiracy claim, and their complaint should be dismissed with prejudice.

Plaintiffs' *modus operandi* in this litigation has been simple:  copy and paste allegations from other complaints into their own even when the facts and theories do not fit.  In their first complaint (ECF No. 1), Plaintiffs borrowed facts and theories from the complaint in *In re Pork Antitrust Litigation*, No. 18-cv-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019), which alleged that Agri Stats, Inc., an industry benchmarking analyst, facilitated communications between pork processing companies.  After Agri Stats informed Plaintiffs that it did not provide any benchmarking services in the *beef* industry, Plaintiffs dismissed Agri Stats (and all related allegations) from this litigation.  Plaintiffs then filed an amended complaint that still lacked sufficient (or Defendant-specific) allegations to support a conspiracy claim.  After Defendants moved to dismiss the amended complaint for all the same reasons the Court dismissed the Complaint in *In re Pork*, Plaintiffs abandoned that complaint and moved for leave to file a third.

1

Now, Plaintiffs have borrowed heavily from the Second Consolidated Amended Class Action Complaint in *In re Cattle Antitrust Litigation*.  No. 0:19-cv-01222 (D. Minn. Oct. 4, 2019), ECF No. 125 ("Cattle Complaint").  Plaintiffs have copied, word for word, twenty-five paragraphs of allegations from two confidential informants cited in the *In re Cattle* complaint, as well as certain bar charts illustrating the slaughter volumes of Defendants and several smaller beef packers, into this latest iteration.  The Complaint still suffers from several dispositive flaws.

*First*, Plaintiffs' allegations concerning anonymous informants—like the identical allegations in the Cattle Complaint—do not suffice to provide direct evidence of a conspiracy.  "Witness 1" and "Witness 2" are not identified with "sufficient particularity" to allow the Court to determine whether it is plausible that "a person in the position occupied by the source would possess the information alleged." *In re Possis Med., Inc. Sec. Litig.*, No. 05-cv-1084, 2007 WL 335051, at *4 (D. Minn. Feb. 1, 2007) (internal quotation marks omitted).  They do not purport to have personal knowledge of a conspiracy and instead rely on hearsay and speculation.  And the conduct they allege—such as reducing slaughter volumes during seasonal periods associated with higher fed cattle prices—is consistent with each Defendant's economic self-interest and is therefore insufficient to state a conspiracy claim.

*Second*, and despite Plaintiffs' conclusory allegation that Defendants acted in parallel to reduce slaughter production, the Complaint still fails to allege any facts to support an inference of conspiracy.  Indeed, the allegations Plaintiffs copied and pasted from the Cattle Complaint, including bar charts illustrating slaughter capacity over the

period in question, shows that each Defendant *increased* its slaughter volumes during the supposed conspiracy, and that their production levels were *not* moving in parallel. Compl. ¶ 11; *infra* fig.2. Similarly, though they conclude that Defendants agreed to reduce their slaughter capacity by closing or idling six plants, Plaintiffs allege that only one of the six plants closed after the inception of the claimed conspiracy, and Plaintiffs fail to allege that one Defendant—JBS—closed any plants at all. Compl. ¶¶ 87, 89–92, 94.

*Third*, Plaintiffs assert that "[a]t the same time as they reduced their slaughter numbers, Tyson, JBS, Cargill, and National Beef agreed to reduce their purchase of cash cattle." Compl. ¶ 101. But Plaintiffs never—as they must—plead any facts to support that conclusion. Instead, they merely allege that Defendants rely on formula and forward contracts, and other so-called "captive supply" agreements, for 70 percent of their supply needs. *Id.* ¶ 64. But ensuring a "reliable and stable supply of cattle for . . . packing plants" through such agreements is "unquestionably" an independent and legitimate business justification for such conduct. *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1282 (11th Cir. 2005).

*Fourth*, the Complaint fails to allege any "plus factors" suggesting that Defendants were conspiring instead of competing. There are no allegations that Defendants used a conduit (such as Agri Stats) to exchange competitively sensitive information. There are no allegations that Defendants met and colluded at specific times and places. There are no allegations that any particular person or company took any particular action. Instead, the Complaint defaults to speculative comments about packer behavior from an industry blog, relies on pseudonymous and speculative allegations that Defendants had "opportunities"

3

to collude, and presumes that certain market characteristics (such as industry concentration, inelastic supply and demand, relative bargaining power, and barriers to entry) support an inference of conspiracy. These allegations, taken one-by-one or altogether, cannot support an inference of conspiracy.

*Fifth*, Plaintiffs lack standing to bring these claims. Plaintiffs allege that there was a "strong relationship" between fed cattle and retail beef prices, Compl. ¶ 6, and that Defendants conspired to *suppress* the prices of fed cattle, *id.* ¶ 67. Taking these allegations as true, fed cattle and retail beef prices would have been *higher* in the absence of a conspiracy. And Plaintiffs admit that retail beef prices *fell* by 6% during the alleged conspiracy, *id.* ¶ 19, which means that the alleged conspiracy actually *benefited* them. Consequently, Plaintiffs have not suffered an injury-in-fact necessary to establish antitrust or Article III standing.

These defects provide ample reasons to dismiss Plaintiffs' federal and state law claims, but the Complaint suffers from many more. For example, the statute of limitations has run, and Plaintiffs have not alleged any facts to suggest that Defendants fraudulently concealed their conduct. In fact, the Complaint alleges that Defendants largely carried out their conspiracy in the open by closing plants and publicly explaining why.

With no facts to support their claims, Plaintiffs resort to innuendo, relying on industry blogs and statements from unnamed industry insiders that "meat works like the mafia." Compl. ¶ 3. They also accuse Defendants of making money, which (according to Plaintiffs) *must* mean that they were colluding with one another rather than pursuing

independent economic interests. Such speculative assertions cannot push Plaintiffs' conspiracy claim across the line from possible to plausible.

Plaintiffs have now had three opportunities to plead a plausible antitrust conspiracy claim, and all three times they have failed. The Complaint should be dismissed with prejudice.

## STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *In re Pork*, 2019 WL 3752497, at *5 (D. Minn. Aug. 8, 2019). "Some threshold of plausibility must be crossed" before courts will permit an antitrust case "to go into its inevitably costly and protracted discovery phase." *Twombly*, 550 U.S. at 558 (quoting *Asahi Glass Co v. Pentech Pharmaceuticals, Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003)). There is simply no basis to "force Defendants into significant and costly discovery without plausible allegations that they engaged in the conduct alleged." *In re Pork*, 2019 WL 3752497, at *9; *see also Twombly*, 550 U.S. at 558.

Plaintiffs pleading an antitrust conspiracy must plead "factual content"—such as the "relevant individuals, acts, and conversations"—that "raise a right to relief above the speculative level." *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056–57 (8th Cir. 2018) (citations and internal quotation marks omitted). The allegations must be specific to the defendants; plaintiffs cannot plead industry-wide trends and ask the court to speculate that the defendants contributed to those trends. *In re Pork*, 2019 WL 3752497,

at *8.   The court also must consider "whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct."  *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 682).

Where, as here, plaintiffs rely on circumstantial allegations of a conspiracy, the Court must evaluate the plausibility of allegations that Defendants engaged in parallel conduct.  And if so, the court must also evaluate whether Plaintiffs have plausibly alleged sufficient "plus factors" to support a conclusion that any alleged parallel conduct cannot be explained by independent business decisions.  *In re Pork*, 2019 WL 3752497, at *6; *see also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018).  Parallel conduct without plus factors and plus factors without parallel conduct will not suffice, and a surplus in one category cannot make up for a shortfall in the other.  *See In re Pork*, 2019 WL 3752497, at *6.

## ARGUMENT

## I.   PLAINTIFFS FAIL TO STATE A SHERMAN ACT CLAIM

To assert a claim for a violation of Section 1 of the Sherman Act, Plaintiffs must allege, among other things, that Defendants entered into an agreement in restraint of trade. *St. Louis Convention & Visitors Comm'n v. Nat'l Football League*, 154 F.3d 851, 861 (8th Cir. 1998).   They have utterly failed to do so.   Relying on anonymous witnesses and speculative allegations, Plaintiffs have attempted to spin a tale that Defendants engaged a "concerted scheme to suppress throughput of beef."  Compl. ¶ 1.  According to Plaintiffs, Defendants did so by reducing their "slaughter capacity" and "slaughter numbers" on the one hand, and by "agreeing to limit their purchase of cash cattle" and "coordinating their

procurement operations" on the other. *Id.* ¶ 67. But Plaintiffs have not alleged sufficient facts to demonstrate direct or circumstantial evidence of an anticompetitive agreement.

## A.     Plaintiffs' Allegations About "Witness 1" And "Witness 2" Do Not Provide Direct Evidence Of A Conspiracy[1]

Plaintiffs' claims rely in large part on statements from two anonymous individuals: "Witness 1" and "Witness 2." Their statements are not sufficient to plausibly allege that Defendants engaged in a conspiracy.

According to the Complaint, Witness 1 is a "former employee" of an unnamed Defendant whose "employment ceased in 2018." Compl. ¶ 70. Plaintiffs contend that Witness 1 heard about an "agreement" between Defendants to cut cattle slaughter volumes from a fabrication manager at his plant. *Id.* ¶ 73. But the fabrication manager was not directly involved in the alleged agreement, either. Rather, the Complaint suggests that the fabrication manager *may* have heard about it from somebody else. *Id.* ¶ 74.

Witness 2 is a "former feedlot manager, who managed a 35,000 head commercial feedlot in the Panhandle region from 2012 until early 2016." Compl. ¶ 105. He claims that Defendants coordinated cattle purchases through a queuing convention that required producers to give the first bidder the right to buy a pen of cattle. According to the Complaint, other packers could still bid and buy at higher prices, but the first bidder retained a right of first refusal to buy the pen at the initial price he bid. *Id.* at 38–39 (¶1).

---

[1] Plaintiffs' allegations about "Witness 1" and "Witness 2" are nearly identical to those in the Cattle Complaint. Accordingly, Defendants' response here is substantially similar to Defendants' response in that case, see Br. in Support of Mot. to Dismiss at 12–21, *In re Cattle Antitrust Litigation*, No. 19-cv-1222 (D. Minn. Nov. 13, 2019), ECF No. 140.

The existence of these confidential witnesses fails to plausibly suggest a conspiracy because they are not identified with "sufficient particularity" such that the Court can determine whether it is plausible that "a person in the position occupied by the source would possess the information alleged." *In re Possis Med., Inc. Secs. Litig.*, No. 05-cv-1084, 2007 WL 335051, at *4 (D. Minn. Feb. 1, 2007) (internal quotation marks omitted). And they do not support a reasonable inference of conspiracy—particularly so because their claims are undermined by other facts alleged in the Complaint.

> 1.   Plaintiffs Have Failed To Sufficiently Identify The Confidential Witnesses And Their Allegations Should Not Be Credited

"Courts are understandably wary of 'testimony' by unidentified 'witnesses.'" *In re Possis Med., Inc.*, 2007 WL 335051, at *4 (internal quotation marks omitted). A confidential witness "may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, [or] may even be nonexistent." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013). Thus, confidential witnesses must be "sufficiently identified" before their allegations can be accepted as true. *See In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1013 (E.D. Mich. 2010). A plaintiff must provide enough identifying information about the witnesses so that the court can determine whether the witnesses have a basis for the claimed knowledge and can evaluate the plausibility of the witnesses' statements. *See Shoemaker v. Cardiovascular Sys., Inc.*, No. 16-cv-568, 2017 WL 1180444, at *8 (D. Minn. Mar. 29, 2017) ("Recognizing that confidential witnesses could have a variety of reasons for speaking to

plaintiff's counsel, courts routinely evaluate and disregard the statements on a motion to dismiss." (citation omitted)).[2]

The Complaint does not contain sufficient information about Witness 1 to credit his allegations. The Complaint does not identify Witness 1's name, former employer, or the name or location of his former processing plant within the large "Texas Panhandle / Western Kansas region." Compl. ¶ 70. And because Witness 1's employment "ceased in 2018," *id.*, he might be "acting from spite rather than knowledge," *City of Livonia*, 711 F.3d at 759. Moreover, much of what Witness 1 claims is speculative. Compl. ¶ 76 (alleging that Witness 1 "*understood*" the anonymous fabrication manager to be referring to all Defendants' plants in the Texas Panhandle region (emphasis added)); *id.* ¶ 77 (alleging that Witness 1 "is certain that the Fabrication Manager *intended to convey* that all of the Packing Defendants were reducing their slaughter volumes by agreement" (emphasis added)).

Witness 1 does not have first-hand knowledge of an alleged conspiracy; instead, he learned about it from the plant's unnamed fabrication manager, who apparently learned about it from his unnamed supervisor or somebody else altogether. Compl. ¶¶ 74–76. And Plaintiffs never allege that the supervisor, or anyone else in the company, entered into or was witness to a collusive agreement, raising substantial questions about the degrees of

---

[2] Nearly all of the decisions involving confidential witness statements at the motion-to-dismiss stage are securities fraud cases subject to heightened pleading requirements. Those decisions nonetheless are instructive, because a plaintiff always must provide enough identifying information so that the court can evaluate the plausibility of the witness's allegations.

9

separation—and hearsay—between Witness 1 and anyone actually in a position to know whether any of the Defendants engaged in a conspiracy.

Further, Plaintiffs never explain how the fabrication manager was in a position to know of an agreement among *all* Defendants. *See* Compl. ¶¶ 78–80. Plaintiffs make clear that the fabrication manager was not a senior-level employee. Rather, he "needed to be informed as to cattle buying, cattle slaughter, and beef selling" by the "head office," and was therefore subordinate to those who were most likely to know about and direct the implementation of an ostensible conspiracy. *Id.* ¶ 78. And Plaintiffs say only that the fabrication manager "interacted with personnel across [his employer's] business" and had "friends and colleagues . . . at other Packing Defendant plants." But they do not say who those people were, what job titles they held, what information they provided, or how they would have known about the purported conspiracy. *Id.* ¶¶ 78–80. Those allegations do not support a reasonable inference that the fabrication manager had a basis for knowing whether all Defendants were engaged in any illicit activity.

