## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CATTLE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | Case No. 0:19-cv-1222-JRT-HB |
| PETERSON, et al.,<br><br>                      Plaintiffs,<br><br>   v.<br><br>JBS S.A., et al.,<br><br>                      Defendants. | Case No. 0:19-cv-1129-JRT-HB |
| IN RE DPP BEEF LITIGATION<br><br>This document relates to:<br><br>ALL CASES | Case No. 0:20-cv-1319-JRT-HB |
| ERBERT & GERBERT'S, INC.,<br><br>                      Plaintiff,<br><br>   v.<br><br>CARGILL, INC., et al.,<br><br>                      Defendants. | Case No. 0:20-cv-1414-JRT-HB |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE FEDERAL CLAIMS

## (REDACTED)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

LEGAL STANDARD ......................................................................................... 4

ARGUMENT........................................................................................................ 5

I.    PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE SHERMAN ACT ......... 5

    A.    Plaintiffs' Witness Allegations Do Not Provide Direct Evidence Of A Conspiracy ......................................................................................... 6

        1.    Witness 1's allegations do not support a conspiracy.................................. 6

            a.    Neither Witness 1 nor his source was in a position to know about the alleged agreement.............................. 7

            b.    Even if credited, Witness 1's allegations do not substantiate the claim of a conspiracy ................................ 11

        2.    Witness 2 offers no direct evidence of a conspiracy ............................... 14

    B.    Plaintiffs Fail To Plead Parallel Conduct Supporting The Inference Of A Conspiracy ......................................................................................... 15

        1.    Plaintiffs fail to plead that Defendants engaged in parallel slaughter reductions ...................................................................... 17

            a.    Plaintiffs' estimates of Defendants' quarterly slaughter volumes do not support their alleged conspiracy........................... 17

            b.    Plaintiffs' other Defendant-specific slaughter volume allegations do not support the alleged conspiracy ......................... 22

            c.    Reducing slaughter volumes when prices are high is rational economic behavior ................................................. 25

        2.    Plaintiffs fail to plead that Defendants agreed to curtail cash cattle purchases ........................................................................ 26

        3.    Plaintiffs fail to plead that Defendants coordinated how they bought cash cattle .................................................................. 29

        4.    Plaintiffs fail to plead that Defendants manipulated cattle imports ........ 33

        5.    Plaintiffs fail to plead that Defendants closed plants as part of the conspiracy ............................................................................ 35

    C.    Plaintiffs Fail To Plead Other Facts Supporting The Inference Of A Conspiracy ......................................................................................... 37

        1.    Plaintiffs have not alleged sufficient plus factors.................................. 37

        2.    Plaintiffs' regression model does not show a conspiracy........................ 44

        3.    The complaints explain why fed cattle prices lawfully fell..................... 46

**TABLE OF CONTENTS**
**(continued)**

D.   Purchaser Plaintiffs Fail To Allege An Injury In Fact That Confers Standing To Sue ................................................................. 48

E.   R-CALF And NFU Lack Standing To Seek Money Damages ......................... 49

II.   PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE PACKERS AND STOCKYARDS ACT ......................................................... 50

III.   PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE COMMODITY EXCHANGE ACT ......................................................... 52

A.   Plaintiffs' CEA Claims Are Derivative Of Their Sherman Act Claims ........... 52

B.   Plaintiffs Fail To Plead The Elements Of A CEA Claim ................................. 53

C.   Plaintiffs' Secondary Liability Claims Fail Because They Fail To Allege A Primary Liability Claim ........................................ 55

IV.   PLAINTIFFS' CLAIMS ARE TIME-BARRED ............................................. 55

A.   Plaintiffs Do Not Plead Fraudulent Concealment ............................................ 56

1.   Plaintiffs do not allege that Defendants concealed the supposed conspiracy ......................................................... 57

2.   Plaintiffs do not allege that they failed to discover the alleged conspiracy ......................................................... 58

3.   Plaintiffs do not plead diligence .............................................................. 59

B.   The Continuing-Violation Doctrine Does Not Permit Plaintiffs To Recover Damages For Acts Outside The Limitations Period ........................... 61

CONCLUSION ......................................................................................... 62

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................... 4, 5, 37

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ............................................................................... 50

*Bell Atl. Corp v. Twombly*,
   550 U.S. 544 (2007) ........................................................................ *passim*

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
   203 F.3d 1028 (8th Cir. 2000) ...................................................... 30, 35, 42

*Brown v. Medtronic, Inc.*,
   628 F.3d 451 (8th Cir. 2010) ..................................................................... 5

*In re Canadian Imp. Antitrust Litig.*,
   470 F.3d 785 (8th Cir. 2006) .............................................................. 48, 49

*In re Cattle Antitrust Litig.*,
   No. 19-cv-1222, 2020 WL 5884676 (D. Minn. Sept. 29, 2020) .......................... *passim*

*CFTC v. M25 Invs., Inc.*,
   No. 09-cv-1831, 2010 WL 769367 (N.D. Tex. Mar. 6, 2010) .................................... 54

*In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
   390 F. Supp. 3d 916 (N.D. Ill. 2019) ......................................................... 55

*In re Chocolate Confectionary Antitrust Litig.*,
   801 F.3d 383 (3d Cir. 2015) .................................................................. 8, 43

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999) ................................................................... 40

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   801 F.3d 758 (7th Cir. 2015) ................................................................... 53

*E.L. by White v. Voluntary Interdistrict Choice Corp.*,
   864 F.3d 932 (8th Cir. 2017) ................................................................... 48

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ...................................................................... 43

iii

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                                    **Page(s)**

*In re EpiPen Direct Purchaser Litig.*,
   No. 20-cv-0827, 2021 WL 147166 (D. Minn. Jan. 15, 2021) .................................... 61

*Erie Cty. v. Morton Salt, Inc.*,
   702 F.3d 860 (6th Cir. 2012) ............................................................... 39, 40

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
   788 F. Supp. 1042 (D. Minn. 1992) ....................................................... 41

*In re Flat Glass Antitrust Litig.*,
   191 F.R.D. 472 (W.D. Pa. 1999) .......................................................... 60

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) .................................................. 42

*Griffin v. Smithfield Foods, Inc.*,
   183 F. Supp. 2d 824 (E.D. Va. 2002) .................................................... 51

*In re GSE Bonds Antitrust Litigation*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019) ................................................ *passim*

*Harry v. Total Gas & Power N. Am., Inc.*,
   889 F.3d 104 (2d Cir. 2018) .............................................................. 53

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
   620 F. Supp. 2d 499 (S.D.N.Y. 2009) ................................................... 42

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
   700 F. Supp. 2d 378 (S.D.N.Y. 2010) ............................................. 7, 8, 10

*Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*,
   231 F. Supp. 2d 1253 (N.D. Ga. 2002) .................................................. 44

*IBP, Inc. v. Glickman*,
   187 F.3d 974 (8th Cir. 1999) .......................................................... 30, 51

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3rd Cir. 2010) ...................................................... 11, 38, 39

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   797 F.3d 538 (8th Cir. 2015) ............................................................. 5

**TABLE OF AUTHORITIES**
**(continued)**

**Cases (continued)**                                                                 **Page(s)**

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
    No. 13-cv-2664, 2014 WL 943224 (D. Minn. Mar. 11, 2014) ................................... 60

*InterVest, Inc. v. Bloomberg, L.P.*,
    340 F.3d 144 (3d Cir. 2003) ....................................................................................... 14

*Jackson v. Swift Eckrich, Inc.*,
    53 F.3d 1452 (8th Cir. 1995) ................................................................................. 51, 56

*Kelsey K. v. NFL Enters., LLC*,
    254 F. Supp. 3d 1140 (N.D. Cal. 2017) ..................................................................... 21

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
    910 F.3d 927 (7th Cir. 2018) ..................................................................................... 26

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ................................................................................................... 61

*LaFlamme v. Societe Air France*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ....................................................................... 21

*Levy v. BASF Metals Ltd.*,
    917 F.3d 106 (2d Cir. 2019) ....................................................................................... 56

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    935 F. Supp. 2d 666 (S.D.N.Y. 2013) ....................................................................... 55

*LLM Bar Exam, LLC v. Barbri, Inc.*,
    271 F. Supp. 3d 547 (S.D.N.Y. 2017) ....................................................................... 36

*Lovett v. Gen. Motors Corp.*,
    975 F.2d 518 (8th Cir. 1992) ..................................................................................... 50

*In re LTL Shipping Servs. Antitrust Litig.*,
    No. 08-md-01895, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ................................. 39

*In re McCormick & Co.*,
    217 F. Supp. 3d 124 (D.D.C. 2016) .......................................................................... 25

*McDonald v. Johnson & Johnson*,
    722 F.2d 1370 (8th Cir. 1983) ................................................................................... 49

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                                                                         **Page(s)**

*McDonough v. Anoka Cty.*,
  799 F.3d 931 (8th Cir. 2015) ................................................................................ 5

*Midwest Commc'ns, Inc. v. Minn. Twins, Inc.*,
  779 F.2d 444 (8th Cir. 1985) ............................................................................... 49

*In re Milk Prods. Antitrust Litig.*,
  84 F. Supp. 2d 1016 (D. Minn. 1997) ............................................................. 56, 60

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ....................................................................... 6, 22, 37

*Nat'l Farmers' Org., Inc. v. Associated Milk Prods., Inc.*,
  850 F.2d 1286 (8th Cir. 1988) ............................................................................. 48

*Org. for Competitive Mkts. v. U.S. Dep't of Agric.*,
  912 F.3d 455 (8th Cir. 2018) ............................................................................... 51

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  911 F.3d 505 (8th Cir. 2018) ............................................................................... 36

*Pickett v. Tyson Fresh Meats, Inc.*,
  420 F.3d 1272 (11th Cir. 2005) ........................................................................... 28

*In re Platinum & Palladium Commodities Litig.*,
  828 F. Supp. 2d 588 (S.D.N.Y. 2011) .................................................................. 52

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
  828 F.2d 211 (4th Cir. 1987) ............................................................................... 58

*In re Pork Antitrust Litig.*,
  No. 18-cv-1776, 2019 WL 3752497 (D. Minn. Aug. 8, 2019) ........................... *passim*

*In re Pork Antitrust Litig.*,
  No. 18-cv-1776, 2020 WL 6149666 (D. Minn. Oct. 20, 2020) ................................ 57

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  860 F.3d 1059 (8th Cir. 2017) ............................................................................. 61

*In re Pre-Filled Propane Tank Antitrust Litig.*,
  893 F.3d 1047 (8th Cir. 2018) ..................................................................... 4, 12, 27

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                                                           **Page(s)**

*Prosterman v. Am. Airlines, Inc.*,
   747 F. App'x 458 (9th Cir. 2018) .................................................................... 39

*In re Refrigerant Compressors Antitrust Litig.*,
   92 F. Supp. 3d 652 (E.D. Mich. 2015) ........................................................... 60

*In re Scrap Metal Antitrust Litig.*,
   527 F.3d 517 (6th Cir. 2008) ......................................................................... 57

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
   366 F. Supp. 3d 516 (S.D.N.Y. 2018) ............................................................ 55

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
   277 F. Supp. 3d 521 (S.D.N.Y. 2017) ............................................................ 53

*Stahl v. U.S. Dep't of Agric.*,
   327 F.3d 697 (8th Cir. 2003) ........................................................................... 5

*Summerhill v. Terminix, Inc.*,
   637 F.3d 877 (8th Cir. 2011) ......................................................................... 57

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,
   830 F.2d 1374 (7th Cir. 1987) ....................................................................... 50

*Tatum v. Legg Mason Wood Walker, Inc.*,
   83 F.3d 121 (5th Cir. 1996) ........................................................................... 55

*In re Text Messaging Antitrust Litig.*,
   782 F.3d 867 (7th Cir. 2015) ......................................................................... 14

*In re Tyson Foods, Inc. Sec. Litig.*,
   275 F. Supp. 3d 970 (W.D. Ark. 2017) .......................................................... 38

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) .......................................................................... 11

*Wash. Cty. Health Care Auth, Inc. v. Baxter Int'l Inc.*,
   328 F. Supp. 3d 824 (N.D. Ill. 2018) ............................................................. 21

*White v. R.M. Packer Co.*,
   635 F.3d 571 (1st Cir. 2011) ......................................................................... 40

## TABLE OF AUTHORITIES
### (continued)

**Cases (continued)**                                                              **Page(s)**

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    401 U.S. 321 (1971) ................................................................... 56

*In re Zinc Antitrust Litig.*,
    155 F. Supp. 3d 337 (S.D.N.Y. 2016) .......................................... 32

**Statutes and Rules**

Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ....................................... *passim*

    7 U.S.C. § 25(a)(1) ...................................................................... 53

    7 U.S.C. § 25(c) ........................................................................... 56

7 U.S.C. § 1638 ........................................................................................ 34

Packers and Stockyards Act, 7 U.S.C. § 181 *et seq.* .................................. *passim*

Sherman Act, 15 U.S.C. § 1 *et seq.* ........................................................... *passim*

    15 U.S.C. § 15b ........................................................................... 56

Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 759,
    129 Stat. 2242 (2015) .................................................................. 34

Fed. R. Civ. P. 9(b) ................................................................................... 57

Fed. R. Civ. P. 12(b)(6) ............................................................................... 4

**Other Authorities**

Ltr. from Bill Bullard, CEO, R-CALF, to Sen. Charles E. Grassley, Chairman of
    the Sen. Comm. on the Jud. (Jan. 5, 2016) ........................................ 59, 60

Cattle Buyers Weekly, *"Top 30 Beef Packers" Annual Reports, 2008-2019* .................. 23

Consol. Beef Producers, *Who We Are* (last accessed Feb. 17, 2021) ................................ 59

Food Indus. Ass'n, *2017 Annual Meat Conference: Registered Attendees* (last
    accessed Feb. 17, 2021) ............................................................... 41

## TABLE OF AUTHORITIES
### (continued)

**Other Authorities (continued)**                                    **Page(s)**

Kansas State Univ., *Inaugural AgCon Brings Business, Government Together to Discuss Ag Futures Market* (Mar. 8, 2018) ................................................................. 41

David J. Lynch, *"America First" May Be Last Hope for These Cattle Ranchers*, Wash. Post (May 3, 2019) ............................................................................................ 34

Nat'l Cattlemen's Beef Ass'n, *NCBA Allied Industry Membership* (2019) ...................... 41

N. Am. Meat Inst., *About Us: Board of Directors* (last accessed Feb. 17, 2021) ............. 41

Glynn Tonsor, et al., *Assessing Beef Demand Determinants* (Jan. 18, 2018) .................. 21

U.S. Gov't Accountability Off., GAO-18-296, *U.S. Department of Agriculture: Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market* (Apr. 2018) ................................................................................................................. 42, 47

U.S. Dep't of Agric., *Boxed Beef & Fed Cattle Price Spread Investigation Report* (July 22, 2020) ............................................................................................................ 42

USDA Econ. Research Serv., *Historical Monthly Price Spread Data for Beef, Pork, Broilers* (Feb. 28, 2019) ..................................................................................... 46

USDA Econ. Research Serv., *Livestock Prices* (Oct. 28, 2019) ....................................... 46

USDA Econ., Stats., & Mkt. Info. Sys., *Actual Slaughter Under Federal Inspection* (Jan. 14, 2021) .......................................................................................... 18

# INTRODUCTION

Fed cattle prices hit a historic peak in 2014, largely because a significant drought led to reduced supply. In 2015, the cattle herd started to rebuild, and fed cattle prices fell. As the Government Accountability Office (GAO) found, this price drop was due to normal supply and demand forces.