Plaintiffs' allegations about Witness 2 are similarly thin. They never provide Witness 2's name or identify the feedlot where he worked. Plaintiffs say only that Witness 2 managed a feedlot in the broad expanse of the "Texas Panhandle / Western Kansas region," Compl. ¶ 70, from sometime in 2012 until "early 2016." *Id.* ¶ 105. Like Witness 1, Witness 2 primarily relies on unidentified sources instead of personal knowledge. He claims that he "heard from . . . field buyers and other industry participants about other producers being 'blackballed'" by Defendants for failing to follow an industry queuing convention. *Id.* ¶ 108. But Plaintiffs do not provide the names of those field buyers or

industry participants or the dates of those conversations.  Nor do they allege that those individuals were speaking from personal knowledge.  Without this critical information, Witness 2's skeletal allegations are not entitled to any weight.

The court's decisions in *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683 (E.D. Mich. 2010), and *In re Packaged Ice*, 723 F. Supp. 2d 987, highlight the problems with Plaintiffs' allegations.  In these cases (which arose from an alleged antitrust conspiracy and were decided by the same judge), the court evaluated statements from four confidential witnesses that were intended to corroborate information from a whistleblower identified by name in the complaint.  *Chamberlain*, 757 F. Supp. 2d at 690–91.  The court credited some of the statements of the first three confidential witnesses, but disregarded the allegations of a fourth, who (like Witness 1) claimed that he was told by other employees that his company and another had "management meetings" during which one company agreed to leave California and the other agreed to stay out of Arizona.  *Id.* at 692.

Because the fourth witness's knowledge was "alleged to have been gained from 'other . . . employees' and 'co-workers,'" the court determined that the complaint did not provide an adequate "foundation for [his] testimony."  *Id*. at 705–06.  Other courts have reached the same conclusion about the credibility of confidential witness allegations.  *See, e.g.*, *Shoemaker*, 2017 WL 1180444, at *9 (disregarding confidential witness allegations that were "vague or based on second-hand knowledge"); *In re Metawave Commc'ns Corp. Secs. Litig.*, 298 F. Supp. 2d at 1069 (disregarding confidential witness allegations that were "based on hearsay [and] [could] not be imputed to the Individual Defendants").

11

In this case, Plaintiffs have provided even fewer details about their anonymous witnesses. In *Chamberlain*, plaintiffs identified the witness's employer, the facility where he worked, and his dates of employment. 757 F. Supp. 2d at 692. Here, Plaintiffs provided little more than the job titles of Witnesses 1 and 2. They have not provided the names of their previous employers or the facilities where they worked. They have not explained how the witnesses (or Witness 1's fabrication manager or his supervisor) would know whether other Defendants had entered into or implemented an agreement. And Plaintiffs have not identified any information—in the form of admissions or statements from other witnesses—to corroborate the allegations of witnesses who are *not* "speaking from personal knowledge," and are much more likely to be "merely regurgitating gossip and innuendo." *In re Metawave Commc'ns Corp.*, 298 F. Supp. 2d at 1068 (internal quotation marks omitted).

The Court should decline to credit these allegations for these reasons and for the additional reason that they were copied, verbatim, from the Cattle Complaint. On December 3, 2019, Defendants sent Plaintiffs' counsel a letter asking them to 1) identify the names and former employers of the two confidential witnesses and 2) confirm that Plaintiffs' counsel had independently validated the factual basis for their allegations.[3] Plaintiffs' counsel did not respond before the due date of this motion. Absent evidence that counsel independently investigated the confidential witness allegations, the Court

---

[3] *See* Ltr. from Mark W. Ryan, Mayer Brown, to Steve W. Berman, Hagens Berman (Dec. 3, 2019), attached as Exhibit A to the declaration of Benjamin L. Ellison, filed contemporaneously with this motion.

would have ample authority to strike them. *See, e.g., Brown v. Ameriprise Fin. Servs., Inc.*, 276 F.R.D. 599, 606 (D. Minn. 2011) (striking allegations because "Plaintiff was required to have a reasonable factual basis for her claims, but instead copied huge swaths from a complaint in a different case against a different defendant"); *In re Lehman Bros. Secs. & ERISA Litig.*, No. 09-MD-2017, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) ("Allowing counsel to rely on confidential witness statements recounted in a separate complaint would provide the Court little assurance that the factual contentions have any evidentiary support."). There is no reason to credit such suspect allegations for purposes of this motion to dismiss the Complaint.

>2.     The Confidential Witness Allegations Cannot Support A Conspiracy Claim Even if They Are Afforded Any Weight

The Plaintiffs' Sherman Act claim must be dismissed because their "allegations are too vague to provide adequate notice of the factual grounds on which [their antitrust] claim rests." *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1048 (D. Minn. 1992). Attributing vague assertions to a confidential witness does not make them any less conclusory, *see In re Metawave Commc'ns Corp.*, 298 F. Supp. 2d at 1069 (dismissing a confidential witness's allegations as "merely opinion, or vague"), and does not provide the necessary "factual content" to support the "reasonable inference" of a conspiracy. *In re Pre-Filled Propane Tank*, 893 F.3d at 1057 (citations and internal quotation marks omitted). And the witnesses' allegations are consistent with lawful behavior in any event.

Witness 1 alleges that Defendants "had an 'agreement' to reduce their purchase and slaughter volumes." Compl. ¶ 73. But Witness 1 never describes what slaughter reductions were agreed upon and when; how and when each Defendant implemented those reductions; or how long the reductions lasted. Further, Witness 1 is apparently unsure whether any reductions were due to a conspiracy. He claims that the plant where he worked "might" have dropped its slaughter levels as part of the alleged agreement and does not describe how other Defendants implemented the purported agreement. *Id.* ¶ 83.

Plaintiffs do not allege any specific volume reductions by any Defendant. All Plaintiffs say is that "[p]ublic reports indicate" that Defendants reduced their slaughter volumes seasonally (without alleging any specific reductions in any public reports), Compl. ¶ 84, which is perfectly consistent with lawful—and wholly rational individual profit-maximizing—behavior.

Witness 1's statements simply do not provide direct evidence of a conspiracy *or* parallel conduct because "allegations of direct evidence of an agreement" must be "sufficiently detailed." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323–24 (3d Cir. 2010). That means identifying, among other things, "the contours of the alleged agreement," such as the "specific time, place, [and] person involved in the alleged conspirac[y]." *In re Mylan N.V. Secs. Litig.*, 379 F. Supp. 3d 198, 209 (S.D.N.Y. 2019) (internal quotation marks omitted); *In re Pork*, 2019 WL 3752497, at *8 (observing that without defendant-specific allegations, "the Court has no basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted" to effectuate the alleged conspiracy). Witness 1 does not provide *any* such detail. He does

not specify when the conspiracy was formed, where it was formed, who formed it, or what they specifically agreed to do (other than a vague suggestion that they agreed to "reduce their purchase and slaughter volumes" when fed cattle prices got "too high for their liking."). And because Witness 1 has no basis for alleging—and does not attempt to allege—which Defendants cut production, when, and by how much, his statement does not support a claim of parallel conduct, either.

Even if Witness 1's assertions *could* be imputed to each Defendant, they would not constitute plausible allegations of conspiracy because periodic reductions in plant hours and production are consistent with ordinary market behavior. By Plaintiffs' own admission, a plant's capacity is not a fixed number. To the contrary, "[w]eekly plant capacity is determined not only by plant size, but by the number and length of shifts run in a given week." Compl. ¶ 56. In determining how many shifts to run (and how long to run each one), plant managers consider the supply of fed cattle in the surrounding region (because significant transportation costs make it costly to purchase cattle from other regions), as well as other factors, such as maintenance needs and available labor. Further, because a plant may "reduce its slaughter during periods associated with seasonal rises in fed cattle prices," *id.* ¶ 84, periodic reductions in slaughter volumes should be expected when fewer cattle are available. In other words, a bare allegation that Defendants "periodically" reduced cattle slaughter is perfectly consistent with ordinary (and perfectly lawful) business behavior and not at all indicative of a conspiracy.

And reducing production by underutilizing machinery—essentially what Witness 1 is alleging here—"is the kind of flexible behavior that is consistent with rational attempts

to raise prices through watchful attention to one's competitors." *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018). Had the "[defendant's] efforts not paid off, it could have increased its output quickly." *Id.* For that reason, the fact that a company may have taken an easily-reversible step to restrict its production does not support an inference of conspiracy. *Id.*

Witness 2's allegations similarly fail to support a conspiracy. He alleges that Defendants "enforced" a queuing convention by which Defendants required ranchers to give the first bidder a right of first refusal; if the first bidder offered $X, that bidder was "on the cattle" at that price. Compl. at 38–43 (¶¶ 1, 107–118). Such a convention (if it existed), would not have been anticompetitive because it would not prevent other packers from bidding higher prices for the same pen of cattle. Compl. at 38–39 (¶ 1) ("If Packer B is willing to pay X + $1, the producer may again choose to accept that bid or pass on it.").

In any event, Witness 2's allegations fail to show that all Defendants adhered to or enforced any such convention. Witness 2 cites just one instance in which two unidentified Defendants stopped visiting the feedlot where he worked because his predecessor failed to abide by the alleged queueing convention. Compl. ¶ 107. The incident allegedly took place sometime before Witness 2 "took over management of the feedlot in 2012," *id.*, years *before* the purported conspiracy began in 2015, and cannot provide the foundation for a conspiracy claim. Acts occurring "before the class contends the conspiracy ever began . . . [are] . . . of little relevance to this case." *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask., Inc.*, 203 F.3d 1028, 1034 n.7 (8th Cir. 2000) (en banc).

16

Moreover, Witness 2 *admits* that the other two Defendants continued to bid on the feedlot's cattle even after the feedlot failed to comply with the alleged queuing convention. Compl. ¶ 107.  Witness 2 claims that he heard from unidentified "field buyers and other industry participants," *id.* ¶ 108, of other instances in which Defendants enforced the convention.  But absent any details to support that conclusory allegation, Witness 2 has not provided the Court any "basis to analyze which, how many, or when any of the individual Defendants may have affirmatively acted" in the manner he describes.  *In re Pork*, 2019 WL 3752497, at *8.

### B.   Plaintiffs' Allegations About Ostensibly Parallel Conduct Cannot Support An Inference Of Conspiracy

Nor have Plaintiffs provided the Court any basis for inferring a conspiracy from the facts alleged in the Complaint.  As this Court explained in *In re Pork*, "parallel conduct" from which an agreement may be inferred is "behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *In re Pork*, 2019 WL 3752497, at *6 n.6 (quoting *Twombly*, 550 U.S. at 557 n.4).  An agreement may not be inferred from "conscious parallelism," the "process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).  Simply put, Plaintiffs

have not alleged any facts that would provide an adequate foundation for a parallel conduct claim.

1.    Plaintiffs Have Not Alleged That Defendants Engaged In Parallel Conduct To Reduce Their Slaughter Capacity

Having failed to plausibly allege the existence of a conspiracy with statements from confidential witnesses, Plaintiffs claim that Defendants agreed to reduce their slaughter capacity by closing or idling certain plants (as evidenced by allegedly parallel conduct). Compl. ¶ 67. Specifically, Plaintiffs point to four plants that closed, each before the alleged conspiracy began in 2015: (i) Cargill's Plainview, Texas facility, which closed in 2013; (ii) Cargill's Milwaukee, Wisconsin facility, which closed in 2014; (iii) National Beef's Brawley, California plant, which closed in 2014; and (iv) Tyson's Cherokee, Iowa plant, which closed in 2014. *Id.* ¶¶ 87, 90, 91, 96. Plaintiffs further contend that JBS acquired a closed plant in Nampa, Idaho in 2013 and kept it idled during the class period, that Tyson closed its Denison, Iowa plant in 2015, and that it refused to lease its Cherokee, Iowa, plant to a competitor until 2019. *Id.* ¶¶ 89, 94, 96. These allegations do not show that Defendants engaged in parallel conduct for five distinct reasons.

*First*, Plaintiffs allege that only one of the six plants discussed closed after the inception of the claimed conspiracy, and Plaintiffs fail to allege that one Defendant—JBS—closed any plants at all. Acts occurring "before the class contends the conspiracy ever began . . . [are] . . . of little relevance to this case." *Blomkest Fertilizer*, 203 F.3d at 1037 n.7. Moreover, Plaintiffs may not "merely lump multiple defendants together" to survive a motion to dismiss. *Petersen v. England*, No. 09-cv-2850, 2010 WL 3893797, at

*10 (D. Minn. Sept. 30, 2010) (Tunheim, J.) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007)). Rather, Plaintiffs must "differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Id.*; *see also In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997), *aff'd*, 195 F.3d 430 (8th Cir. 1999) (allegations against a defendant must be dismissed where the defendant is simply "lump[ed]" together with others without specific allegations). Plaintiffs cannot state a conspiracy claim against *all* Defendants on the basis of a single act by *one* Defendant during the class period. *See Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012) ("A complaint which lumps all defendants together . . . does not sufficiently allege who did what to whom."); *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1020 (D. Minn. 1997) (dismissing claims where the complaint "attempt[s] to lump [defendant] in with the other defendants"), *aff'd*, 195 F.3d 430 (8th Cir. 1999).

*Second*, Plaintiffs fail to allege conduct that is "reasonably proximate in time and value." *In re Pork*, 2019 WL 3752497, at *8 (quoting *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 441 (E.D. Pa. 2018)). In *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, for example, the Eighth Circuit held that plaintiffs failed to plausibly allege parallel conduct, in part because the conduct alleged there (dropping Plaintiff's products from two distribution networks) occurred six months apart and therefore lacked "temporal proximity." 911 F.3d 505, 516–17 (8th Cir. 2018). Here, the purportedly parallel plant closures were even further removed in time from each other and from the inception of the claimed conspiracy. An antitrust claim must make "factual

sense." *Lerma v. Univision Commc'ns, Inc.*, 52 F. Supp. 2d 1011, 1025 (E.D. Wis. 1999); *see Iqbal*, 556 U.S. at 679 (explaining that "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). Plaintiffs' supposition that a conspiracy may be inferred from plant closures occurring over a period of years, largely before the purported conspiracy began, does not make sense.