Plaintiffs allege something much more nefarious. They claim that Defendants, the four largest meatpackers in the United States, conspired to suppress fed cattle prices and increase beef prices, primarily by making coordinated slaughter reductions.[1]

The Court dismissed Plaintiffs' prior complaints because Plaintiffs had not plausibly pleaded direct or indirect evidence of the alleged conspiracy. Plaintiffs have not fixed the fatal defects the Court identified. This brief addresses Plaintiffs' federal claims; the state claims are discussed in a separate brief.

As before, Plaintiffs assert that two witnesses provide direct evidence of the supposed conspiracy. Plaintiffs have not cured the defects the Court found the last time around. Most importantly, Plaintiffs still do not allege facts sufficient to show that either person had any personal knowledge of any conspiracy. The first person, the former quality

---

[1] Plaintiffs present their allegations in four complaints. One is brought by ranchers, feedlot owners, and ranchers' organizations. *See* Third Consol. Am. Class Action Compl. ¶¶ 29-41, *In re Cattle Antitrust Litig.*, No. 19-cv-01222, ECF No. 312 (*Cattle* Compl.). Three are brought by direct and indirect purchasers of beef. *See* Corrected Consol. Am. Class Action Compl. ¶¶ 32-33, *In re DPP Beef Litig.*, No. 20-cv-1319, ECF No. 158 (*DPP* Compl.) (direct purchasers of beef); Corrected Third Am. Class Action Compl. ¶¶ 30-49, *Peterson v. JBS S.A.*, No. 19-cv-1129, ECF No. 256 (*Peterson* Compl.) (indirect retail purchasers of beef); Corrected Am. Class Action Compl. ¶ 31, *Erbert & Gerbert's, Inc. v. Cargill, Inc.*, No. 20-cv-1414, ECF No. 125 (*Erbert* Compl.) (indirect commercial purchaser of beef).

assurance officer at a JBS plant, says that a fabrication manager at his plant once mentioned an "agreement," "or words to that effect."  The quality assurance officer is just repeating what he heard from the fabrication manager, and the fabrication manager does not claim to have any personal knowledge of the supposed agreement.  (Plaintiffs pleaded that the fabrication manager had personal knowledge the last time around, but now they have *deleted* that allegation from the complaints.)  So this talk of an "agreement" is nothing but hearsay and speculation.  The fabrication manager provides no details about the supposed agreement, such as who agreed to it, which plants were involved, or when or how any reductions took place.  Plaintiffs have added nothing of substance to the prior complaints.

The second witness, a former feedlot manager, does not say anything about coordinated slaughter reductions.  So, as the Court recognized last time, those allegations do not provide direct evidence of the asserted conspiracy.  All this witness says is that some Defendants followed certain purchasing practices at his feedlot; that does not show an agreement, and the practices at issue are not anticompetitive.

Plaintiffs are left with trying to show conspiracy through allegations of parallel conduct combined with plus factors.  The Court previously found Plaintiffs' allegations of parallel conduct insufficient because they were not Defendant-specific.  Plaintiffs have added each Defendant's estimated quarterly slaughter volumes, but those estimates depend on industry-wide data, so they have the same problem as before.  Plaintiffs also add Defendant-specific monthly slaughter volumes for 2019, and yearly slaughter volumes for 2018 and 2019.  But that data (like the new estimated quarterly data) actually undercuts the claim of parallel conduct, because it shows that Defendants acted differently from each

2

other, and that Defendants *increased* slaughter volumes during the times Plaintiffs say they were conspiring to *decrease* slaughter volumes. That just does not show Defendants acting in parallel to reduce slaughter volumes.

Plaintiffs' other allegations of parallel conduct are largely unchanged from the previous complaints. They did not plausibly plead a conspiracy before, and they still do not now. For example, Plaintiffs again say that three Defendants closed plants on five occasions, but four of those were before the supposed conspiracy, and they did not happen in parallel.

Without a plausible claim of parallel conduct, there is no need to reach Plaintiffs' asserted plus factors. In any event, those plus factors merely reflect that the fed cattle and beef markets are concentrated commodity markets – where companies should be expected to respond similarly to market forces. They do not push the complaints over the line to plausibly alleging a conspiracy.

Plaintiffs ignore the obvious alternative explanation for the fall in fed cattle prices. That explanation makes their claim of conspiracy implausible. Plaintiffs' real grievance is that prices did not remain at historic highs. But as the GAO concluded after an 18-month investigation, ordinary market forces caused those prices to fall. There is no reason to look for conspiracy when the explanation is clear.

The remaining federal claims (for violations of the Packers and Stockyards Act and the Commodity Exchange Act) cannot survive without the Sherman Act claims, as the Court recognized previously. Plaintiffs' claims also are untimely and cannot be rescued by the fraudulent-concealment or continuing-violation doctrines.

Plaintiffs have had plenty of chances.  All Plaintiffs have amended their complaints at least twice.  They still have not provided the Court with anything plausibly suggesting a conspiracy here.  The Court should not send this case to costly and time-consuming discovery based on such flimsy allegations.  Instead, the Court should dismiss Plaintiffs' federal claims with prejudice.

## LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "sufficient factual matter" that if "accepted as true" "'state[s] a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that "pleads facts that are 'merely consistent with' a defendant's liability . . . 'stops short of the line between possibility and plausibility.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

The plaintiff must plead "factual content" – such as the "relevant individuals, acts, and conversations" – that "raise a right to relief above the speculative level."  *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056-57 (8th Cir. 2018) (citations and internal quotation marks omitted).  The allegations must be defendant-specific; the plaintiff cannot plead industry-wide trends and ask the court to speculate that each defendant contributed to those trends.  *In re Pork Antitrust Litig.*, No. 18-cv-1776, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019).  The court considers "whether there are lawful, 'obvious alternative explanation[s]' for the alleged conduct" that make the plaintiff's allegation of

a conspiracy implausible.  *McDonough v. Anoka Cty.*, 799 F.3d 931, 946 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 682).

The court may look to the complaint itself and to documents attached to or incorporated by reference in the complaint.  *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459-60 (8th Cir. 2010); *see Twombly*, 550 U.S. at 568 n.13.  The court also may consider items in the public record.  *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).  The court should be "reasonably aggressive in weeding out meritless antitrust claims at the pleading stage" because of the "unusually high cost of discovery in antitrust cases." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (internal quotation marks omitted).

## ARGUMENT

Plaintiffs claim that when fed cattle prices hit historic highs in 2014, Defendants conspired to "jointly manage their collective demand below the available cattle supply," mainly by coordinating reductions in slaughter volumes, to lower the price of fed cattle and increase the price of beef.  *Cattle* Compl. ¶ 12.  The Court already dismissed the complaints once.  Despite multiple amendments, Plaintiffs still do not plausibly allege an antitrust conspiracy.

## I.   PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE SHERMAN ACT

To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1 *et seq.*, a plaintiff must plausibly allege that the defendants entered into an agreement to restrain competition. *In re Cattle Antitrust Litig.*, No. 19-cv-1222, 2020 WL 5884676, at *4 (D. Minn. Sept. 29, 2020).  The plaintiff can attempt to show an agreement in two ways:  through direct

evidence of an agreement, or through evidence of parallel conduct and "plus factors" that "plausibly suggest[] the existence" of an agreement. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).

Plaintiffs attempt both. But Plaintiffs have not fixed the problems the Court identified in the prior complaints, and their own data undermines their claim of a conspiracy.

### A. Plaintiffs' Witness Allegations Do Not Provide Direct Evidence Of A Conspiracy

Plaintiffs provide allegations from two confidential witnesses – a former quality assurance officer at a Swift (JBS) plant and a former manager of a feedlot. *Cattle* Compl. ¶ 28.[2] The Court previously refused to credit these allegations, because Plaintiffs had not explained how the first person was in a position to know of any conspiracy, and because the second person described only purchasing practices, not coordinated slaughter reductions. *Cattle*, 2020 WL 5884676, at *5. In the new complaints, Plaintiffs allege additional information about the two witnesses, but they have not solved the problems identified by the Court or provided any new substance that makes a conspiracy plausible here.

#### 1. Witness 1's allegations do not support a conspiracy

Witness 1 is a former quality assurance officer at Swift's plant in Cactus, Texas. *Cattle* Compl. ¶ 102. The previous complaints, which provided no identifying information

---

[2] Because the allegations about the federal claims are substantially the same across all four complaints, this brief principally cites to the *Cattle* Complaint.

about Witness 1, claimed that a fabrication manager at Witness 1's plant told him that Defendants had an "agreement" to reduce slaughter volumes when prices were "too high." *See* Second Consol. Am. Class Action Compl. ¶ 95, *Cattle*, *supra*, ECF No. 125 (Previous *Cattle* Compl.).

The Court recognized that the prior complaints failed to provide "sufficient[] detail[]" about Witness 1 or the fabrication manager to show that either were in a position to know of the alleged conspiracy. *Cattle*, 2020 WL 5884676, at *5. The new complaints do not solve that problem.

### a. Neither Witness 1 nor his source was in a position to know about the alleged agreement

The new complaints still do not plead facts that show that Witness 1 or his alleged source were in any position to know about any conspiracy. The new complaints provide some identifying details about Witness 1 and his source, such as Witness 1's first name and last initial (Jason F.), *Cattle* Compl. ¶ 101; details about his plant (a plant owned by Swift, a JBS subsidiary, in Cactus, Texas), *id.*; and the name of the source, the fabrication manager (James Hooker), *id.* ¶¶ 101, 107. But they still do not allege that either person directly participated in the alleged conspiracy or were in any position to learn about the supposed conspiracy from anyone who participated in it.

For a court to credit a witness's allegations, the complaint must contain factual allegations sufficient to show how the witness would have known of the claimed conspiracy. *Cattle*, 2020 WL 5884676, at *5 (citing *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 396 n.5 (S.D.N.Y. 2010)). For example, courts have credited

allegations from "a participant" in the conspiracy who admitted that the "conspiracy existed," *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 396 (3d Cir. 2015), and allegations from a witness with first-hand knowledge of the conspiracy who worked for the business unit being investigated by the Department of Justice and who was cooperating in that investigation, *Hinds Cty.*, 700 F. Supp. 2d at 396 n.5.

Here, the complaints show that Witness 1's information is based only on speculation and hearsay. Witness 1 has no personal knowledge of the alleged conspiracy; he learned everything from his source (Hooker). *Cattle* Compl. ¶ 101. But Plaintiffs do not explain how Hooker learned of the supposed agreement. They do not claim that Hooker had first-hand knowledge of any conspiracy. On the contrary: In the new complaints, Plaintiffs *deleted* the allegation that Hooker "had first-hand knowledge" of the supposed conspiracy. Previous *Cattle* Compl. ¶ 98. And Plaintiffs do not allege any meeting, encounter, or conversation in which Hooker learned about the alleged agreement. At best, Hooker is repeating a rumor or speculation. In fact, the complaints do not name *anyone* who allegedly had first-hand knowledge of the conspiracy.

The facts alleged in the complaints establish that Witness 1's source, Hooker, was *not* in a position to know that JBS was part of any supposed agreement. He was not a corporate executive and did not work at corporate headquarters. *Cattle* Compl. ¶ 107. He was a fabrication manager at a single plant, and was not even directly responsible for slaughter operations or coordination at that plant. *Id.* ¶ 105. Plaintiffs allege that Hooker needed to know what the slaughter levels would be at his plant. *Id.* ¶ 109. But that does not show that Hooker played any role in setting slaughter levels, or that he would be

involved in (or know of) a corporate decision to collude with other packers to decrease slaughter levels at particular times.  It is implausible that corporate executives would have disclosed a highly sensitive secret (an illegal antitrust conspiracy) to a plant-level fabrication manager like Hooker.  It is even less plausible that Hooker would have casually shared that secret with Witness 1, an employee with whom he had only a "decent" working relationship, and who regularly "interact[ed] with [Department of Agriculture] inspectors." *Id.* ¶¶ 105-06.  And critically, Plaintiffs do not claim that Hooker has any first-hand knowledge of a conspiracy.

Plaintiffs allege that Hooker interacted with other JBS employees, but they conspicuously do not plead that Hooker learned about the conspiracy from any of those interactions.  For example, they allege that Hooker once received "an angry phone call from his immediate supervisor" who worked at headquarters, but they do not say that the call was about the supposed conspiracy.  *Cattle* Compl. ¶ 117.  They also allege that Hooker communicated with the senior JBS executive in charge of plant operations, *id.* ¶ 110, but again, they do not mention any conspiracy.  And the group picture that includes Hooker and the senior executive (and various USDA officials), *id.* ¶ 113, does nothing to show Hooker knew of a conspiracy; indeed, it was taken five years after Hooker allegedly told Witness 1 about the agreement, *id.* ¶ 113 n.45.  None of this plausibly pleads a conspiracy. It is nothing but rumors, hearsay, and innuendo.