*Third*, Tyson's initial refusal to sell its Cherokee facility to another meatpacking company, Compl. ¶ 96, is insufficient to establish parallel conduct. The act of a single Defendant is insufficient to state a conspiracy claim against all Defendants, and Tyson's refusal to sell its plant to a competitor was as sensible as it was lawful. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1074 (10th Cir. 2013), *cert. denied*, 572 U.S. 1096 (U.S. 2014) ("Normally, this sort of unilateral behavior—choosing whom to deal with and on what terms—is protected by the antitrust laws."). Indeed, the Complaint alleges that Tyson CEO Donnie Smith told investors in late 2015 that excess industry capacity limited the company's "ability to drive margins above . . . 1.5% to 3%." Compl. ¶ 99.[4] Taking that allegation as true, it was perfectly rational—and in Tyson's own best interest—to restrict some of that capacity by shuttering the Cherokee plant. Moreover, there was nothing unlawful about its refusal to sell the plant to a competitor, as the antitrust laws are intended to protect competition, not competitors. *Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d

---

[4] Such a "vague public statement" by a single Defendant would not permit the Court to "infer that each Defendant engaged in similar parallel conduct simply because they make up the majority of the industry." *In re Pork*, 2019 WL 3752497, at *9.

444, 450 (8th Cir. 1985).  Tyson had no legal obligation to sell the plant to anyone.  *See*

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004)

(holding that antitrust laws do not create a duty to transact with competitors).

*Finally*, Plaintiffs' charts in Paragraphs 10 and 11, which rely on the same data,

show that all Defendants increased, rather than decreased, their fed cattle slaughter

volumes during the alleged conspiracy.  The chart in Paragraph 10 shows each Defendant's

average yearly slaughter volume for 2007 to 2014 (the eight years before the alleged

conspiracy) and average for 2015 to 2017 (the first three years of the conspiracy).  Compl.

¶ 10.  The chart in Paragraph 11, copied below, provides the same information with more

detail about the years of the supposed conspiracy.  It shows average slaughter volumes for

2007 to 2014 and yearly slaughter volumes for 2015, 2016, and 2017.  Compl. ¶ 11.

*Figure 1: Plaintiffs' Chart In Paragraph 11*



The chart shows that each Defendant's slaughter volumes actually *increased* during the supposed conspiracy; indeed, each Defendant's yellow bar for 2017 is higher than its orange bar for 2015. (And Plaintiffs admit as much in the paragraph accompanying the chart: "Tyson, JBS, Cargill, and National Beef each increased its slaughter volume during the Class Period . . . ." Compl. ¶ 11.)

Moreover, the charts in Paragraphs 10 and 11 do not show that any Defendant reduced fed cattle slaughter volumes in 2015, the first year of the alleged conspiracy, much less that all Defendants did so in parallel. The chart in Paragraph 11 compares Defendants' 2015 slaughter volumes only to each Defendant's average slaughter volume for the eight-year period between 2007 and 2014 (depicted in the blue bar). Notably, it does not compare 2015 volumes to 2014 volumes—almost certainly because doing so would undermine their claim. The 2014 data for 2014, which is available from the source Plaintiffs cite, does *not*

show that all Defendants reduced their fed cattle slaughter volume from 2014 to 2015. Instead, it shows that Defendants all acted very differently—*not* in parallel—during the supposed conspiracy:

*Figure 2*:  *Defendants' Year-on-Year Change in Fed Cattle Slaughter Volume*



*See* Cattle Buyers Weekly, *Top 30 Beef Packers Annual Reports, 2008-2017* ("CBW Reports").[5]

> 2.  Plaintiffs Have Not Alleged That Defendants Engaged In Parallel Conduct To Limit Their Cash Cattle Purchases

Further, Plaintiffs fail to allege meaningful facts from which the Court could analyze "which, how many, or when any of the individual Defendants may have affirmatively

---

[5] Because the CBW Reports are not publicly available, the data is filed under seal as Exhibit B, attached to the declaration of Benjamin L. Ellison, which is being filed contemporaneously with this motion.

acted" to limit their cash cattle purchases.  *In re Pork*, 2019 WL 3752497, at *8.  Such broad brushstroke pleading plainly violates the *Iqbal/Twombly* rule that labels, conclusions, and a "formulaic recitation of the elements of a cause of action" cannot support an antitrust conspiracy claim.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555); *In re Pork*, 2019 WL 3752497, at *5.

Plaintiffs assert that "[a]t the same time as they reduced their slaughter numbers, Tyson, JBS, Cargill, and National Beef agreed to reduce their purchase of cash cattle." Compl. ¶ 101.  This wholly conclusory statement—and the paragraph purporting to support it—does not include individualized allegations about each Defendant necessary to plausibly allege that an agreement was reached.  *See In re Milk Prods.*, 84 F. Supp. 2d at 1020 (dismissing claim against defendant for failing to "list specific actions" and instead "attempt[ing] to lump [defendant] in with the other defendants simply by alleging that [defendant] communicated with them").

Moreover, reducing cash cattle purchases is as consistent with individual decision-making as with a conspiracy.  Plaintiffs admit that Defendants "use contractual agreements for approximately 70 percent of their supply of fed cattle," Compl. ¶ 64, so they "are not as reliant on the cash-cattle trade because they have a guaranteed supply of cattle through their captive supply agreements," *id.* ¶ 65.  Ensuring a "reliable and stable supply of cattle for [] packing plants" is "unquestionably" a legitimate business justification for Defendants' conduct.  *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1282 (11th Cir. 2005).  Plaintiffs have not pleaded sufficient facts to support a contrary conclusion.

3.      Plaintiffs Have Not Adequately Alleged That Defendants
        Coordinated Their Cash Cattle Procurement Practices

Plaintiffs would also have the Court infer a conspiracy on the basis of allegations that Defendants engaged in a number of coordinated procurement practices. But the practices reflected in those allegations are as consistent with competition as conspiracy, and Plaintiffs have not pleaded sufficient facts to push their claims out of the realm of "merely possible" to "plausible," as *Twombly* requires.

*First*, Plaintiffs allege that Defendants imposed a "queuing convention" on feedlots in certain parts of the country, and "blackballed" producers who did not comply with this convention. Compl. ¶¶ 107–18. But the Complaint describes just one instance in which a feedlot was allegedly blackballed. *Id.* ¶ 107. And (as described *supra* at 11) the incident occurred years before the alleged conspiracy began and involved just two Defendants. *Id.*

Further, the alleged "queuing convention" reflects standard contract principles of offer and acceptance—*not* anything nefarious. Plaintiffs allege that when a packer bids on a pen of cattle, the producer can accept the bid or pass on it. Compl. at 38–39 (¶ 1). If the producer passes on the bid, it can seek a better price from other packers, and can accept or reject any higher bid it receives. *Id.* If the producer receives a bid that is the same as the initial high bid, it must give the initial high bidder the chance to buy the cattle. *Id.* There is nothing anticompetitive about this practice, which simply reflects the basic contract principle that an offeror has the right to rescind its offer at any time prior to the offeree's acceptance. *See, e.g.*, *McKie Ford, Inc. v. Sec'y of Labor*, 191 F.3d 853, 857 (8th Cir.

1999) ("It is, of course, well settled that a party may revoke an offer before acceptance.");
*see also* Restatement (Second) of Contracts § 42 (Am. Law. Inst. 1981).[6]

Neither do Plaintiffs explain how such a practice would harm competition or cause Plaintiffs any injury.  Nor could they, as the Eighth Circuit has upheld a similar "right of first refusal" in the cattle industry.  *IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999).  In *IBP*, the court explained that such arrangements do not "ha[ve] the actual effect of suppressing or reducing competition" for fed cattle.  *Id.*  Here, the queuing convention alleged is even more procompetitive than the arrangement upheld in *IBP*, which allowed the defendant to buy a pen of cattle by merely matching, rather than outbidding, a higher bid from another packer.  *Id.* at 976.

*Second*, Plaintiffs contend that "in late 2014 or early 2015" unnamed field buyers for Tyson, JBS, Cargill, and National Beef jointly demanded that the first bidder at Witness 2's feedlot be determined each week by drawing cards.  Compl. ¶ 113.  This allegation does not suggest a conspiracy to restrain the prices paid for fed cattle, because a procedure to determine which packer would *start* the bidding would not affect any other packer's ability to compete by offering a higher bid.  *See id.* ¶ 114.  And the Complaint itself includes a legitimate purpose for such a procedure:  the packers were simply trying to avoid the inconvenience of camping out at feedlots overnight to place the first bid.  *Id.* ¶ 115.

---

[6] Contrary to Plaintiffs' claims, Compl. ¶ 1 at 38–39 n.24, the same principle holds true in a standard auction.  *See In re NextWave Personal Comm's, Inc.,* 200 F.3d 43, 60 (2d Cir. 1999).

*Third*, Plaintiffs allege that a single packer would solicit certain feedlots as part of an ostensible "home market" allocation scheme. Compl. ¶ 112. But Plaintiffs do not provide any specific facts to explain who-did-what-when as part of the alleged scheme, or explain why their conclusory allegation of a conspiracy should prevail over the more logical conclusion that convenience and cost may determine whether a meatpacker bids at a particular feedlot. In fact, the Complaint acknowledges that transportation costs are important factors in this industry. *Id.* ¶¶ 119–20.

*Finally*, Plaintiffs allege Defendants would refrain from buying cattle in certain regions for several weeks in order to "back-up" the pipeline and to cause the prices of cattle to fall. Compl. ¶ 104. Plaintiffs do not support this conclusory allegation with any details, identify which of the "Defendants" engaged in this practice, or explain why it would not be in each Defendant's independent economic interests to purchase cattle at the lowest cost possible.

In short, none of Plaintiffs' allegations about coordinated cash purchases shore up their conspiracy claim. They are not free to assume a conspiracy and explain the facts accordingly. *Blomkest*, 203 F.3d at 1033. Rather, they must plead facts tending to exclude the possibility that Defendants acted independently. *See Twombly*, 550 U.S. at 557. They have not done so here.

4.      Plaintiffs Have Undermined Their Own Conspiracy Allegations By Claiming Defendants Imported Fed Cattle

Plaintiffs' allegations about beef imports undermine the heart of their claim that Defendants engaged in a conspiracy to reduce the total number of fed cattle they purchased.

Compl. ¶ 1.  After all, if some but not all Defendants imported fed cattle from producers outside the United States after the alleged conspiracy began, *id.* ¶ 121, they would not be evidencing a common commitment to the alleged scheme.

Moreover, Plaintiffs also appear to believe that the Court may infer a conspiracy among *all* Defendants on the basis of conclusory allegations that *some* Defendants have imported fed cattle even when it was purportedly uneconomical to do so.  Compl. ¶ 121.  Plaintiffs do not allege who imported what, from where, for which plants, when, or at what cost—or that any particular import purchases occurred pursuant to an agreement.  To state an actionable claim, though, Plaintiffs must allege Defendant-specific facts.  They cannot plead industry-wide trends and ask the court to infer that Defendants contributed to those trends.  *In re Pork*, 2019 WL 3752497, at *8.

Finally, the Court cannot ignore lawful and "'obvious alternative explanation[s]' for the alleged conduct."  *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 682).  In this case, Plaintiffs' own allegations explain why it might be more economical for a packer to purchase imported fed cattle than domestic fed cattle.  For example, a packer with a plant near the Canadian border (such as Tyson's plant in Washington state, Compl. ¶ 122) may reasonably decide to import Canadian cattle rather than buy and transport cattle from farther away in the United States.[7]

---

[7] There is at least one other obvious lawful explanation for increased imports.  In 2016, Congress repealed the Mandatory Country of Origin Labeling (COOL) rule for beef.  Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 759, 129 Stat. 2242, 2284–85 (2015) (amending 7 U.S.C. § 1638).  When the rule was in place, domestic feedlots could charge higher prices than foreign feedlots because of the

**C.      Plaintiffs' "Plus Factor" Allegations Are Irrelevant Without Facts to Support Their Parallel Conduct Allegations**

A plaintiff seeking to rely on circumstantial allegations of a conspiracy must couple parallel conduct allegations with "substantial additional evidence—often referred to as 'plus factors.'" *In re Tyson Foods, Inc. Secs. Litig.*, 275 F. Supp. 3d 970, 991 (W.D. Ark. 2017) (quotations omitted). Such "plus factors may include: (1) a shared motive to conspire; (2) action against self-interest; (3) market concentration; and (4) a high-level of interfirm communication exist[ing] in conjunction with the parallel actions." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1013 (E.D. Mo. 2018) (quotations omitted); *aff'd*, 911 F.3d 505 (8th Cir. 2018). To survive a motion to dismiss, "plus factor" allegations (like any others) must be supported with facts rather than conclusions or speculation.

Because Plaintiffs have failed to plead parallel conduct, the Court need not consider Plaintiffs' alleged plus factors. As the Court explained in *In re Pork*, "without plausible allegations of parallel conduct," plus factors "are insufficient to establish an inference of an agreement." 2019 WL 3752497, at *7; *see also In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990). Nonetheless, Plaintiffs' plus factor allegations are deficient, too.

Many of Plaintiffs' "plus factors" are simply characteristics of an oligopolistic— and perfectly legal—market, and not indicia of a conspiracy. *Williamson Oil Co. v. Philip*

---

premium paid for domestic beef. After the rule was repealed, foreign beef no longer had to be labeled as such. That spurred additional imports and caused domestic cattle prices to fall.

*Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003). That "defendants operate in an oligopolistic market," is "legally insufficient" to constitute evidence of a conspiracy. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322 (3d Cir. 2010). Otherwise "an antitrust complaint targeting any industry with those features would survive a motion to dismiss regardless of whether there were any additional facts suggesting an agreement." *Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F.3d 824, 841 (N.D. Ill. 2018).

**Barriers to Entry.** Plaintiffs contend that the meatpacking industry has high barriers to entry. Compl. ¶¶ 171–75. While barriers to entry may "make the market susceptible to conscious parallelism," without more, they do not make conspiracy "a more plausible explanation than mere interdependence" in a concentrated market. *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1317 (S.D. Fla. 2010); *see, e.g.*, *White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 582 (1st Cir. 2011) (rejecting plaintiffs' argument that high barriers to entry constitute a plus factor).

**Industry Concentration.** Plaintiffs allege that the industry has experienced increased concentration in recent years (Compl. ¶¶ 160–70) and that Defendants controlled "approximately 75 percent of the market for both slaughter capacity and processed beef sales" during the alleged conspiracy. *Id.* ¶ 163. These allegations are no more indicative of conspiracy than are Plaintiffs' allegations about barriers to entry. *See In re Fla. Cement*, 746 F. Supp. 2d. at 1317; *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007) (dismissing Sherman Act Section 1 claim by putative class of credit cardholders where defendant card issuers had a combined 70% share of the market), *aff'd,*

741 F.3d 1022 (9th Cir. 2014).   Indeed, high industry concentration makes it more likely that independent market participants will reach similar price and output decisions *without* coordination.  *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 964 (N.D. Cal. 2007).   And Plaintiffs' allegations that Defendants' "four-firm concentration ratio," Compl. ¶ 167, put the beef industry in an "ideal zone" for collusion, *id.* ¶ 170, do not give rise to an inference of conspiracy for the same reason.[8]  Concentration alone cannot help a court to differentiate between parallel conduct that is the result of unilateral rather than collusive decision-making.  *In re Late Fee*, 528 F Supp. 2d at 964.