Plaintiffs also do not explain how Hooker would have known that other Defendants were involved in the alleged conspiracy.  As with the prior complaints, Plaintiffs claim only that Hooker had "friends and former colleagues . . . at other Packing Defendant

9

plants," without saying which plants, who those people were, what job titles they held, what if any information they provided, or how they would have known about the alleged conspiracy. *Cattle* Compl. ¶ 115. Witness 1 alleges that Hooker "intended to convey that all of the Packing Defendants were reducing their slaughter volumes by agreement." *Id.* ¶ 119. But Plaintiffs do not explain how Hooker had any basis to believe that all Defendants were involved in a conspiracy.

This case is very different from *Hinds County*, as the Court recognized in its prior order. *Cattle*, 2020 WL 5884676, at *5. The plaintiffs in that case accused financial institutions of conspiring to fix prices in the municipal derivatives market. *Hinds Cty.*, 700 F. Supp. 2d at 385. To support their claims, the plaintiffs relied on information provided by a confidential witness who worked for one of the defendants' municipal derivatives business unit and was cooperating with the Department of Justice's investigation into the defendants. *Id.* at 388, 396 n.5. The plaintiffs also identified specific people who worked at other defendants who also allegedly had first-hand knowledge of the conspiracy, and provided details of specific communications between the confidential witness and those people relating to the conspiracy. *Id.* at 396-97. There is nothing comparable here: Witness 1 and Hooker lack personal knowledge of the alleged conspiracy; their job descriptions would not put them in positions to know of a conspiracy; and Plaintiffs do not name anyone at any other Defendant who allegedly had knowledge of any conspiracy.

The Court therefore should not credit Witness 1's allegations.

### b.   Even if credited, Witness 1's allegations do not substantiate the claim of a conspiracy

The other problem with Witness 1's allegations is that they do not provide "sufficient[] detail[]" about the conspiracy to be plausible.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3rd Cir. 2010).  That detail could include allegations about the "specific time, place, or person involved in the alleged conspiracies," or of "document[s] or conversation[s]" about an agreement.  *Id.* at 324 n.23 (quoting *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 565 (2007)); *see, e.g.*, *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (citing "a recorded phone call in which two competitors agreed to fix prices"); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 358 (S.D.N.Y. 2019) (referencing chatroom logs).  Plaintiffs still have not provided any of that detail here.

The complaints still allege only one conversation in which the fabrication manager allegedly told Witness 1 about an agreement to cut slaughter volumes.  Specifically, Witness 1 alleges that "sometime in 2015," he had one conversation with Hooker in which Hooker told him that their plant and unidentified "competitor plants" (of unspecified companies) "have had that agreement that [they] don't kill while prices are up for a while (or words to that effect)."  *Cattle* Compl. ¶ 118.[3]  The complaints do not provide any detail

---

[3]  Plaintiffs allude to other conversations in which Hooker told Witness 1 that Defendants would reduce slaughter volumes when prices were high, but provide no details on those conversations and do not allege that Hooker said anything about an agreement in those other conversations.  *See Cattle* Compl. ¶ 116.

about the supposed agreement; in fact, Plaintiffs *removed* details of the alleged conspiracy that were in the prior complaints.[4]

Witness 1 does not describe what slaughter reductions were agreed upon or when; how and when each participant implemented those reductions; or how long those reductions lasted. Although the complaints claim that Defendants conspired to cut production in the "second and third quarters of most years" between 2015 and 2020, *Cattle* Compl. ¶ 124, Witness 1 does not link the supposed agreement to slaughter reductions in those time periods.

Further, Witness 1 appears to be unsure whether any reductions even were due to a conspiracy. He claims that his plant "might" have dropped its slaughter levels as part of the alleged agreement, and he does not make any claims about how other participants implemented the purported agreement. *Cattle* Compl. ¶ 121. So even if credited, Witness 1's allegations simply do not provide sufficient "factual content" to support the "reasonable inference" of any conspiracy. *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1057 (8th Cir. 2018) (internal quotation marks omitted).

*GSE Bonds* is instructive, because the district court there concluded that similar allegations were not sufficient direct evidence of a conspiracy. In that case, the plaintiffs

---

[4] For example, Witness 1 no longer names the plants that were part of the supposed conspiracy, and now alleges only unspecified "competitor plants" were involved. *Compare Cattle* Compl. ¶ 118, *with* Previous *Cattle* Compl. ¶ 96. He also no longer alleges that slaughter reductions "during periods associated with seasonal rises in fed cattle prices, such as those traditionally experienced in the late winter/early spring" were part of the alleged conspiracy. Previous *Cattle* Compl. ¶ 104.

alleged that banks were colluding to fix the price of government bonds.  *GSE Bonds*, 396 F. Supp. 3d at 357.  To support that allegation, the plaintiffs pointed to chat room logs in which employees of some of the banks discussed price-fixing.  *Id*. at 358-59.  The whistleblower who provided the chat-room logs alleged that other banks (not in the chatroom logs) were involved in the conspiracy, but he did not provide "any specifics" of their involvement.  *Id*. at 364.  The district court concluded that the chat room logs were direct evidence of a conspiracy with respect to the banks that appeared in those logs, but that the whistleblower's "unadorned" assertion that other banks were involved was insufficient to tie those banks to the alleged conspiracy.  *Id*.

The allegations in this case are even weaker.  Unlike the whistleblower in *GSE Bonds*, neither Witness 1 nor his source claims any personal knowledge of any conspiracy. And like the allegation found insufficient in *GSE Bonds*, Witness 1's allegation is vague. He alleges one conversation where Hooker referred to an "agreement" ("or words to that effect"), *Cattle* Compl. ¶ 118, but he does not say who agreed to make the slaughter reductions, which companies or plants were part of the agreement, when any reductions took place, the extent of any reductions, or how they were carried out.  He also does not say when the agreement was in effect or specify particular periods when production was cut (even though Plaintiffs elsewhere allege cuts in particular quarters).  In fact, Plaintiffs *removed* Witness 1's only allegation about when the slaughter reductions took place (during times "associated with seasonal rises in fed cattle prices, such as . . . in the late winter/early spring," Previous *Cattle* Compl. ¶ 104).  So the allegations are even less detailed than the allegations the Court previously found insufficient.

13

Also like in *GSE Bonds*, there is nothing to corroborate Witness 1's allegation – no chat logs, phone calls, emails, testimony of other witnesses, or guilty pleas.  One vague conversation that might have included the word "agreement" is not plausible direct evidence of a conspiracy.  *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872-74 (7th Cir. 2015) (emails describing a price increase as "col[l]usive" were too ambiguous to constitute direct evidence); *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 163 (3d Cir. 2003) ("A vague reference to 'rules' is insufficiently explicit.").  Witness 1 simply does not give the Court any basis to believe there was a conspiracy here.

### 2.      Witness 2 offers no direct evidence of a conspiracy

Witness 2 previously managed a commercial feedlot in Texline, Texas.  *Cattle* Compl. ¶ 143.  He did not work for any Defendant, and he does not claim to know of any agreement to reduce slaughter volumes.  His allegations concern only purchasing practices.  Thus, as the Court recognized previously, Witness 2 does not provide any direct evidence of a conspiracy to cut slaughter volumes.

Witness 2 alleges that Defendants coordinated cattle purchases through what Plaintiffs call a "queueing convention."  *Cattle* Compl. ¶¶ 166-69.  Under the alleged convention, Defendants could withdraw offers that producers did not accept right away (instead of leaving those offers open while producers sought better offers, as the producers would prefer) and required producers to give the first high bidder on a pen of cattle the right to buy at that price.  *Id.* ¶¶ 160-61.  Witness 2 also alleges that Defendants' buyers required him to draw cards each week to determine which buyer would start the bidding for his cattle.  *Id.* ¶¶ 169-72.

14

The Court previously recognized that Witness 2 does not provide direct evidence of a conspiracy because he does not claim knowledge of any agreement. *Cattle*, 2020 WL 5884676, at *5. The Court also noted that Witness 2's queuing-convention allegations did not provide support for the alleged conspiracy, because they were not tied to slaughter reductions, "the main thrust of Plaintiffs' alleged price-fixing conspiracy." *Id.*

Plaintiffs have not solved the problems the Court identified. The new complaints provide some identifying information about Witness 2: They say Witness 2's name is "Matt T." and that he worked for Carrizo Feeders. *Cattle* Compl. ¶¶ 143, 170. But Witness 2 still does not say anything about slaughter reductions; as before, he alleges only that the buyers who visited his feedlot coordinated how they bought cattle. (And as explained below, those allegations do not plausibly plead a conspiracy, because they are consistent with lawful competition. *See* pp. 29-31, *infra*.)

In sum, the Witness 1 and Witness 2 allegations still do not support Plaintiffs' claim of a conspiracy to coordinate reductions in slaughter volumes. Plaintiffs thus have not pleaded plausible direct evidence of a conspiracy.

### B.   Plaintiffs Fail To Plead Parallel Conduct Supporting The Inference Of A Conspiracy

The complaints also do not provide plausible indirect evidence of a conspiracy – parallel conduct and plus factors.

Beginning with parallel conduct: Plaintiffs principally allege that Defendants agreed to undertake "parallel slaughter reductions." *Cattle* Compl. ¶¶ 9-10. They also allege that Defendants amplified the effect of the production cuts by curtailing cash cattle

purchases during their periodic slaughter reductions; by coordinating procurement practices; by manipulating fed cattle imports; and by closing or idling plants. *Id.* ¶ 9.

To show parallel conduct, Plaintiffs must plead "specific information" that each Defendant "affirmatively acted" to reduce slaughter volumes in parallel. *Cattle*, 2020 WL 5884676, at *6 (internal quotation marks omitted). The previous complaints did not do that; they primarily relied on industry-wide data. The only Defendant-specific data was *yearly* fed cattle slaughter volumes for 2014 to 2017; that data could not substantiate Plaintiffs' claim of *periodic* slaughter reductions. *See* Previous *Cattle* Compl. ¶ 12 fig.3. The data also undercut Plaintiffs' claims, because it showed that Defendants generally *increased* their annual slaughter volumes. *See id.* The Court accordingly held that the previous complaints failed to allege parallel conduct. *Cattle*, 2020 WL 5884676, at *6 (previous complaints did "little to allege how the individual Defendants acted and instead resort[ed] to group pleading, arguing that the market did this or that").

Plaintiffs have added new allegations about Defendants' slaughter volumes, but the allegations undermine their claim of a conspiracy. Plaintiffs plead estimates of Defendants' quarterly slaughter volumes for 2012-2019. *Cattle* Compl. ¶ 127 fig.2. Those estimates are based on industry-wide data, which is insufficient to show how any individual Defendant acted. Plaintiffs also provide monthly slaughter volumes for each Defendant for 2019, *id.* ¶ 250 figs.23-32, as well as updated annual slaughter volumes, to include 2018 and 2019, *id.* ¶ 133 fig.4. The new allegations show that Defendants did not reduce slaughter volumes in parallel; instead, Defendants increased their slaughter volumes, often in non-parallel ways.

1. **Plaintiffs fail to plead that Defendants engaged in parallel slaughter reductions**

   a. **Plaintiffs' estimates of Defendants' quarterly slaughter volumes do not support their alleged conspiracy**

Plaintiffs claim that starting in 2015, Defendants engaged in coordinated slaughter reductions, which drove down fed cattle prices by creating artificial supply gluts. *Cattle* Compl. ¶ 123. Their primary support comes from Figure 2 in the *Cattle* complaint, which supposedly shows Defendants' quarterly slaughter volumes for 2012 to 2019:

Figure 1: *Cattle* Figure 2 – Packing Defendants' Quarterly Fed Cattle Slaughter Volume



*Id.* ¶ 127 fig.2. According to Plaintiffs, this figure shows that Defendants cut slaughter volumes in parallel. *Id.* ¶ 127. There are multiple problems with Figure 2.

**Figure 2 reflects industry-wide data, not Defendant-specific data.** Figure 2 does not report publicly available data; Plaintiffs constructed it. From the little that Plaintiffs disclose of their methodology, it is clear that the figure reflects industry-wide data, not

Defendant-specific data.[5]  So Plaintiffs again are pleading industry trends and asking the Court to speculate that Defendants contributed to those trends, an approach the Court already has rejected.  *Cattle*, 2020 WL 5884676, at *6.

Plaintiffs state that they constructed Figure 2 by using the quarterly financial disclosures of JBS, Tyson, and National Beef's shareholder.  *Cattle* Compl. ¶ 127 n.49. (National Beef and Cargill do not issue quarterly financial reports.)  The data is revenue data for entire divisions of those Defendants – not slaughter data for fed cattle.  *See id.*  So Plaintiffs first estimated cattle-related revenues for JBS, Tyson, and National Beef, and then estimated the cattle volumes "necessary to generate" those revenues.  *See id.*  They claim to have "derived" Cargill's numbers "by reference to" Cargill's supposed market share.  *Id.*

To perform the critical step of estimating cattle volumes from revenues, Plaintiffs used industry-wide averages, not Defendant-specific information.  Specifically, Plaintiffs used USDA industry averages for metrics such as carcass weights, drop credits, and grading performance.  *Cattle* Compl. ¶ 127 n.49; *see, e.g.*, USDA Econ., Stats., & Mkt. Info. Sys., *Actual Slaughter Under Federal Inspection* (Jan. 14, 2021), https://usda.library. cornell.edu/concern/publications/1g05fb61q.  It is not clear how Plaintiffs used those metrics to estimate volumes.

---

[5]  In response to Defendants' request, Plaintiffs refused to provide any additional details regarding their methodology or data sources.  *See* Ltr. from Amanda Lawrence, Scott + Scott, to William H. Stallings, Mayer Brown, at 1 (Jan. 12, 2021) (attached as Exhibit A).

The industry-wide averages mask significant variation among Defendants. For example, Figure 34 in the *Cattle* complaint depicts one of Plaintiffs' metrics, average carcass weight. That figure shows in 2019, weights varied by a different amount each week from Defendant to Defendant. ████████████ *Cattle* Compl. ¶ 260 fig.34. Those substantial variations show that using industry-wide averages does not accurately estimate Defendant-specific slaughter volumes. So at best, Plaintiffs are pleading industry-wide data. At worst, the numbers in Figure 2 are pure speculation, and not the type of "factual matter" that can withstand a motion to dismiss. *Twombly*, 550 U.S. at 556.