Finally, even if industry consolidation were a relevant "plus factor" here, Plaintiffs have failed to allege that the meatpacking industry suffers from such a high degree of concentration to render it more susceptible to conscious parallelism, never mind coordinated conduct.  Plaintiffs allege in a header that the meatpacking industry is "highly concentrated."   But the allegations purporting to support those headlines show that the industry is only "moderately concentrated" under the Herfindahl-Hirschman Index ("HHI"), a standard measure of market concentration.  Compl. ¶¶ 164–65.  This is not enough to infer a conspiracy.  *See Transnor (Bermuda) Ltd. v. BP N. Am. Petroleum*, 738

---

[8] Plaintiffs are not aided by the charts in Paragraphs 163, 165, and 168, which do not identify the data underlying the conclusions depicted in them or explain the methodology by which those conclusions were reached.  Rather, like the other charts in the Second Amended Complaint, they fall squarely into the category of "labels and conclusions" insufficient to support an antitrust claim.  *See* discussion *infra* at 22–24; *see also Twombly*, 550 U.S. at 555 and *In re Pork*, 2019 WL 3752497 at *5.

F. Supp. 1472, 1482 n.15 (S.D.N.Y. 1990) (holding that a "moderately concentrated market" is "unlikely . . . [to] operate[] as an oligopoly").[9]

***Beef Is a Commodity Product.***  Plaintiffs allege that demand for retail beef—an allegedly commoditized product—is inelastic.  Compl. ¶¶ 183–86.  But inelastic demand is just as characteristic of a non-collusive oligopolistic market as of a conspiracy.  *See, e.g.*, *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1305 (N.D. Ga. 2002) (observing that "the 'nature of the market' is not a 'plus factor'"); *aff'd sub nom. Williamson Oil Co.*, 346 F.3d 1287 (11th Cir. 2003); *accord Erie Cty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) ("[D]escriptions of the market . . . do not give rise to an inference of an unlawful agreement.").  And inelastic demand may help to explain why market participants may match one another's prices as rational business conduct, not as part of a conspiracy.  *See In re Potash Antitrust Litig.*, 954 F. Supp. 1334, 1342 n.7 (D. Minn. 1997), *aff'd in part, rev'd in part on other grounds sub nom. Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 176 F.3d 1055 (8th Cir. 1999) ("[D]ue to the relative inelasticity of demand . . . if a seller attempts to sell at a lower price . . . its competitors will be given the opportunity to meet its lower price, thereby resulting in uniform prices again, but at a lower level; and without any increase in the original seller's net share of the market." (internal quotations omitted)).

---

[9] Moreover, the charts purporting to support the HHI allegations suffer from the same infirmities as other charts in the Complaint:  they do not identify the data or explain the methodology on which they rely, and are too conclusory to be entitled to a presumption of truth.  *See Iqbal*, 556 U.S. at 681.

**Market Share Stability.**   Plaintiffs suggest that a comparison of the "volatility" of Defendants' market shares from 2005 to 2014 and from 2015 to the present somehow support an inference of conspiracy during the latter period of time.  Compl. ¶¶ 179–82.  But market shares "are simply descriptions of the market, not allegations of anything that the defendants did . . . and do not give rise to an inference of an unlawful agreement."  *Erie Cty.*, 702 F.3d at 870; *see also White*, 635 F.3d at 582 (rejecting plaintiffs' argument that "stable relative market shares over time among the four defendants" constitute a plus factor); *In re Citric Acid Litig.*, 191 F.3d 1090, 1101 (9th Cir. 1999) (observing that "it is not reasonable to infer that a firm is engaging in illegal activities merely from the fact that it failed to continue to increase market share").

**Profitability of the Beef Industry.**   Plaintiffs also allege that the Defendants made more money after 2015 and that their increased profitability must be indicative of a conspiracy.  Compl. ¶¶ 126, 134–44.  But in a "free capitalistic society, all entrepreneurs have a legitimate understandable motive to increase profits."  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 229 (3d Cir. 2011) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 137 (3d Cir. 1999)).   And "without a 'scintilla of evidence of concerted, collusive conduct,' this motive does not on its own constitute evidence of a 'plus factor.'"   *Id.* (quoting *In re Baby Food*, 166 F.3d at 137).

**Public earnings statements.**   Plaintiffs allege that routine earnings statements by JBS and Tyson before and after the alleged conspiracy somehow suggest that any change in the margins of *two* Defendants could only be explained by a conspiracy among *all* Defendants.  Compl. ¶¶ 134–52.  "[V]ague public statements" like these, which neither

identify nor suggest any coordination or communications between any (and not all) Defendants, are insufficient to plausibly allege parallel conduct. *See In re Pork*, 2019 WL 3752497, at *9. Such statements are also insufficient to allege a "plus factor," as a defendant's desire to "maintain the level of profits it earned . . . is not evidence of a conspiracy." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 166 (3d Cir. 2003). JBS's and Tyson's routine earning statements, without more, cannot make a conspiracy among all Defendants more plausible.

***Opportunities to Collude.*** Plaintiffs assert that Defendants had ample opportunity to collude through various trade associations. Compl. ¶¶ 199–202. But Plaintiffs fail to describe a single specific meeting or communication that occurred at, in connection with, or through these trade associations. Nor do Plaintiffs attempt to link the timing of any meeting with any actions taken in furtherance of the alleged conspiracy.

Plaintiffs allege that "Defendants' management and employees have regular opportunities to meet and collude through their membership in various trade and industry associations." Compl. ¶ 199. But time and again, courts have held that "belong[ing] to the same trade guild" does not establish a plausible inference of a conspiracy. *Twombly*, 550 U.S. at 567 n.12; *see, e.g.*, *Five Smiths, Inc.*, 788 F. Supp. at 1049 n.5 ("A trade association is not a 'walking conspiracy' of its members."). That is all Plaintiffs allege here.

Moreover, the trade associations identified in the Complaint are enormous and include the very members of the beef industry that Defendants allegedly colluded against. For example, the National Cattlemen's Beef Association ("NCBA") boasts "a membership

base of over 25,000 in all areas of the industry."[10]   The Product Council, of which Defendants are alleged participants, "represents all sectors of the beef industry" and includes "companies from packers, processors, retailers, foodservice, wholesale/manufacturers and suppliers."[11]   It is laughable to suggest that Defendants conspired against their customers under their very noses.

*Oversight of Production Decisions.*   Finally, Plaintiffs allege that Defendants "have significant oversight of each other's prices and production decisions."   Compl. at 74.   In particular, Plaintiffs allege that "Defendants' field buyers' weekly trips to inspect the feedlots in their territory provide an opportunity to meet and exchange commercially sensitive information amongst each other."   *Id.* ¶ 203.

Plaintiffs do not allege any specific communications or meetings between field buyers.   The "mere opportunity to conspire" is "not necessarily probative evidence of a price-fixing conspiracy."   *Blomkest Fertilizer, Inc.*, 203 F.3d at 1036 (citation omitted). Plaintiffs claim that Defendants' field buyers would request information from producers and "drive past their competitors' plants to determine and report upon those plants' operating levels."   Compl. ¶¶ 205–06.   But the act of observing a competitor's behavior is not illegal and does not support an inference of conspiracy.

* * *

---

[10] NCBA, *Allied Industry Membership* (2019),
https://www.ncba.org/CMDocs/BeefUSA/AboutUs/2019NCBA%20Allied%20Industry%20Brochure.pdf.

[11] NCBA, *Product Council Members* (2019),
https://www.ncba.org/productcouncilmembers.aspx.

In wholly conclusory terms, Plaintiffs have alleged that certain characteristics of the cattle and beef industries, combined with Defendants' profitability, make their claim of coordination more plausible.  But "an inference of conspiracy is not warranted where the conduct is at least as consistent with legitimate business decisions" as with conspiracy. *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 884 (8th Cir. 1978). Plaintiffs' purported "plus factors" thus do not nudge their claims across the line from possible to plausible, and so their claims must be dismissed.  *Twombly*, 550 U.S. at 553.

## II.     PLAINTIFFS FAIL TO ALLEGE AN INJURY-IN-FACT THAT CONFERS STANDING TO SUE

To assert a claim for a violation of Section 1 of the Sherman Act, Plaintiffs must plead facts demonstrating that they suffered non-speculative damages as a result of Defendants' alleged antitrust violations.  *See In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006).  In other words, Plaintiffs must plead facts showing that Defendants' allegedly unlawful conduct—not other factors—caused an increase in the price of the retail beef products they purchased.  *See, e.g.*, *Nat'l Farmers' Org., Inc. v. Associated Milk Prods., Inc.*, 850 F.2d 1286, 1305 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989).  Plaintiffs have not done so, thus raising prudential and Article III standing concerns because they have failed to show that their claimed injury is "fairly traceable to the challenged action of the defendant."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Plaintiffs allege that Defendants conspired to suppress the prices of fed cattle, Compl. ¶ 67, and that there was a "strong relationship" between fed cattle and retail beef

prices, *id.* ¶ 6.  Taken to their logical conclusion, these allegations suggest that fed cattle and retail beef prices would have been *higher* in the absence of a conspiracy.  But Plaintiffs do not allege a single fact suggesting that *retail* beef prices were higher because of the alleged conspiracy.  To the contrary, Plaintiffs admit that retail beef prices *fell* by 6% during the alleged conspiracy.  *Id.*  In other words, the alleged conspiracy to suppress fed cattle prices actually *benefited* Plaintiffs, because they paid less for beef than they would have without the conspiracy.

Hedging their bets, Plaintiffs also allege that Defendants' actions "sever[ed]" the historic relationship between fed cattle prices and retail beef prices, and that Defendants were able to suppress fed cattle prices while inflating wholesale prices.  Compl. ¶ 19.  But it is implausible—and would be purely speculative—to conclude that retail beef prices would have been even lower but for the alleged conspiracy to suppress fed cattle prices.  Plaintiffs cannot establish standing by simply "assert[ing] that [their] damages would not have been incurred without defendant's [anti-competitive conduct]."  *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983); *see In re Canadian Imp. Antitrust Litig.*, 470 F.3d at 791 ("'[V]aguely defined links' in the chain of causation . . . [are] insufficient to establish antitrust standing.").

Plaintiffs' internally inconsistent allegations do not satisfy their obligation to plead facts sufficient to show that they were injured as result of the alleged conspiracy.  Consequently, they do not have antitrust standing to pursue damages or injunctive relief against Defendants under federal antitrust law.

## III.    PLAINTIFFS' SHERMAN ACT CLAIM IS TIME BARRED

Plaintiffs filed their first complaint in this case on April 26, 2019—more than four years after the start of the alleged conspiracy in January 2015.  Compl. ¶ 250.  But the Sherman Act has a four-year statute of limitations, 15 U.S.C. § 15b, so Plaintiffs' claim is time-barred.

Neither Plaintiffs' fraudulent concealment nor their continuing conspiracy allegations toll the statute of limitations.  Plaintiffs were required to allege that: (1) Defendants took affirmative acts "solely to conceal" the alleged conspiracy; (2) Plaintiffs failed to discover the existence of the conspiracy; and (3) Plaintiffs exercised due diligence to uncover the relevant facts.  *In re Milk Prods.*, 84 F. Supp. 2d at 1022.  And these allegations had to meet the heightened pleading standard in Federal Rule of Civil Procedure 9(b), and include the "who, what, when, where, and how" of the alleged concealment.  *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011) (internal quotation marks omitted); *see also Podpeskar v. Makita USA Inc.*, 247 F. Supp. 3d 1001, 1010 (D. Minn. 2017).  Plaintiffs fail to plead facts supporting any of the elements of fraudulent concealment, much less with the particularity required by Rule 9(b).  Similarly, Plaintiffs have failed to plead a continuing conspiracy.

### A.    Plaintiffs Do Not Plead Concealment

Because "a conspiracy . . . is by nature a crime of secrecy and cover-up," to satisfy the concealment element, "Plaintiffs must show acts, *other than the acts constituting the conspiracy*, that demonstrate fraudulent concealment of that conspiracy."  *In re Monosodium Glutamate Antitrust Litig.*, No. 00-MDL-1328, 2003 WL 297287, at *3 (D.

Minn. Feb. 6, 2003) (emphasis added).  Plaintiffs must plead those acts with particularity.

*Summerhill*, 637 F.3d at 880.

> Plaintiffs allege that Defendants concealed the alleged conspiracy by:
>
> i.    communicating with each other by telephone about their purchases and slaughter volumes so that they would not have written evidence of sharing this information with a competitor, as well as relying on non-public forms of communication;
>
> ii.   offering false or pretextual reasons for low fed cattle prices;
>
> iii.  offering pretextual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade;
>
> iv.   affirmatively misrepresenting that they complied with applicable laws and regulations, including antitrust laws; and
>
> v.    misrepresenting the nature of their agreements (and purported adherence to competitive safeguards) to government officials and to the public.

Compl. ¶ 208.  Plaintiffs fail to provide any supporting allegations for claims (i), (iv), and

(v).   Plaintiffs provide no examples of instances in which all four Defendants

"communicat[ed] with each other by telephone" or other through other "non-public forms

of communication."   And the Complaint provides no examples of Defendants'

"misrepresent[ions] that they complied with applicable laws" or "misrepresent[ations]

[about] the nature of their agreements."

That leaves claims (ii) and (iii).  For Defendants' "pre-textual reasons for low fed

cattle prices" and "pre-textual justifications for their plant closures," Plaintiffs point to

generic statements about the cattle industry made in Defendants' public SEC filings or by

some Defendants' executives during earnings calls.  *E.g.*, Compl. ¶ 210 (alleging that

Tyson's SEC filings stated that cattle prices and production are "determined by constantly

changing market forces of supply and demand"); *id.* ¶ 212 (alleging that a JBS executive stated that cattle prices would decrease because "we are going to see more cattle available"). Plaintiffs do not provide any reason to believe these public statements are false or fraudulent, or are even connected to the allegations in this case. Allowing such generic statements to support a claim of fraudulent concealment would "effectively nullify the statute of limitations" in antitrust cases. *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218–19 (4th Cir. 1987).