**Figure 2 contradicts Plaintiffs' claim of conspiracy.** Even assuming Figure 2 was accurate, it undermines rather than supports Plaintiffs' central claim. Figure 2 shows each Defendant's output *increasing* from 2015 to 2019. That is inconsistent with Plaintiffs' core claim that Defendants agreed to "reduce or restrain their respective slaughter capacities" by "engag[ing] in periodic and parallel slaughter reductions throughout" the alleged conspiracy. *Cattle* Compl. ¶¶ 10, 25. Figure 2 also contradicts Plaintiffs' assertion that no Defendant "returned to its pre-2015 slaughter level[]" during the conspiracy, *id.* ¶ 134; it shows that National Beef and Cargill exceeded their 2014 slaughter volumes throughout the alleged conspiracy, that Tyson and JBS reached the same milestone by the third quarter of 2017, and that by the second quarter of 2018 both Tyson and National Beef exceeded their 2012 and 2013 slaughter volumes as well.

**Figure 2 shows non-parallel conduct.** Figure 2 does not show that Defendants cut slaughter volumes *in parallel* in the quarters alleged. Plaintiffs focus on 2015 and 2016, alleging that Defendants cut slaughter volumes in parallel in the second and third quarters.

*Cattle* Compl. ¶¶ 198-238.  The *Peterson* Plaintiffs additionally allege parallel cuts in the fourth quarter of 2015.  *Peterson* Compl. ¶ 199.

Figure 2 does not show that Defendants cut slaughter volumes in parallel in the specified quarters of 2015 and 2016.  Instead, it shows that during the first two years of the supposed conspiracy, Defendants generally acted differently, and that the only quarters when Defendants acted similarly was when they all *increased* slaughter volumes:

- In the first quarter of 2015, Cargill and National Beef were essentially flat, Tyson reduced slaughter volumes by a small amount, and JBS reduced slaughter volumes by a larger amount.

- In the second quarter of 2015, all Defendants increased slaughter volumes, by different amounts.

- In the third quarter of 2015, Tyson and Cargill again increased their slaughter volumes, JBS was essentially flat, and National Beef slightly decreased its volumes.

- In the fourth quarter of 2015, JBS and National Beef increased their slaughter volumes, and Cargill and Tyson decreased their volumes.

- In the first quarter of 2016, Tyson, National Beef, and Cargill decreased their slaughter volumes by small amounts, and JBS decreased its volumes by a larger amount.

- In the second quarter of 2016, all Defendants increased their slaughter volumes.

- In the third quarter of 2016, JBS, Cargill, and National Beef continued to increase their slaughter volumes, and Tyson decreased its volumes.

- In the fourth quarter of 2016, all Defendants increased their slaughter volumes.

Plaintiffs' parallel-conduct allegations for the years after 2015 and 2016 fare no better.  Plaintiffs claim that Defendants cut slaughter volumes in the second and third quarters of "most years" since 2015.  *Cattle* Compl. ¶ 124.  But Figure 2 shows the

opposite: All Defendants *increased* slaughter volumes in the second quarters of every year, as well as the third quarters of 2016 and 2017. *Id.* ¶ 127 fig.2. And in the third quarters of 2018 and 2019, at least one Defendant increased slaughter volumes. *Id.*

The mismatch between Figure 2 and Plaintiffs' allegations is fatal to Plaintiffs' claim of a conspiracy. *See Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017) ("[A]dmissions of non-parallel conduct undercut the very theory asserted by the complaint."); *see also, e.g.*, *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) (allegations of parallel conduct are "dubious" when "in several instances plaintiffs plead disagreement among defendants, action by only some defendants and no action by other defendants, or action by a solitary defendant").

**Figure 2 shows that Defendants' actions were consistent with common market stimuli.** Even if Figure 2 showed parallel slaughter reductions, it would not support a claim of a conspiracy, because it does not show that Defendants acted differently from the industry as a whole. Figure 2 thus does not give the Court any reason to conclude that any reductions were due to an "agreement[] to restrain trade" as opposed to "independent responses to common stimuli." *Wash. Cty. Health Care Auth, Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 831 (N.D. Ill. 2018) (internal quotation marks omitted).

If anything, Figure 2 affirmatively shows that Defendants followed market trends. The *DPP* and *Erbert* Plaintiffs observe that Figure 2 shows Defendants cutting slaughter volumes in the first quarter of most years. *DPP* Compl. ¶ 132; *Erbert* Compl. ¶ 130. But the complaints recognize that is just seasonal fluctuation due to lower demand for beef in winter. *See Cattle* Compl. ¶ 124; Glynn Tonsor, et al., *Assessing Beef Demand*

*Determinants* 16 (Jan. 18, 2018) (cited at *Cattle* Compl. ¶ 273 n.156) ("Beef demand is higher in June and lower in February than December, consistent with grilling and holiday seasonality."). Indeed, Figure 2 shows that Defendants also reduced slaughter volumes in the first quarters of the years *before* the supposed conspiracy. *Id.* ¶ 127 fig.2. There is nothing nefarious about that predictable, cyclical reduction; Defendants' "similar response[s] to this market pressure is a hallmark of independent parallel conduct – not collusion," *Musical Instruments*, 798 F.3d at 1196. If an allegation that Defendants followed industry-wide, seasonal trends were enough to constitute parallel conduct, virtually any group of commodity producers would be subject to endless antitrust lawsuits.

> **b.   Plaintiffs' other Defendant-specific slaughter volume allegations do not support the alleged conspiracy**

Plaintiffs also include monthly slaughter volumes for 2019 and annual slaughter volumes for 2012 to 2019. That data does not support their claims, either.

**Monthly slaughter volumes.** Figures 23 to 32 in the *Cattle* complaint depict each Defendant's monthly slaughter volumes in 2019. ██████████████████████ ██████████████████████████████ Plaintiffs assert that the data supports their claims of parallel slaughter cuts in 2019, but their allegations lack specificity. *Cattle* Compl. ¶¶ 249-50. ████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████   None of this suggests a conspiracy.

**Annual slaughter volumes.**  In the new complaints, Plaintiffs updated their chart

of yearly slaughter volume data to add two more years (2018 and 2019):

Figure 2:  *Cattle* Figure 4 – Average Pre- & Post-Class Period Fed Cattle Slaughter –
Packing Defendants vs. Independent Packers



*Cattle* Compl. ¶ 132 fig.4.  The data still shows that each Defendant generally increased

slaughter volumes since 2015.  *See Cattle*, 2020 WL 5884676, at *6.  And it still shows

that Defendants acted differently from each other in each year.

The Defendants' differences are shown starkly in the following figure.  Defendants

created this figure using the same underlying data as in Plaintiffs' Figure 4, by dividing the

slaughter volume for each Defendant in each year by the previous year's slaughter volume

and expressing the change as a percentage.  *See* Cattle Buyers Weekly, *"Top 30 Beef

Packers" Annual Reports, 2008-2019* (cited at *Cattle* Compl. ¶ 4 n.3).

Figure 3:  Defendants' Year-on-Year Change in Fed Cattle Slaughter Volume



(If a Defendant has no bar in a given year, that is because there was no change in that Defendant's slaughter volume that year.)  This figure shows no discernable pattern among Defendants.  In each year, at least one Defendant did not act like the others.

Plaintiffs also rely on Figure 4 (and their Figure 3) to argue that Defendants behaved differently from independent packers.  *Cattle* Compl. ¶¶ 13-14.  But Figure 4 compares apples and oranges, because it compares *individual* Defendants to *all* independent packers combined.  Further, independent packers are differently situated from Defendants – they operate only regionally, not nationally like Defendants, and on a much smaller scale.  *See id.*  Plaintiffs recognize that regional packers operate differently from national packers; ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████.  So an allegation that large, national companies behaved differently from small, regional ones does not suggest a conspiracy.

In sum, Plaintiffs again have failed to plead that each Defendant engaged in coordinated parallel slaughter reductions.  The Court dismissed the previous complaints on that basis, and it should do so again.

<strong>c.    Reducing slaughter volumes when prices are high is rational economic behavior</strong>

Cutting slaughter volumes when fed cattle prices are high does not suggest an antitrust conspiracy.  That is exactly what a rational economic actor would do when acting independently.  As Plaintiffs acknowledge, Defendants' profits go down when the price of fed cattle goes up.  *Cattle* Compl. ¶ 99.  It therefore is in each Defendant's rational self-interest to reduce cattle slaughter volumes when prices are high, to maintain profitability.

Plaintiffs say that each Defendant could have instead increased production when prices were high to expand market share.  *Cattle* Compl. ¶ 241.  But the antitrust laws do not require Defendants to have followed Plaintiffs' preferred business strategy.  The "independent business justification" for reducing production here defeats the inference of a conspiracy.  *In re McCormick & Co.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016); *see Twombly*, 550 U.S. at 557 n.4.

Any periodic slaughter reductions also would be easily reversible, further undermining any inference of a conspiracy.  Reducing production by underusing machinery – essentially what Plaintiffs allege here – "is the kind of flexible behavior that is consistent with rational attempts to raise prices through watchful attention to one's

competitors' actions." *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018). Had the "[defendant's] efforts not paid off, it could have increased its output quickly." *Id.* For that reason, the fact that a company took an easily reversible step to cut production in order to raise prices in the market does not support an inference that it participated in a conspiracy. *Id.* That is all the complaints allege.

### 2. Plaintiffs fail to plead that Defendants agreed to curtail cash cattle purchases

Plaintiffs allege that Defendants curtailed cash cattle purchases at the same time they cut production to drive down fed cattle prices. *Cattle* Compl. ¶ 135. The Court did not address this allegation in the prior complaints, because Plaintiffs had not pleaded Defendant-specific facts. *See* Previous *Cattle* Compl. ¶¶ 108-12. Plaintiffs have added some new allegations, but they do not support their claim of coordinated reductions in cash cattle purchases.

Plaintiffs rely on Dataset A, which purports to be a compilation of records of "4% of all fed cattle sales from 2012-2019" and "11% of all cash fed cattle sales during that period." *Cattle* Compl. ¶ 137. (Plaintiffs have not produced Dataset A in this litigation.) According to Plaintiffs, Dataset A shows that each Defendant purchased fewer cash cattle in the second and third quarters of 2015 than in the same quarters of previous years. *Id.* ¶¶ 137-38 & tbls.1-2. Plaintiffs also allege that Dataset A shows that each Defendant increased its use of a certain type of contract for buying cattle, called a top-of-the-market contract, between 2014 and 2015, and then decreased its use of that type of contract

between 2015 and 2016.  *Id.* ¶¶ 142-45 & tbls.3-4.  Plaintiffs claim that this pattern would not have emerged without an agreement to curtail cash cattle purchases.  *Id.* ¶ 145.

Dataset A is inherently unreliable, so it does not support a plausible inference of conspiracy.  Dataset A contains just 4% of all fed cattle sales, and no conclusions about Defendants' conduct can be drawn from that small number of sales.  *Cattle* Compl. ¶ 137.  For example, the market shares of the Defendants in Dataset A do not match their actual market shares.  Tyson has the smallest share of the purchases in Dataset A (15.5%), *id.* ¶ 137 n.53, but nationally, Tyson was the market leader, with 26-29% market share during that time, *id.* App. 2 ¶ 4 tbl.2.  Conversely, National Beef has the largest share of the purchases in Dataset A (29.5%), *id.* ¶ 137 n.53, even though nationally, National Beef had the smallest market share (12-14%), *id.* App. 2 ¶ 4 tbl.2.

The trends observed in Dataset A also are inconsistent with reported industry-wide data.  Dataset A indicates that between 2014 and 2015, Defendants' cash cattle purchases declined by between 14.4% points (Tyson) and 70.8% points (National Beef).  *Cattle* Compl. ¶ 145 tbl.4.  But Plaintiffs' industry-wide figures show that cash cattle purchases declined by only 1.8% points for the market as a whole in that time.  *Id.* App. 3.  Then for 2015 to 2016, Dataset A shows Defendants' cash cattle purchases increased by between 38.8% points (National Beef) and 70.7% points (Cargill), *id.* ¶ 145 tbl.4, when the industry as a whole was up only 4.3% points, *id.* App. 3.  Because Dataset A is inherently unreliable, Dataset A does not provide "factual content" supporting Plaintiffs' claims.  *Pre-Filled Propane Tank*, 893 F.3d at 1056-57.

27

Even if the Court credits the Dataset A allegations, the allegations do not show that Defendants curtailed cash cattle purchases to match the alleged reductions in slaughter volumes.  For example, Plaintiffs allege that in the second quarter of 2015, Cargill purchased 56% fewer cash cattle compared to the same quarter in 2014, *Cattle* Compl. ¶ 137 tbl.1 – but their own Figure 2 shows that Cargill's slaughter volumes *increased* between those quarters, *id.* ¶ 127 fig.2.  There is an even greater mismatch for the third quarter of 2015:  Although Plaintiffs allege that Cargill, Tyson, and National Beef all purchased fewer cash cattle in that quarter compared to 2014, *id.* ¶ 137 tbl.1, Figure 2 shows that those Defendants increased their slaughter volumes between those quarters, *id.* ¶ 127 fig.2.

The Dataset A allegations also do not plausibly support Plaintiffs' claims about top-of-the-market contracts.  A top-of-the-market contract is a type of formula contract where the packer agrees to pay the feedlot owner a price based on that week's top cash cattle price.  *Cattle* Compl. ¶ 140 n.57.  There are many reasons for packers and feedlot owners to prefer formula contracts instead of purchasing cattle on the cash market.  *See Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1287 (11th Cir. 2005).  Plaintiffs allege that Defendants increased the use of top-of-the-market contracts between 2014 and 2015, then abandoned those contracts between 2015 and 2016, and that would not have occurred absent an agreement.  *Cattle* Compl. ¶ 145 & tbl.4.  But Dataset A is unreliable, so the Court should not use it to draw conclusions about Defendants' actions.  Further, Plaintiffs do not explain how an agreement not to use top-of-the-market contracts supports their broader conspiracy claim.

Even if Plaintiffs had shown that Defendants reduced cash cattle purchases when Defendants reduced slaughter volumes, that alone would not support the inference of a conspiracy. As Plaintiffs explain, Defendants obtain the bulk of their cattle using formula contracts. *Cattle* Compl. ¶ 6. Defendants are obligated to purchase the cattle under contract – so if Defendants want to reduce slaughter volumes for any reason, the obvious way for them to do so is by reducing cash cattle purchases. In other words, it is perfectly rational and in each Defendant's self-interest to reduce cash cattle purchases whenever slaughter volumes are reduced.