### B.     Plaintiffs Do Not Allege That They Failed To Timely Discover The Conspiracy

Plaintiffs cannot establish the second element of fraudulent concealment, namely, that they failed to discover the alleged conspiracy during the limitations periods. They assert that "[t]he Meatpacking Defendants' conspiracy was inherently self-concealing because it relied on secrecy for its successful operation." Compl. ¶ 219. Plaintiffs' claim is implausible because the Complaint principally relies on information that was available at the time of the supposed conspiracy. Plaintiffs extensively cite publicly available data collected by the federal government and published contemporaneously on a daily or weekly basis. *E.g.*, *id.* ¶¶ 5, 125, 155 n.42, 192. Plaintiffs also cite news articles published contemporaneously with the fall in fed cattle prices in 2015. *See, e.g.*, *id.* ¶¶ 84 n.10, 89 n.14, 96 n.15, 97 n.16, 100 n.17, 102 n.18, 104 n.20, 106 n.23, 125 n.33, 127 n.35, 128 n.36, 130 n.37, 153 n.38, 154 n.41, 155 n.42, 157 n.43, 158 n.45. So Plaintiffs fail to explain what new information has "recently" come to light that allowed them to "discover[]" the conspiracy. *Id.* ¶ 221.

### C.   Plaintiffs Do Not Plead Due Diligence

To establish fraudulent concealment, Plaintiffs must show that they worked diligently to discover their claim once aware "of facts and activities that would 'create notice and excite attention.'"  *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-cv-2664, 2014 WL 943224, at *5 (D. Minn. Mar. 11, 2014) (citation omitted), aff'd, 797 F.3d 538.  Although Plaintiffs allege that they "could not have discovered [the alleged conspiracy] through the exercise of due diligence until recently," Compl. ¶ 221, this assertion is wholly conclusory and therefore insufficient.

Plaintiffs fail to allege that that they exercised *any* diligence in investigating Defendants' actions.  Rather, Plaintiffs claim simply that "[b]ecause of Defendants' fraudulent concealment, Plaintiffs and the Class had insufficient information concerning Defendants' misconduct on which to base a complaint. . . ."  Compl. ¶ 221.  And an investigation by the Government Accounting Office is no substitute for Plaintiffs' own due diligence.  *Id.* ¶ 220.  *See In re Milk Prods.*, 84 F. Supp. 2d at 1024; *cf. In re Refrigerant Compressors Antitrust Litig.*, 92 F. Supp. 3d 652, 670 (E.D. Mich. 2015) (plaintiffs adequately alleged diligence because they took investigative steps before and after the government announced its investigation).  Moreover, the government's investigation resulted in a report *rejecting* a claim of anticompetitive conduct.  Simply put, Plaintiffs' due diligence allegations are inadequate to sustain a claim that they could not have known about Defendants' alleged misconduct any sooner.

### D.      The Continuing Violation Doctrine Does Not Apply Here

Plaintiffs contend that the alleged conspiracy is still ongoing and purport to invoke the continuing violation doctrine, Compl. ¶ 223, which recognizes that each "overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running again." *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 (8th Cir. 2017) (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).  Plaintiffs' reliance on the continuing violation doctrine is misplaced.

*First*, the Complaint does not include allegations about conspiratorial acts after 2016.  The gravamen of Plaintiffs' claim is a supposed scheme to suppress fed cattle prices in 2015 by coordinating production cuts.  *See* Compl. ¶¶ 68–100; *see also id.* ¶ 74 (alleging that Witness 1's overheard conversation "occurred sometime in 2015 or early 2016").  The Complaint's other post-2015 allegations *undercut* the claim of an ongoing conspiracy: They show that industry slaughter volumes increased between 2015 and 2018, *id.* ¶ 98; that each individual Defendant increased its slaughter volumes between 2015 and 2017, *id.* ¶ 11, and imported fed cattle from producers outside the United States after the alleged conspiracy began, id. ¶ 121; *supra* fig.2.  Consequently, the continuing violation doctrine cannot apply to Plaintiffs' claims.

*Second*, even if the doctrine did apply, it would not permit Plaintiffs to recover for violations that are time-barred.  As the Supreme Court has made clear, the continuing violation doctrine "starts the statutory period running again" with each new overt act but "does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period."  *Klehr*, 521 U.S. at 189–90; *see In re Propane Tank Antitrust Litig.*,

860 F.3d at 1068.  So if Plaintiffs had plausibly alleged a continuing violation, they could recover for violations within the applicable statutes of limitations (*i.e.*, the most recent violations in a series of violations) but not resuscitate time-barred claims.  As a result, Plaintiffs could not recover for any injuries allegedly incurred before April 26, 2015 for their Sherman Act claim).[12]

## IV.  ALL OF PLAINTIFFS' STATE CLAIMS ARE DERIVATIVE OF THEIR FEDERAL CLAIMS AND MUST BE DISMISSED

The Complaint contains a kitchen sink full of state law claims, too.  But these claims rest on the same, insufficient conspiracy allegations as the Sherman Act claim and must be dismissed.  *In re Pork*, 2019 WL 3752497, at *10 ("Because the Court finds that Plaintiffs have failed to adequately plead a conspiracy, the Court will grant Defendants' motions to dismiss the state law claims."); *see also Karnatcheva v. JPMorgan Chase Bank, N.A.*, 704 F.3d 545, 548 (8th Cir. 2013) ("We apply federal pleading standards—Rules 8 and 12(b)(6)—to the state substantive law to determine if a complaint makes out a claim under state law.").  Many of these claims fail for additional reasons, which the Court need consider only if it finds that Plaintiffs' conspiracy allegations are sufficient.  Specifically, Plaintiffs' state claims also fail based on lack of standing, failure to plead requisite elements, and untimeliness.  In addition, Plaintiffs' unjust-enrichment claims fail as a matter of law.  For the Court's convenience these deficiencies are summarized below:

---

[12] Moreover, the following states do not recognize the continuing violations doctrine:  District of Columbia, Florida, Kansas, Massachusetts, Mississippi, Nebraska, New Hampshire, New York, Tennessee, and Wisconsin.  *In re Pre-Filled Propane Tank Antirust Litig.*, No. 14-MDL-02567, 2019 WL 4796528, at *16 (W.D. Mo. Aug. 21, 2019).

| Defenses To State Antitrust Claims | | | | | | |
|---|---|---|---|---|---|---|
| **State** | **Derivative of Federal Claims** | **No Named Plaintiff** | **Time Barred** | **No Injury** | **Not Efficient Enforcer** | **State-Specific Argument** |
| Arizona | X | | X | X | | X |
| California | X | | X | X | | |
| District of Columbia | X | | X | X | | |
| Illinois | X | | X | X | | X |
| Iowa | X | | X | X | | |
| Kansas | X | X | X | X | | |
| Maine | X | X | | X | | |
| Michigan | X | X | X | X | X | |
| Minnesota | X | | X | X | | |
| Mississippi | X | X | X | X | | X |
| Missouri | X | | X | X | X | |
| Nebraska | X | | X | X | | |
| Nevada | X | | X | X | X | X |
| New Hampshire | X | X | X | X | X | |
| New Mexico | X | | X | X | X | X |
| New York | X | | X | X | X | |
| North Carolina | X | | X | X | | |
| North Dakota | X | | X | X | X | |
| Oregon | X | X | X | X | | |
| Rhode Island | X | X | X | X | X | |
| South Dakota | X | X | X | X | | |
| Tennessee | X | | X | X | | |
| Utah | X | | X | X | | X |
| West Virginia | X | X | X | X | | |
| Wisconsin | X | | | X | | |

| Defenses To Consumer Protection Claims | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **State** | **Derivative of Federal Claims** | **No Named Plaintiff** | **Time Barred** | **No Class Action or AG Notice** | **Failure to Plead Fraud** | **Failure to Rely** | **No Intrastate Conduct** | **Statute Does Not Apply to Antitrust Claims** |
| California | X | | X | | X | X | | |

| Defenses To Consumer Protection Claims | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **State** | **Derivative of Federal Claims** | **No Named Plaintiff** | **Time Barred** | **No Class Action or AG Notice** | **Failure to Plead Fraud** | **Failure to Rely** | **No Intrastate Conduct** | **Statute Does Not Apply to Antitrust Claims** |
| District of Columbia | X | | X | | X | X | | |
| Florida | X | | X | | X | | X | |
| Hawaii | X | | X | X | X | | | |
| Illinois | X | | X | | X | | | X |
| Massachusetts | X | | X | | | | X | |
| Michigan | X | X | | | X | X | | X |
| Minnesota | X | | | | X | | | X |
| Montana | X | | X | X | X | | | |
| Nebraska | X | | X | | X | | | |
| Nevada | X | | X | | X | | | |
| New Hampshire | X | X | X | | X | | X | |
| New Mexico | X | | X | | X | | | X |
| North Carolina | X | | X | | X | | X | |
| North Dakota | X | | X | | X | X | | X |
| Oregon | X | X | X | | X | | | X |
| Rhode Island | X | X | | | X | | | X |
| South Carolina | X | X | X | X | X | | | |
| South Dakota | X | X | X | | X | | | |
| Utah (CSPA) | X | | | X | X | | | X |
| Utah (UPA) | X | | | | | | | X |

| Defenses to Unjust Enrichment Claims | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **State** | **Derivative of Federal Claims** | **No Named Plaintiff** | **Time-Barred** | **Inadequate Pleading** | **No Direct Benefit** | **No Legal Duty** | **Adequate Legal Remedy** | **Barred By *Illinois Brick*** | **Not A Standalone Claim** |
| Arizona | X | | X | X | | | X | | |
| California | X | | X | X | | | | | X |

| Defenses to Unjust Enrichment Claims | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| State | Derivative of Federal Claims | No Named Plaintiff | Time-Barred | Inadequate Pleading | No Direct Benefit | No Legal Duty | Adequate Legal Remedy | Barred By *Illinois Brick* | Not A Standalone Claim |
| District of Columbia | X | | X | X | | | | | |
| Florida | X | | X | X | X | | | | |
| Hawaii | X | | | X | | | | | |
| Illinois | X | | | X | | X | | | |
| Iowa | X | | | X | | | X | | |
| Kansas | X | X | X | X | X | | X | | |
| Maine | X | X | | X | X | | | | |
| Massachusetts | X | | | X | | | X | | |
| Michigan | X | X | | X | X | | | | |
| Minnesota | X | | | X | | | X | | |
| Mississippi | X | X | X | X | | | | | |
| Missouri | X | | | X | | | | X | |
| Montana | X | | | X | | | | X | |
| Nebraska | X | | X | X | | | X | | |
| Nevada | X | | X | X | | | X | | |
| New Hampshire | X | X | X | X | | | X | | X |
| New Mexico | X | | X | X | | | | | |
| North Carolina | X | | X | X | X | | | | |
| Oregon | X | X | | X | | | | | |
| Rhode Island | X | X | | X | X | | | | |
| South Carolina | X | X | X | X | | X | | X | |
| South Dakota | X | X | | X | | | X | | |
| Tennessee | X | | | X | | | X | | |
| Utah | X | | X | X | X | | X | | |
| West Virginia | X | X | | X | | | | | |
| Wisconsin | X | | | X | | | | | |

### A.  Plaintiffs Do Not Have Standing To Sue Under The Laws Of States Where They Do Not Reside Or Did Not Suffer Injury

Plaintiffs fail to allege that any named plaintiffs were injured under the laws of ten states under which they have brought claims:  Kansas, Maine, Michigan, Mississippi, New Hampshire, Oregon, Rhode Island, South Carolina, South Dakota, and West Virginia. Plaintiffs lack standing to bring these state law claims, so these claims should be dismissed.

It is "well-settled that a named plaintiff in a class action lawsuit is required to establish Article III standing."  *Insulate, Inc.*, 2014 WL 943224, at *11) (quotations omitted).  Specifically, "[n]amed plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury."  *Id.* at *11 (quoting *In re Ductile Iron Pipe Fittings Indirect Purchaser Antitrust Litig.*, No. 12-cv-169, 2013 WL 5503308, at *11 (D.N.J. Oct. 2, 2013)).

In *Insulate*, the named plaintiff resided in California and did not allege that it had suffered an injury in any other state.  2014 WL 943224, at *11.  Further, it did not identify "any specific state in which wrongful conduct occurred" that may have caused its injury. *Id*.  The district court granted defendants' motion to dismiss all state claims (except for California) for lack of Article III standing.  *Id*.  The Eighth Circuit affirmed.  *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538 (8th Cir. 2015).

Here, none of the named Plaintiffs resides in the ten states identified above.  Compl. ¶¶ 25–44.  None claim to have been injured in those states.  Conclusory allegations that unidentified plaintiffs purchased beef in those states cannot suffice to satisfy Plaintiffs' pleading burdens, *Iqbal*, 556 U.S. at 678, and their Kansas, Maine, Michigan, Mississippi,

New Hampshire, Oregon, Rhode Island, South Carolina, South Dakota, and West Virginia state law claims must be dismissed.

## B.    Most Of Plaintiffs' State Law Claims Are Time-Barred

All but two (Maine and Wisconsin) of Plaintiffs' state law antitrust claims have three- and four-year statutes of limitations.  The Complaint alleges a conspiracy beginning in January 2015, but Plaintiffs did not file their case until April 26, 2019.  *See* Compl. at 1. And Plaintiffs are not entitled to the benefit of any tolling of any statute of limitations applicable to their state law claims.  *See supra* Section III.