### 3. Plaintiffs fail to plead that Defendants coordinated how they bought cash cattle

Plaintiffs allege that Defendants all bought cash cattle using certain practices, which helped cause fed cattle prices to decline. To support this claim, they rely on Witness 2's allegations about Defendants' use of the queuing convention and card-drawing at his feedlot. *Cattle* Compl. ¶¶ 159-74. Plaintiffs also allege that ███████████████ ██████████████████████████████████ restricted their cash cattle purchases to limited trading windows each week, *id.* ¶¶ 154-58; and "back[ed] up" cattle in certain regions in certain weeks by not buying cattle when prices were high, and then returning to those regions when prices declined, *id.* ¶¶ 174-78. Plaintiffs' only new allegations are the prices Defendants paid in 2019 and early 2020. None of the allegations, old or new, supports a conspiracy.

**Queuing convention.** Witness 2 alleges that all Defendants enforced the queueing convention, but he does not allege that Defendants had an *agreement* to do so. On the

29

contrary, he says that field buyers from each Defendant "individually" spoke to him about adhering to the convention.  *Cattle* Compl. ¶ 166.

Further, Witness 2 provides only one example of supposed enforcement, which shows that Defendants did not uniformly enforce the convention.  He claims that two Defendants allegedly "stopped visiting [his] feedlot" because it failed to follow the convention, but says that the other two Defendants did continue to bid on that feedlot's cattle.  *Id.* ¶ 167.  And that example occurred before Witness 2 "took over management of the feedlot in 2012," *id.* – well before the supposed conspiracy.  So it cannot be evidence of the claimed conspiracy.  *See Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1037 n.7 (8th Cir. 2000) (en banc).

In any event, the alleged queueing convention is not anticompetitive.  Plaintiffs admit it has been used in the industry for decades.  *Cattle* Compl. ¶ 159.  The Eighth Circuit has upheld a similar "right of first refusal" in the cattle industry, explaining that it did not "ha[ve] the actual effect of suppressing or reducing competition" for fed cattle.  *IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999).  Here, the queuing convention alleged is even more procompetitive:  The arrangement in *IBP* allowed the defendant to buy a pen of cattle by merely matching a higher bid, *id.* at 976, whereas here, the packer must outbid the existing highest bidder.

**Card drawing.**  Plaintiffs also allege that Defendants' field buyers insisted Witness 2 determine who could bid first each week by drawing cards.  *Cattle* Compl. ¶¶ 170-72.  But that may have occurred before the supposed conspiracy; the complaints allege it occurred "in late 2014 or early 2015."  *Id.* ¶ 170.  Further, Plaintiffs do not explain how a

30

random draw to *start* the bidding affected each packer's ability to compete when, as Plaintiffs admit, other packers could offer higher bids than the opening bid. *Id.* ¶ 171. Witness 2 states he "cannot recall" any packer outbidding the initial offer in early 2015, *id.*, but that is unsurprising given that fed cattle prices were falling from their historic highs during that time, *see id.* ¶ 16 fig.5. This card-drawing practice apparently was nothing more than the field buyers trying to avoid the inconvenience of camping out at feedlots overnight to place the first bid. *Id.* ¶ 172.

**Prices in 2019 and early 2020.** Plaintiffs include the following figure, which shows the average price each Defendant paid for fed cattle from January 2019 to April 2020:



Plaintiffs assert that Defendants' prices were "strikingly similar" during the marked time period, and Defendants would not have paid those similar prices for fed cattle without an

31

agreement. *Cattle* Compl. ¶ 153. That ignores the obvious alternative explanation: Fed cattle are a commodity product, *id*. ¶ 23, and similar prices resulting from "conscious parallelism" are expected in a commodity industry, *see In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016). That is particularly true for fed cattle; Defendants are required to report their cash cattle purchases twice every day under the Livestock Mandatory Reporting Act, so everyone knows the average market prices each day. *Cattle* Compl. ¶¶ 92 n.34, 387 fig.45.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

**Limited trading windows.** Plaintiffs allege that Defendants restricted their cash cattle trades to limited trading windows after the market closed on Fridays. Plaintiffs claim that this allowed Defendants to put pressure on feedlot owners to accept low bids without knowing the market price. *Cattle* Compl. ¶ 148. But Plaintiffs immediately contradict this claim by claiming that Defendants' pricing would "quickly be circulated across the market" through interactions in the field, word-of mouth, and industry reporting. *Id*. ¶ 149. And the data Plaintiffs present – the number of days each month in which there were no reported

transactions, by region – is not Defendant-specific.  *See id.* ¶ 154 figs.10-14.  The Court thus cannot tell which (if any) Defendants engaged in this behavior.

In any event, the aggregate, industry-wide data Plaintiffs present do not show any consistent trends.  *Cattle* Compl. ¶ 154 figs.10-14.  Plaintiffs even admit that some regions saw *no* reductions in the number of days without transactions.  *Id.* ¶ 154 n.64.  So this does not provide a basis for inferring collusion.

**Backing up cattle.**  Plaintiffs allege Defendants "back[ed] up" cattle by refraining from buying cattle in certain regions for several weeks, causing prices in those regions to fall, and then Defendants would buy cattle in those regions at the lower prices.  *Cattle* Compl. ¶ 174.  They provide three examples from 2016 when Defendants allegedly reduced cattle purchases from one region when prices were high and increased cattle purchases when prices were low.  *Id.* ¶¶ 175-78.  They provide Defendant-specific allegations for only one of those examples, from April 2016 in Nebraska – but then concede that two Defendants purchased cattle during the supposed "back up" period, undermining any inference of a conspiracy.  *Id.* ¶ 175.  In any event, buying cattle in regions with lower prices (as opposed to regions with higher prices) is exactly what rational economic actors would do.  It does not indicate a collusive agreement.

### 4.     Plaintiffs fail to plead that Defendants manipulated cattle imports

The *Cattle* and *Peterson* Plaintiffs claim that some Defendants agreed to uneconomically import cattle from Canada to suppress fed cattle prices in the United States.  *Cattle* Compl. ¶¶ 180-88.  The *DPP* and *Erbert* Plaintiffs allege the opposite:  They say that Defendants conspired to *restrict* imports, driving up retail beef prices (although

they provide no specifics to support this allegation).  *See DPP* Compl. ¶ 227; *Erbert* Compl. ¶ 225.  Which is it?  The fact that Plaintiffs make such divergent allegations casts doubt on their conspiracy theory.

The *Cattle* and *Peterson* Plaintiffs do not present any meaningful new allegations compared to the prior complaints.  They do not allege that National Beef imported any cattle at all. ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Instead of pleading actual data, these Plaintiffs use "trend lines" to show total U.S. imports and estimating periods in which it would have been uneconomical to import Canadian cattle from Alberta to Nebraska.  *Cattle* Compl. ¶ 183 fig.16.  But those trends are based on industry-wide data and hypothetical shipping costs and cattle prices; the complaints fail to link those costs and prices to any specific Defendant.

Anyway, there is a lawful and obvious explanation for any increased imports.  In 2016, Congress repealed the Mandatory Country of Origin Labeling (COOL) rule for beef.[6]  When the rule was in place, domestic feedlots could charge higher prices than foreign feedlots because of the premium paid for domestic beef.[7]  After the rule was repealed, foreign beef no longer had to be labelled as such. That spurred additional imports and

---

[6]  *See Cattle* Compl. ¶ 185 n.77; Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 759, 129 Stat. 2242, 2284-85 (2015) (amending 7 U.S.C. § 1638).

[7]  David J. Lynch, *"America First" May Be Last Hope for These Cattle Ranchers*, Wash. Post (May 3, 2019), https://perma.cc/7LQT-MQU8?type=image (R-CALF CEO's recognition of positive effect of labeling requirement on domestic fed cattle prices).

caused domestic cattle prices to fall.  The complaints concede that one Defendant increased its imports from Canada after the Mandatory COOL repeal.  *Cattle* Compl. ¶ 185 n.77.  So even if Plaintiffs had adequately pleaded that any Defendant increased its imports, that would not support any conspiracy.

### 5.   Plaintiffs fail to plead that Defendants closed plants as part of the conspiracy

In the prior complaints, Plaintiffs claimed that "Defendants first sought to reduce demand through a series of plant closures."  Previous *Cattle* Compl. ¶ 150.  The Court did not address this allegation in its order.  Plaintiffs have not added to their allegations; the amended complaints cite the same five instances of plant closures as before:

| Closure date | Defendant | Plant location | Capacity |
|---|---|---|---|
| February 2013 | Cargill | Plainview, TX | 4,000 head/day |
| June 2014 | National Beef | Brawley, CA | 2,000 head/day |
| August 2014 | Cargill | Milwaukee, WI | 1,300-1,400 head/day |
| September 2014 | Tyson | Cherokee, IA | Not pleaded |
| August 2015 | Tyson | Denison, IA | 2,000 head/day |

*Cattle* Compl. ¶ 190.  Plaintiffs acknowledge that JBS did not close any plants, and in fact "undertook a capital investment" to improve one of its fed cattle plants during the alleged conspiracy.  *Id.* ¶ 197.  But they claim that JBS's decision not to reopen a plant that was already idle when JBS acquired it (along with other assets) in April 2013 was somehow part of the conspiracy.  *Id.* ¶ 190.

Four of the five closures occurred before the supposed conspiracy began in 2015.  *Cattle* Compl. ¶ 1.  They cannot be evidence of the claimed conspiracy.  *See Blomkest Fertilizer, Inc.*, 203 F.3d at 1037 n.7 (act occurring "before the class contends the conspiracy ever began . . . is . . . of little relevance").  These closures also occurred far apart

and in no discernable pattern, so they do not suggest parallel conduct.  Over one year

separated the first and second closures, and about another year separated the fourth and

fifth closures.  That is not parallel conduct.  *In re Pork Antitrust Litig.*, No. 18-cv-1776,

2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) (*Pork I*) (allegations must be "temporally

proximate" to constitute parallel conduct); *see Park Irmat Drug Corp. v. Express Scripts

Holding Co.*, 911 F.3d 505, 516-17 (8th Cir. 2018) (conduct "executed under dissimilar

circumstances and separated by six months" did not permit an inference of parallel

conduct); *LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 579 (S.D.N.Y. 2017),

*aff'd*, 922 F.3d 136 (2d Cir. 2019) (conduct that occurred "at different times over the span

of several years" is not parallel conduct).

Further, one of the closures did not actually reduce industry capacity.  In 2015 (after

the conspiracy supposedly began), National Beef sold the Brawley plant it had closed in

2014 (before the start of the alleged conspiracy) to an independent packer, One World Beef,

which reopened the plant in 2016.  *Cattle* Compl. ¶ 197; *see id.* ¶ 154 (crediting the

reopening of the Brawley plant as driving an "increase in slaughter capacity between 2016

and 2017").  National Beef's sale of the plant to another packer, leading to the reopening

of that plant, clearly is inconsistent with a conspiracy to reduce slaughter volumes.

Further, there is an obvious lawful explanation for the closures.  There was a

"shortage of fed cattle" between 2009 and 2014 caused by significant droughts.  *Cattle*

Compl. ¶ 7.  Packers' margins directly depend on how well they utilize their plants.  *Id.*

¶ 89.  So when fed cattle volumes fell, packers had a strong economic incentive to close

underutilized and inefficient plants and concentrate production into newer, more efficient

plants.  Tellingly, Plaintiffs deleted the figure from the prior complaints that showed that industry slaughter capacity greatly exceeded industry slaughter volumes during the years of the droughts, and continued to exceed slaughter volumes from 2015 onward, even as slaughter volumes increased.  *See* Previous *Cattle* Compl. ¶ 154 fig.18.  That figure made clear that the plant closures were rational responses to significant excess capacity in the industry.

In sum, Plaintiffs have not pleaded the Defendant-specific allegations necessary to establish that Defendants acted in parallel to reduce slaughter volumes or to take any other actions of the alleged conspiracy.

## C.  Plaintiffs Fail To Plead Other Facts Supporting The Inference Of A Conspiracy

### 1.  Plaintiffs have not alleged sufficient plus factors

To plausibly plead a conspiracy, Plaintiffs must allege not only parallel conduct, but also plus factors, meaning other facts suggesting that Defendants' behavior was due to a conspiracy, rather than "chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *Pork I*, 2019 WL 3752497, at *6 n.6 (quoting *Twombly*, 550 U.S. at 557 n.4).  "Where a complaint pleads facts that are merely *consistent with* a defendant's liability, it stops short of the line between possibility and plausibility" and should be dismissed.  *Id.* at *5 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (emphasis added).

"[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."  *Musical*

*Instruments*, 798 F.3d at 1194.   Examples of plus factors are "a common motive to conspire"; evidence the "parallel acts were against the apparent individual economic self-interests of the alleged conspirators"; and "evidence of a high level of interfirm communications."   *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 991 (W.D. Ark. 2017) (internal quotation marks omitted).   Factors that simply reflect that the industry is concentrated are not enough.   *See Ins. Brokerage*, 618 F.3d at 321.

In its prior order, the Court stated that Plaintiffs' plus factors were "strong" because they included many of the same plus factors as in *Pork*.   *Cattle*, 2020 WL 5884676, at *6. But *Pork* involved an important factor not present here:  the "central role that Agri Stats played in the alleged conspiracy."   *Pork I*, 2019 WL 3752497, at *7.   Plaintiffs alleged that one of the two ways the *Pork* Defendants carried out the claimed conspiracy was exchanging non-public, competitively sensitive information through Agri Stats.   *Id.* at *2. Here, there are no Agri Stats allegations, or any allegations about how the Defendants entered into, carried out, monitored, or enforced the alleged agreement.

The plus factors alleged in this case do not suggest that any parallel conduct was the product of an unlawful agreement.   Plaintiffs plead nine plus factors, five of which merely address market characteristics.   The remaining four are consistent with ordinary competition and have been rejected by courts.