Specifically, 23 of Plaintiffs' state antitrust claims—those with limitations periods of four years or less—are time-barred (at least in part).[13]  Similarly, Plaintiffs' consumer protection claims are time-barred (at least in part) under the laws of 15 different states and

---

[13] Arizona, Ariz. Rev. Stat. § 44-1410(B) (four years); California, Cal. Bus. & Prof. Code § 16750.1 (four years); District of Columbia, D.C. Code § 28-4511 (four years); Illinois, 740 Ill. Comp. Stat. 10/7(2) (four years); Iowa Code § 553.16 (four years); Kansas, Kan. Stat. Ann. § 60-512 (2) (three years); Michigan, Mich. Comp. Laws § 445.781(2) (four years); Minnesota, Minn. Stat. § 325D.64(1) (four years); Mississippi, See Miss. Code Ann. § 15-1-49(1) (three years); Missouri, Mo. Rev. Stat. § 416.131(2) (four years); Nebraska, Neb. Rev. Stat. § 25-212 (four years); Nevada, Nev. Rev. Stat. § 598A.220(2) (four years); New Hampshire, N.H. Rev. Stat. Ann. § 356:12 (four years); New Mexico, N.M. Stat. Ann. § 57-1-12 (four years); New York, N.Y. Gen. Bus. Law § 340(5) (four years); North Carolina, N.C. Gen. Stat. § 75-16.2 (four years); North Dakota, N.D. Cent. Code § 51-08.1-10 (four years); Oregon, Or. Rev. Stat. § 646.800(1)-(2) (four years); Rhode Island, R.I. Gen. Laws § 6-36-23 (four years); South Dakota, S.D. Cod. Laws § 37-1-14.4 (four years); Tennessee, *see State ex rel. Leech v. Levi Strauss & Co.*, 79-cv-722, 1980 WL 4696, at *6 (Tenn. Ch. Sept. 25, 1980) (three years); Utah, Utah Code Ann. § 76-10- 3117(2) (four years); West Virginia, W. Va. Code § 47-18-11 (four years).

the District of Columbia.[14]   And the same problem limits Plaintiffs' unjust enrichment

claims for the 12 states and the District of Columbia that apply statutes of limitations of

fewer than four years.[15]   Plaintiffs can bring unjust enrichment claims only within those

time periods; any conduct falling outside the time periods is not actionable.

> ### C.    The State Law Claims All Fail For Additional Reasons
>
> 1.    Many Of Plaintiffs' State Antitrust Law Claims Are Barred By The *AGC* & *Illinois Brick* Decisions

Following the Supreme Court's holding in *Associated General Contractors of*

*California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983),

that plaintiffs' alleged injuries cannot be too attenuated from the alleged conspiracy,

numerous courts have dismissed indirect purchaser claims for lack of antitrust standing

---

[14] *See* Cal. Bus. & Prof. Code § 17208 (four years); District of Columbia, D.C. Code § 12-301(8) (three years); Florida, Fla. Stat. § 95.11(3)(f) (four years); Hawaii, Haw. Rev. Stat. § 480-24 (four years); Illinois, 815 Ill. Comp. Stat. 505/10a(3) (three years); Massachusetts, Mass. Gen. Laws Chap. 260, § 5A (four years); Montana, Mont. Code § 27-2-211(1)(c) (two years); Nebraska, Neb. Rev. Stat. § 59-1612 (two years); Nevada, Nev. Rev. Stat. § 11.190 (four years); New Hampshire, N.H. Rev. Stat. Ann. § 508:4 (three years); New Mexico, N.M. Stat. § 37-1-4 (four years); North Carolina, N.C. Gen. Stat. § 75-16.2 (four years); North Dakota, N.D. Cent. Code § 28-01-17 (three years); Oregon, Or. Rev. Stat. § 646.638 (one year); South Carolina, S.C. Code § 39-5-10 (three years); and South Dakota, S.D. Codified Laws § 37-24-33 (four years).

[15] Those include Arizona, Ariz. Rev. Stat. § 12-550 (four years); California, Cal. Code Civ. Proc. § 339(1) (two years); Florida, Fla. Stat. § 95.11(3)(k) (four years); Kansas, Kan. Stat. Ann. § 60-512(1) (three years); Mississippi, Miss. Code. Ann. § 15-1-49(1) (three years); Nebraska, Neb. Rev. Stat. § 25-206 (four years); Nevada, Nev. Rev. Stat. § 11.190(2)(c) (four years); New Hampshire, N.H. Rev. Stat. § 508:4(I) (three years); New Mexico, N.M. Stat. Ann. § 37-1-4 (four years); North Carolina, N.C. Gen. Stat. § 1-52(1) (three years); South Carolina, S.C. Stat. § 15-3-530(1) (three years); Utah, Utah Code Ann. § 78B-2-307(3) (four years); and the District of Columbia, D.C. Code § 12-301(8) (three years).

because such plaintiffs are not efficient enforcers of antitrust laws.   **Eight** of Plaintiffs'

state law antitrust claims arise from state laws that recognize *AGC*'s limits on indirect

purchaser claims.   Those claims must be dismissed because Plaintiffs, indirect purchasers

of beef products, are too remote from the alleged antitrust violations to be efficient

enforcers of the antitrust laws.   *See, e.g., In re Dynamic Random Access Memory (DRAM)*

*Antitrust Litig.*, 516 F. Supp. 2d 1072, 1092 (N.D. Cal. 2007); *In re Keurig Green Mountain*

*Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019).

Plaintiffs' Sherman Act claim is at least as remote as the indirect purchasers' claim

in *In re Keurig*.   In that case, the alleged overcharge was passed on through "one or two

intermediaries."   *In re Keurig*, 383 F. Supp. 3d at 223.   The same is true in this case.   Compl.

¶¶ 57–58 (packers sell processed beef to retailers or wholesalers).   As in *In re Keurig*, there

are more efficient enforcers of the antitrust laws, and they have ample incentive to file suit.

*See In re Cattle Antitrust Litig.*, No. 19-cv-01222 (D. Minn 2019).

Plaintiffs' injury is also speculative.   According to their own allegations, Plaintiffs

paid lower prices for retail beef during the alleged conspiracy.   *See supra* Section II.   They

are separated by multiple levels of distribution from the cattle feedlots that were the

purported targets of the conspiracy, so any retail price effects may have been caused by

multiple independent and intervening factors.   And Plaintiffs' requested relief largely

duplicates relief that could be sought by other parties and could lead to duplicative

recoveries by various entities in the distribution chain.

The Michigan, Nevada, New Hampshire, New Mexico, New York, and South

Dakota claims must be dismissed because these states apply or would apply the *AGC*

factors.  *In re Keurig*, 383 F. Supp. 3d at 264.   The Court should also conclude that *AGC* applies in Missouri and Rhode Island because appellate courts in those states have favorably cited or quoted *AGC*.  *See, e.g.*, *Duvall v. Silvers, Asher, Sher & McLaren, M.D.'s*, 998 S.W.2d 821, 825 (Mo. Ct. App. 1999) (quoting *AGC*); *Cortellesso v. Cortellesso*, No. P.C. 95-4571, 1997 WL 839911, at *7 (R.I. Super. Apr. 29, 1997) (citing *AGC*).

The Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), also bars Plaintiffs' state antitrust (and consumer protection) claims under the laws of Missouri, Montana, and South Carolina.  In *Illinois Brick*, the Supreme Court held that indirect purchasers (like Plaintiffs here) cannot recover money damages under the federal antitrust laws.  *Id.* at 748.  Because most states interpret their state antitrust laws to follow federal law, *Illinois Brick* bars indirect purchasers from pursuing state-law antitrust claims unless the State expressly permits indirect purchasers to bring those claims.  *See In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011).

Missouri applies *Illinois Brick*, indicating a state policy of restricting antitrust standing to parties directly harmed by allegedly anticompetitive conduct.  *See Ireland v. Microsoft Corp.*, No. 00-cv-201515, 2001 WL 1868946, at *1 (Mo. Cir. Ct. Jan. 24, 2001) ("*Illinois Brick* . . . is controlling and applicable to plaintiff's claims under the Missouri Antitrust Laws and the Missouri Merchandising Practices Act (MMPA)").  Plaintiffs' attempt to use Missouri's consumer protection statute (MMPA) as an end run around *Illinois Brick* makes no difference.  *Id*.   And Montana and South Carolina have not

expressly permitted indirect purchasers to bring claims under state antitrust law, so the *Illinois Brick* rule continues to apply in those States.[16]

There also are no Montana or South Carolina cases expressly permitting indirect purchasers to bring antitrust claims under those State's consumer-protection laws.[17]  Until a state court indicates otherwise, this Court should not conclude that those States would allow indirect purchasers to use state consumer-protection laws to circumvent the limitations of *Illinois Brick. See Ashley Cty. v. Pfizer, Inc.*, 552 F.3d 659, 673 (8th Cir. 2009) ("[I]t is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." (internal quotation marks omitted)); *see also Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 963 (7th Cir. 2000) (when faced with "equally plausible interpretations of state law," federal courts should "generally choose the narrower interpretation which restricts liability" (internal quotation marks omitted)).

---

[16] *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1186–87 (N.D. Cal. 2009) (applying Illinois Brick to Montana's antitrust statute); *In re Dealer Management Sys. Antitrust Litig.*, 362 F. Supp. 3d 519, 539–40 (N.D. Ill. 2019) (applying Illinois Brick to South Carolina's antitrust statute).

[17] *See Smith v. Video Lottery*, 858 P.2d 11, 13 (Mont. 1993) (noting that there is "minimal Montana law" interpreting the state consumer-protection statute); *In re Aggrenox Antitrust Litig.*, No. 14-md-2516, 2016 WL 4204478, at *9 (D. Conn. Aug. 9, 2016) (noting the lack of "any authority for the argument that the South Carolina [consumer-protection law] can operate as a surrogate for antitrust law").

2. **Indirect Purchasers Cannot Maintain A Class Action Under Illinois Law**

Plaintiffs have asserted a claim under the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1, *et seq.* Illinois law does not permit indirect plaintiffs to file class action lawsuits, and so this claim should be dismissed.

The Illinois Antitrust Act states, "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae." 740 Ill. Comp. Stat. 10/7(2). District courts in Illinois have interpreted this provision as barring indirect purchasers from filing an antitrust class action anywhere. *See, e.g.*, *Dvorak v. St. Clair Cty., Ill.*, 14-cv-1119, 2018 WL 1532793, at *10 (S.D. Ill. Mar. 29, 2018) ("Defendants correctly point out that the statute prohibits indirect purchasers from maintaining a class action for antitrust violations."). Recent district court opinions have concurred. *See, e.g.*, *Jones v. Micron Tech. Inc.*, No. 18-cv-02518, 2019 WL 4232417, at *19–20 (N.D. Cal. Sept. 3, 2019); *In re Generic Pharm. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 834 (E.D. Pa. 2019) ("The prevailing view of the District Courts that have considered this issue within this Circuit is that the Illinois Antitrust Act prohibits indirect purchaser class actions.").

Rule 23 of the Federal Rules of Civil Procedure does not compel a different result. Rule 23 does not supersede Illinois' bar because "the indirect purchaser restrictions of the IAA are 'intertwined' with the underlying substantive right, [such that] application of Rule 23 would 'abridge, enlarge or modify' Illinois' substantive rights." *In re Wellbutrin XL*

*Antitrust Litig.*, 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010); *see also In re Lipitor Antitrust Litig.*, 336 F. Supp. 3d 395, 417 (D.N.J. 2018) ("[A] majority of courts have held that the Act . . . prohibits indirect purchaser class actions.").

        3.     Under Mississippi Law, Plaintiffs Must Allege Wholly *Intra*state Conduct

Plaintiffs filed suit under the Mississippi Antitrust Statute, Miss. Code. Ann. §§ 75-21-1, *et seq.*, requiring that Plaintiffs allege Defendants' engaged in wholly *intra*state conduct. Plaintiffs have failed to do so.

The Mississippi Antitrust Statute "focuses on the location where the anticompetitive conduct occurred" and requires that "plaintiffs . . . allege[] at least *some* conduct by [defendant] which was performed wholly intrastate." *In re Keurig*, 383 F. Supp. 3d at 266 (quoting *In re Microsoft Corp. Antitrust Litig.*, No. MDL 1332, 2003 WL 22070561, at *2 (D. Md. Aug. 22, 2003)). The district court in *In re Keurig* ultimately dismissed the Mississippi antitrust claim because indirect purchaser plaintiffs "do not allege that Keurig itself manufactured or distributed any brewers or K-Cups from locations in Mississippi [or that indirect purchaser plaintiffs] bought any brewers or K-Cups directly from Keurig in Mississippi." *Id*. at 267.

Plaintiffs' Mississippi antitrust allegations are similarly deficient. The Complaint alleges that "Plaintiffs purchased beef within the State of Mississippi" and "Defendants' beef is sold indirectly via distributors throughout the State of Mississippi." Compl. ¶¶ 318, 322. Like the complaint in *In re Keurig*, the Complaint does not allege that packers "manufactured or distributed" beef "from locations in Mississippi" or that Plaintiffs

purchased beef "*directly* from" packers in Mississippi.  383 F. Supp. 3d at 267 (emphasis added).  Indirect distribution is insufficient to satisfy Mississippi's nexus requirement because it does not establish that at least some of *Defendants'* conduct was performed wholly within the state of Mississippi.

4.     There Is No Private Right of Action Under New Mexico Law

Plaintiffs file suit under New Mexico Antitrust Act §§ 57-1-1, *et seq*.  This statute limits enforcement authority to the New Mexico Attorney General; it does not provide a private right of action.

The New Mexico Antitrust Act specifies that "[i]n order to promote the uniform administration of the Antitrust Act in New Mexico, the attorney general is to be responsible for its enforcement."  N.M. Stat. Ann. § 57-1-10.  Based on this language, the U.S. District Court for the District of New Mexico dismissed a private price-fixing action brought under the Act. R. & R., *Ahlgrim v. Keefe Grp., LLC*, No. 16-cv-177, 2016 WL 9819520, at *5 (D.N.M. Oct. 19, 2016) ("Because the enforcement of the laws governing price fixing is limited to the New Mexico Attorney General . . . , Plaintiff has no private right of action."), *R. & R. adopted*, 2016 WL 7246110 (D.N.M. Nov. 30, 2016).  Therefore, the Court should dismiss Plaintiffs' New Mexico antitrust claim.

5.     Arizona, Nevada, And Utah Laws Required Plaintiffs To Provide Notice Of Suit To The Attorneys General Of Those States

Plaintiffs allege antitrust violations under Arizona, Nevada, and Utah state laws. These states require plaintiffs to notify their state attorneys general upon filing such claims.

Two states require *simultaneous* notice.  Plaintiffs have failed to plead that they complied with these requirements, and these state antitrust law claims must be dismissed.