**Factors 1-5:  Market characteristics.**   Plaintiffs identify five characteristics of the fed cattle industry as plus factors:  (1) the industry is concentrated, *Cattle* Compl. ¶ 291; (2) fed cattle supply and beef demand are somewhat inelastic, *id.* ¶¶ 292-93; (3) "the parties' relative bargaining power" creates market access risk, *id.* ¶ 296; (4) there are high barriers

to entry, *id*. ¶¶ 304-07; and (5) Defendants have similar cost structures and monitor each other's activity, *id*. ¶¶ 308-13.  Plaintiffs in *DPP* and *Erbert* also allege that beef is a commodity product.  *DPP* Compl. ¶¶ 206-09; *Erbert* Compl. ¶¶ 204-07.

These allegations merely describe a concentrated commodity market and are not evidence of a conspiracy.  *See Ins. Brokerage*, 618 F.3d at 322 (the fact that "defendants operate in an oligopolistic market . . . [is] legally insufficient" evidence of a conspiracy). "[D]escriptions of the market . . . do not give rise to an inference of an unlawful agreement."  *Erie Cty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012).  In a concentrated industry, each competitor "would be equally impacted by market variables" and "would have the same incentive" to react to those variables in the same way.  *In re LTL Shipping Servs. Antitrust Litig.*, No. 08-md-01895, 2009 WL 323219, at *15 (N.D. Ga. Jan. 28, 2009).  If Plaintiffs' allegations were enough to be plus factors, then any allegation of parallel conduct in a concentrated commodity industry would survive a motion to dismiss – even though competitors' conduct often follows each other in such an industry.  *See Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 461 (9th Cir. 2018) (explaining that "conscious parallelism" is "endemic to an oligopoly").

Plaintiffs allege that Defendants monitored each other's activities, but those allegations do not suggest a conspiracy, because they do not show Defendants agreed with each other to do anything.  *See Cattle* Compl. ¶¶ 309-13.  Plaintiffs also allege that Defendants' field buyers requested information from producers and drove by competitors' plants.  *See id*. ¶¶ 310-11.  That is just individual gathering of competitive intelligence, not agreeing to a massive antitrust conspiracy.  Plaintiffs further allege that Defendants

"purchased beef produced by each other" to use in their own products, *id.* ¶ 312, but purchasing a product from a competitor is a perfectly legitimate business activity.

The *Peterson*, *DPP*, and *Erbert* Plaintiffs allege that the meatpacking market featured unusual market share stability during the relevant period. *Peterson* Compl. ¶¶ 286-88; *DPP* Compl. ¶ 232; *Erbert* Compl. ¶ 230. But Figure 2 disproves that; it shows that Cargill and National Beef gained share relative to Tyson and JBS, with Cargill overtaking JBS at several points during the alleged conspiracy. *See Cattle* Compl. ¶ 127 fig.2. In any event, market share stability is not a plus factor; "it is not reasonable to infer that a firm is engaging in illegal activities merely from the fact that it failed to continue to increase market share." *In re Citric Acid Litig.*, 191 F.3d 1090, 1101 (9th Cir. 1999); *see Erie Cty.*, 702 F.3d at 869-70 (rejecting plaintiffs' argument that "stable market shares," "high incumbency," and "high prices and profits" constitute plus factors); *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) (rejecting plaintiffs' argument that "stable relative market shares over time among the four defendants" constitute a plus factor).

**Factor 6:  Opportunities to collude.**  Plaintiffs allege numerous "opportunities to collude," including trade association meetings, field buyer activities, and inter-competitor sales. *Cattle* Compl. ¶¶ 297-303, 309, 312. None plausibly amounts to a plus factor.

Plaintiffs allege that "Defendants' executives and employees have regular opportunities to meet and collude, including through their membership and participation in various trade and industry associations." *Cattle* Compl. ¶ 297. But the complaints do not describe a single improper meeting or communication during any trade association meeting; all they allege is that Defendants belonged to those organizations and attended

40

those meetings.  *See id.* ¶¶ 297-302.  Courts have recognized that "belong[ing] to the same trade guild" does not permit a plausible inference of a conspiracy.  *Twombly*, 550 U.S. at 567 n.12; *see, e.g.*, *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1049 n.5 (D. Minn. 1992) ("A trade association is not a 'walking conspiracy' of its members.").

The trade association allegations in this case are particularly unpersuasive because putative class members (ranchers, direct purchasers, and indirect purchasers) belonged to many of the organizations, attended many of the events alleged, or both.[8]  One event, AgCon, was even hosted by federal regulators.[9]  It is not plausible to assert, without more, that Defendants used trade association meetings, in the presence of Plaintiffs and federal regulators, to hatch a conspiracy aimed at harming Plaintiffs.

Plaintiffs also allege that "Defendants' field buyers' weekly trips to inspect the feedlots in their territories provide an opportunity to meet and exchange commercially sensitive information amongst each other."  *Cattle* Compl. ¶ 309.  Plaintiffs plead no

---

[8]  *See, e.g.*, Nat'l Cattlemen's Beef Ass'n, *NCBA Allied Industry Membership* (2019), https://www.ncba.org/CMDocs/BeefUSA/Member/2019/NCBA%20Allied%20Industry %20Brochure.pdf (cited at *Cattle* Compl. ¶ 298 n.184) (many feedlot owners are members of the association); N. Am. Meat Inst., *About Us:  Board of Directors*, https://www. meatinstitute.org/index.php?ht=d/sp/i/234/pid/234 (last accessed Feb. 17, 2021) (cited at *Cattle* Compl. ¶ 300 n.190) (major purchasers are board members); Food Indus. Ass'n, *2017 Annual Meat Conference:  Registered Attendees*, https://www.fmi.org/forms/ meeting/MeetingRosterPublic/viewRoster?meetingId=43A35D00000DFE&sortBy=name (last accessed Feb. 17, 2021) (cited at *Cattle* Compl. ¶ 301 n.192) (direct and indirect purchasers attended event).

[9]  Kansas State Univ., *Inaugural AgCon Brings Business, Government Together to Discuss Ag Futures Market* (Mar. 8, 2018), https://www.ksre.k-state.edu/news/stories/2018/03/ AgCon2018.html.

specifics – no communication or meeting where any discussion took place, and no allegations of the content of any discussion. The "mere opportunity to conspire" is "not necessarily probative evidence of [a] price-fixing conspiracy." *Blomkest Fertilizer, Inc.*, 203 F.3d at 1036.

**Factor 7: Ongoing government investigations.** Plaintiffs allege that regulators are or were investigating Defendants. *Cattle* Compl. ¶¶ 314-38. But the bare existence of an investigation, absent any convictions or guilty pleas, does not make Plaintiffs' alleged conspiracy any more plausible. *See, e.g.*, *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009). An ongoing government "investigation . . . carries no weight in pleading an antitrust conspiracy claim." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).

The preliminary results from one of those investigations, into the fire at Tyson's Holcomb plant in August 2019, did not identify any anticompetitive conduct, instead concluding that "[s]hortly after the fire, packers increased their processing volumes." U.S. Dep't of Agric., *Boxed Beef & Fed Cattle Price Spread Investigation Report* 3 (July 22, 2020), https://www.ams.usda.gov/sites/default/files/media/CattleandBeefPriceMargin Report.pdf (cited at *Cattle* Compl. ¶ 265 n.147). And the GAO's investigation into fed cattle prices concluded that market forces accounted for the fall in those prices starting in 2015. U.S. Gov't Accountability Off., GAO-18-296, *U.S. Department of Agriculture: Additional Data Analysis Could Enhance Monitoring of U.S. Cattle Market* 16 (Apr. 2018) (GAO Report), https://www.gao.gov/assets/700/691178.pdf (cited at *Cattle* Compl. ¶ 82 n.21).

Plaintiffs also mention investigations outside the cattle and beef industries, including investigations and litigation involving broiler chicken and pork that do not involve all Defendants. *E.g.*, *Cattle* Compl. ¶ 332. Courts uniformly reject the "if it happened there, it could have happened here" argument. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (per curiam) (internal quotation marks omitted); *see Chocolate Confectionary*, 801 F.3d at 403 ("A conspiracy elsewhere, without more, generally does not tend to prove a domestic conspiracy."). That is particularly true here, where Plaintiffs point to allegations in industries in which two Defendants, National Beef and Cargill, do not participate.

**Factor 8: Cuts during periods of high demand.** The *DPP* and *Erbert* Plaintiffs argue that Defendants implemented production cuts despite surging beef demand. *DPP* Compl. ¶¶ 236-39; *Erbert* Compl. ¶¶ 234-37. Plaintiffs cite one statement by a Tyson executive at an industry conference in November 2018, and two news articles from February and August 2019, to support their assertion that beef demand was high during those times, but they do not allege that any production cuts occurred at those times. *See id.* Elsewhere in the complaints, Plaintiffs say that slaughter volumes were at or near multi-year highs during those times. *See DPP* Compl. ¶ 13 fig.1. Those contradictory allegations do not support the inference of a conspiracy.

**Factor 9: Public statements.** The *DPP* and *Erbert* Plaintiffs allege that "Defendants signaled their conspiracy and encouraged each other to maintain it . . . during earnings calls." *DPP* Compl. ¶ 179; *Erbert* Compl. ¶ 177. The cited statements, by executives of only two Defendants (Tyson and JBS) during earning calls, were ordinary

statements to investors about general industry trends and each company's outlook, and do not plausibly support a conspiracy.[10]  No statement refers to any other Defendants.  Also, the complaints do not allege that executives from Cargill or National Beef made any statements.

Statements that "generally refer to the industry as a whole, and are largely vague" do not show a conspiracy.  *Pork I*, 2019 WL 3752497, at *8-9; *see, e.g.*, *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1280 (N.D. Ga. 2002) (holding that there is nothing "ominous or collusive" about "statements made every day by corporate executives to industry analysts"), *aff'd sub nom. Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003).  The cited statements are too vague and benign to plausibly support Plaintiffs' alleged conspiracy.

### 2.    Plaintiffs' regression model does not show a conspiracy

The *Cattle* Plaintiffs provide a purported regression model, which they claim shows that fed cattle prices were "artificially depressed" beyond the normal forces of supply and demand between January 2015 and December 2017.  *Cattle* Compl. ¶ 278.  That model, which is unchanged from the prior *Cattle* complaint, does not support an inference of a conspiracy.

---

[10] *E.g.*, *DPP* Compl. ¶ 179 (alleging that a Tyson executive told investors in 2014 that Tyson sought to "run [its] beef business for margin, not market share"); *id.* (alleging that a JBS executive told investors in 2016 that JBS was expecting "to see a little bit more production of beef this year and next year," but that numbers were "below how it was a few years ago").

The model is not specific to any Defendant.  All of the data it uses – population, GDP, inflation, feed costs, prices of substitutes, net imports, numbers of packer plants and feedlots, and feedlot capacity, *see Cattle* Compl. ¶ 280 – is aggregated, industry-wide data. Accordingly, the model "do[es] not plausibly suggest that the particular defendants named in this suit were part of [a] conspiracy."  *GSE Bonds*, 396 F. Supp. 3d at 365 (rejecting reliance on industry-wide statistical analyses).

In any event, the model does not show what Plaintiffs claim it shows.  Plaintiffs claim that the model indicates that "fed cattle prices were artificially depressed by an average of 7.9%" during the alleged conspiracy period.  *Cattle* Compl. ¶ 278.  But the model is not capable of determining the *reason* for any alleged price depression.  All the model shows is that the 17 variables Plaintiffs chose to include account for the vast majority of the movement in fed cattle prices; the model attributes the rest of the movement to an antitrust conspiracy.  *See id.* ¶ 280 (explaining that the model "ascribe[s] to artificial price suppression" any "residual, unexplained price decrease" after accounting for the variables Plaintiffs included in the model).

Plaintiffs have not plausibly alleged that those 17 variables are the only variables affecting the price of fed cattle, or that anything not explained by those variables must be an antitrust conspiracy.  Notably, Plaintiffs did not include the supply of fed cattle as a variable, even though the complaint acknowledges that supply increased starting in 2015, *Cattle* Compl. ¶ 218, and supply would be an obvious driver of fed cattle prices.  The model's conclusory allegations thus provide no support for Plaintiffs' claims.

### 3.    The complaints explain why fed cattle prices lawfully fell

Plaintiffs' overarching theory is that Defendants' conspiracy caused fed cattle prices to fall starting in 2015. But the complaints themselves present obvious alternative and lawful explanations for that result.

Figure 5 in the *Cattle* complaint shows that fed cattle prices began falling in 2015. *See Cattle* Compl. ¶ 16 fig.5. Plaintiffs start this chart in January 2010. When the same data is viewed over a longer time frame, it is clear that the key change in prices was not the 2015 decline, but rather the dramatic rise in prices that started in 2009:

Figure 7:  Cattle *Figure 5 – "Fed Cattle Prices vs. Retail Beef Prices," expanded to January 2000*



(This figure uses the same data as *Cattle* Figure 5, except it extends back to January 2000.[11])

---

[11]    *See* USDA Econ. Research Serv., *Livestock Prices* (Oct. 28, 2019), https://www.ers.usda.gov/webdocs/DataFiles/51875/LivestockPrices.xlsx; USDA Econ. Research Serv., *Historical Monthly Price Spread Data for Beef, Pork, Broilers* (Feb. 28, 2019), https://www.ers.usda.gov/webdocs/DataFiles/52160/history.xls

Plaintiffs' real grievance is that prices did not stay at their all-time highs.  Yet the complaints acknowledge why prices increased to the historic highs (drought and "strong beef demand"), *Cattle* Compl. ¶ 7, and why prices then fell (the drought ended and the fed cattle supply increased), *see id.* ¶ 218 (the 2015 "fed cattle inventory was at or slightly above 2014 levels in almost every month" in part because of "the continuing rebuild of the cow-herd").   The complaints also acknowledge the drop in prices of feeder cattle, which likely contributed to the increase in the fed cattle supply.  *Id.* ¶ 268.  And the complaints acknowledge that the demand for domestic fed cattle decreased, in part due to the repeal of the Mandatory COOL rule.  *See id.* ¶ 280(h).

That all is consistent with the GAO's report.  The GAO studied the causes of the fall in fed cattle prices for two years and concluded that "supply and demand factors" – not collusion by packers – accounted for the changes in fed cattle prices.  GAO Report 1, 16.  Plaintiffs repeatedly cite the GAO report throughout their complaints, but claim that the GAO's conclusion is unsound because the GAO did not review internal packer documents in its investigation.  *Cattle* Compl. ¶ 283; *see* GAO Report 29.  The GAO concluded that market forces accounted for the changes in fed cattle prices, and so there was no need to explore Plaintiffs' conspiracy theory further, through internal packer documents or otherwise.  GAO Report 12.  The obvious and lawful explanations for the changes in fed cattle prices undermine any claim of conspiracy.