Under Arizona law, antitrust plaintiffs "*shall simultaneously* with the filing of . . . pendent state law claims in the federal court, serve a copy of the complaint . . . on the attorney general," and "[p]roof of service on the attorney general shall be filed with the court." Ariz. Rev. Stat. § 44-1415(A) (emphasis added).  Nevada law is similar:  plaintiffs "commencing an action for any violation of the provisions of this chapter *shall*, *simultaneously* with the filing of the complaint with the court, mail a copy of the complaint to the Attorney General." Nev. Rev. Stat. § 598A.210(3) (emphasis added).  Finally, under Utah law, "[t]he attorney general *shall* be notified by the plaintiff about the filing of any class action involving antitrust violations that includes plaintiffs from this state.  The attorney general shall receive a copy of each filing from each plaintiff."  Utah Code Ann. § 76-10-3109(9) (emphasis added).

Pre-filing notices provisions are "not merely a procedural nicety, but, rather, 'a prerequisite to suit.'"  *In re Lipitor*, 336 F. Supp. 3d at 413 (quoting *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 19 (1st Cir. 2004)) (dismissing Arizona, Hawaii, Nevada, and Utah claims for failure to comply with pertinent notice provisions); *see also In re Effexor Antitrust Litig.*, 357 F. Supp. 3d 363, 390 (D.N.J. 2018) ("[T]hree notice provisions under Arizona, Nevada, and Utah antitrust laws are applicable here and Plaintiffs failed to comply

. . . [these claims] are dismissed without prejudice."). Plaintiffs have not complied and so their claims should be dismissed.[18]

### D.     Plaintiffs' Consumer Protection Claims Fail For Every State

Despite having been previously apprised of the numerous deficiencies with their consumer protection claims—including, among others, the lack of any particularized allegations of fraud, and the simple fact that many of the relevant consumer protection statues do not apply to the alleged antitrust conspiracies—the Complaint is devoid of any effort to shore up these claims. For the reasons set forth in Defendants' original motion to dismiss, and repeated again here, each of Plaintiffs' consumer protection claims fail.

    1.     Plaintiffs Have Not Pleaded The Fraud Underlying Their Consumer
           Claims With Particularity

To state viable consumer-protection claims, Plaintiffs in this case must satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b). Plaintiffs' continued failure to do so warrants dismissal of all but two of their consumer-protection claims.[19]

Rule 9(b)'s pleading requirements apply to consumer claims under the laws of California, Florida, Michigan, Minnesota, and the District of Columbia. *See, e.g.*, *E-Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to" consumer claims under MUDTPA and MCFA);

---

[18] In addition, other state antitrust claims fail because they are derivative of Plaintiffs' Sherman Act claims. *See supra* at Sections I–II.

[19] Plaintiffs plead only two consumer claims without allegations of fraud or deception: Massachusetts's Consumer Protection Act and Utah's Unfair Practices Act. Plaintiffs fail to state claims under these statutes for other reasons explained below.

*Mack v. LLR, Inc.*, No 17-cv-00853, 2018 WL 6927860, at *6 (C.D. Cal. Aug. 15, 2018) ("the heightened particularity requirements of Rule 9(b) apply to claims under California's UCL."); *Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327, 1333 (S.D. Fla. 2012) ("plaintiffs' FDUTPA claim must be plead with particularity"); *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 666 (E.D. Mich. 2011) ("When the [MCPA] claim is based on breach of express or implied warranties, these pleading strictures do not apply but otherwise, the allegations must include the specificity required by Fed. R. Civ. P. 9(b)."); *Jackson v. ASA Holdings*, 751 F. Supp. 2d 91, 98 (D.D.C. 2010) ("At least one court in this District has held that [DCCPPA] claims must be pled with particularity because they are akin to claims of fraud.").

Rule 9(b)'s particularity requirement applies to the majority of Plaintiffs' consumer protection claims because they allege fraudulent conduct. Plaintiffs allege either that Defendants' conduct was fraudulent or deceptive (California, Compl. ¶¶ 425, 427–28; D.C., *id.* ¶ 439; Florida, *id.* ¶ 451; Hawaii, *id.* ¶ 456; Illinois, *id.* ¶ 464; Michigan, *id.* ¶¶ 475–76; Minnesota, *id.* ¶¶ 483, 485–86; Montana, *id.* ¶¶ 492, 495; Nebraska, *id.* ¶¶ 500–02; Nevada, *id.* ¶¶ 508, 510–11; New Hampshire, *id.* ¶¶ 520–21; New Mexico, *id.* ¶ 531; North Carolina, *id.* ¶ 541; North Dakota, *id.* ¶¶ 552–53; Oregon, *id.* ¶¶ 562–63; Rhode Island, *id.* ¶¶ 573–74, 577–78; South Carolina, *id.* ¶¶ 586–87; South Dakota, *id.* ¶¶ 593–96; and Utah, *id.* ¶ 606) or that Defendants "misled consumers," "failed to disclose material facts," or "withheld material facts" (Illinois, *id.* ¶ 465; Michigan, *id.* ¶ 477; Nebraska, *id.* ¶ 502; New Hampshire, *id.* ¶ 523; New Mexico, *id.* ¶ 532; North Carolina, *id.* ¶ 543; Oregon, *id.* ¶ 564; Rhode Island, *id.* ¶ 577; South Carolina, *id.* ¶ 588; and Utah, *id.* ¶ 609).

Because 19 of Plaintiffs' 21 consumer protection claims must be pleaded with particularity under Rule 9(b), Plaintiffs' failure to allege "the who, what, when, where, and how" of the alleged fraudulent misrepresentations or deceptions is fatal to these claims. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 550 (8th Cir. 1997).   Consequently, these claims should be dismissed.

> 2.   Many Of The Consumer Protection Statutes Do Not Apply To Alleged Antitrust Conspiracies

Plaintiffs' state law claims remain premised entirely on the same conduct that forms the basis of their antitrust claims.  This fact precludes Plaintiffs from stating claims under eight consumer-protection statutes, which either do not cover conduct like the alleged antitrust violations or do not cover injuries suffered by consumers like Plaintiffs.

*Illinois*.  "There is no indication that the legislature intended that [Illinois's] Consumer Fraud Act be an additional antitrust enforcement mechanism."  *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 993 (Ill. 1990).  To allow indirect purchasers to bring antitrust claims under the guise of consumer claims "would constitute an end run around the Illinois legislature's determination" that only "the state's Attorney General [can] bring a class action on behalf of indirect purchasers."   *In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 700 (E.D. Pa. 2014).   Therefore, consumer claims based on antitrust violations must be dismissed.  *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 788 (N.D. Ohio 2011).

*Michigan*.  "[T]he plain language" of Michigan's Consumer Protection Act limits its application to certain enumerated wrongs which do not include antitrust violations such

as price fixing. *In re Cast Iron Soil Pipe And Fittings Antitrust Litig.*, 14-md-2508, 2015 WL 5166014, at *29 (E.D. Tenn. June 24, 2015); *In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1076 (S.D. Cal. 2017) ("Plaintiffs do not point to a specific provision of the MCPA definitional section covering antitrust violations, and the Court is unable to find one.").

*Minnesota*.  An alleged antitrust "conspiracy [to] maintain[] prices at an artificially high level" is not the type of "deception or material omission claim" cognizable under Minnesota's Consumer Fraud Act.  *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 190 (D. Me. 2004); *see also In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 760 (E.D. Pa. 2014) (conspiracy that is "merely anticompetitive" is not fraudulent as required by MCFA).

*New Mexico*.  To plead the type of "unconscionable" conduct covered by New Mexico's Unfair Trade Practices Act, a plaintiff must allege "something more than merely alleging that the price of a product was unfairly high."  *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1030 (N.D. Cal. 2007) (dismissing price fixing claim for failure to allege unconscionable conduct).

*Oregon*.  Oregon's Unfair Trade Practices Act does not apply to antitrust conspiracies because such acts are not "unconscionable" within the meaning of the Act, *see In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1171 (N.D. Cal. 2015), nor are they covered by the Act's catchall provision.  *See In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1115 (N.D. Cal. 2007).

*Rhode Island*.  Rhode Island's consumer protection statute does not extend to price fixing conspiracies.  *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1161 (N.D. Cal. 2009) (The statute defines "unfair methods of competition and unfair or deceptive acts or practices to consist of 19 separately enumerated practices, *none of which includes price fixing.*" (emphasis original; internal quotations omitted)); *In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883, 2009 WL 3754041, at *11 (N.D. Ill. Nov. 5, 2009).

*Utah*.  Utah's CSPA "prohibits only deceptive and unconscionable acts, which are expressly enumerated in the statute[;]" antitrust violations are not enumerated and are therefore insufficient to state a CSPA claim.  *In re Dynamic Random Access Memory*, 516 F. Supp. 2d at 1117 (internal quotation marks omitted).  Utah's UPA, by contrast, applies only to claims by competitors, not those of consumers like Plaintiffs here.  *See Garrard v. Gateway Fin. Servs., Inc.*, 207 P.3d 1227, 1230 (Utah 2009); *MacArthur v. San Juan Cty.*, 416 F. Supp. 2d 1098, 1181 (D. Utah 2005).

In short, Plaintiffs' consumer protection claims under the consumer protection laws of Illinois, Michigan, Minnesota, New Mexico, Oregon, Rhode Island, and Utah must be dismissed because they are based on conduct that these statutes do not cover.

3. Plaintiffs Fail To Plead The Reliance Element Required By Three States And The District Of Columbia

Where, as here, plaintiffs premise their consumer protection claims on a misrepresentation, plaintiffs' actual reliance on defendants' misrepresentation is a required element of a claim under California, D.C., Michigan, and North Dakota law.  *See Kwikset Corp. v. Superior Court*, 246 P.3d 877, 888 (Cal. 2011) ("[A] plaintiff proceeding on a

claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements." (internal citations and quotations omitted)); *Jackson v. ASA Holdings*, 751 F. Supp. 2d 91, 99 (D.D.C. 2010); *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 393 F. Supp. 3d 745, 758 (N.D. Ill. July 16, 2019) ("[P]laintiff did not state an MCPA claim where the omission did not affect the plaintiff's decision to purchase the product."); *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1241 (D. Kan. 2015) (dismissing NDCP claim for failure to plead reliance); N.D. Cent. Code § 51-15-02 (requiring defendants intended that "others rely thereon in connection with the sale or advertisement of any merchandise."). Plaintiffs' continued failure to allege facts from which the Court could infer the necessary reliance – such as the specific misrepresentations and the circumstances in which Plaintiffs were exposed to them – requires dismissal of these four claims.

> 4.     Plaintiffs Fail To Plead Intrastate Conduct Required By Four States

Four of the consumer protection statutes that Plaintiffs invoke are limited to remediating unfair or deceptive practices that are carried out, at least partially, within the state's territory. Consequently, Plaintiffs must allege that culpable conduct underlying Defendants' alleged conspiracy occurred within these states for these claims to survive.

**Florida**. "FDUTPA applies only to actions that occurred within the state of Florida." *Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012).

**Massachusetts**. Massachusetts's Consumer Protection Act applies only to claims for which "the center of gravity of the circumstances that give rise to the claim is primarily

and substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 799 (Mass. 2003).

*New Hampshire*.  Under New Hampshire's Consumer Protection Act, the offending conduct "must occur within the state—the unfair method of competition or any unfair or deceptive act or practice in trade or commerce—not the actual sale." *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 504 (D.N.H. 1996) (internal quotations omitted); *Wilcox Indus. Corp. v. Hansen*, 870 F. Supp. 2d 296, 305 (D.N.H. 2012) (dismissing consumer protection claim where there was "simply no allegation that any offending conduct occurred in New Hampshire").

*North Carolina*.  To state a claim under North Carolina's Unfair Trade and Business Practices Act, a plaintiff must allege that the offending practice had a substantial effect on in-state businesses.  *See In re Refrigerant Compressors Antitrust Litig.*, No. 09-md-02042, 2013 WL 1431756, at *19 (E.D. Mich. Apr. 9, 2013).

Plaintiffs have, again, failed to plead the geographic locus of any of Defendants' allegedly culpable conduct.[20]  Plaintiffs, at most, allege that the attenuated effects of Defendants' conduct eventually reached the states listed above.  Plaintiffs' failure to identify culpable conduct occurring within these states requires dismissal of these claims.

---

[20] Plaintiffs' only geography-specific allegations reference the closure of Defendants' plants in California, Idaho, Iowa, Kansas, Texas, and Wisconsin.  Compl. ¶¶ 87, 89–90, 92, 94, 96, 153.  These closures (which are not culpable conduct) did not occur in any of the states that require intrastate conduct.

5.      Plaintiffs Are Prohibited From Proceeding As A Class Action Under Three State Consumer-Protection Laws

The consumer-protection statutes of three states—Montana, South Carolina, and Utah—expressly prohibit Plaintiffs from bringing consumer claims as class actions. *See* Mont. Code Ann. § 30-14-133(1) ("A consumer who suffers any ascertainable loss … may bring an individual but not a class action"); S.C. Code Ann. § 39-5-140(a) ("Any person who suffers any ascertainable loss . . . may bring an action individually, but not in a representative capacity, to recover actual damages."); Utah Code Ann. § 13-11-19(2) ("A consumer who suffers loss as a result of a violation of this chapter may recover, but not in a class action, actual damages or $2,000 . . . ."). Federal courts have routinely upheld these class actions bars against arguments that the court ought to apply Federal Rule 23 instead. *See In re Lipitor*, 336 F. Supp. 3d at 416; *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 635 (D.S.C. 2015); *In re Dynamic Random Access Memory Antitrust Litig.*, 516 F. Supp. 2d at 1104. Accordingly, Plaintiffs' consumer protection claims under Montana, South Carolina, and Utah law must be dismissed to the extent they are brought as class claims.

6.      Plaintiffs' Failure To Provide Statutory Notice Warrants Dismissing The Hawaii Consumer Claim

Under Hawaii law, a plaintiff seeking to represent a class of indirect purchasers must notify the attorney general "not later than seven days after filing of the complaint." Haw. Rev. Stat. Ann. § 480-13.3. This notice requirement is "not merely a procedural nicety" and is not displaced by the federal rules. *In re Lipitor*, 336 F. Supp. 3d at 413, 415–16. Plaintiffs' failure to plead that they complied with the notice requirement warrants

dismissal of the Hawaii consumer claim.  *Id.* at 16; *In re Asacol Antitrust Litig.*, 15-cv-12730, 2016 WL 4083333, at *15 (D. Mass. July 20, 2016).