47

### D.     Purchaser Plaintiffs Fail To Allege An Injury In Fact That Confers Standing To Sue

To have Article III standing and standing to assert a claim for a violation of Section 1 of the Sherman Act, Plaintiffs must plead facts demonstrating that they suffered damages as a result of Defendants' alleged antitrust violations.  *See E.L. by White v. Voluntary Interdistrict Choice Corp.*, 864 F.3d 932, 935 (8th Cir. 2017); *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006).  Here, that means that Plaintiffs who purchased beef – the *Peterson*, *DPP*, and *Erbert* Plaintiffs – must plead facts showing that Defendants' allegedly unlawful conduct caused the prices of the beef products they purchased to be higher than they otherwise would have been.  *See, e.g.*, *Nat'l Farmers' Org., Inc. v. Associated Milk Prods., Inc.*, 850 F.2d 1286, 1305 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989).

Purchaser Plaintiffs have not made that showing.  They allege that Defendants conspired to depress and stabilize the prices of fed cattle, *Peterson* Compl. ¶ 86, and that there was a "strong relationship" between fed cattle and retail beef prices, *id.* ¶ 11.  Those allegations would logically suggest that fed cattle and retail beef prices would have been *higher* in the absence of a conspiracy.   But the complaints allege that beef prices *fell* by 6% during the alleged conspiracy.  *Id.* ¶ 24.  Purchaser Plaintiffs thus must allege facts establishing that they would have paid even less for beef without the alleged conspiracy.

Plaintiffs provide only a conclusory allegation that Defendants' actions "sever[ed]" the historic relationship between cattle prices and beef prices, and that Defendants were able to suppress fed cattle prices while inflating beef prices.  *Peterson* Compl. ¶ 24.  They

do not plead facts indicating that beef prices would have fallen by more than 6% but for the alleged conspiracy to suppress fed cattle prices. Other allegations contradict that claim; Plaintiffs allege that "the industry expected the price of fed cattle to stabilize in 2015 and to continue at or around the $150 per hundredweight . . . mark for a number of years." *Cattle* Compl. ¶ 7. If that is true, and there was a close relationship between cattle and beef prices, then beef prices should also have remained stable, not declined by more than 6%. Plaintiffs cannot establish standing by simply "assert[ing] that [their] damages would not have been incurred without defendant's [anti-competitive conduct]." *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983); *see Canadian Imp.*, 470 F.3d at 792 ("'[V]aguely defined links' in the chain of causation . . . [are] insufficient to establish antitrust standing.").

### E.   R-CALF And NFU Lack Standing To Seek Money Damages

The two trade association Plaintiffs in *Cattle* seek antitrust damages, but they lack standing to do so. The Ranchers Cattlemen Action Legal Fund United Stockgrowers of America (R-CALF) and the National Farmers Union (NFU) seek "damages in their personal capacity" because (they claim) the alleged conspiracy has "frustrated their respective missions to protect the interests of their members, and diverted their resources to help their members mitigate damages and prevent further breaches of the law by Packing Defendants." *Cattle* Compl. ¶ 31.

The problem for them is that only those who are "the target of the anticompetitive activity" can seek antitrust damages; those "who [have] merely suffered indirect, secondary, or remote injury" cannot. *Midwest Commc'ns, Inc. v. Minn. Twins, Inc.*, 779

F.2d 444, 451 (8th Cir. 1985) (internal quotation marks omitted).  Plaintiffs who do not participate directly in the market at issue usually cannot seek antitrust damages.  *See, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539 (1983).

R-CALF and NFU do not participate in the market at issue because they do not sell fed cattle.  *See Cattle* Compl. ¶ 31.  Instead, they claim they spent money to mitigate the alleged harm to their members.  But that is an indirect, derivative injury.  *See Lovett v. Gen. Motors Corp.*, 975 F.2d 518, 520-21 (8th Cir. 1992) (owner of target of antitrust conspiracy who lost value of business lacked standing); *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1378 (7th Cir. 1987) (employee of target of antitrust conspiracy who lost commissions lacked standing).  R-CALF and NFU therefore lack standing to seek antitrust damages either for themselves or on behalf of their members.

## II.     PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE PACKERS AND STOCKYARDS ACT

The *Cattle* Plaintiffs claim that Defendants violated the Packers and Stockyards Act, 7 U.S.C. § 181 *et seq.* (PSA), by conspiring to suppress fed cattle prices.  *Cattle* Compl. ¶ 458.  That is just Plaintiffs' Sherman Act conspiracy.  As the Court previously held, if their Sherman Act claim fails, then so too does their PSA claim based on the same conspiracy.  *Cattle*, 2020 WL 5884676, at *7.

The Court also noted that the PSA may apply to actions by packers that "have at least the potential to suppress or reduce competition," even absent a conspiracy, *Cattle*, 2020 WL 5884676, at *7, but Plaintiffs have not pursued that path.  Their allegations center

solely on the alleged antitrust conspiracy.  *Cattle* Compl. ¶¶ 458-59.  And even if Plaintiffs had attempted to assert a standalone claim for unfair conduct, that claim would fail, because none of their allegations amounts to a PSA violation.

To state a PSA claim, Plaintiffs must show that Defendants' actions had "an actual or potential adverse effect on competition."  *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 457 (8th Cir. 2018).  The Court held that the prior complaints had not made that showing, and Plaintiffs have not substantively changed their allegations. "Merely cutting back slaughter volume in a single year" does not suffice to state a PSA claim.  *Cattle*, 2020 WL 5884676, at *7.  The "queuing-convention allegations are also insufficient" to plead a PSA claim, because "the Eighth Circuit explicitly held that right-of-first-refusal agreements do not violate the PSA."  *Cattle*, 2020 WL 5884676, at *7 (citing *IBP*, 187 F.3d at 977).  Plaintiffs have not added more to those claims.

Plaintiffs' remaining allegations – drawing cards to avoid attending the feedlot at increasingly early hours to place bids, *Cattle* Compl. ¶¶ 170-72, conducting cash trades on Fridays, *id.* ¶ 154, seeking supply from certain regions, *id.* ¶¶ 174-79, and deciding to import cattle to meet a producer's needs, *id.* ¶¶ 180-88 – are merely Defendants' choices about with whom and when to contract.  "[I]t has been long established that the intent of the PSA is not to 'upset the traditional principles of freedom of contract.'"  *Griffin v. Smithfield Foods, Inc.*, 183 F. Supp. 2d 824, 828 (E.D. Va. 2002) (quoting *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1458 (8th Cir. 1995)).  Without plausible allegations of a conspiracy, the PSA claims cannot survive.

## III.  PLAINTIFFS FAIL TO PLEAD A VIOLATION OF THE COMMODITY EXCHANGE ACT

The *Cattle* Plaintiffs bring four claims under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* (CEA) – two primary liability claims (for price manipulation and use of a manipulative device) and two secondary liability claims (for principal-agent liability and for aiding and abetting).  All claims fail because they depend on the Sherman Act claims. Further, Plaintiffs do not plausibly allege the elements of any independent CEA claims. And without any viable primary liability claims, Plaintiffs' secondary liability claims fail.

### A.  Plaintiffs' CEA Claims Are Derivative Of Their Sherman Act Claims

Plaintiffs allege that Defendants violated the CEA in three ways, all of which depend on their Sherman Act claims.

Plaintiffs' first theory of CEA liability expressly depends on the alleged antitrust conspiracy to "suppress the price of physical cattle."  *Cattle* Compl. ¶ 345.  When an alleged Sherman Act conspiracy "is the basis for the CEA claim," and the Sherman Act claim is deficient, "the CEA claim cannot continue."  *Cattle*, 2020 WL 5884676, at *6; *see, e.g.*, *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 598 (S.D.N.Y. 2011).  Because Plaintiffs' Sherman Act allegations are deficient, *see* pp. 5-47, *supra*, their CEA claim based on the Sherman Act claim fails.

Plaintiffs' second and third theories of CEA liability also repackage their Sherman Act claims.  Plaintiffs allege that "certain Defendants" "established large short positions in Live Cattle Futures," and that by taking those short positions, Defendants lowered prices for cattle futures.  *Cattle* Compl. ¶ 345.  They allege that lowering future prices ultimately

lowered cattle prices generally (their second theory of liability), as well as prices in specific contracts that incorporated the price of live cattle futures (their third theory). *Id.* Plaintiffs assert that Defendants had "no commercial need" for short positions, and that Defendants took those positions only to further their "overarching goal of suppressing" fed cattle prices. *Id.* ¶ 402. But that is just the supposed Sherman Act conspiracy. Because Plaintiffs' CEA claims are inextricably intertwined with their Sherman Act claims, the Court should dismiss the CEA claims along with the Sherman Act claims.

**B.     Plaintiffs Fail To Plead The Elements Of A CEA Claim**

Plaintiffs' CEA claims independently fail because Plaintiffs do not allege facts to satisfy the elements of those claims. To state a price-manipulation claim under the CEA, Plaintiffs must allege facts showing that (1) there was an artificial futures market price; (2) the defendant had the ability to influence futures market prices and in fact caused that artificial futures market price; and (3) the defendant specifically intended to cause the artificial futures market price. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764-65 (7th Cir. 2015). They also must plausibly allege a net loss from any claimed CEA violation, to show that they suffered "actual damages" from unlawful transactions. 7 U.S.C. § 25(a)(1); *see Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 111 (2d Cir. 2018). It is not enough for Plaintiffs to have bought a commodity at an artificially reduced price, because they could have sold that commodity at the same reduced price, with no damages. *See Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 570 (S.D.N.Y. 2017).

Plaintiffs do not plead any of those elements.  First, Plaintiffs fail to plead factual allegations showing artificial prices.  They allege that a link exists between live cattle prices and the prices of cattle futures, and that Defendants' antitrust conspiracy caused live cattle prices to be artificially low.  *Cattle* Compl. ¶ 390.  But they have not plausibly pleaded an antitrust conspiracy, so they have not pleaded that live cattle prices were artificially low.  *See* pp. 5-47, *supra*.  Plaintiffs point to no other facts on that point.  They cite a whistleblower complaint from 2018, but that complaint involved trading activity only on one day, and Plaintiffs do not allege that any Defendant was involved.  *Id.* ¶ 413.

Second, Plaintiffs do not allege that any Defendant had the ability to influence market prices.  They rely entirely on group allegations against "Livestock Slaughterers." *Cattle* Compl. ¶ 397.  That sort of group pleading does not work for Sherman Act claims, and it does not work for CEA claims, either.  *See CFTC v. M25 Invs., Inc.*, No. 09-cv-1831, 2010 WL 769367, at *3 (N.D. Tex. Mar. 6, 2010).  Further, Plaintiffs do not even show that "Livestock Slaughterers" as a group had the ability to influence market prices.  The most they claim is that, on one day in June 2017, the group held 15% of the overall short positions in the futures market.  *Cattle* Compl. ¶ 399.  They do not plead facts showing that that was enough to influence the market on that day, much less at other times.

Third, Plaintiffs do not plead intent.  They assert that Defendants had no economic reason to hold net short positions, but they plead no facts to back that up.  *Cattle* Compl. ¶ 397.  Further, any claim of bad intent is implausible given that Defendants reported their short positions to the Commodities Futures Trading Commission, and sometimes also in their public financial statements.  *Id.* ¶¶ 377, 379, 397-400.

Finally, Plaintiffs fail to plead a net loss. Plaintiffs conclusorily assert that they suffered "injury and economic damages" from the alleged price manipulation. *Cattle* Compl. ¶¶ 466, 472. But if Plaintiffs bought and sold futures or options at prices reduced by constant amounts, they did not suffer any losses because the transactions were a wash. *See In re LIBOR-Based Fin. Instruments*, 935 F. Supp. 2d at 716-17. And if Plaintiffs bought and sold futures or options at prices reduced by different amounts at different times, those reductions did not necessarily cause net losses, either. Whether Plaintiffs suffered net losses caused by the claimed violations would depend on the specifics of their trading activity, *see id.* – and Plaintiffs do not allege any of that information. Their claims therefore fail. *See, e.g., In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 936-37 (N.D. Ill. 2019).

### C.  Plaintiffs' Secondary Liability Claims Fail Because They Fail To Allege A Primary Liability Claim

Plaintiffs' claims for principal-agent liability and aiding and abetting are viable only if the "underlying primary violation of the CEA can survive a motion to dismiss." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018); *see Tatum v. Legg Mason Wood Walker, Inc.*, 83 F.3d 121, 123 n.3 (5th Cir. 1996). Because Plaintiffs have failed to state a primary CEA claim, their derivative claims necessarily fail.

## IV.  PLAINTIFFS' CLAIMS ARE TIME-BARRED

The *Cattle* and *Peterson* Plaintiffs filed their first complaints in April 2019, more than four years after the start of the alleged conspiracy in January 2015. The *DPP* and

*Erbert* Plaintiffs filed their first complaints even later, in June 2020.  All claims are untimely.

The limitations period is four years for Sherman Act and PSA claims, 15 U.S.C. § 15b (Sherman Act); *Jackson*, 53 F.3d at 1460 (PSA), and it "begins to run when a defendant commits an act that injures a plaintiff's business," *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  The limitations period is only two years for CEA claims, 7 U.S.C. § 25(c), and it begins to run from the "discovery of the injury," *Levy v. BASF Metals Ltd.*, 917 F.3d 106, 108 (2d Cir. 2019) (internal quotation marks omitted).

Here, Plaintiffs discovered their alleged injuries no later than January 2016, when R-CALF publicly accused Defendants of engineering the fall in fed cattle prices.  *Cattle* Compl. ¶ 434.  Plaintiffs' claims thus are all time-barred.

The doctrine of fraudulent concealment does not save Plaintiffs' claims.  Plaintiffs do not allege the facts needed to invoke that doctrine.  The continuing-violation doctrine also cannot save Plaintiffs' untimely claims.

A.     **Plaintiffs Do Not Plead Fraudulent Concealment**

For fraudulent concealment, Plaintiffs must allege that (1) Defendants took affirmative acts "solely to conceal" the alleged conspiracy, (2) Plaintiffs failed to discover the existence of the conspiracy, and (3) Plaintiffs exercised due diligence to uncover the relevant facts.  *In re Milk Prods. Antitrust Litig.*, 84 F. Supp. 2d 1016, 1022 (D. Minn. 1997) (internal quotation marks omitted).  The allegations must meet the heightened

pleading standard of Federal Rule of Civil Procedure 9(b).  *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011).