### E.       Plaintiffs' Unjust Enrichment Claims Fail In Every State

Plaintiffs seek to bring unjust enrichment claims under the laws of 27 states and the District of Columbia.  Compl. ¶ 623.  Plaintiffs fail to state a claim for unjust enrichment under any state's laws for several reasons.  First, as noted above, the unjust enrichment claims are entirely derivative of the deficient antitrust-conspiracy claims and many are barred (at least in part) by the relevant state statute of limitations.  Second, Plaintiffs allege unjust enrichment generally, without pleading the elements of that claim under each state's laws.  Finally, individual claims fail for a number of state-specific reasons explained below.

#### 1.       Plaintiffs Do Not Plead The Elements Of Unjust Enrichment In Any Jurisdiction

Plaintiffs were required to plead facts supporting the elements of each of their 28 unjust enrichment claims.  They have not done so.

Unjust enrichment claims vary by state, sometimes in "substantial" ways.  *Rapp v. Green Tree Servicing, LLC*, 302 F.R.D. 505, 513 (D. Minn. 2014).  In particular, many states have additional elements beyond the minimum elements common to all States.  *Id.* at 514.  As a result, Plaintiffs must allege facts to establish the elements of unjust enrichment in each state.  It is not enough for them to plead antitrust claims and "merely allege[] that those claims are also actionable . . . as unjust enrichment."  *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016) (dismissing the unjust enrichment claims in that situation).

Here, Plaintiffs' unjust enrichment claims assert only that:

> As a result of their unlawful conduct described above, defendants have and will continu[e] to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits of beef.

> Under common law principles of unjust enrichment, defendants should not be permitted to retain the benefits conferred on them by overpayments by plaintiffs and members of the classes in [the 27 States and the District of Columbia].

Compl. ¶¶ 622–23.  This bare assertion is inadequate to plead a claim under any state's law.  It does not identify the elements for an unjust enrichment claim in any state, and Plaintiffs "fail to account for any consequential differences that may exist among the undifferentiated state-law claims." *In re Opana ER*, 162 F.Supp.3d at 726.

### 2. Plaintiffs Do Not Allege A Direct Benefit, As Required In Seven States

Some states require plaintiffs to bring unjust enrichment claims to show that the defendant received the alleged unjust benefit directly from the plaintiff.  Those states include Florida, Kansas, Maine, Michigan, North Carolina, Rhode Island, and Utah.[21]

The Complaint does not allege that direct benefit; in fact, it contradicts it.  Plaintiffs are indirect purchasers, who by definition, did not transact *directly* with any Defendant— instead, Plaintiffs bought beef from retailers such as grocery stores.  Compl. ¶¶ 25–44.

---

[21] *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017); *Spires v. Hosp. Corp. of Am.*, 289 Fed. App'x 269, 273 (10th Cir. 2008) (Kansas); *Rivers v. Amato*, No. 00-cv-131, 2001 WL 1736498, at *4 (Me. Super. Ct. June 22, 2001); *Smith v. Glenmark Generics, Inc., USA*, No. 315898, 2014 WL 4087968, at *1 (Mich. Ct. App. Aug. 19, 2014); *Effler v. Pyles*, 380 S.E.2d 149, 152 (N.C. Ct. App. 1989); *Alessi v. Bowen Court Condominium*, 03-cv-0235, 2010 WL 897246, at *4 (R.I. Super. Ct. Mar. 10, 2010); *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1018 (Utah 2015).

Accordingly, any benefit Plaintiffs conferred by buying beef at retail "would be on others in the chain of distribution from whom they purchased, not on Defendants." *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *26. The Court therefore should dismiss Plaintiffs' claims in the states that require a direct benefit for unjust enrichment. *See id.* (Dismissing unjust enrichment claims brought by indirect purchasers under the laws of states that require a direct benefit); *see also In re Aftermarket Filters Antitrust Litig.*, 2010 WL 1416259, at *3 (same).

3. Plaintiffs Do Not Allege a Legal Duty, as Is Required in Two States

Under Illinois or South Carolina law, a plaintiff bringing an unjust enrichment claim must allege that the defendant owed him or her a legal duty. *Phila. Indem. Ins. Co. v. Pace Suburban Bus. Serv.*, 67 N.E.3d 556, 570 (Ill. Ct. App. 2016) ("For a cause of action based on a theory of unjust enrichment to exist, there must be an independent basis that establishes a duty on the part of the defendant to act and the defendant must have failed to abide by that duty."); *Pitts v. Jackson Nat'l Life Ins.*, 574 S.E.2d 502, 511–12 (S.C. Ct. App. 2002) ("[Plaintiff] failed to establish any duty to disclose or other cause of action that would allow recovery for unjust enrichment.").

Plaintiffs have not alleged any such duty (under either common law, statute, or contract) in the Complaint. And they have alleged facts that strongly suggest the opposite, because they are indirect purchasers who do not have any direct relationship with Defendants. Compl. ¶¶ 25–44. The Court should dismiss the Illinois and South Carolina unjust enrichment claims on this basis.

4.      Plaintiffs Have An Adequate Legal Remedy, Precluding Unjust
        Enrichment In Eleven States

Some states allow a plaintiff to bring an unjust enrichment claim only when the

plaintiff lacks an adequate remedy at law. *See Dooner v. Yuen*, No. 16-cv-1939, 2016 WL

6080814, at *3 (D. Minn. Oct. 17, 2016) ("[U]njust enrichment is an equitable claim that

the Court may not consider where an adequate remedy at law is available.").  Those states

include eleven of the States implicated here—Arizona, Iowa, Kansas, Massachusetts,

Minnesota, Nebraska, Nevada, New Hampshire, South Dakota, Tennessee, and Utah.[22]  In

each of those states, Plaintiffs have (and are attempting to invoke) a legal remedy under a

state antitrust or consumer protection law, so they cannot also proceed with an unjust

enrichment claim.   Compl. ¶¶ 257–64 (Arizona); *id.* ¶¶ 286–90 (Iowa); *id.* ¶¶ 291–96

(Kansas); *id.* ¶¶ 469–70 (Massachusetts); *id.* ¶¶ 481–90 (Minnesota); *id.* ¶¶ 496–505

(Nebraska); *id.* ¶¶ 506–15 (Nevada); *id.* ¶¶ 516–26 (New Hampshire); *id.* ¶¶ 591–600

(South Dakota); *id.* ¶¶ 393–400 (Tennessee); *id.* ¶¶ 401–06 (Utah).

Accordingly, Plaintiffs cannot bring unjust enrichment claims under the laws of

those eleven states.  "District courts routinely dismiss unjust enrichment claims where the

---

[22] *Trustmark Ins. Co. v. Bank One, Ariz.*, 48 P.3d 485, 491 (Ariz. Ct. App. 2002);
*Holdsworth v. Nissly*, 520 N.W.2d 332, 335 (Iowa Ct. App. 1994); *Nelson v. Nelson*, 205
P.3d 715, 724 (Kan. 2009); *Ruggers Inc. v. U.S. Rugby Football Union, Ltd.*, 843 F.
Supp. 2d 139, 147 (D. Mass. 2012); *Southtown Plumbing, Inc. v. Har-Ned Lumber Co.,
Inc.*, 493 N.W. 2d 137, 140 (Minn. 1992); *Kanne v. Visa U.S.A. Inc.*, 273 N.W.2d 293,
302 (Neb. 2006); *Small v. Univ. Med. Ctr. of S. Nev.*, 13-cv-00298, 2016 WL 4157309, at
*3 (D. Nev. Aug. 3, 2016); *E. Elec. Corp. v. FERD Const., Inc.*, 05-cv-303, 2005 WL
3447957, at *2–3 (D.N.H. Dec. 15, 2005); *Rindal v. Sohler*, 658 N.W.2d 769, 772 (S.D.
2003); *Furlough v. Spherion Atl. Workforce, LLC*, 397 S.W.3d 114, 134 (Tenn. 2013);
*Thorpe v. Washington City*, 243 P.3d 500, 507 (Utah Ct. App. 2010).

plaintiff pleaded and pursued both equitable and legal claims," *United States v. Bame*, 721 F.3d 1025, 1031 (8th Cir. 2013), and the Court should do the same here.

       5.     Plaintiffs' Unjust Enrichment Claims Are Barred By *Illinois Brick* In Three States

As noted above, indirect purchasers cannot bring state-law antitrust or consumer protection claims in Missouri, Montana, or South Carolina. Plaintiffs should not be allowed to circumvent those statutory schemes by bringing unjust enrichment claims based on the same conduct. *See, e.g.*, *In re Digital Music*, 812 F. Supp. 2d at 413; *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 542 (E.D. Pa. 2010); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1380 (S. D. Fla. 2001); *see also Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013) ("[I]f . . . plaintiffs were permitted to repackage their antitrust claims as unjust enrichment actions, the entire thrust and purpose of the antitrust standing doctrine would disintegrate.").

The Eighth Circuit recently adopted this anti-circumvention principle in the antitrust context. In *Pre-Filled Propane Tank*, the Eighth Circuit held that indirect purchasers may not circumvent the *Illinois Brick* rule for federal antitrust claims by seeking disgorgement as a form of equitable relief. 893 F.3d at 1058–59. The court explained that plaintiffs' claim was "an impermissible attempt to circumvent Supreme Court precedent." *Id.* at 1059. And to reach that conclusion, the court relied on the decisions in *Digital Music*, *Flonase*, and *Terazosin Hydrochloride* cited above. *Id.*

Accordingly, because Plaintiffs are barred from bringing state-law antitrust and consumer-protection claims in Missouri, Montana, and South Carolina, they cannot use unjust enrichment to circumvent those bars.

      6.    Unjust Enrichment Is Not A Standalone Cause Of Action In Two States

Finally, California and New Hampshire do not recognize unjust enrichment as a standalone cause of action. *See De Havilland v. FX Networks, Inc.*, 21 Cal. App. 5th 845, 870 (2018) ("Unjust enrichment is not a cause of action." (internal quotation marks omitted)); *Gen. Insulation Co. v. Eckman Const.*, 992 A.2d 613, 621 (N.H. 2010) ("[U]njust enrichment generally does not form an independent basis for a cause of action." (internal quotation marks omitted)). Although both States recognize unjust enrichment as a form of *remedy*, *see Hill v. Roll International Corp.*, 195 Cal. App. 4th 1295, 1307 (2011); *Gen. Insulation Co.*, 992 A.2d at 620, that does not aid Plaintiffs at the pleading stage. Plaintiffs must have some other viable cause of action to even get to the question of remedy. Therefore, the Court should dismiss Plaintiffs' standalone unjust enrichment claims in California and New Hampshire.

## V.    PLAINTIFFS' CLAIMS SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs are now on their third attempt to state a claim against Defendants. Plaintiffs have failed every time to allege sufficient facts to show direct evidence of a conspiracy or circumstantial evidence of parallel conduct coupled with plus factors. They have failed every time to allege facts tying each Defendant to the alleged conspiracy. They have failed every time to articulate an internally consistent theory with allegations that do

not contradict themselves.  And they have already conceded that they have not suffered an antitrust injury.  There is no way to solve these problems without creating additional inconsistencies and contradictions that would provide even more reasons to dismiss the complaint with prejudice.  *See ecoNugenics, Inc. v. Bioenergy Life Sci., Inc.*, 355 F. Supp. 3d 785, 794 (D. Minn. 2019) (plaintiff may only amend a complaint "with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint" (internal quotation marks omitted)).

## CONCLUSION

Plaintiffs have already had three times at bat.  All three times they have struck out. Consequently, the Amended Complaint should be dismissed with prejudice.

Respectfully submitted this 10th day of December, 2019.

s/ Benjamin L. Ellison
Andrew M. Luger, Reg. No. 0189261
Benjamin L. Ellison, Reg. No. 0392777
**JONES DAY**
90 South Seventh Street, Suite 4950
Minneapolis, MN 55402
(612) 217-8862
aluger@jonesday.com
bellison@jonesday.com

Julia E. McEvoy
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3867
jmcevoy@jonesday.com
*Admitted Pro Hac Vice*

Paula W. Render
**JONES DAY**
77 West Wacker, Suite 3500
Chicago, Illinois 60601-1692
(312) 269-1555
prender@jonesday.com
*Admitted Pro Hac Vice*

*Counsel for Defendant National Beef
Packing Company, LLC*

s/ Donald G. Heeman
Donald G. Heeman, Reg. No. 0286023
Jessica J. Nelson, Reg. No. 0347358
Randi J. Winter, Reg. No. 0391354
**SPENCER FANE**
150 South Fifth St.
Suite 1900
Minneapolis, MN 55402
(612) 268-7000
dheeman@spencerfane.com
jnelson@spencerfane.com
rwinter@spencerfane.com

Stephen Neuwirth
Sami H. Rashid
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
51 Madison Avenue
New York, NY 10010
(212) 849-7000
stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com
*Admitted Pro Hac Vice*

Ethan Glass, Reg. No. 0316490
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8265
ethanglass@quinnemanuel.com

*Counsel for Defendant
JBS USA Food Company Holdings*

s/ David P. Graham
David P. Graham, Reg. No. 0185462
**DYKEMA GOSSETT, PLLC**
4000 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
(612) 486-1521
dgraham@dykema.com

Jon B. Jacobs
Jeremy C. Keeney
**PERKINS COIE LLP**
700 13th Street, NW, Suite 600
Washington, DC 20005
(202) 654-1758
jbjacobs@perkinscoie.com
jkeeney@perkinscoie.com
*Admitted Pro Hac Vice*

Susan E. Foster
Ulrike B. Connelly
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
(206) 359-8846
sfoster@perkinscoie.com
uconnelly@perkinscoie.com
*Admitted Pro Hac Vice*

*Counsel for Defendant Tyson Foods, Inc.*

s/ Kathryn N. Hibbard
Kathryn N. Hibbard, Reg. No. 0387155
X. Kevin Zhao, Reg. No. 0391302
**GREENE ESPEL PLLP**
222 South 9th Street, Suite 2200
Minneapolis, MN 55402
(612) 373-0830
khibbard@greeneespel.com
kzhao@greeneespel.com

Mark W. Ryan
Michael E. Lackey, Jr.
Nicole A. Saharsky
**MAYER BROWN LLP**
1999 K Street, NW
Washington, DC 20009
(202) 263-3338
mryan@mayerbrown.com
mlackey@mayerbrown.com
nsaharsky@mayerbrown.com
*Admitted Pro Hac Vice*

*Counsel for Defendant*
*Cargill, Incorporated*