Plaintiffs do not plead facts supporting any of the elements of fraudulent concealment, much less with the particularity required by Rule 9(b).

### 1.  Plaintiffs do not allege that Defendants concealed the supposed conspiracy.

This Court has held that in order to satisfy the concealment element, Plaintiffs must allege with particularity that Defendants took "affirmative actions to fraudulently conceal their antitrust violations."  *In re Pork Antitrust Litig.*, No. 18-cv-1776, 2020 WL 6149666, at *7 (D. Minn. Oct. 20, 2020) (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008)) (*Pork II*).  Plaintiffs cannot merely plead a "self-concealing" conspiracy, because under that logic, "fraudulent concealment [would] apply to nearly every conspiracy."  *Id.*

Plaintiffs allege that Defendants concealed the alleged conspiracy in a number of ways.  But they plead no facts to support the alleged concealment.  Plaintiffs allege that Defendants "g[ave] false or pre-textual reasons for low fed cattle prices" and "offer[ed] pre-textual justifications" for their actions.  *Cattle* Compl. ¶ 440.  The only support they have are statements about the cattle industry made in Defendants' public SEC filings or by some Defendants' executives during earnings calls.  *E.g.*, *id.* ¶ 442 (alleging that Tyson's SEC filings stated that cattle prices are "determined by constantly changing market forces of supply and demand").  Plaintiffs do not link those generic statements to any conspiracy.

57

Similarly, Plaintiffs allege that Defendants "misrepresent[ed] the nature of their agreements" to "government officials and to the public." *Cattle* Compl. ¶ 440. Plaintiffs point to generalized statements in Defendants' annual reports and other public filings. *E.g.*, *Erbert* Compl. ¶ 268. Plaintiffs do not give any reason to believe these public statements are false or fraudulent, or are connected to the allegations in this case. If those types of generic statements were enough to constitute fraudulent concealment, it would "effectively nullify the statute of limitations" in antitrust cases. *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218-19 (4th Cir. 1987).

Plaintiffs also claim that Defendants "represent[ed] that [their] fed cattle bids and contract terms were the product of honest competition," *Cattle* Compl. ¶ 440, "misrepresent[ed] the nature of their agreements," *id.*, and "communicat[ed] privately" by "nonpublic forms of communication," *DPP* Compl. ¶ 269; *Erbert* Compl. ¶ 267. The complaints are devoid of any supporting factual allegations for those assertions.

### 2.   Plaintiffs do not allege that they failed to discover the alleged conspiracy

Plaintiffs also do not establish the second element of fraudulent concealment, which is that they failed to discover the alleged conspiracy during the limitations periods. They assert that they "did not learn, and could not have learned, of Packing Defendants' misconduct . . . until late January 2019, when Witness 1 stepped forward and shared with Plaintiffs details of Packing Defendants' express agreement." *Cattle* Compl. ¶ 433.

Plaintiffs' claim is implausible because Witness 1 does not provide any details of any agreement, and because the complaints principally rely on information that was

available at the time of the supposed conspiracy.  The complaints extensively cite data collected by the federal government and published contemporaneously on a daily or weekly basis.  *E.g.*, *Cattle* Compl. ¶¶ 13-14, 152-54, 175-77, 211-24; *see id.* ¶ 92 n.34 (explaining that packers report prices and purchase volumes to the USDA "on a daily and weekly basis"); *id.* ¶ 279 n.161 (explaining that the USDA publishes daily fed cattle pricing data).

The complaints also cite news articles published contemporaneously with the changes in fed cattle prices.  *See, e.g.*, *Cattle* Compl. ¶¶ 135 n.52, 144 n.60, 249 nn.134-35.  Nearly all were written by Cassie Fish for the blog "The Beef."  The blog has close ties to *Cattle* Plaintiffs – it is published by Consolidated Beef Producers, a "cooperative of innovative cattle producers," for which *Cattle* Plaintiff Charles Weinreis serves as the chairman of the board.  *See* Consol. Beef Producers, *Who We Are*, https://cbp.coop/who-we-are/ (last accessed Feb. 17, 2021).  It is implausible for Plaintiffs not to have been aware of Fish's allegations as they were published.

Further, Plaintiff R-CALF has been publicly accusing Defendants of colluding to suppress fed cattle prices since January 2016.  *See* Ltr. from Bill Bullard, CEO, R-CALF, to Sen. Charles E. Grassley, Chairman of the Sen. Comm. on the Jud. 2 (Jan. 5, 2016) (Jan. Bullard Ltr.), https://perma.cc/Z5U4-948P; *see Cattle* Compl. ¶ 434 & n.290.  Plaintiffs fail to identify any new information that came to light that allowed them to "discover" the conspiracy that R-CALF has been alleging since January 2016.

### 3.    Plaintiffs do not plead diligence

Plaintiffs also fail to plead that they worked diligently to discover their claim once they became aware "of facts and activities that would 'create notice and excite attention.' "

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-cv-2664, 2014 WL 943224, at *5 (D. Minn. Mar. 11, 2014) (citation omitted), *aff'd*, 797 F.3d 538 (8th Cir. 2015).

Only the *Cattle* Plaintiffs provide any allegations of diligence. *See Cattle* Compl. ¶¶ 434-37. They allege that they exercised diligence by "request[ing] a governmental investigation into . . . Packing Defendants' conduct." *Cattle* Compl. ¶¶ 434, 436. But Plaintiffs cannot rely on the government's investigation as establishing their *own* diligence. *See Milk Prods.*, 84 F. Supp. 2d at 1024; *cf. In re Refrigerant Compressors Antitrust Litig.*, 92 F. Supp. 3d 652, 670 (E.D. Mich. 2015) (plaintiffs adequately alleged diligence because they investigated themselves, in addition to the government's investigation). Further, only one Plaintiff (R-CALF) requested that the government investigate, *see* Jan. Bullard Ltr. 2; that cannot establish every Plaintiff exercised due diligence, *see In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 487 (W.D. Pa. 1999). (The *Cattle* complaint conclusorily alleges that other Plaintiffs "assisted" or "supported" R-CALF's efforts but provides no details as to that support other than membership in R-CALF. *Cattle* Compl. ¶ 434 n.290.)

The *Peterson* Plaintiffs do not address this element at all. *See Peterson* Compl. ¶¶ 337-43. The *DPP* and *Erbert* Plaintiffs acknowledge that they need to show diligence, but all they provide is a bare assertion that they could not have discovered the alleged conspiracy until the *Cattle* complaint first pleaded allegations relating to Witness 1. *DPP* Compl. ¶¶ 305-11; *Erbert* Compl. ¶ 303-09. They do not allege that they took any steps to try to investigate their claims. The complaints' allegations of due diligence thus are inadequate.

**B.     The Continuing-Violation Doctrine Does Not Permit Plaintiffs To Recover Damages For Acts Outside The Limitations Period**

Plaintiffs allege that because the alleged conspiracy is ongoing, the continuing-violation doctrine applies to their claims.  *Cattle* Compl. ¶ 426; *see Peterson* Compl. ¶ 344; *DPP* Compl. ¶ 312; *Erbert* Compl. ¶ 316.  In the antitrust context, the doctrine means that each allegedly unlawful act "starts the statutory period running again," but "does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997) (internal quotation marks omitted); *see In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1068 (8th Cir. 2017) (en banc).  An antitrust plaintiff thus can assert claims when each violation occurs, but those claims must be within the limitations period.  The plaintiff may not reach back to claims before the limitations period.  *In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827, 2021 WL 147166, at *8 (D. Minn. Jan. 15, 2021).

Here, Plaintiffs can recover only for violations within the limitations periods, but cannot reach back to resuscitate time-barred claims.  The *Cattle* Plaintiffs therefore cannot recover for any injuries allegedly incurred before April 23, 2015, for their Sherman Act and PSA claims, or before April 23, 2017, for their CEA claims, and the *DPP* Plaintiffs could not recover for any injuries allegedly incurred before June 6, 2016, for their Sherman Act claims.  (The *Peterson* and *Erbert* Plaintiffs cannot recover damages under the Sherman Act, because they are indirect purchasers.)

In any event, Plaintiffs have not adequately alleged conspiratorial acts within the limitations period, and thus cannot invoke the continuing-violations doctrine.  The bulk of

their allegations focus on 2015 and 2016.  *See Cattle* Compl. ¶¶ 198-238.  In particular, Witness 1's and Witness 2's allegations date to 2015.  *See id.* ¶¶ 117, 143.  Plaintiffs assert that the conspiracy continued into later years, but their allegations about those years are particularly thin.  And their estimates of Defendants' slaughter volumes show that each Defendant increased its slaughter volumes after 2016, in non-parallel ways.  *See id.* ¶ 127 fig.2.  So not only have Plaintiffs not plausibly alleged a conspiracy to suppress fed cattle prices in 2015 and 2016, they have done even less to allege a conspiracy beyond 2016.

## CONCLUSION

Plaintiffs have amended their complaints multiple times.  Each amendment has made it more clear that Plaintiffs do not have plausible evidence of an antitrust conspiracy.  Plaintiffs have not pleaded facts to overcome the obvious lawful alternative explanations for why fed cattle prices fell after hitting historic highs.  The Court should dismiss the federal claims in *Cattle*, *Peterson*, *DPP*, and *Erbert* with prejudice.

Date:  February 18, 2021                    Respectfully submitted,


s/ *X. Kevin Zhao*                          s/ *Lewis A. Remele, Jr.*
X. Kevin Zhao, Reg. No. 0391302             Lewis A. Remele, Jr., Reg. No. 90724
Holley C. M. Horrell, Reg. No. 0399636      Christopher R. Morris, Reg. No. 230613
Davida S. McGhee, Reg. No. 0400175          **BASSFORD REMELE, P.A.**
**GREENE ESPEL PLLP**                       100 South Fifth Street, Suite 1500
222 South 9th Street, Suite 2200            Minneapolis, MN 55402
Minneapolis, MN 55402                       Tel: (612) 333-3000
Tel: (612) 373-0830                         lremele@bassford.com
kzhao@greeneespel.com                       cmorris@bassford.com
hhorrell@greeneespel.com
dwilliams@greeneespel.com                   William F. Hargens (*pro hac vice*)
                                            Mark F. Enenbach (*pro hac vice*)
Michael E. Lackey, Jr. (*pro hac vice*)     Patrick E. Brookhouser, Jr. (*pro hac vice*)
Nicole Saharsky (*pro hac vice*)            Matthew G. Munro (*pro hac vice*)
William H. Stallings (*pro hac vice*)       **MCGRATH NORTH MULLIN &**
**MAYER BROWN LLP**                         **KRATZ, PC LLO**
1999 K Street, NW                           First National Tower, Suite 3700
Washington, DC 20006-1101                   1601 Dodge Street
Tel: (202) 263-3338                         Omaha, NE 68102
mlackey@mayerbrown.com                      Tel: (402) 341-3070
nsaharsky@mayerbrown.com                    whargens@mcgrathnorth.com
wstallings@mayerbrown.com                   menenbach@mcgrathnorth.com
                                            pbrookhouser@mcgrathnorth.com
*Counsel for Defendants Cargill,*           mmunro@mcgrathnorth.com
*Incorporated and Cargill Meat Solutions*
*Corporation*                               *Counsel for Defendants JBS USA Food*
                                            *Company, JBS Packerland, Inc., and Swift*
                                            *Beef Company in the Cattle case and*
                                            *Special Appearance for JBS S.A. in Cattle*

s/ *Donald G. Heeman*
Donald G. Heeman, Reg. No. 0286023
Jessica J. Nelson, Reg. No. 0347358
Randi J. Winter, Reg. No. 0391354
**SPENCER FANE**
100 South Fifth Street, Suite
2500Minneapolis, MN 55402
Tel: (612) 268-7000
dheeman@spencerfane.com
jnelson@spencerfane.com
rwinter@spenderfane.com

Stephen Neuwirth  (*pro hac vice*)
Sami H. Rashid (*pro hac vice*)
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
51 Madison Avenue
New York, NY 10010
Tel: (212) 849-7000
stephenneuwirth@quinnemanuel.com
samirashid@quinnemanuel.com

Ethan Glass, Reg. No. 0316490
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8265
ethan.glass@quinnemanuel.com

*Counsel for Defendants JBS USA Food
Company Holdings, JBS Packerland, Inc.,
and Swift Beef Company, and Special
Appearance for JBS S.A., in the Peterson,
DPP and Erbert & Gerbert's cases*

s/ *Benjamin L. Ellison*
Benjamin L. Ellison, Reg. No. 0392777
**JONES DAY**
90 South 7th Street, Suite 4950
Minneapolis, MN 55402
Tel: (612) 217-8800
bellison@jonesday.com

Julie E. McEvoy (*pro hac vice*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Tel: (202) 879-3939
jmcevoy@jonesday.com

Michelle K. Fischer (*pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
mfischer@jonesday.com

Eddie Hasdoo (*pro hac vice*)
**JONES DAY**
77 West Wacker Drive, Suite 3500
Chicago, IL 60601-1692
Tel: (312) 269-4214
ehasdoo@jonesday.com

*Counsel for Defendant National Beef
Packing Company, LLC*

s/ *David P. Graham*
David P. Graham, Reg. No. 0185462
**DYKEMA GOSSETT, PLLC**
4000 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402
Tel: (612) 486-1521
dgraham@dykema.com

Jon B. Jacobs (*pro hac vice*)
Jeremy C. Keeney (*pro hac vice*)
**PERKINS COIE LLP**
700 13th Street, NW, Suite 800
Washington, DC 20005
Tel: (202) 654-1758
jbjacobs@perkinscoie.com
jkeeney@perkinscoie.com

Susan E. Foster (*pro hac vice*)
Ulrike B. Connelly (*pro hac vice*)
Tiffany L. Lee (*pro hac vice*)
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Tel: (206) 359-8846
sfoster@perkinscoie.com
uconnelly@perkinscoie.com
tiffanylee@perkinscoie.com

*Counsel for Defendants Tyson Foods, Inc.*
*and Tyson Fresh Meats, Inc.*